## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| NETCHOICE,<br><br>*Plaintiff*,<br><br>v.<br><br>LIZ MURRILL, in her official capacity as Attorney General of Louisiana;<br>MIKE DUPREE, in his official capacity as Director of the Public Protection Division, Louisiana Department of Justice,<br><br>*Defendants*. | Civil Action No. 3:25 -cv-00231 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NetChoice brings this civil action against Defendants for declaratory and injunctive relief and alleges as follows:

## INTRODUCTION

1.    Louisiana is attempting to unconstitutionally restrict minors' access to protected online speech—impairing adults' access along the way. Louisiana Senate Bill 162's (the "Act") restrictions violate bedrock principles of constitutional law and precedent from across the nation. *See* Ex. 1 (text of Act). As the U.S. Supreme Court has repeatedly held, minors "are entitled to a significant measure of First Amendment protection." *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up; quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). "[T]he State" lacks "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3 (emphasis in original). And the government may not impede or chill adults' access to protected speech in its effort to regulate what it deems acceptable for minors. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997). These principles apply with equal force online: Governments cannot "regulate ['social media'] free of

the First Amendment's restraints." *Moody v. NetChoice, LLC*, 603 U.S. 707, 726-27 (2024) (citation omitted).

2.     That is why courts nationwide have enjoined similar state laws restricting minors' access to online speech. *NetChoice, LLC v. Bonta*, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025) (enjoining broad regulation of online services, including age-estimation requirements); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) ("*CCIA*") (enjoining law requiring filtering and monitoring of certain content-based categories of speech on minors' accounts); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024) (enjoining age-assurance and parental-consent law); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753 (S.D. Miss. 2024) (enjoining age-verification and parental-consent law); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024) (enjoining parental-consent law); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) (enjoining age-verification and parental-consent law).

3.     This Court should join those courts and similarly enjoin Defendants' enforcement of this Act against NetChoice's members.

4.     The websites regulated by the Act allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all "protected by the First Amendment" from government interference. *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017)).[1] The Act would fundamentally change all of that. It would place multiple restrictions on minors' and adults' abilities to access covered websites and, in some cases, block access altogether. Further, the Act actually encourages companies to "not permit minors to use the[ir]" websites by exempting from regulation websites that bar minors'

---

[1] This Complaint refers to all "interactive computer service[s]," "internet-based service[s,] or application[s]," § 1751(11), (12)(a), as "websites." Unless otherwise noted, statutory citations in this Complaint refer to Title 51 of the Louisiana Revised Code.

access. § 1751(b)(ii). Even for those minors who can access the websites, the Act would directly regulate the speech that companies can disseminate.

5.    Accordingly, the Act—in whole and in part—is unlawful for multiple reasons.

6.    *First*, the Act's requirement that covered websites verify the ages of *all* Louisiana account holders, § 1752(A), violates the First Amendment. *Fitch*, 738 F. Supp. 3d at 773-74 (enjoining age-verification requirement); *Griffin*, 2023 WL 5660155, at *17, 21 (same); *see Bonta*, 2025 WL 807961, at *21-22 (enjoining age-estimation requirement); *Reyes*, 748 F. Supp. 3d at 1129 n.169 (enjoining age-assurance requirement). All individuals, minors and adults alike, must be age-verified, which may include handing over personal information or identification that many are unwilling or unable to provide as a precondition to accessing and engaging in protected speech. Such requirements burden and infringe access to protected speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 673; *Reno*, 521 U.S. at 882.

7.    *Second*, the Act's requirement that minors must obtain parental consent as a prerequisite to creating accounts (and thus to access and engage in protected speech) on covered websites, § 1752(B), violates the First Amendment. *See Fitch*, F. Supp. 3d at 774 (enjoining parental-consent requirement to access protected speech); *Yost*, 716 F. Supp. 3d at 559 (same); *Griffin*, 2023 WL 5660155, at *21 (same); *see also Reyes*, 748 F. Supp. 3d at 1126 & n.135 (enjoining parental-consent requirement for minors to speak to certain audiences). The Supreme Court has held that governments may not require minors to secure "*their parents' prior consent*" before accessing protected speech. *Brown*, 564 U.S. at 795 n.3 (emphasis in original).

8.    *Third*, the Act's restrictions on advertisements displayed to minors both violate the First Amendment and are preempted by 47 U.S.C. § 230. These restrictions affect websites' right to disseminate advertisements, individuals' right to speak, and minors' right to view

3

advertisements. *E.g.*, *Students Engaged in Advancing Tex. v. Paxton*, 2025 WL 455463, at *13-14 (W.D. Tex. Feb. 7, 2025) ("*SEAT*"). The restrictions are broad and undefined, potentially covering contextual ads—including ads for things like higher-education opportunities, military service, and test preparation. The Act could go so far as to prohibit user-generated promotional content about activities like babysitting services, music lessons, or sports clinics. Moreover, Congress expressly preempted state laws restricting websites' decisions to publish (or not to publish) advertisements and any requirement to monitor for such content. 47 U.S.C. § 230(c)(1), (e)(3).

9.      Because these provisions burden members' ability to disseminate and users' ability to access and engage in protected speech, they independently trigger heightened scrutiny. Moreover, they all trigger heightened scrutiny because they depend on the Act's content-based central coverage definition of "[s]ocial media company." § 1751(11); *see Reyes*, 748 F. Supp. 3d 1120-23 (holding that law's central coverage definition was facially content-based); *Fitch*, 738 F. Supp. 3d at 770-71 (similar); *Yost*, 716 F. Supp. 3d at 557-58 (similar). None of the Act's provisions can satisfy the demanding requirements of strict scrutiny, or for that matter any level of heightened scrutiny, as they are not appropriately tailored to any substantial or compelling interest.

10.      Finally, the Act's central "[s]ocial media company" definition, § 1751(11), is also unconstitutionally vague, leaving many websites across the internet uncertain about whether they must shoulder the Act's burdens.

11.      For these reasons and more, this Court should enjoin Defendants from enforcing the Act against Plaintiff's members and declare the Act unlawful.

## PARTIES & STANDING

12.    Plaintiff NetChoice is a District of Columbia nonprofit trade association for internet companies.[2] NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the internet, while minimizing burdens that could prevent businesses from making the internet more accessible and useful.

13.    NetChoice has standing to bring its challenges on at least two grounds.

14.    First, NetChoice has associational standing to challenge the Act, because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021); *Reyes*, 748 F. Supp. 3d at 1118-19; *CCIA*, 747 F. Supp. 3d at 1025-26; *Fitch*, 738 F. Supp. 3d at 766-68; *Yost*, 716 F. Supp. 3d at 548-50; *Griffin*, 2023 WL 5660155, at *9.

