**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| NETCHOICE,<br><br>*Plaintiff*,<br><br>v.<br><br>LIZ MURRILL, in her official capacity as<br>Attorney General of Louisiana;<br>MIKE DUPREE, in his official capacity as<br>Director of the Public Protection Division,<br>Louisiana Department of Justice,<br><br>*Defendants*. | Civil Action No. 3:25 -cv-00231<br><br>JUDGE JOHN W. deGRAVELLES<br><br>MAG. JUDGE SCOTT D. JOHNSON |

**PLAINTIFF NETCHOICE'S MEMORANDUM IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# Table of Authorities

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996) ...........................................................................................14

*A.B. v. Salesforce, Inc.*,
    123 F.4th 788 (5th Cir. 2024) .......................................................................24, 25

*ACLU v. Mukasey*,
    534 F.3d 181 (3d Cir. 2008)...............................................................................11

*Ala. Ass'n of Realtors v. HHS*,
    594 U.S. 758 (2021)............................................................................................25

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003).................................................................................11

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021).....................................................................................18, 19

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)...................................................................1, 2, 11, 18, 22

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) .................................................................................9

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)..............................................1, 2, 10, 12, 15, 16, 18, 19, 20, 22

*Butler v. Michigan*,
    352 U.S. 380 (1957)............................................................................................21

*Calise v. Meta Platforms, Inc.*,
    103 F.4th 732 (9th Cir. 2024) .............................................................................24

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980)............................................................................................15

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022)..............................................................................................16

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
    747 F. Supp. 3d 1011 (W.D. Tex. 2024).....................................1, 9, 16, 17, 19, 20

*Edenfield v. Fane*,
 507 U.S. 761 (1993) ................................................................................................15

*Erznoznik v. City of Jacksonville*,
 422 U.S. 205 (1975) ..........................................................................................18, 19

*FCC v. Fox TV Stations, Inc.*,
 567 U.S. 239 (2012) ................................................................................................23

*FEC v. Cruz*,
 596 U.S. 289 (2022) ................................................................................................10

*Free Speech Coalition, Inc. v. Paxton*,
 95 F.4th 263 (5th Cir. 2024) ..................................................................................11

*FTC v. Match Grp., Inc.*,
 2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ........................................................24

*HomeAway.com, Inc. v. City of Santa Monica*,
 918 F.3d 676 (9th Cir. 2019) ..................................................................................24

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
 515 U.S. 557 (1995) ................................................................................................14

*John Doe No. 1 v. Reed*,
 561 U.S. 186 (2010) ................................................................................................10

*La'Tiejira v. Facebook, Inc.*,
 272 F. Supp. 3d 981 (S.D. Tex. 2017) ...................................................................24

*Miami Herald Pub. Co. v. Tornillo*,
 418 U.S. 241 (1974) ............................................................................................2, 14

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
 460 U.S. 575 (1983) ..........................................................................................17, 24

*Moody v. NetChoice, LLC*,
 603 U.S. 707 (2024) ....................................................................2, 4, 5, 6, 7, 9, 14

*Nat'l Press Photographers Ass'n v. McCraw*,
 90 F.4th 770 (5th Cir. 2024) ..................................................................................23

*NetChoice, LLC v. Bonta*,
 113 F.4th 1101 (9th Cir. 2024) ...............................................................................19

*NetChoice, LLC v. Bonta*,
 2025 WL 807961 (N.D. Cal. Mar. 13, 2025)..............................................1, 11, 17

*NetChoice, LLC v. Fitch*,
    738 F. Supp. 3d 753 (S.D. Miss. 2024)..........................................1, 2, 9, 11, 12, 16, 19, 22, 23

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)................1, 2, 9, 11, 12, 13, 20, 21, 22, 23, 24

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah Sept. 10, 2024)............................1, 2, 9, 11, 12, 16, 17, 19, 20

*NetChoice, LLC v. Yost*,
    716 F. Supp. 3d 539 (S.D. Ohio 2024) ................................................1, 2, 9, 12, 17, 19, 20, 22

*Netflix, Inc. v. Babin*,
    88 F.4th 1080 (5th Cir. 2023) ...............................................................................................25

*Nken v. Holder*,
    556 U.S. 418 (2009)...............................................................................................................25

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)...............................................................................................2, 5, 6, 7, 10, 15, 18

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)..............................................................................................10, 16, 18

*Reno v. ACLU*,
    521 U.S. 844 (1997)...............................................................................................1, 2, 11, 21, 22

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020).................................................................................................................25

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995)...............................................................................................................15

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011).............................................................................2, 13, 14, 15, 16, 20, 22

*In re State*,
    148 So. 3d 968 (La. Ct. App. 2014)........................................................................................8

*Students Engaged in Advancing Tex. v. Paxton*,
    2025 WL 455463 (W.D. Tex. Feb. 7, 2025)...............................................................2, 14, 22

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ..................................................................................................9

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994).............................................................................................................17

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)................................................................................18, 19, 20

*United States v. Williams*,
    553 U.S. 285 (2008)................................................................................23

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)................................................................................23

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)................................................................................9, 22

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ................................................................7, 10

**Statutes**

47 U.S.C. § 230....................................................................................................3, 24, 25

Cal. Civ. Code § 1798.140..................................................................................................23

La. Rev. Stat. § 1751............................................1, 3, 4, 5, 6, 7, 15, 16, 17, 20, 21, 22, 23, 24, 25

La. Rev. Stat. § 1752...........................................................1, 2, 7, 8, 10, 11, 12, 17, 21, 22, 25

La. Rev. Stat. § 1753.............................................................1, 2, 8, 10, 13, 18, 22, 24, 25

La. Rev. Stat. § 1754....................................................................................1, 8, 18, 25

La. Rev. Stat. § 1755...................................................................................8, 9, 25

La. Rev. Stat. § 1756...................................................................................8, 9, 25

La. Rev. Stat. § 1762.................................................................................................8

# Table of Contents

Introduction ............................................................................................................. 1

Background ............................................................................................................... 3

    A. Factual background ........................................................................................ 3

        1. NetChoice-member websites disseminate protected speech................................. 3

        2. Parents have many tools to oversee how their children use the internet. .............. 4

        3. Many websites advertise to make their services available to all. ......................... 5

    B. Louisiana Senate Bill 162 ............................................................................... 5

Argument .................................................................................................................. 9

    I. NetChoice is likely to succeed on the merits of its claim that the Act's speech regulations violate the First Amendment. ............................................................... 10