15.    Based on the Act's definitions, § 1751, the Act regulates, at a minimum, the following NetChoice members: (1) Meta, which owns and operates Facebook and Instagram; (2) Nextdoor; (3) Pinterest; (4) Snap Inc., which owns and operates Snapchat; (5) Reddit; (6) X; and (7) YouTube. Although the Act does not regulate all of Plaintiff's members, this Complaint refers to members with services that the Act regulates as "members."

16.    Defendants have already identified multiple NetChoice members as covered by the Act and at risk of enforcement, by sending those members a letter stating they are not in compliance with the Act. At a minimum, members Pinterest, Reddit, Snapchat, and X all received such letters. Defendants later withdrew those letters as premature.

---

[2] NetChoice's members are listed at NetChoice, About Us, https://perma.cc/LCD2-62CQ.

17.    Second, NetChoice has standing to assert the First Amendment rights of members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *CCIA*, 747 F. Supp. 3d at 1126; *Fitch*, 738 F. Supp. 3d at 768; *Yost*, 716 F. Supp. 3d at 550-51.[3]

18.    Defendant Liz Murrill is the Louisiana Attorney General. Defendant Mike Dupree is the Director of the Public Protection Division of the Louisiana Department of Justice—which is "headed by the attorney general." La. Const. art. IV, § 8. Both are Louisiana residents and are sued in their official capacities. The Act provides that the Division has "exclusive authority to administer and enforce" the Act's requirements. § 1756(A); *see* § 1751(2)-(3).

19.    The fact that Defendants have already identified some NetChoice members for enforcement demonstrates that Defendants pose a "credible threat of enforc[ing]" the Act against NetChoice's members. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).

## JURISDICTION & VENUE

20.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

21.    This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Louisiana. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in, and the events giving rise to this civil action occurred in, Louisiana.

---

[3] This Complaint uses the terms "minor," "adult," "account holder," and "user" to refer only to Louisiana minors, adults, account holders, and users. Likewise, this Complaint generally employs the term "user" to encompass both of what the Act refers to as "user[s]" and "account holder[s]." *See* § 1751(1), (13). Plaintiff and its members reserve the right to argue that their compliance obligations for "users" (under the Act) are different than their compliance obligations for "account holders," and are different from the burdens discussed in this Complaint.

## BACKGROUND

22.    **NetChoice members' covered websites disseminate, facilitate, and promote speech protected by the First Amendment.** Websites such as Plaintiff's members' covered services "engage[] in expression" through their "display" and "compil[ing] and curat[ing]" of protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 603 U.S. at 716, 728, 742. They "allow[] users"—both minors and adults—"to gain access to information[,] communicate with one another," and "engage in a wide array of protected First Amendment activity." *Packingham*, 582 U.S. at 105, 107.

23.    Minors—like adults—use NetChoice members' websites to engage in speech protected by the First Amendment from governmental interference. On these websites, minors can "take positions on and engage with others in pursuit of the type of 'political, social, economic, educational, religious, and cultural' activities" protected by the First Amendment. *Fitch*, 738 F. Supp. 3d at 772 (citation omitted); *see Yost*, 716 F. Supp. 3d at 552; *Griffin*, 2023 WL 5660155, at *5-6. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for causes they care about, showcase their art or athletic talent, and hear from their local government officials. Goodreads allows users to discuss their current favorite books and find new ones. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows its users to explore recipes, home decor, and more. On Reddit, users have access to hundreds of thousands of communities, endless conversation, and authentic human connection—with user-created and led communities on all manner of subjects. Snapchat enables users to have digital conversations with friends and family in ways that replicate real-life interactions. On X, "users can petition their elected

representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

24.    All of these websites allow their users to create accounts and communicate with other users through posts. § 1751(10).

25.    Like many other websites, many NetChoice members require users to create an account before they can access some or all of the protected speech—and speech-facilitating functions—available on their websites.

26.    **Existing options for parental control and oversight.** Parents have many existing choices to regulate whether and how their minor children use the internet. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Reyes*, 748 F. Supp. 3d at 1126 n.138; *Fitch*, 738 F. Supp. 3d at 774; *Griffin*, 2023 WL 5660155, at *6-8.

27.    There are resources that collect all of these parental tools in one place. *E.g.*, Internet Matters, Parental Control Guides, https://perma.cc/E8Z6-USL6.

28.    Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the internet.

29.    Cellular and broadband internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Family, https://perma.cc/77VY-RZLN; AT&T, AT&T Secure Family, https://perma.cc/M6U7-NJAN; T-Mobile, Family Controls and Privacy, https://perma.cc/H7BL-PNW6; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/TZF5-YV64.

30.    Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox,

https://perma.cc/HXL5-S3JA. For example, some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/JWQ9-U2B3; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/B5FR-GX8P. Parents can also use widely available third-party browser extensions to reinforce these tools. *E.g.*, Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://perma.cc/EUB5-4JCP.

31.    Wireless routers often have settings allowing parents to block particular websites, filter content, monitor internet usage, and control time spent on the internet. *See, e.g.*, Netgear, Smart Parental Controls, https://perma.cc/LQC4-FXE2; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/SB5R-JXXD.

32.    Device manufacturers allow parents to limit the time their children spend on the device, curtail the applications that can be used, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone or iPad, https://perma.cc/CNR7-GLZC; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/MSF9-SBCS; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/N6SH-BHFT; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/9YNH-9VGX.

33.    Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested By Our Editors*, CNN underscored (Jan. 2, 2025), https://perma.cc/N6XA-8NH6.

34.    In addition, many NetChoice members provide parents with tools and options to help monitor their minor children's activities. Facebook offers supervision tools that parents and guardians can use to help support their teens. When supervision is set up on Facebook, a parent can see how much time their teen has spent on the Facebook app each day for the last week and

their average daily time spent for the week; set scheduled breaks for their teen; see their teen's Facebook friends; see some of their teen's privacy settings and content preferences; and see the people and Pages their teen has blocked. *See, e.g.*, Meta, Supervision on Facebook, https://perma.cc/CW2G-CPP7. Similarly, Snapchat's "Family Center" allows parents to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report abuse. *See* Snapchat Support, What is Family Center, https://perma.cc/JCK2-TD2E. Instagram currently offers supervision features for teens under 18 that allow parents and guardians to set time limits; set reminders to close the app; see the average amount of time their teen has spent on Instagram; see which accounts their teen is following and which accounts are following their teen, which accounts their teen is currently blocking, and their teen's account privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help Center, About Supervision on Instagram, https://perma.cc/34GX-73ZL. Instagram announced that minors under 18 will automatically be placed into "Instagram Teen Accounts" which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/QS88-4U2G. Minors under 16 will need a parent's permission to change any of these Instagram Teen Accounts settings to less strict settings. *Id.* Via Teen Accounts, parents will have added supervision features, including ways to get insights into who their minors are chatting with and seeing topics their minor is looking at. *Id.* YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and

subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, More Choices for Kids, Tweens, and Teens from YouTube, https://perma.cc/Q4UL-QL5M.