        A. The Act's speech regulations trigger heightened First Amendment scrutiny. ............ 10

            1. The Act's age-verification requirement to access protected speech for both minors and adults violates the First Amendment (§ 1752(A)). ........................... 10

            2. The Act's parental-consent requirement for minors to access protected speech violates the First Amendment (§ 1752(B)). .......................................... 11

            3. The Act's restriction on certain advertisements on minors' accounts violates the First Amendment (§ 1753(2)). ......................................................... 13

            4. The Act's speech regulations are content-based, triggering First Amendment strict scrutiny............................................................................... 15

        B. The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny............................................................................................. 18

            1. The State lacks a sufficient governmental interest in restricting adults' and minors' access to protected speech. ................................................... 18

            2. The Act's speech regulations are not properly tailored. ..................................... 19

                a. The Act's speech regulations are not the least restrictive means to accomplish any interest the State may assert............................................. 19

                b. The entire Act is improperly tailored....................................................... 20

                c. The age-verification, parental-consent, and advertising provisions are independently improperly tailored............................................................. 21

    II. NetChoice is likely to succeed on the merits of its claim that the Act's central coverage definition of "social media company" is unconstitutionally vague.................. 23

    III. NetChoice is likely to succeed on the merits of its claim that the Act's restrictions on certain advertising on minors' accounts are preempted by 47 U.S.C. § 230................... 24

    IV. NetChoice meets all the remaining factors for a preliminary injunction......................... 25

Conclusion ............................................................................................................... 25

## Introduction

Louisiana is attempting to restrict minors' access to protected online speech—impairing adults' access along the way. Using content-based provisions to target disfavored websites, Louisiana Senate Bill 162 ("Act") restricts protected First Amendment activity by imposing (1) age verification for *all* users to access social media websites, § 1752(A); (2) parental consent for minors to access those websites, § 1752(B); and (3) restrictions on certain advertising practices to minors, § 1753(2).[1] Courts nationwide have enjoined enforcement of similar laws. *NetChoice, LLC v. Bonta*, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1134 (D. Utah Sept. 10, 2024); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1044 (W.D. Tex. 2024) ("*CCIA*"); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753, 780 (S.D. Miss. 2024); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 561-62 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023). Accordingly, Plaintiff NetChoice requests that this Court enjoin Defendants' enforcement of the Act, §§ 1751-54, against NetChoice's members by June 17, 2025, before the Act's July 1, 2025 effective date.

"Minors are entitled to a significant measure of First Amendment protection," and the government's power to protect children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up). Governments thus lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3. Furthermore, requiring age-verification before accessing protected speech significantly chills and burdens First Amendment rights. *Ashcroft v. ACLU*, 542 U.S. 656, 667, 671 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997).

---

[1] This Motion uses "websites" to refer to all websites, applications, and other digital services, and "covered websites" to refer to all digital services the Act regulates. Unless otherwise noted, statutory citations in this Motion refer to Title 51 of the Louisiana Revised Code.

These principles apply with equal force to social media. Restricting "access to social media . . . prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). Through the internet, people can "gain access to information and communicate with one another on any subject that might come to mind." *Id.* at 99. That speech often takes place on NetChoice members' websites, which offer "capacity for communication of all kinds." *Id.* at 104 (citation omitted). These websites disseminate a "staggering amount" of protected speech to adults and minors. *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). So governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Id.* at 726-27 (citation omitted).

In several different ways, the Act would stifle this protected speech in violation of the First Amendment. *First*, the Act's age-verification requirement (§ 1752(A)) restricts access to protected speech for both minors and adults. *See, e.g.*, *Ashcroft*, 542 U.S. at 667 (invalidating age-verification requirement); *Reno*, 521 U.S. at 882 (same); *Reyes*, 748 F. Supp. 3d at 1129 n.169, 1134 (same); *Fitch*, 738 F. Supp. 3d at 773-74, 780 (same); *Griffin*, 2023 WL 5660155, at *17, 21 (same). *Second*, the Act's parental-consent requirement (§ 1752(B)) infringes minors' right to access protected speech "*without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3; *see Fitch*, 738 F. Supp. 3d at 774, 780 (enjoining parental-consent requirement); *Yost*, 716 F. Supp. 3d at 559, 561-62 (same); *Griffin*, 2023 WL 5660155, at *14-15, 21 (same); *see also Reyes*, 748 F. Supp. 3d at 116 & n.135 (similar). *Third*, the Act's prohibitions on advertisements based on most "personal information" on minors' accounts (§ 1753(2)) restrict websites' use of information in disseminating speech and their editorial control over the arrangement and presentation of third-party speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *Students Engaged in Advancing Tex. v. Paxton*, 2025 WL 455463, at

*13-14 (W.D. Tex. Feb. 7, 2025) ("*SEAT*"). The Act's advertising restrictions are also preempted by 47 U.S.C. § 230 ("§ 230").

On top of all that, the Act imposes these speech regulations on select websites by using a content-based and vague coverage definition of "[s]ocial media company," § 1751(11), which independently makes the Act's speech regulations subject to strict scrutiny. This coverage definition creates illogical results that fail any form of heightened First Amendment scrutiny. YouTube must comply with the Act, but Hulu and Disney+ are exempted. § 1751(12)(b)(iii). X must comply with the Act, but the same content shown on a forum with fewer than "five million account holders worldwide," § 1751(11), need not comply. Nextdoor would be covered, but not if it limited discussion to "public safety." § 1751(12)(b)(viii). Minors must secure parental consent (and all users must verify their ages) to engage in "interactive gaming" on Facebook, but not on websites like Roblox "where the predominant or exclusive function is . . . interactive gaming." § 1751(12)(b)(vi). All job seekers must jump through those same hoops on covered websites, but not on websites where "the predominant or exclusive function is . . . [providing] [c]areer development opportunities." § 1751(12)(b)(ix). The First Amendment tolerates none of this.