35.    All NetChoice members prohibit minors under 13 from accessing their main services, although some offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://perma.cc/R79L-K4TG; YouTube Help, What Is a Pre-Teen Supervised Experience on YouTube, https://perma.cc/3CS7-8BQD. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

36.    **Advertising on covered websites.** Most members offer free-to-use websites because the websites generate revenue from advertising. Advertising ensures that many online services—and their protected expression—are available to all, regardless of socioeconomic status.

37.    Contextual ads aim to show ads of interest to particular users, and rely on contextual information gained from sources such as a webpage's content, a user's views, or recent browsing history (including search queries).

38.    Contextual ads generally command a premium price relative to ads that draw on no data, allowing websites to generate higher revenue from fewer advertisements. Without these ads, many NetChoice members would have no choice but to either charge subscription fees to users, increase the volume of ads, or both. Subscription fees, in particular, restrict less-affluent users' ability to access information and exacerbate the digital divide.

39.    **Covered websites' dedication to beneficial user experiences and user security.** NetChoice's members expend vast resources to improve their services and curate the content

on their websites to best ensure that it is appropriate for users, especially with respect to minors. They restrict the publication of content they consider harmful, like violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. *See, e.g.*, *Moody*, 603 U.S. at 735-36 (discussing policies about "hate speech, violent or graphic content, child safety"). Conversely, many covered websites promote positive and age-appropriate content, such as content that encourages a healthy self-image.

## LOUISIANA SENATE BILL 162

40.    The Louisiana Legislature enacted Senate Bill 162, which places multiple content-based restrictions on certain websites and their users—including parental-consent and age-verification requirements and restrictions on advertising on minors' accounts.

41.    The Act takes effect on July 1, 2025.

42.    The Act was originally slated to take effect July 1, 2024, but the Louisiana Legislature extended that effective date in Louisiana House Bill 577 (2024) ("HB577"). This lawsuit challenges the provisions of Louisiana law that were originally enacted in SB162 and then amended and re-enacted in HB577.

43.    **Content- and speaker-based central coverage definition of "social media company." § 1751(11).** The Act's arbitrary size threshold and highly reticulated set of definitions and content-based and speaker-based exclusions mean that the Act regulates a targeted set of internet websites under its "social media company" definition. The Act regulates only "social media compan[ies]" providing "social media platform[s]." § 1751(11)-(12). These covered "actors" and "activities," *Moody*, 603 U.S. at 724, include the members and services identified above in ¶ 15.

44.    The Act defines "[s]ocial media company" as "a person or entity that provides a social media platform that has at least five million account holders worldwide and is an interactive computer service." § 1751(11); *see* § 1751(5) (defining "[i]nteractive computer service").

45.     A "social media platform" means "a public or semipublic internet-based service or application that has users in Louisiana and that meets all of the following" criteria, including whether they "allow users to interact socially"—a content-based criterion:

> (i) The service or application connects users in order to allow users to interact socially with each other within the service or application. . . .
> (ii) The service or application allows users to . . .
>> (aa) Construct a public or semipublic profile for purposes of signing into and using the service or application.
>> (bb) Populate a list of other users with whom an individual shares a social or virtual connection within the system, including subscribing to content related to another user.
>> (cc) Create or post content viewable by other users, including but not limited to, on message boards, in chat rooms, on video channels, or through a landing page or main feed that presents the user with content generated by other users.

§ 1751(12)(a).[4] *Moody* applied full First Amendment protection to websites that work in exactly this way—that "allow users to upload content . . . to share with others" and allow those "viewing the content . . . [to] react to it, comment on it, or share it themselves." 603 U.S. at 719.

46.     However, the Act excludes websites that, "pursuant to [their] terms of use, do[] not permit minors to use the platform and utilize[] commercially reasonable age assurance mechanisms to attempt to prohibit minors from becoming an account holder or user." § 1751(12)(b)(ii). The Act defines a "[m]inor" as "an individual under circumstances where a social media company reasonably believes or has actual knowledge that the individual is under the age of sixteen and is not emancipated or married." § 1751(9).

47.     In other words, the Act encourages websites to bar such minors altogether: If a website wants to be excluded from the Act's coverage and requirements, it must block minors from

---

[4] The Act provides that "[a] service or application that provides email or direct messaging services, enterprise cloud storage services, enterprise cybersecurity services, educational devices, or enterprise collaboration tools for K-12 schools shall not be considered to meet this criterion on the basis of that function alone." § 1751(12)(a)(i).

becoming account holders and, critically, prevent minor users from even viewing or accessing any

content on the website. *See* § 1751(13) (defining "[u]ser" as "a person who has access to view all

or some of the posts on a social media platform but is not an account holder").

48.     The Act's definition of "social media platform" also contains a litany of con-

tent-based exceptions, because it excludes "an online service, website, or application where the

predominant or exclusive function is":

(i) Electronic mail.
. . .
(iii) A streaming service that provides only licensed media in a continuous flow . . . and
does not obtain a license to the media from a user or account holder by agreement to its
terms of service.
(iv) *News, sports, entertainment*, or other content that is preselected by the provider and
not user generated, and any chat, comment, or interactive functionality that is provided
incidental to, directly related to, or dependent upon provisions of the content.
(v) *Online shopping* or electronic commerce . . . .
(vi) *Interactive gaming*, virtual gaming, or an online service that allows the creation and
uploading of content and the communication related to that content . . . .
(vii) Photograph editing that has an associated photograph hosting service if the interaction
with other users or account holders is generally limited to liking or commenting.
(viii) Single purpose community *groups for public safety* . . . .
(ix) Career development opportunities, including professional networking, job skills, learn-
ing certifications, and job posting and application services.
(x) Business-to-business software.
(xi) A teleconferencing or videoconferencing service . . . .
(xii) Cloud storage.
(xiii) Shared document collaboration.
(xiv) Cloud computing services . . . .
(xv) Providing access to or interacting with data visualization platforms, libraries, or hubs.
(xvi) Permitting comments on a digital news website if the news content is posted by only
the provider of the digital news website.
(xvii) Providing or obtaining technical support for a platform, product, or service.
(xviii) Academic, scholarly, or genealogical research.
(xix) Internet access and broadband service.
(xx) A classified advertising service in which the provider of the online service, website,
or application is limited to all of the following: (aa) Permitting only the sale of goods. (bb)
Prohibiting the solicitation of personal service. (cc) Posting or creating a substantial
amount of the content. (dd) Providing the ability to chat, comment, or interact with other
users only if it is directly related to the provider's content.
(xxi) An online, service, website, or application that is used by or under the direction of an
educational entity, . . . where the majority of the content is created or posted by the provider

of the online service, website, or application and the ability to chat, comment, or interact with other users is directly related to the provider's content.