**Background**

A.     **Factual background**

1.     **NetChoice-member websites disseminate protected speech.**

NetChoice is an internet trade association. Cleland Decl. ¶ 3. Based on the Act's definitions, the Act regulates some websites operated by NetChoice members, including: (1) Meta (Facebook and Instagram); (2) Nextdoor; (3) Pinterest; (4) Reddit; (5) Snap Inc. (Snapchat); (6) X; and (7) YouTube. *See id.* ¶¶ 11-13. These websites "engage[] in expression" by "display[ing]," "compil[ing,] and curat[ing]," protected speech (text, audio, images, and video) "created by

others." *Moody*, 603 U.S. at 716, 728; *see* Cleland Decl. ¶ 6; Kessel Decl. ¶¶ 14-19.[2] On most of these services, users must have an account to access either some or all of the protected speech and speech-enabling functions. Cleland Decl. ¶ 15; Kessel Decl. ¶ 13. Creating accounts on these web-sites allows users to access and engage in a wide variety of protected expression, education, civic engagement, and entertainment. Cleland Decl. ¶¶ 6-8; Kessel Decl. ¶ 4-5, 8, 11. Users can com-municate with others about news, politics, sports, extracurriculars, educational opportunities, and career information, among many other things. Cleland Decl. ¶¶ 6-8; Kessel Decl. ¶¶ 4-5, 8, 11.

### 2.    Parents have many tools to oversee how their children use the internet.

Parents can and do control their children's online experiences. Cleland Decl. ¶ 10. To start, parents control what *devices* minors can access—and when. *Id.* Not all devices are internet-ena-bled. And devices come with many parental-control options, including the ability to lock or limit specific apps and features, restrict the device settings to limit content and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* ¶ 10.b.

Parents also control the *networks* that minors use. Wireless routers allow parents to manage which network a minor connects to and to set up rules defining which internet websites minors can use (and at what times). *Id.* ¶ 10.a. Many internet service providers offer similar controls. *Id.* Par-ents also control *software*. Web browsers offer parental controls. *Id.* ¶ 10.c. And third-party paren-tal control software is available for many devices. *Id.*

In addition, some members have developed their own suite of parental controls and other protections for minors on their services. *E.g.*, *id.* ¶¶ 9.a-b, 10.d; Boyle Decl. ¶¶ 6-7. These controls supplement the resources that members spend crafting and enforcing "content moderation"

---

[2] This Motion uses the term "user" to encompass both what the Act calls "[u]ser[s]" and "[a]ccount holder[s]." § 1751(1), (13). When discussing the Act's requirements, this Motion also uses "minor," "adult," "account holder," and "user" to refer only to Louisiana minors under 16, adults, account holders, and users covered by the Act. § 1751(6)-(9).

policies aiming to prevent objectionable speech from reaching users. *E.g.*, Cleland Decl. ¶ 9.c; Kessel Decl. ¶¶ 6-10, 21-24. These members' efforts have been successful. Cleland Decl. ¶ 9.c.

### 3.    Many websites advertise to make their services available to all.

Most covered websites depend on ads for a substantial portion of their revenue. Cleland Decl. ¶ 17.c; Boyle Decl. ¶ 8.a. Contextual advertising helps advertisers display their ads to users who are most likely to be interested, rather than blanketing all users indiscriminately. Internet ads often draw insight from a website's or webpage's content. Cleland Decl. ¶ 17.a. For example, a user who visits a National Park's social media account might see ads for lodging near the park or camping equipment. This spares users from seeing ads for products or services in which they have little or no interest. Account holders use websites for advertising, too. Individuals advertise every-thing from fundraisers to babysitting services; artists advertise shows, small businesses advertise discounts, and paid "influencers" advertise sponsored products. *Id.* ¶ 17.b.

### B.    Louisiana Senate Bill 162

The Act takes effect on July 1, 2025.

**1. Covered actors and activities. § 1751(11)-(12).** The Act's speech regulations apply to only a subset of internet "actors" and "activities," *Moody*, 603 U.S. at 724, discriminating based on content. In particular, the Act regulates only "[s]ocial media compan[ies]" providing "[s]ocial media platform[s]." § 1751(11)-(12). These websites "allow users to upload content . . . to share with others," and those "viewing the content can" "react to it, comment on it, or share it them-selves." *Moody*, 603 U.S. at 719. Such "social media" websites both engage in and facilitate First-Amendment-protected expression. *Id.*; *Packingham*, 582 U.S. at 104-05.

The Act defines "[s]ocial media company" as "a person or entity that provides a social media platform that has at least five million account holders worldwide and is an interactive

computer service." § 1751(11).[3] In turn, "social media platform" is any "public or semipublic internet-based service or application that has users in Louisiana and that meets all of the following" criteria, including whether they "allow users to interact socially"—a content-based criterion:

> (i) The service or application connects users in order to allow users to interact socially with each other within the service or application. . . .
> (ii) The service or application allows users to do all of the following:
>     (aa) Construct a public or semipublic profile for purposes of signing into and using the service or application.
>     (bb) Populate a list of other users with whom an individual shares a social or virtual connection within the system, including subscribing to content . . . .
>     (cc) Create or post content viewable by other users, including but not limited to, on message boards, in chat rooms, on video channels, or through a landing page or main feed that presents the user with content generated by other users.

§ 1751(12)(a). So the Act covers websites offering social media "platform[ ] feeds" of "curated compilation[s]" of "third-party speech." *Moody*, 603 U.S. at 727-28. This is consistent with the common usage of "social media." *See id.* at 719; *Packingham*, 582 U.S. at 104-05.

The Act excludes websites based on their content, including websites with the following "predominant or exclusive function[s]": "streaming service[s]," "[n]ews, sports, entertainment," "[o]nline shopping," "[i]nteractive gaming, virtual gaming," "[p]hotograph editing" and "associated photograph hosting," "[s]ingle purpose community groups for public safety" (but only "if the interaction with other users or account holders is limited to that single purpose"), "[c]areer development opportunities, including professional networking," "data visualization," "digital news," "technical support," "[a]cademic, scholarly, or genealogical research," "classified advertising service," and websites "used by or under the direction of an educational entity." § 1751(12)(b).

The Act also encourages websites to exclude minors, as it does not apply to any website that "pursuant to its terms of use, does not permit minors to use the platform and utilizes

---

    [3] An "[i]nteractive computer service" is "an information service, information system, or information access software provider that provides or enables computer access by multiple users to a computer server and provides access to the internet." § 1751(5).

commercially reasonable age assurance mechanisms to attempt to prohibit minors from becoming an account holder or user." § 1751(12)(b)(ii). Minors are those that covered websites "believe[] or ha[ve] actual knowledge that the individual is under the age of sixteen and is not emancipated or married." § 1751(9). Thus, this provision could require websites to ensure that minors younger than 16 are unable to view even "some of the posts" on a service. § 1751(13) (defining "[u]ser").