§ 1751(12)(b) (emphases added; paragraph breaks adjusted); *see Griffin*, 2023 WL 5660155, at *2-3 (summarizing similar exemptions in a similar law).

49.    Accordingly, the Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply when assessing the First Amendment implications of distinct *compelled*-speech laws that may also regulate non-social media services. *See Moody*, 603 U.S. at 724-25 (discussing email, online marketplace, ride-sharing, and peer-to-peer payment services). The Act's exclusion of "[e]lectronic mail," § 1751(12)(b)(i), excludes "email," *Moody*, 603 U.S. at 725. The Act's exclusion of "[o]nline shopping," § 1751(12)(b)(v), excludes "online marketplace[s] like Etsy," *Moody*, 603 U.S. at 725. The Act's exclusion of "electronic commerce," § 1751(12)(b)(v), excludes "payment service[s] like Venmo," *Moody*, 603 U.S. at 725. The Act's exclusion of websites where the "content . . . is preselected by the provider and not user generated," § 1751(12)(b)(iv), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725. And the Act excludes websites that provide "direct messaging services . . . alone." § 1751(12)(a)(i); *see Moody*, 603 U.S. at 724 ("direct messaging").

50.    Nothing in the Act defines key coverage terms, such as "interact socially," "predominant or exclusive function," or "incidental to." § 1751(12)(a)(1), (b)(iv).

51.    **Age-verification. § 1752(A).** The Act requires covered websites to "make commercially reasonable efforts to verify the age of Louisiana account holders with a level of certainty appropriate to the risks that arise from the information management practices of the social media company." § 1752(A). Otherwise, the Act states that covered websites can "apply the accommodation afforded to minors pursuant to this Chapter to all account holders." *Id.*

52.     These provisions of the Act mean that covered websites must take one of two actions. In either case, the Act requires covered websites to restrict the protected speech rights of their minor *and* adult users.

53.     First, covered websites can verify everyone's age. But many people may not—or cannot—provide proof of age to gain access to the covered websites. That will deter people (both minors and adults) from accessing covered websites, thereby chilling their protected speech. And it will chill, or outright prohibit, the dissemination of speech to those users.

54.     Second, covered websites can alternatively treat all account holders on the website as the Act requires minors to be treated. At a minimum, that requires applying the Act's restrictions on advertising discussed below at ¶¶ 61-63, and direct messaging to both minor *and* adult account holders. *See* § 1753(1) ("[Covered websites] shall prohibit . . . [a]dults from direct messaging [minors] unless the minor is already connected to the adult on the service.").

55.     The "commercially reasonable" requirement does not alter which websites the Act covers. Nor does it alleviate the unconstitutional burdens. Rather, it creates uncertainty for covered websites and fails to serve any purported governmental interests.

56.     **Parental consent. § 1752(B).** The Act provides that a "social media company shall not permit a Louisiana resident who is a minor to be an account holder on the social media company's social media platform unless the minor has the express consent of a parent or guardian." § 1752(B). Thus, the Act requires covered websites to obtain express parental consent as a precondition to access protected speech on covered websites.

57.     The Act includes a non-exhaustive list of "[a]cceptable methods of obtaining express consent," including:

(1) Providing a form for the minor's parent or guardian to sign and return to the digital service provider by common carrier, facsimile, or electronic scan.

(2) Providing a toll-free telephone number for the minor's parent or guardian to call to consent.

(3) Coordinating a call with a minor's parent or guardian over video conferencing technology.

(4) Collecting information related to the government-issued identification of the minor's parent or guardian and deleting that information after confirming the identity of the minor's parent or guardian.

(5) Allowing the minor's parent or guardian to provide consent by responding to an email and taking additional steps to verify the identity of the minor's parent or guardian.

(6) Any other commercially reasonable method of obtaining consent in light of available technology.

§ 1752(B).

58.      For minors that have parental consent, the Act requires covered websites to provide parents with supervision tools. § 1754.

59.      The Act does not account for the difficulty in verifying a parent-child relationship. *See Griffin*, 2023 WL 5660155, at *4 ("[T]he biggest challenge . . . with parental consent is actually establishing . . . the parental relationship."); *see Fitch*, 738 F. Supp. 3d at 775. These difficulties are compounded when, *e.g.*, families are nontraditional (such as foster families), families have differences in last name or address, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated.

60.      The "commercially reasonable" requirement does not alter which websites the Act covers. Nor does it alleviate the unconstitutional burdens. Rather, it creates uncertainty for covered websites and fails to serve any purported governmental interests.

61.      **The Act's restrictions on advertising. § 1753(2).** The Act also restricts advertisements on minors' accounts: "For a Louisiana minor account holder, a social media company shall prohibit . . . [t]he display of any advertising in the account based on the Louisiana minor account holder's personal information, except age and location." § 1753(2).

62. Because the Act does not define "personal information," the restriction on advertising could apply to contextual advertising. That conclusion is bolstered by the fact that "[t]argeted advertising" is separately regulated by another provision of Louisiana law enacted in HB577 (which NetChoice does *not* challenge here). *See* § 1762(A)(10)(a), (B)(1) (prohibiting "displaying an advertisement to an account holder where the advertisement is selected based on personal data obtained from the account holder's activities over time and across nonaffiliated websites or online applications to predict the account holder's preferences or interests"). Louisiana courts interpret statutes to avoid rendering provisions surplusage. *In re State*, 148 So. 3d 968, 974 (La. Ct. App. 2014) ("Courts should give effect to all parts of a statute and should not adopt a statutory construction that makes any part superfluous or meaningless, if that result can be avoided."), *rev'd on other grounds* 156 So. 3d 648 (La. 2015).

63. Moreover, the Act's failure to define "advertising" could extend the Act's reach to user-generated promotional content, such as teenagers "advertising" their own services (*e.g.*, babysitting or lawnmowing) to their neighbors.