Because the Act blatantly targets "social media" websites, this Court "need not speculate" about "hypothetical or imaginary cases." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (cleaned up). Restricting "access to social media" triggers heightened First Amendment scrutiny. *Packingham*, 582 U.S. at 108. And the Act's definitions cover the "social media" services that *Moody* held have full First Amendment protection. 603 U.S. at 724-25, 738-40. The Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply (in the context of *compelled*-speech laws). *Id.* at 724-25, 730. The Act's exclusion of "electronic commerce" and "[o]nline shopping," § 1751(12)(b)(v), excludes "payment service[s] like Venmo" and "marketplace[s] like Etsy," *Moody*, 603 U.S. at 725. The Act's exclusion of websites where the "content . . . is preselected by the provider and not user generated," § 1751(12)(b)(iv), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725. And the Act excludes websites that provide "direct messaging services . . . alone." § 1751(12)(a)(i); *see Moody*, 603 U.S. at 724.

**2. The Act's speech regulations.**

*Age-verification. § 1752(A).* Covered websites "shall make commercially reasonable efforts to verify the age of Louisiana account holders with a level of certainty appropriate to the risks that arise from the information management practices of the social media company." § 1752(A). Otherwise, covered websites must treat *all users* the same way that the Act requires covered websites to treat minors. § 1752(A). That includes the limitation on receiving advertising discussed

7

below and limitations on direct messaging. *See* § 1753(1) ("prohibit . . . [a]dults from direct messaging [minors] unless the minor is already connected to the adult on the service").

*Parental-consent. § 1752(B).* Covered websites "shall not permit" a minor "to be an account holder . . . unless the minor has the express consent of a parent or guardian." § 1752(B). The Act provides five enumerated "[a]cceptable methods of obtaining express consent" and one catch-all for "[a]ny other commercially reasonable method of obtaining consent in light of available technology." § 1752(B). For minors that have parental consent, the Act requires covered websites to provide parents with supervision tools. § 1754.

*Certain ads on minors' accounts. § 1753(2).* "For a Louisiana minor account holder," covered websites "shall prohibit . . . [t]he display of any advertising in the account based on the Louisiana minor account holder's personal information, except age and location." § 1753(2). This provision likely prohibits contextual advertising, because "[t]argeted advertising" is separately regulated by another provision of Louisiana law. § 1762(A)(10)(a), (B)(1) (prohibiting "displaying an advertisement . . . where the advertisement is selected based on personal data . . . to predict the account holder's preferences or interests"). Louisiana courts interpret statutes to avoid rendering provisions surplusage. *In re State*, 148 So. 3d 968, 974 (La. Ct. App. 2014), *rev'd on other grounds*, 156 So. 3d 648 (La. 2015). Moreover, the Act's failure to define "advertising" could extend the Act's reach to user-created promotional content.

*Limitation on information collection and use. § 1753(3).* The Act also imposes a restriction on the "collection or use of personal information from . . . activities of the account other than information beyond what is adequate, relevant, and reasonably necessary in relation to the purposes for which such information is collected, as disclosed." § 1753(3).

*Investigation, enforcement, and penalties. §§ 1755-56.* The Act entrusts Defendants with

investigative and "exclusive" enforcement authority over the Act. §§ 1755-56. The Division Director "may impose an administrative fine of up to two thousand five hundred dollars for each violation." § 1756(B). And the Division Director may sue covered websites seeking declaratory and injunctive relief, disgorgement, damages, fees, and costs. § 1756(C), (D)(4).

### Argument

NetChoice is entitled to a preliminary injunction because it can demonstrate: (1) "likelihood of success on the merits"; (2) "irreparable harm"; (3) the "balance of equities"; and (4) the "public interest." *Book People, Inc. v. Wong*, 91 F.4th 318, 336 (5th Cir. 2024) (citation omitted).

NetChoice has associational standing to assert its members' rights. *E.g.*, *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021).[4] NetChoice also has standing to assert the First Amendment rights of its members' users—current and prospective. *E.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).[5]

NetChoice raises both facial challenges and challenges to the Act's provisions as applied to the NetChoice members and services listed above at p.3. For Plaintiff's First Amendment claims, the Act should "be struck down in its entirety" because its "unconstitutional applications substantially outweigh its constitutional ones" when "judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723-24 (citation omitted).

This facial inquiry "first" asks what "actors" and "activities" are regulated by the Act. *Id.* at 724; *see supra* pp.5-8. It "next" compares the Act's unconstitutional applications to any constitutional applications, asking whether the former "substantially outweigh" the latter. *Moody*, 603 U.S. at 723-24. That inquiry here is straightforward "from the face of the law": All aspects of the

---

[4] *See Reyes*, 748 F. Supp. 3d at 1118-19; *CCIA*, 747 F. Supp. 3d at 1028-31; *Fitch*, 738 F. Supp. 3d at 766-68; *Yost*, 716 F. Supp. 3d at 549-50; *Griffin*, 2023 WL 5660155, at *9-10.

[5] *See CCIA*, 747 F. Supp. 3d at 1031; *Fitch*, 738 F. Supp. 3d at 767-68; *Yost*, 716 F. Supp. 3d at 550-51; *Griffin*, 2023 WL 5660155, at *11-12.

Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues." *X Corp.*, 116 F.4th at 899. At a minimum, the Act is invalid as applied to members' regulated services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).

I.      **NetChoice is likely to succeed on the merits of its claim that the Act's speech regulations violate the First Amendment.**

A.      **The Act's speech regulations trigger heightened First Amendment scrutiny.**

The Act—including its age-verification, § 1752(A), parental-consent, § 1752(B), and advertising provisions, § 1753(2)—triggers strict scrutiny. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). Laws regulating speech based on content are subject to "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

1.      **The Act's age-verification requirement to access protected speech for both minors and adults violates the First Amendment (§ 1752(A)).**

The Act violates the First Amendment by requiring *all* users—minors and adults—to "verify . . . age[s]" to be "account holders" on covered websites. § 1752(A). Heightened First Amendment scrutiny applies when governments age-gate access to speech. *Brown*, 564 U.S. at 764.

The Act's age-verification requirement would impose an impermissible hurdle for all users to access and engage in protected speech. Users would need to provide documentation before discussing their faith on a forum dedicated to religion, "petition[ing] their elected representatives" on X, "shar[ing] vacation photos" with "their friends and neighbors" on Facebook, looking for work around the neighborhood on Nextdoor, learning how to solve math problems on YouTube, and otherwise creating or receiving protected speech. *Packingham*, 582 U.S. at 104-05.