64. **Information collection and use. § 1753(3).** The Act also imposes an undefined restriction on the "collection or use of personal information from . . . activities of the account other than information beyond what is adequate, relevant, and reasonably necessary in relation to the purposes for which such information is collected, as disclosed." § 1753(3).

65. **The Act's enforcement provisions. § 1756.** The Director of the Public Protection Division "may impose an administrative fine of up to two thousand five hundred dollars for each violation" of the Act. § 1756(B). The Director may also bring an action in court to enforce the Act, and the court may "[i]mpose a civil penalty of up to two thousand five hundred dollars for each violation," in addition to other relief, including "damages to the aggrieved person" and costs and

fees. § 1756(B)-(C), (D)(4). Covered websites that violate any "administrative order or court order issued for a violation" are "subject to a civil penalty of not more than five thousand dollars for each violation." § 1756(D)(5).

66.    Although the Act allows websites to "cure[]" first-time violations of a particular provision after receiving notice of the violation, that is of limited utility and potentially illusory because it can be construed as essentially a single-use defense. No such defense potentially exists if the website "[c]ommits another violation of the same provision"—even if the later violation is different in kind. § 1756(D)(3)(b). Thus, depending on how it is construed, this ability to "cure" may provide covered websites with little protection from liability.

## CLAIMS

67.    Plaintiff raises both (1) a facial challenge to the Act's provisions challenged in this lawsuit; and (2) a challenge to these provisions as applied to the members and services identified in ¶ 15.

68.    For all First Amendment claims, the facial challenge standard asks whether "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). At a minimum, the Act is invalid to the extent it regulates "social media" websites, including as applied to Plaintiffs' members' regulated services identified in ¶ 15. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

69.    The First Amendment facial challenge here is straightforward "from the face of the law": All aspects of the Act's speech-restricting provisions, "in every application to a covered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about 'hypothetical' or 'imaginary' cases.'" *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)); *CCIA*,

19

2024 WL 4051786, at *15 (facial challenge proper because state law "raises the same First Amend-ment issues in every application to a covered business" (quoting *Bonta*, 113 F.4th at 1116 (affirm-ing preliminary injunction of law requiring websites to issue reports opining on potential harms to minors); (internal quotation marks omitted))); *Reyes*, 748 F. Supp. 3d at 1121 n.92 (noting that First Amendment facial challenge "questions are easily answered" where "[t]here is no dispute about who and what the Act regulates" or "how the First Amendment applies to *different* websites or regulatory requirements" (internal citation omitted)).

70.     Similarly, for Plaintiff's First and Fourteenth Amendment vagueness claims, "void-for-vagueness challenges are successfully made when laws have the capacity 'to chill constitution-ally protected conduct, especially conduct protected by the First Amendment.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (citation omitted) (collecting cases); *see Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). Here, a facial vagueness challenge is proper because "there is no reason to believe one social media company is better suited than another to understand [the Act's] vague terms." *CCIA*, 2024 WL 4051786, at *9.

71.     Each First and Fourteenth Amendment challenge raises the rights of both NetChoice members and those who use or could prospectively use NetChoice members' websites.

## COUNT I
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT (ALL SPEECH REGULATIONS RELYING ON CENTRAL COVERAGE DEFINITION – § 1751(11)-(12))

72.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

73.     As incorporated against the States by the Fourteenth Amendment, the First Amend-ment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. The First Amendment

protects "publish[ing]," *Reno*, 521 U.S. at 853; "disseminat[ing]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023); and "creating, distributing, [and] consuming" protected speech, *Brown*, 564 U.S. at 792 n.1. And those rights apply to "social-media platforms." *Moody*, 603 U.S. at 719. The "speech social media companies engage in when they make decisions about how to construct and operate their platforms . . . is protected speech" under the First Amendment. *Reyes*, 748 F. Supp. 3d at 1120.

74.    "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

75.    The State cannot demonstrate that the Act's restrictions and burdens on speech satisfy any form of heightened First Amendment scrutiny because the Act's central coverage definition is unconstitutionally content-based.

76.    "[W]here a statute's gateway coverage definition divides the universe into covered and uncovered business based on the type of content they publish, those statutes are content-based and subject to strict scrutiny. . . . All of the Act's Regulatory Provisions, not just those that directly regulate expression, impose burdens on covered businesses based on the expressive content they provide." *Bonta*, 2025 WL 807961, at *11, *13.

77.    The "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (citation omitted). The State lacks a sufficient governmental interest supporting the Act. Regardless, the Act is not properly tailored to satisfy any form of First Amendment scrutiny.

78.    **The Act triggers strict scrutiny.** The Act triggers strict scrutiny because its provisions defining which "social media compan[ies]" are covered, § 1751(11)-(12), are content-based.

79.     The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (citation omitted). Government cannot use "subtler forms of discrimination that achieve identical results based on function or purpose." *Id.* at 74 (citation omitted). "Content-based laws . . . are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted).

80.     The Act's central coverage definition is content-based because it draws lines based on the subject of the speech on a particular website. For instance, the Act *includes* websites based on whether they "allow users to interact socially." § 1751(12)(a)(i).

81.     Likewise, the Act *excludes* a host of websites based on the subject matter presented on the particular website, including websites where the "predominant or exclusive function" is: "streaming service[s]," "[n]ews, sports, entertainment," "online shopping," "[i]nteractive gaming, virtual gaming," "[p]hotograph editing" and "associated photograph hosting," "[s]ingle purpose community groups for public safety" (but only "if the interaction with other users or account holders is limited to that single purpose"), "[c]areer development opportunities, including professional networking," "data visualization," "digital news," "technical support," "[a]cademic, scholarly, or genealogical research," "classified advertising service," and websites "used by or under the direction of an educational entity." § 1751(12)(b). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see also Sorrell*, 564 U.S. at 564 (content-based

exceptions render law content-based); *Reyes*, 748 F. Supp. 3d at 1122; *Fitch*, 738 F. Supp. 3d at 770-71; *Yost*, 716 F. Supp. 3d at 557-58.

82.    The Act's central coverage definition is also content-based because it exempts web-sites with other "predominant or exclusive function[s]," § 1751(12)(b). This reference to "func-tion" is a proxy for other content-based restrictions. But governments cannot "swap[] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *Reagan*, 596 U.S. at 74. The Act violates this precept because it exempts internet websites that allow people to "interact" regarding some content (*e.g.*, sports or gaming) while restricting websites that allow people to "interact" regarding other content (*e.g.*, politics or religion). § 1751(12)(b).