The First Amendment does not tolerate this burden to access protected speech. The Act's age-verification requirement unlawfully bars access to speech entirely for those unwilling or

unable to provide the requisite documentation. *E.g.*, *Reno*, 521 U.S. at 856; *e.g.*, Kessel Decl. ¶¶ 27, 29. The Supreme Court has held that requiring adults or minors to provide personal information or documentation—such as "identif[ication]" or "credit card information"— burdens access to protected speech. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882. Yet under the Act, covered websites must place *all* content behind an age-verification system. § 1752(A). That is much broader than the age-verification law held unconstitutional in *Ashcroft*, which regulated "sexually explicit materials." 542 U.S. at 659.[6]

*Griffin* invalidated Arkansas's similar age-verification requirement, concluding that "[i]t is likely that many adults" and minors "who otherwise would be interested in becoming account holders . . . will be deterred—and their speech chilled—as a result of the . . . requirements." 2023 WL 5660155, at *17. Those who are willing to comply with these requirements must "forgo the anonymity otherwise available on the internet" as the price of admission. *Id.* (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (similar); *see* Kessel Decl. ¶¶ 10-13, 27-29. Courts since *Griffin* have applied the same principles to enjoin enforcement of age-assurance and age-verification requirements to access social media. *E.g.*, *Bonta*, 2025 WL 807961, at *22; *Reyes*, 748 F. Supp. 3d at 1129 n.169; *Fitch*, 738 F. Supp. 3d at 774.

### 2.   The Act's parental-consent requirement for minors to access protected speech violates the First Amendment (§ 1752(B)).

The Act violates the First Amendment by requiring minors to secure the "express consent

---

[6] The Fifth Circuit's *Free Speech Coalition, Inc. v. Paxton* decision considered age-verification requirements for "pornographic websites," which disseminate speech *unprotected* for minors. 95 F.4th 263, 266, 273 (5th Cir. 2024), *petition for cert. granted* 144 S. Ct. 2714 (July 2, 2024). *Paxton* held that "regulations of the distribution *to minors* of materials obscene *for minors* are subject only to rational-basis review." *Id.* at 269. The Act here regulates minors' access to speech that is *protected* for minors—not speech that they have no First Amendment right to view.

of a parent" to "be an account holder"—*i.e.*, to access and engage in protected speech—on covered websites. § 1752(B); *see Yost*, 716 F. Supp. 3d at 558 ("[L]aws that require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny.").

Minors have the "right to speak or be spoken to without their parents' consent," and "the state" lacks the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. *Brown* invalidated a law prohibiting the sale or rental of "violent video games" to minors, while permitting minors to play such games with parental consent. *Id.* at 802. Any other result would allow States to impose parental-consent requirements for "political rall[ies]" or "religious" services. *Id.* at 795 n.3. The Court rejected that idea. *Id.*

Following *Brown*, courts have repeatedly enjoined enforcement of parental-consent requirements for minors to access and engage in protected speech, including on websites operated by NetChoice's members. *Yost* rejected Ohio's parental-consent requirement to access social media websites. *See* 716 F. Supp. 3d at 558-60. *Griffin* rejected Arkansas's parental-consent requirement to access "social media platforms." 2023 WL 5660155, at *17. *Fitch* rejected Mississippi's parental-consent requirement to access a "broad range of covered [social media] websites." 738 F. Supp. 3d at 774-76. And *Reyes* rejected Utah's parental-consent requirement for minors to speak to certain audiences on "social media service[s]." 748 F. Supp. 3d at 1126 & n.135.

The Act's materially identical parental-consent requirement violates the First Amendment for the same reasons. It would impose a substantial hurdle between minors and "vast quantities of constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *17. Minors who wish to exchange information about their religious or political views could not do so unless their parents approve. That problem is exacerbated because the Act does not account for the difficulty in verifying a parent-child relationship for purposes of processing parental consent. *E.g.*, Boyle Decl.

¶ 10. *Griffin* credited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." 2023 WL 5660155, at *4. These difficulties are compounded when, *e.g.*, families are nontraditional (*e.g.*, foster families), families have different last names, parents disagree about consent, minors are unsafe at home, or parental rights are terminated. *See* Cleland Decl. ¶ 16; Boyle Decl. ¶ 10; Kessel Decl. ¶¶ 30-31. Facing liability, websites are likely to "err on the side of caution and require detailed proof of the parental relationship." *Griffin*, 2023 WL 5660155, at *15. So "parents and guardians who otherwise would have freely given consent . . . will be dissuaded by the red tape." *Id.* Those obstacles will drive them to "refuse consent—which will unnecessarily burden minors' access to . . . speech." *Id.*

3.   **The Act's restriction on certain advertisements on minors' accounts violates the First Amendment (§ 1753(2)).**

The Act further violates the First Amendment by prohibiting the "display of any advertising" on minors' accounts based on "personal information, except age and location." § 1753(2).

The First Amendment prohibits the State from dictating how private entities choose which lawful ads to publish—and what lawfully obtained information they use to make that choice. To begin, "[a]n individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used." *Sorrell*, 564 U.S. at 568 (cleaned up). *Sorrell* thus invalidated a law prohibiting the use of "prescriber-identifying information" for purposes of pharmaceutical marketing by pharmaceutical manufacturers. *Id.* at 564. In so doing, it rejected the idea that "use of . . . information [is] conduct." *Id.* at 570. The prescriber-identifying information was akin to "cookbooks, laboratory results, or train schedules"—all "facts" protected by the First Amendment. *Id.* And restrictions on the use of particular facts to engage in "protected expression" trigger First Amendment scrutiny. *Id.* at 565. The law in *Sorrell* "burden[ed] disfavored speech by disfavored speakers." *Id.* at 564. Accordingly, the Court concluded

13

that the law in *Sorrell* violated any level of heightened First Amendment scrutiny. *Id.* at 571.

Also, the "selection of" an "advertisement for inclusion" in a "compilation of speech" "fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995); *see Moody*, 603 U.S. at 728 ("choice of material" in a publication "constitute[s] the exercise of editorial control and judgment").