83.    At a minimum, the Act triggers heightened First Amendment scrutiny because the Act's central coverage definition is also speaker-based. The Act discriminates based on who is disseminating speech—regulating covered websites but not others like those whose "predominant or exclusive function" is "[n]ews, sports, [or] entertainment," even if those websites have similar content.

84.    "[L]aws that single out the press, or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (cleaned up). The First Amendment limits state power to enforce "restrictions distinguish-ing among different speakers, allowing speech by some but not others." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

85.    The Act's central coverage definition is speaker-based because it does not apply to websites with fewer than "five million account holders worldwide." § 1751(11). The Act regulates large websites (*e.g.*, X) while ignoring identical expression on similar, smaller websites. *See, e.g.*,

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting law that "target[ed] a small group of newspapers").

86.    The Act's central coverage definition is speaker-based because it singles out for favorable treatment websites that include "content that is preselected" and "generated" by the website and "not" the user, § 1751(12)(b)(iv), while burdening similar websites that disseminate user-generated content, § 1751(12)(a)(ii)(cc), even if those websites also post or create their own content (as many websites do).

87.    The Act is also speaker-based because it burdens minors more than adults. While the Act's provisions burden both minors' and adults' access to speech, minors face the prospect of being entirely barred from access to covered websites without parental consent, and even if they obtain such consent, the speech they can access is more limited than what adults can access.

88.    Because the Act's central coverage definition is both content-based and speaker-based, so too is each provision of the Act restricting speech that relies on this definition. *See Reyes*, 748 F. Supp. 3d at 1120 (finding "persuasive" the argument that "the entire Act facially violates the First Amendment because the Act's operative [speech-restricting] provisions each rely on the Central Coverage Definition").

89.    The Act's age-verification requirement, § 1752(A), regulates and burdens speech by requiring adults and minors to provide personal information to access protected speech.

90.    The Act's parental-consent requirement, § 1752(B), regulates and burdens speech by requiring minors to obtain parental consent to access protected speech.

91.    The Act's advertising restrictions, § 1753(2), regulate and burden speech by restricting the dissemination of advertisements and requiring covered websites to monitor for advertisements in user-created content.

92.    The Act's direct-messaging provisions, § 1753(1), restrictions on information collection and use, § 1753(3), and parental-tool provisions, § 1754, regulate speech by imposing legal duties on covered websites for disseminating speech of a certain type of content.

93.    Therefore, because each of these provisions of the Act is a "[g]overnment regulation of speech," *Reed*, 576 U.S. at 163, and relies on the Act's content-based and speaker-based central coverage definition, each provision triggers strict scrutiny (or, at a minimum, heightened First Amendment scrutiny).

94.    **The entire Act fails strict scrutiny.** The Act cannot satisfy any form of heightened First Amendment scrutiny.

95.    Under strict scrutiny, the State must demonstrate that the Act is "the least restrictive means of achieving a compelling state interest." *AFP*, 594 U.S. at 607 (citation omitted).

96.    The Act does not serve any compelling governmental interest.

97.    Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (cleaned up).

98.    Under the First Amendment, Defendants have the burden to "specifically identify" how the Act addresses an "actual problem' in need of solving." *Id.* at 799 (citation omitted). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* Here, Defendants must demonstrate that there is a problem in need of *governmental* solution, as compared to private, family solutions, and that any such governmental solution is the governmental solution with the least possible restrictive effect on speech. Defendants cannot carry either burden. Parents have a wealth of choices to help oversee their minor children online, and those choices provide families more flexibility than the State's one-size-fits-all mandate. The Supreme

Court has repeatedly endorsed similar parental controls over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

99.    The State has not "specifically identif[ied]" how the Act's scope responds to "an actual problem in need of solving" by government mandate. *Brown*, 564 U.S. at 799 (cleaned up). Nor has it demonstrated why the Legislature ignored the viable alternatives available to parents. *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 748 F. Supp. 3d at 1126.

100.    The Act is not properly or narrowly tailored to any articulated interest. It "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Reyes*, 748 F. Supp. 3d at 1126 n.170 (citation omitted); *see Fitch*, 738 F. Supp. 3d at 773-76 (similar); *Yost*, 716 F. Supp. 3d at 559-60 (similar).

101.    The Act's central coverage definition gives the entire Act an arbitrary scope. For example, identical content is treated differently based on whether it appears on a "news" website versus a covered website. § 1751(12)(b)(iv). So too for content on a website with fewer than "five million account holders worldwide" versus a covered website that has more account holders. § 1751(11).

102.    The Act is also overinclusive because it regulates all manner of protected speech, including political and religious speech that lies at the very heart of the First Amendment.

103.    The Act's one-size-fits-all approach of treating all minors at every development stage—from websites' youngest users to sixteen-year-olds—alike is also vastly overbroad. *See Reno*, 521 U.S. at 866; *Am. Booksellers Ass'n*, 484 U.S. at 394-96.

104.    The Act is also underinclusive, because it includes myriad exemptions, some of which result in allowing access to the exact same speech on a smaller or different website. For instance, there is no reason to treat identical content—and people's access to that content—

differently based on whether it appears on a website with 5 million accounts versus 4.9 million accounts. Yet the Act does just that. Moreover, the Act permits a 15-year-old to read content on the New York Times' website that it cannot read on Facebook without parental consent; she can watch sports videos on ESPN but cannot share her own softball recruiting highlight videos on Instagram without parental consent; and she can listen to a Taylor Swift song on Spotify but cannot listen to that same song on YouTube without parental consent. These exemptions undermine any contention that the State is addressing a "serious social problem." *See Brown*, 564 U.S. at 802; *Griffin*, 2023 WL 5660155, at *19 (holding that state law regulating some websites but exempting "interactive gaming websites and platform[s]" was "not narrowly tailored"). In fact, the Act peculiarly seems to regulate websites that are most likely to offer parental controls and engage in content moderation, *see supra* ¶¶ 26-35, while leaving unregulated many websites that lack such oversight.

105.    All of these flaws would render the Act invalid under intermediate First Amendment scrutiny as well.

106.    Even if the Act were to apply to other websites with user-created content, such as blogs with user comments, the Act would be facially unlawful as those kinds of websites raise the same First Amendment issues and would render the Act even more improperly tailored.

107.    Regardless, the Act is unconstitutional as applied to NetChoice members' services identified in ¶ 15.

108.    The Act's central coverage definition is integral to the entire Act. Without this central definition, no other provision in the Act could operate. Thus, the entire Act is invalid.

109.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members and internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and internet users.