The Act's restriction on certain ads on minors' accounts violates these principles. The Western District of Texas recently enjoined enforcement of a similar provision. *SEAT*, 2025 WL 455463, at *13-14. Rather than targeting specific kinds of problematic ads or regulating advertisers themselves, the Act regulates a handful of covered websites' choices about what information they use when deciding how to display ads on their services. *Id.* at *14. That is like telling the *New York Times* that it may not rely on market research to place its ads. Because the Act singles out content-based categories of "personal information" that websites cannot use, it is analogous to the law invalidated in *Sorrell*, 564 U.S. at 563. And because it targets websites' "editorial control and judgment," it must satisfy strict scrutiny. *Tornillo*, 418 U.S. at 258; *see Hurley*, 515 U.S. at 570. Because this provision could reach all manner of "advertisements" that do not "propose a commercial transaction," the "strict scrutiny applies to them equally." *SEAT*, 2025 WL 455463, at *10. Further, there is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and concurring in the judgment).

Moreover, to the extent the Act covers *user-generated* promotional content that is presented to minor users through personalization based on user data, covered websites would have to screen and monitor all users posts to determine (1) whether they are advertisements; and (2) whether they are based on "personal information." Assuming such monitoring were possible

(which is unlikely, Cleland Decl. ¶ 17.b), this would chill protected speech.

Even if construed as regulating commercial speech, the Act's "purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional." *Sorrell*, 564 U.S. at 566. This provision fails intermediate scrutiny. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 570 (1980). "[A]ccurately inform[ing] the public about lawful activity" is protected. *Id.* at 563. This Act does not attempt to regulate false or misleading speech.

Consequently, the government must demonstrate a "substantial interest," that the Act "directly advances" that interest, and "is not more extensive than is necessary." *Id.* at 564, 566. The State "must demonstrate that the harms it recites are real." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (cleaned up). Otherwise, "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). The State has no legitimate interest in "suppress[ing] [speech] solely to protect the young from ideas or images that a legislative body thinks unsuitable." *Brown*, 564 U.S. at 795. That includes ads. Nor may the State prohibit certain ads because they are considered "persuasive." *Sorrell*, 564 U.S. at 578. Regardless, prohibiting such advertising on only a handful of websites is an insurmountable tailoring problem. *Id.* at 573-75.

> **4.    The Act's speech regulations are content-based, triggering First Amendment strict scrutiny.**

The Act's "social media company" coverage definition (§ 1751(11)-(12)) is content-based, subjecting the Act's speech regulations to strict scrutiny. This definition is also speaker-based, which triggers heightened First Amendment scrutiny. Regardless, governmental restrictions on "access to" social media raise heightened scrutiny. *Packingham*, 582 U.S. at 105.

*Content-based distinctions.* The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its

content." *Brown*, 564 U.S. at 790-91 (citation omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves" it satisfies "strict scrutiny." *Reed*, 576 U.S. at 163-64.

The Act's coverage definition is content-based, rendering all of the Act's provisions content-based. *Sorrell*, 564 U.S. at 566 ("[C]ontent-based burdens must satisfy the same rigorous scrutiny as [] content-based bans."). Specifically, the Act both defines covered websites and excludes numerous other websites from its onerous regulations based on their "subject matter" and thus their "content." *Reed*, 576 U.S. at 163; *see Sorrell*, 564 U.S. at 563-64 (content-based exceptions render statute content-based). The Act includes websites based on whether they "allow users to interact socially." § 1751(12)(a)(i). But it exempts websites with other "predominant or exclusive function[s]." § 1751(12)(b). So "[n]on-social interactions, such as professional interactions, are not covered, while social interactions are," rendering the Act content-based. *CCIA*, 747 F. Supp. 3d at 1034. Many courts have held that similar "interact socially" coverage provisions are content-based. *See id.*; *Reyes*, 748 F. Supp. 3d at 1122; *Fitch*, 738 F. Supp. 3d at 770-71. The Act's reference to "function" is a proxy for other content-based restrictions. Governments cannot "swap[] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022).

Meanwhile, the Act outright exempts the State's favored entities based on the content they feature—to name just a few, "[n]ews, sports, entertainment," "[s]ingle purpose community groups for public safety," "professional networking," and "[a]cademic, scholarly, or genealogical research" websites. § 1751(12)(b). Consequently, websites that disseminate or devote themselves to these state-preferred topics may serve minors without hurdles. "The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based

regulation." *CCIA*, 747 F. Supp. 3d at 1032; *see Yost*, 716 F. Supp. 3d at 557-58. But websites like those operated by NetChoice's members that disseminate a different or broader mix of content are not so lucky. Nor are their users. Although a 17-year-old may discuss public safety in a single-purpose community website, he cannot discuss that same issue with his neighbors on Nextdoor without parental consent. Likewise, Reddit has some communities devoted to the Act's exempted topics, but is nevertheless covered because it also has communities devoted to non-exempt topics.

*Speaker-based distinctions.* The Act triggers heightened First Amendment scrutiny because the Act's central coverage definition is speaker-based. Such laws "present serious First Amendment concerns" when they "discriminate . . . among different speakers within a single medium" or "f[a]ll upon only a small number" of speakers. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994). "[L]aws that single out the press, or certain elements thereof . . . are always subject to at least some degree of heightened First Amendment scrutiny." *Id.* at 640-41 (citation omitted).

Along with the laundry list of content-based exclusions, the Act also does not apply to websites with fewer than "five million account holders worldwide." § 1751(11). In other words, the Act restricts speech that occurs on covered websites that have a relatively large number of users (*e.g.*, X). But it ignores *identical* speech occurring on otherwise similar websites—even those with millions of users. *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting law that "target[ed] a small group of newspapers").

If "a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute" *Bonta*, 2025 WL 807961, at *12 (collecting cases); *see id.* at *11, *13; *Reyes*, 748 F. Supp. 3d at 1120. The Act's speech regulations all depend on this coverage definition and are thus content-based and speaker-based: age verification, § 1752(A); parental consent, § 1752(B); advertising restrictions,

§ 1753(2); direct messaging limitations, § 1753(1); data collection and use limitations, § 1753(3); and parental supervision provisions, § 1754. All of these provisions are "[g]overnment regulation[s] of speech" because they impose additional legal duties on covered websites if they disseminate speech of a certain type of "content." *Reed*, 576 U.S. at 163.

**B.      The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny.**

Because the Act triggers strict scrutiny several times over, Defendants must demonstrate that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (citation omitted). Neither the Act nor any of its individual provisions can satisfy this demanding standard. They also cannot satisfy any form of heightened scrutiny, as they are not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted).