**COUNT II**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(CENTRAL COVERAGE DEFINITION – § 1751(11)-(12))**

110.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

111.    The Act's central coverage definition of "social media company," § 1751(11)-(12), is content-based and unconstitutionally vague, and it violates principles of free speech and due process.

112.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). And a law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment. *Fox*, 567 U.S. at 253-54.

113.    The Act's central coverage definition fails to provide necessary notice. It does not define what it means to exclude websites based on their "predominant or exclusive function." § 1751(12)(b); *see Griffin*, 2023 WL 5660155, at *13 (concluding coverage definition with identical language was unconstitutionally vague). For example, many people use LinkedIn for "[c]areer development opportunities" and "professional networking," § 1751(12)(b)(ix), but many others use it for social interaction. The same is true of Slack, which many people and businesses use for business purposes or "[s]hared document collaboration." § 1751(12)(b)(xiii).

114.    Moreover, the Act excludes certain websites that provide "chat, comment, or interactive functionality that is provided incidental to" certain online services. § 1751(12)(b)(iv). Just like "predominant or exclusive function," "incidental to" is vague. *See Fitch*, 738 F. Supp. 3d at

777-78 (holding that the terms "primarily" and "incidental to" in central coverage definition were "overly indefinite, leaving it open for potential arbitrary and discriminatory enforcement")

115.    Many websites will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2023 WL 5660155, at *13. Therefore, the Act "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements. Such ambiguity renders a law unconstitutional." *Id.*; *see also Fox*, 567 U.S. at 252-53.

116.    Because of this vagueness, the Act's central coverage definition violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

117.    The Act's central coverage definition is integral to the entire Act. Without this central definition, no other provision in the Act could operate. Thus, the entire Act is invalid.

118.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members and internet users of their fundamental First Amendment and Due Process rights and will irreparably harm Plaintiff, its members, and internet users.

## COUNT III
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
## (AGE VERIFICATION – § 1752(A))

119.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

120.    The Act's age-verification requirement, § 1752(A), is unconstitutional and cannot satisfy any form of First Amendment scrutiny.

121.    Governmental demands for people to provide identification or personal information burden and infringe access to protected speech and the ability to engage in protected speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 874.

122.    These principles apply equally to minors, as age-verification to access "social me-dia" websites "obviously burden[] minors' First Amendment Rights." *Griffin*, 2023 WL 5660155, at *17 (discussing *Brown*, 564 U.S. at 794-95).

123.    "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourage[s] users from accessing the regulated sites.'" *Id.* (quoting *Reno*, 521 U.S. at 856); *see Fitch*, 738 F. Supp. 3d at 774 (holding that age-verification requirement "burdens adults' First Amendment rights, and that alone makes it overinclusive"). So too for minors. Those who are not deterred must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Griffin*, 2023 WL 5660155, at *17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3rd Cir. 2008) ("relinquish their anonymity to access protected speech").

124.    The age-verification provision triggers strict scrutiny because it relies on the Act's central coverage definition.

125.    The age-verification provision also independently triggers strict scrutiny.

126.    The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

127.    The age-verification requirement is also not properly tailored.

128.    The Act's alternative to age-verification of "apply[ing] the accommodations af-forded to minors pursuant to" the Act "to all account holders" does not cure the age-verification requirement's unconstitutionality. § 1752(A). It simply presents websites with an alternative way to restrict both minors' and adults' access to protected speech.

129.    The Act's age-verification requirement is integral to the entire Act. Without this provision, no other provision in the Act could operate. The age-verification provision is not severable and thus the entire Act is invalid.

130.    Unless declared invalid and enjoined, the Act's age-verification provision, § 1752(A), will unlawfully deprive Plaintiff's affected members and internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and internet users.

**COUNT IV**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE**
**STATES BY THE FOURTEENTH AMENDMENT**
**(PARENTAL CONSENT– § 1752(B))**

131.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

132.    The Act's parental-consent requirement, § 1752(B), is unconstitutional and cannot satisfy any form of First Amendment scrutiny.

133.    Minors have robust First Amendment rights, and websites that publish and disseminate speech have the right to publish and disseminate speech to minors absent governmental restraint. Although States have power to protect minors, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

134.    The Act requires covered websites and users to secure parental consent before allowing users to create or maintain an account and, therefore, before they can access protected speech. § 1752(B). But the Supreme Court has held that laws requiring parental consent for minors to access or engage in protected speech are unconstitutional. *Brown*, 564 U.S. at 795 & n.3, 804-05.

135.    These First Amendment protections should apply with special force to the covered websites here, which the Supreme Court has repeatedly recognized disseminate and facilitate a broad range of protected and valuable speech. *Moody*, 603 U.S. at 716-17, 726-28, 730-31;

*Packingham*, 582 U.S. at 105. That, in part, is why courts have held that parental-consent require-ments for minors to use "social media" websites violate the First Amendment. *Fitch*, 738 F. Supp. 3d at 775; *Yost*, 716 F. Supp. 3d at 558; *Griffin*, 2023 WL 5660155, at *18.

136.    The parental-consent requirement triggers strict scrutiny because it relies on the Act's central coverage definition.

137.    The parental-consent requirement also independently triggers strict scrutiny. *Yost*, 716 F. Supp. 3d at 558.

138.    The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

139.    The parental-consent requirement is also not properly tailored.

140.    For example, the Act is underinclusive because if the government is concerned about minors accessing social media websites due to particular purported risks or harms of doing so, it makes no sense to allow minors to be exposed to such alleged harms so long as that exposure occurs on websites that have less than five million account holders, or so long as they have a single parent's consent. *See Brown*, 564 U.S. at 802; *Yost*, 716 F. Supp. 3d at 558, 561; *Griffin*, 2023 WL 5660155, at *18.

141.    Unless declared invalid and enjoined, the Act's parental-consent requirement, § 1752(B), will unlawfully deprive Plaintiff's affected members and internet users of their funda-mental First Amendment rights and will irreparably harm Plaintiff, its members, and internet users.

## COUNT V
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
## (ADVERTISING RESTRICTIONS– § 1753(2))

142.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

143.    The Act's restrictions on advertising, § 1753(2), are unconstitutional and cannot survive any form of First Amendment scrutiny.

144.    The "selection of" an "advertisement for inclusion" in a "compilation of speech" "fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995). More generally, the "choice of material to go into a" publication "constitute[s] the exercise of editorial control and judgment" protected by the First Amendment. *Tornillo*, 418 U.S. at 258.

145.    There is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and concurring in the judgment). Thus, restrictions on advertisements should face the same rigorous scrutiny as bans on other speech.