**1.      The State lacks a sufficient governmental interest in restricting adults' and minors' access to protected speech.**

To satisfy the First Amendment, the State must "specifically identify an actual problem in need of solving" *by the government*. *Brown*, 564 U.S. at 799 (cleaned up). "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will mere "predictive judgment[s]" about harm. *Id.* at 799. Louisiana lacks a sufficient governmental interest in restricting access to protected speech.

*Preventing harms to minors.* Although, "a State possesses legitimate power to protect children from harm," that "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794. Governments may not "protect the young from ideas or images that a legislative body thinks unsuitable." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975).

Here, parents have many means of overseeing their minor children online. *See supra* Part A.2. Those are precisely the kinds of parental tools that the Supreme Court has endorsed over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp.,*

*Inc.*, 529 U.S. 803, 826 (2000). Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

*Parental authority.* The Supreme Court has rejected a governmental interest "in aid of parental authority" to restrict minors' access to protected speech. *Id.* at 802. The Court in *Brown* "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* As the Court explained, accepting that argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212-13). *see, e.g.*, *Yost*, 716 F. Supp. 3d at 558. This case presents no such circumstances.

### 2.     The Act's speech regulations are not properly tailored.

In any event, the Act's speech regulations are not narrowly tailored, let alone the "least restrictive means" of pursuing any governmental interest. *AFP*, 594 U.S. at 607 (citation omitted). Rather, the Act is both "seriously underinclusive" and "seriously overinclusive." *Brown*, 564 U.S. at 805. Because these "requirements are overbroad, overly restrictive, and underinclusive, they are properly enjoined on their face." *CCIA*, 747 F. Supp. 3d at 1038.

#### a.  The Act's speech regulations are not the least restrictive means to accomplish any interest the State may assert.

None of the Act's speech restrictions is the "least restrictive" way to accomplish any goals that the State might assert. *AFP*, 594 U.S. at 607 (citation omitted). Parents already have many options to oversee their children online. Louisiana could alternatively give "parents the information needed to engage in active supervision" over children's internet access. *Playboy*, 529 U.S. at 826; *see, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Reyes*, 748 F. Supp. 3d at 1127; *Fitch*, 2024 WL 3276409, at *11; *Yost*, 716 F. Supp. 3d at 559. That would

require little more than publicizing the diverse supervisory technologies that are widely available. *See supra* Part A.2. For example, the State could "encourage the use of filters by parents" that private companies already make available "to protect minors." *Griffin*, 2023 WL 5660155, at \*21 (cleaned up); *see* Cleland Decl. ¶ 9. Louisiana ignored these less restrictive options. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824.

Furthermore, members' self-regulation is extensive, websites already engage in content moderation and provide parental controls and other tools. *See supra* Part A.2. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention. *Brown*, 564 U.S. at 803 (crediting video game industry's self-regulation).

### b.  The entire Act is improperly tailored.

Several tailoring flaws pervade all of the Act's speech regulations.

The Act is vastly overinclusive—both in the range of protected speech it restricts and the regulated websites. It targets websites that disseminate a broad range of protected speech. *See, e.g.*, *Reyes*, 748 F. Supp. 3d at 1129. So it does not purport to identify websites that are harmful to minors or even particularly likely to be accessed by minors. And for the websites it regulates, the Act restricts users' access to *all* speech on those websites, including core protected speech.

The Act's coverage is also "seriously underinclusive." *Brown*, 564 U.S. at 805. The Act's central coverage definition creates pervasive gaps in the State's regulatory regime. *Sorrell*, 564 U.S. at 573 (governmental regulation requires "coherent policy"); *see, e.g.*, *Reyes*, 748 F. Supp. 3d at 1128-29; *CCIA*, 747 F. Supp. 3d at \*16. If Louisiana is attempting to provide parents greater control over their minor children, it makes no sense to limit coverage to websites that do not qualify for one of numerous statutory exceptions, or meet an arbitrary 5-million user threshold. § 1751(11)-(12); *see Griffin*, 2023 WL 5660155, at \*18. If the State is attempting to regulate

particular interactions by minors, that too will be ineffective. For example, the Act restricts minor users from using covered websites to engage in conversations about sports but does not do so for *the exact same conversation* that takes place on a website where sports is the "predominant or exclusive function," § 1751(12)(b)(vi). Examples abound for all the Act's other exceptions.

### c. The age-verification, parental-consent, and advertising provisions are independently improperly tailored.

Beyond these overarching problems, specific provisions have still more tailoring flaws.

*Age verification (§ 1752(A)).* Age verification is only a means to effectuate the Act's other age-based restrictions, like the parental-consent requirement and the advertising restrictions. Because those other provisions are unconstitutional, age-verification serves no standalone governmental interest. *See, e.g.*, *Griffin*, 2023 WL 5660155, at *18-21 ("Age-gating social media platforms for adults and minors does not appear to be an effective approach when, in reality, it is the content on particular platforms that is driving the State's true concerns.").

Furthermore, the Act is overinclusive as to any governmental interest that focuses only on minors. All users, *adults* included, must undergo age verification to access a broad range of protected speech on a broad range of websites. To access protected political, religious, artistic, or other protected speech on covered websites, adults must verify their ages. And for the websites that cannot verify the ages of their users, those websites must treat all adults on the websites as minors—subject to all the limitations on minors' accounts under the Act. *See supra* pp.7-8. That would unconstitutionally "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). Impeding adults' access to protected speech is enough to render the Act insufficiently tailored. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882.

*Parental consent (§ 1752(B)).* The parental-consent requirement is improperly tailored. Like other parental-consent laws to engage in protected speech, the Act's requirement is

underinclusive. If covered websites are genuinely "dangerous," it does "not make sense to" allow minors to access them "so long as one parent . . . says it's OK." *Griffin*, 2023 WL 5660155, at \*18 (cleaned up); *see Fitch*, 738 F. Supp. 3d at 775; *Yost*, 716 F. Supp. 3d at 559-60.

Furthermore, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. The Act's one-size-fits-all approach requires express parental consent for all minors at every developmental stage—from websites' youngest users to 17-year-olds. *Id.*; *see Reno*, 521 U.S. at 865-66.

*Restriction on certain advertising on minors' accounts (§ 1753(2)).* The Act's restriction on disseminating ads based on "personal data" on minors' accounts also is not properly tailored to further any governmental interest. There is an obvious less-restrictive alternative: The Act could give minors the ability to opt out of such advertising.