146.    This provision triggers strict scrutiny because it relies on the Act's central coverage definition.

147.    This provision independently triggers and fails strict scrutiny. *See SEAT*, 2025 WL 455463, at *13-14.

148.    Regardless, this provision fails intermediate scrutiny or whatever level of scrutiny may apply under the commercial-speech doctrine.

149.    Louisiana does not have a "free-floating" interest in preventing minors from seeing protected speech. *Brown*, 564 U.S. at 794-95. Advertisements that "accurately inform the public about lawful activity" are protected speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). Assuming for the sake of argument that regulating websites' editorial decisions is subject to only intermediate scrutiny, this provision requires *at least* "a

substantial interest." *Id.* at 564. Yet the Act does not contain any legislative findings of fact (or even a statement of purpose) identifying such an interest.

150.    "[T]here may exist a compelling state interest in promoting teen mental health by limiting teens' exposure to certain advertising, but nowhere does the Court see a specific interest articulated for removing teens' access to targeted advertising of all kinds, much less a compelling one, as is required." *SEAT*, 2025 WL 455463, at *13.

151.    The Act's restrictions on advertising to minors are also not properly tailored.

152.    The State cannot demonstrate what purported problem these restrictions respond to, how they are necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

153.    "The targeted advertising requirements do nothing to distinguish between potentially harmful advertising and advertising that is not harmful, or that could be beneficial, to minors." *Id.*

154.    Contextual ads are common across many websites on the internet that minors visit. The same is true of user-generated promotional content. Thus, the Act's application to just a handful of websites is not properly tailored.

155.    The Act is not limited to advertisements that are inappropriate for minors.

156.    The Act is not limited to the use of particularly sensitive personal information.

157.    To the contrary, the Act would restrict the use of innocuous information about user interests—or even contextual information—to disseminate valuable advertisements to users.

158.    Unless declared invalid and enjoined, the Act's advertising restrictions, § 1753(2), will unlawfully deprive Plaintiff's affected members and internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and internet users.

**COUNT VI**
**42 U.S.C. § 1983**
**FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,**
**42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**
**(ADVERTISING RESTRICTIONS– § 1753(2))**

159.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

160.    Plaintiff may assert federal preemption under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

161.    47 U.S.C. § 230 preempts the Act's restrictions on advertising to minors. § 1753(2).

162.    Covered websites are "interactive computer services" and disseminate "information provided by another information content provider." 47 U.S.C. § 230(c)(1), (f)(2).

163.    Congress enacted Section 230 to provide all websites with protections from liability for the third-party content on their websites: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). To remove any doubt, Section 230 expressly preempts state law to the contrary. *Id.* § 230(e)(3).

164.    In Section 230, Congress granted websites "broad immunity" for "all claims" related to the "publication of information created by third parties." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)).

165.    Advertisements are "information provided by another information content provider." 47 U.S.C. § 230(c)(1).

166.    Section 230 protects websites' decisions to publish third-party advertisements—whether those ads are paid content placements or user-generated content. It would be "inconsistent" with Section 230(c)(1), *id.* § 230(e)(3), to impose liability on websites for "display[ing]" third-party advertisements to minors, § 1753(2); *see, e.g., Calise v. Meta Platforms, Inc.*, 2022 WL 1240860, at *3 (N.D. Cal. Apr. 27, 2022) (dismissing suit under Section 230 where "claims [we]re

premised on . . . publication of the third-party advertisements"). Moreover, Section 230 preempts requirements to proactively "monitor third-party content," including to verify whether that content includes "advertising." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 123 n.11 (D. Mass. 2019) (similar). Section 230 protects "decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role." *Salesforce*, 123 F.4th at 793 (citation omitted). And thus laws that mandate monitoring would unlawfully "treat[]" websites "as the publisher or speaker of . . . information provided by another information content provider." 47 U.S.C. § 230(c)(1).

167.    Unless declared invalid and enjoined, the Act's advertising restrictions, § 1753(2), will unlawfully deprive Plaintiff's members and internet users of their rights and will irreparably harm Plaintiff, its members, and internet users.

## COUNT VII
## EQUITABLE RELIEF

168.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

169.    The Act, §§ 1751-1759, as a whole and individual challenged provisions of the Act violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

170.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

## COUNT VIII
## 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
## DECLARATORY RELIEF

171.   Plaintiff incorporates all prior paragraphs as though fully set forth herein.

172.   The Act violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its covered members, and internet users of enforceable rights. The Act is unlawful and unenforceable because the entire Act relies on an unconstitutional central coverage definition of covered "social media compan[ies]." § 1751(11)-(12).

173.   Sections 1751(11)-(12), 1752(A)-(B), and 1753(2) of the Act are unlawful and un-enforceable, together and separately, because they violate the First Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and internet users of enforceable rights.

174.   Section 1751(11)-(12) of the Act is unlawful and unenforceable because it is un-constitutionally vague in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and internet users of enforceable rights.

175.   Section 1753(2) of the Act is unlawful and unenforceable because it is preempted by federal law.

176.   The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

177.   With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

178.   This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

179.    This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

Plaintiff requests an order and judgment:

a.    declaring that Louisiana Senate Bill 162, §§ 1751-54, is unlawful;

b.    declaring that Louisiana Senate Bill 162, §§ 1751-54, violates the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to NetChoice's regulated members;

c.    declaring that Louisiana Senate Bill 162 is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution;

d.    declaring that the entire Act and §§ 1751(11)-(12), 1752(A)-(B), 1753(2) violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to NetChoice's regulated members;

e.    declaring that the entire Act and § 1751(11)-(12) is void for vagueness in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution.

f.    declaring that § 1753(2) is preempted by federal law;

g.    enjoining Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiff or its members;

h.    entering judgment in favor of Plaintiff;

i.    awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

j.    awarding Plaintiff all other such relief as the Court deems proper and just.

Dated: March 18, 2025

Respectfully submitted,

/s/ Louis M. Grossman

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon G. Denmark*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
  Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

*pro hac vice forthcoming

Claire E. Juneau (#33209)
Louis M. Grossman (#28591)
Jeffrey J. Gelpi (#37130)
**KEAN MILLER LLP**
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone: (504) 585-3050
claire.juneau@keanmiller.com
louis.grossman@keanmiller.com
jeffrey.gelpi@keanmiller.com
*Lead Counsel*

and-

J. Christopher Dippel, Jr. (#30480)
**KEAN MILLER LLP**
400 Convention Street, Suite 700
Baton Rouge, LA 70802
Telephone: (225) 389-3762
chris.dippel@keanmiller.com

*Attorneys for Plaintiff NetChoice*