In addition, it is "seriously underinclusive." *Brown*, 564 U.S. at 805. The "statute allows" minors' personal "information to be used" for advertising "by all but a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573; *id.* at 574-75. Minors will encounter such ads on "interactive gaming" websites; "news, sports, [and] entertainment" websites; websites without user-generated content; and those that do not have 5 million users. § 1751(11), (12)(a)-(b). "Why . . . can a teenager view a targeted advertisement on a sports or shopping website but not on a social platform?" *SEAT*, 2025 WL 455463, at \*14. Further, this provision does nothing to regulate the *kinds* of advertisements minors might see, and thus permits the dissemination of all manner of inappropriate advertisements. *Id.* The only justification that leaves Louisiana is an impermissible interest in preventing speech "[t]hat the State finds [] too persuasive." *Sorrell*, 564 U.S. at 578.

Further, this provision is overinclusive. Leaving "personal data" undefined restricts an unduly broad range of ads. For instance, the Act is not limited to what other States call "sensitive

personal information." Cal. Civ. Code § 1798.140(ae). It does not serve any governmental interest to prohibit websites from publishing ads based on, *e.g.*, a user's search for college admissions. Finally, the Act could extend to any number of user-created promotions for pet-sitting, sports camps, or concerts—if that content is presented to users through personalization.

## II.     NetChoice is likely to succeed on the merits of its claim that the Act's central coverage definition of "social media company" is unconstitutionally vague.

The Act's "social media company" definition is also unconstitutionally vague. § 1751(11)-(12). Laws must "give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). They cannot be "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "[V]agueness may be grounds for a pre-enforcement challenge" if a law "chills protected speech under the First Amendment"—even if the law is not vague in every application. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024). This First Amendment vagueness standard is "more stringent" for the State to meet than the ordinary vagueness standard. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Determining whether the Act applies requires identifying a website's "predominant or exclusive function." § 1751(12)(b). *Griffin* enjoined as unconstitutionally vague a law relying on identical terms. 2023 WL 5660155, at *14; *see Fitch*, 738 F. Supp. 3d at 777-78 ("primarily" and "incidental to" were "overly indefinite, leaving it open for potential arbitrary and discriminatory enforcement"). Here too, "predominant or exclusive function" is undefined, even though that phrase is "critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2023 WL 5660155, at *13. For example, many people use LinkedIn for "professional networking," § 1751(12)(b)(ix), but many others use it for social interaction. So the Act "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the

Act's costly . . . requirements." *Griffin*, 2023 WL 5660155, at \*13. This "renders a law unconstitutional." *Id.*[7]

### III.     NetChoice is likely to succeed on the merits of its claim that the Act's restrictions on certain advertising on minors' accounts are preempted by 47 U.S.C. § 230.

The Act's restriction on disseminating certain ads on minors' accounts (§ 1753(2)) is unlawful for an independent reason. It is preempted by § 230, because it would penalize covered websites for disseminating third-party content and could require monitoring that content.

Websites have "broad immunity" for "all claims stemming from their *publication of information created by third parties.*" *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (cleaned up). That includes penalizing websites for exercising "editorial functions" over third-party content, such as "decisions relating to the monitoring, screening, and deletion of content." *Id.* at 793, 798 (citation omitted). "No [website] shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1).[8] "No cause of action may be brought and no liability may be imposed . . . that is inconsistent with" § 230. *Id.* § 230(e)(3).

Here, § 230 preempts the Act's restriction on ads on minors' accounts. It would subject covered websites to "cause[s] of action" and "liability," *id.*, for publishing third-party-generated ads to minors. But courts have concluded that § 230 protects websites' decisions to disseminate third-party ads. *See, e.g.*, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024); *FTC v. Match Grp., Inc.*, 2022 WL 877107, at \*10 (N.D. Tex. Mar. 24, 2022).

Moreover, § 230 preempts requirements to "monitor third-party content," including to

---

[7] None of the arguments above is affected by the Act's requirement for "commercially reasonable" age verification or parental consent. Governments cannot restrict speech simply because a publisher can afford it. *E.g.*, *Minneapolis Star*, 460 U.S. at 592 (speech restriction invalid even though larger entities are "better able to bear the burden"). And any form of age-verification or parental consent would restrict users' access to speech in violation of the principles above.

[8] Members operate websites that qualify as "interactive computer service[s]" under 47 U.S.C. § 230(f)(2). *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017).

verify whether user-created content includes advertising. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019). Section 230 protects "decisions relating to the monitoring" and "screening" of content. *Salesforce*, 123 F.4th at 793 (citation omitted). Similarly, § 230 protects websites from liability for third-party content that they (purportedly) do not moderate. *Id.*

## IV.    NetChoice meets all the remaining factors for a preliminary injunction.

NetChoice meets "arguably the most important factor" for preliminary injunctive relief: "likelihood of success on the merits." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023). NetChoice can easily meet the remaining factors as well.

The Act will cause NetChoice's members and their users irreparable harm. Defendants have already indicated their willingness to enforce the Act against NetChoice members, having sent some members a (later-withdrawn) letter stating that members are not in compliance. Cleland Decl. ¶ 19; Boyle Decl. ¶ 9. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). The Act's penalties—$2,500 per violation, plus damages—magnify the harms. *See supra* p.9. Furthermore, the Act requires websites to shoulder compliance costs "with no guarantee of eventual recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Each website must adopt age-verification and parental-consent systems and alter the way they publish ads. Cleland Decl. ¶ 18; Boyle Decl. ¶ 9; Kessel Decl. ¶ 27.

The final factors—harm to the opposing party and the public interest—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Injunctions protecting First Amendment freedoms are always in the public interest." *Babin*, 88 F.4th at 1100 (cleaned up).

## Conclusion

This Court should enjoin Defendants from enforcing §§ 1751-56 against NetChoice's members by June 17, 2025, and in all events before the Act takes effect on July 1, 2025.

Dated: March 18, 2025

Respectfully submitted,

*/s/ Louis M. Grossman*

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon G. Denmark*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
    Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

*pro hac vice forthcoming*

Claire E. Juneau (#33209)
Jeffrey J. Gelpi (#37130)
**KEAN MILLER LLP**
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone: (504) 585-3050
claire.juneau@keanmiller.com
jeffrey.gelpi@keanmiller.com
***Lead Counsel***

-and-

J. Christopher Dippel, Jr. (#30480)
**KEAN MILLER LLP**
400 Convention Street, Suite 700
Baton Rouge, LA 70802
Telephone:  (225) 389-3762
chris.dippel@keanmiller.com

*Attorneys for Plaintiff NetChoice*