**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| NETCHOICE, | |
| *Plaintiff*, | |
| v. | |
| LIZ MURRILL, in her official capacity as Attorney General of Louisiana; MIKE DUPREE, in his official capacity as Director of the Public Protection Division, Louisiana Department of Justice, | Civil Action No. 3:25-cv-231-JWD-RLB |
| *Defendants*. | |

**PLAINTIFF NETCHOICE'S OPPOSITION
<u>TO DEFENDANTS' MOTION TO COMPEL</u>**

# Table of Contents

Table of Authorities ........................................................................................................ ii

Introduction .................................................................................................................... 1

Background ...................................................................................................................... 1

Standard of Review ....................................................................................................... 12

Argument ....................................................................................................................... 12

   I.   Mr. Cleland properly testified as to information within NetChoice's organizational knowledge, custody, possession, and control. ............................................... 12

      A.  Rule 30(b)(6)—like the rest of the Federal Rules of Civil Procedure—does not require a witness to confer or consult with third parties to the litigation, such as companies that are members of NetChoice's trade association. ................................. 13

      B.  NetChoice discharged its obligations to provide a 30(b)(6) witness that testified as to information within NetChoice's knowledge, custody, possession, and control. .... 16

      C.  No redeposition is necessary specifically for Topics 7, 8, 18, and 19, as Defendants request. ........................................................................................................ 19

   II.  Defendants' questions about internal NetChoice membership criteria are irrelevant to this First Amendment challenge and protected from disclosure by the First Amendment and the Federal Rules of Civil Procedure—as NetChoice has maintained since May 19, 2025. .................................................................................... 20

   III. This Court should accordingly reject Defendants' requests for relief, including its requests for more depositions and for fees. ............................................................. 22

Conclusion .................................................................................................................... 24

## Table of Authorities

**Page(s)**

**Cases**

*Bd. of Trustees of Leland Stanford Junior Univ. v. Tyco Int'l Ltd.*,
 253 F.R.D. 524 (C.D. Cal. 2008) ............................................................15

*Brazos River Auth. v. GE Ionics, Inc.*,
 469 F.3d 416 (5th Cir. 2006) ..........................................................14, 15

*Brown v. Ent. Merchs. Ass'n*,
 564 U.S. 786 (2011)..............................................................................22

*Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*,
 201 F.R.D. 33 (D. Mass. 2001)......................................................14, 15

*Canyon Furniture Co. v. Rueda Sanchez*,
 2018 WL 6265041 (W.D. Tex. Nov. 8, 2018) ......................................23

*Clark v. Auger Servs., Inc.*,
 443 F. Supp. 3d 685 (M.D. La. 2020)...................................................20

*Dean v. Shell Pipeline Co., LP*,
 2020 WL 2813521 (M.D. La. May 29, 2020)........................................22

*Dean v. Shell Pipeline Co., LP*,
 2020 WL 5899428 (M.D. La. Oct. 5, 2020) ..........................................19

*Free Speech Coal., Inc. v. Paxton*,
 145 S. Ct. 2291 (2025)..........................................................................21

*Goodyear Tire & Rubber Co. v. CEVA Logistics Singapore, Ltd.*,
 348 F.R.D. 54 (E.D. La. 2024).........................................12, 15, 16, 19

*Hendrick v. Progressive Prop. Ins. Co.*,
 2023 WL 3680075 (M.D. La. Jan. 17, 2023).........................................12

*John Doe No. 1 v. Reed*,
 561 U.S. 186 (2010)................................................................................3

*Johnson v. Holliday*,
 2016 WL 5334671 (M.D. La. Sept. 22, 2016).......................................15

*Melancon v. Cargill Inc.*,
 2017 WL 2573950 (E.D. La. June 14, 2017).........................................12

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)..........................................................................................3

*Murray v. LeBlanc,*
    2024 WL 2741199 (M.D. La. May 28, 2024)...........................................................15

*Narcisse v. All Ways Transp., LLC,*
    2023 WL 6545423 (M.D. La. July 7, 2023) ...................................................14, 21

*NetChoice, L.L.C. v. Fitch,*
    134 F.4th 799 (5th Cir. 2025) ..............................................................................2, 3

*Peairs v. State Farm Mut. Auto. Ins. Co.,*
    2021 WL 5371553 (M.D. La. Nov. 17, 2021) ...........................................................12

*In re Taxotere (Docetaxel) Prods. Liab. Litig.,*
    26 F.4th 256 (5th Cir. 2022) ...............................................................................15

*Tucker Mgmt., LLC v. United Nat'l Ins. Co.,*
    2016 WL 923110 (M.D. La. Mar. 10, 2016) ...........................................................13

*United States v. Taylor,*
    166 F.R.D. 356 (M.D.N.C. 1996) .........................................................................15

**Statutes**

La. Rev. Stat. § 51:1751.........................................................................................18

**Other Authorities**

Fed. R. Civ. P. 30 .......................................................1, 12, 13, 14, 15, 19, 22, 23, 24

Fed. R. Civ. P. 37 ...............................................................................................23

L.R. 26 ...........................................................................................................12

**Introduction**

Defendants' chief complaint in their motion to compel is that NetChoice's 30(b)(6) corporate representative did not yield much internal, confidential, and proprietary information about companies that are not NetChoice itself, but rather members of NetChoice's advocacy trade association. Yet, Defendants have been on notice since at least May 19, 2025, that NetChoice itself does not have the extensive internal information that Defendants seek about NetChoice's member companies in its custody, possession, or control. And despite that notice, Defendants made no attempt whatsoever to seek that information from the members themselves.

In response to a 30(b)(6) deposition noticed for the second-to-last day of fact discovery, NetChoice had an obligation to put up a witness to testify as to *NetChoice's* organizational knowledge regarding the deposition topics noticed by Defendants. Fed. R. Civ. P. 30(b)(6). NetChoice did exactly that. NetChoice did not have any obligation to put up a witness to testify as to the organizational knowledge of any other entity, including its member companies. And Defendants cite *nothing* to the contrary. If Defendants thought it was necessary to secure non-public information that NetChoice's regulated members possess, they could and should have sought that information from the members themselves. But after discovery has closed, Defendants cannot turn their own lack of diligence into an untimely complaint about NetChoice's consistent and proper discovery responses.

NetChoice respectfully requests that this Court deny Defendants' motion to compel and deny Defendants their requested relief.

**Background**

Defendants' recounting of the relevant background omits almost all the relevant context. That context illustrates both Defendants' lack of diligence and that Defendants have been on notice for months about the information NetChoice has—and does not have.

1

The roots of this dispute go back to at least May 19, 2025, when NetChoice plainly explained to Defendants what kind of information is within NetChoice's institutional knowledge, custody, possession, and control. Just as importantly, NetChoice made abundantly clear what type of information it did not have in its knowledge, custody, possession, and control—particularly as it related to the detailed, internal operations of all its various member companies. Also, at Defendants' request, NetChoice provided the contact information for the outside counsel representing certain of its member companies with the understanding that Defendants might seek third-party discovery on those members. But at no point during the fact discovery period did Defendants seek discovery from NetChoice's members or raise *any* issue with NetChoice's responses to Defendants' discovery requests. Only now, after the close of fact discovery, do Defendants complain that NetChoice does not have the minute details about how its members operate. NetChoice has been telling Defendants for months that it knows what it knows and does not know what it does not know. Defendants' lack of diligence to try to obtain that information through the proper channels is grounds alone to deny Defendants' baseless motion to compel.

**A.** NetChoice is a trade association that engages in advocacy on behalf of its member companies. And it has a Litigation Center that brings lawsuits that are in line with NetChoice's mission, including lawsuits seeking to vindicate the rights of its members and those who use members' services. *E.g.*, *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 807 (5th Cir. 2025) ("[I]t is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least when the violation of those rights adversely affects the platform. NetChoice satisfies the prudential standing requirement.").

NetChoice is not a clearinghouse of information for its member companies. Nor does NetChoice exercise any control over its member companies' internal operations in any way. In

fact, NetChoice engages in litigation to preserve the confidentiality of its members' internal, confidential, and trade-secret protected information—and its members' general autonomy.

In short, NetChoice does not have access to much of the information that Defendants seek, which is uniquely within the knowledge of its members. Rather, NetChoice relies on publicly available information about its members.

**B.** NetChoice sued and moved for a preliminary injunction of Louisiana Senate Bill 162's ("Act") enforcement on March 18, 2025. ECF 1, 6. NetChoice raised: (1) a *facial* First Amendment challenge, which requires NetChoice to demonstrate that "the law's unconstitutional applications substantially outweigh its constitutional ones," *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024); (2) an *as-applied* First Amendment challenge, that the Act is unconstitutional "to the extent" it restricts speech from NetChoice's regulated members and their users, *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010); and (3) a facial vagueness challenge, *see* ECF 1 ¶¶ 67-71.[1] NetChoice seeks relief for its regulated members under the Act, and not all "41 publicly disclosed members." *Contra* Mem.2.

In support of its motion for preliminary injunction, NetChoice provided three declarations: one from NetChoice's eventual 30(b)(6) witness, Mr. Bartlett Cleland, and two from representatives of NetChoice member companies with services regulated by the Act. *See* ECF 6-3 to -5. Importantly, Mr. Cleland's declaration relied extensively on publicly available information. *See generally* ECF 6-3.

---

[1] Defendants therefore misstate both the full range of NetChoice's claims and NetChoice's burden when Defendants say that "NetChoice bears the burden to show that 'not a single set of circumstances exists under which the law would be valid.'" Mem.10-11 (quoting *Fitch*, 134 F.4th at 807). As *Fitch* says in the very next sentence to that cited by Defendants, a different standard applies "[i]n First Amendment cases": "The question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." 134 F.4th at 807 (cleaned up).

NetChoice requested that this Court rule on its preliminary injunction motion on or before the Act's July 1, 2025, effective date. ECF 6.

*Defendants*, however, proposed an alternative: Defendants suggested that the parties conduct expedited discovery and proceed quickly to summary judgment, with Defendants promising to "delay implementation" (*i.e.*, enforcement) of the Act until December 19, 2025. ECF 26 at 2. And Defendants' proposal initially allotted 83 days for fact discovery—from the April 23 exchange of initial disclosures to the July 14 original close of fact discovery.[2] NetChoice agreed to this "*expedited* fact and expert discovery." Mem.2 (emphasis added).

Since at least April 23, Defendants have been on notice that NetChoice views this case as turning on publicly available information. On that date, the parties exchanged initial disclosures and NetChoice produced nearly 300 pages of publicly available information. As Defendants acknowledge, NetChoice's initial disclosures identified Mr. Cleland and "confined the scope of [his] relevant knowledge to the . . . declaration[] already filed." Mem.3.

Defendants have *never* objected to, or even sought to discuss, NetChoice's initial disclosures—or the updates to those disclosures that NetChoice provided on July 23.

**C.** Defendants served their first, and only, set of written discovery requests on April 23.

On May 19—four days *before* NetChoice's deadline to serve responses—NetChoice served 65 pages of detailed responses and objections to interrogatories, responses and objections to requests for production, and responses and objections to requests for admission. *See* Ex. 1.[3] In

---

[2] The parties would later agree to extend the end of fact discovery to July 31. ECF 31.

[3] Although this portion of the brief refers to NetChoice's May 19 discovery responses, NetChoice's June 13 updated discovery responses contain the same objections and kinds of information—just adding publicly available information about NetChoice members identified by Defendants as regulated by the Act and new members to NetChoice's trade association. So NetChoice emphasizes the May 19 responses here because these responses put Defendants on notice of information at the heart of the parties' current dispute.

accordance with its objections, NetChoice also produced more than 5000 additional pages of documents.

Over the entire course of discovery, Defendants never raised any issue—or even asked to discuss—NetChoice's May 19 discovery responses. The same is true of NetChoice's June 13 supplemental written discovery responses. Nor did Defendants attempt to serve any interrogatories requesting information about whom to contact at member companies.

That is important, because the topics of written discovery overlap almost entirely with the topics for Mr. Cleland's 30(b)(6) deposition. And NetChoice's responses to Defendants' requests for written discovery clearly articulate the kinds of information in NetChoice's knowledge, custody, possession, or control—and thus the kinds of information that a NetChoice witness would be able to provide in a 30(b)(6) deposition. Moreover, NetChoice's objections and responses explain what information is either publicly available or uniquely in the custody, possession, or control of NetChoice's member companies or other third parties.

Accordingly, NetChoice's May 19 responses to Defendants' written discovery requests are instructive.

*First*, NetChoice responded to nine of fifteen interrogatories that the information sought about members is "publicly available." Ex. 1 at 7, 22, 28, 30, 31, 35, 37, 41, 44 (Interrogatory Nos. 4, 6-11, 14-15). Likewise, NetChoice responded to most requests for production that the documents sought are "publicly available." *Id.* at 46, 49-56 (RFP Nos. 1, 2, 8-18, 20-21, 23). And NetChoice *still* provided voluminous information and documents responsive to those requests.

These interrogatories include topics that are the same as—or encompass—the complained-about deposition topics here:

| | |
|---|---|
| **Interrogatory No. 4:** With regard to Members NetChoice claims the Secure Online Child Act regulates, please identify and describe all of the policies of those Members related to access by Minor Users, including, terms of use or service; content moderation policies; *content compiling and curating for those users*; data collection of Personal Information and retention of that data for Minor Users; and selection and display of advertisements for Minor Users, including whether and what kind of Personal Information is used. (Emphasis added.) | **Deposition Topic 18:** For each NetChoice Member, All processes and procedures of the Algorithms used to promote or display or make available additional content for Users to access. |
| **Interrogatory No. 10:** With regard to Members NetChoice claims the Secure Online Child Act regulates, please identify and describe all content moderation policies, algorithm changes, content restrictions, or Service restrictions or modifications applicable to Minor Users (collectively 'Minor User Changes') and the reasons for the identified Minor User Changes. | **Deposition Topic 19:** For each NetChoice Member, Any Algorithm used, for Minor Users, to provide, display, select, or make content available, including whether Any Algorithm differs for adult Users and if so, how. |

*Compare* Ex. 1 at 6, 34 (Interrogatory Nos. 4, 10), *with* ECF 35-5 at 9 (Deposition Topics 18, 19).

*Second*, NetChoice also responded to one interrogatory that the requested information about NetChoice's members is not in NetChoice's custody, possession, or control. Ex. 1 at 22 (Interrogatory No. 5). It likewise declined to produce documents about members that are not in NetChoice's custody, possession, or control. Ex. 1 at 47-48, 52, 54 (RFP Nos. 3-7, 16, 19).

That interrogatory include topics that are the same as—or encompass—the complained-about deposition topics here:

**Interrogatory No. 5:** For each Member you claim to be regulated by the Secure Online Child Act in response to Interrogatory No. 3, please identify the number of known Minor Users (determined as of December 31 of each year requested), number of Minor Users for which the Member has express parental consent, and the amount of revenue derived from Minor Users from 2019-2025. Please limit this answer to Minor Users in the United States and also provide the number of known Minor Users and amount of revenue derived therefrom for Minor Users in Louisiana.

**Deposition Topic 7:** For each Regulated Member, including, but not limited to, Meta, Nextdoor, Pinterest, Reddit, Snap Inc., X, and YouTube, the number of known Minor Users per year within the United States; the number of Minor Users for which the Regulated Member has obtained express parental consent within the United States; and the amount of revenue derived from Minor Users from 2019-2025 within the United States.

**Deposition Topic 8:** For each Regulated Member, including, but not limited to, Meta, Nextdoor, Pinterest, Reddit, Snap Inc., X, and YouTube, the number of known Minor Users per year within Louisiana; the number of Minor Users for which the Regulated Member has obtained express parental consent within Louisiana; and the amount of revenue derived from Minor Users from 2019-2025 within Louisiana.

*Compare* Ex. 1 at 22 (Interrogatory No. 5), *with* ECF 35-5 at 8 (Topics 7, 8).

Finally, NetChoice objected to multiple interrogatories and requests for production based on First Amendment, attorney-client, and/or joint-and-common-interest privilege. *See* Ex. 1 at 4 (Interrogatory No. 2); *id.* at 55-57 (RFP Nos. 22, 24-26).

In particular, NetChoice asserted multiple objections to and thus declined to respond to the following interrogatory overlapping with the complained-of deposition topics here:

**Interrogatory No. 2:** Identify all tiers or levels of membership in NetChoice describing such tiers or levels in terms of cost of membership; rights, duties, and responsibilities; voting power; and all Members in each tier or level. Please also provide the time period that each NetChoice Member has been associated with NetChoice in total and in any particular tier or level of membership.

**Deposition Topic 3:** NetChoice's Members, including, but not limited to:
a) The types or tiers of Membership in NetChoice, if any;
c) The process by which Persons become Members of NetChoice;
e) The application process to become a Member of NetChoice;

7

f) The time period that each NetChoice Member has been associated with NetChoice in total and in any particular tier or level of membership;

g) The role or involvement that Any Member played in the filing of the Lawsuit; and

h) The number of Account Holders for each Member.

i) The benefits or advantages that Membership in NetChoice conveys upon its Members.

*Compare* Ex. 1 at 4 (Interrogatory No. 2), *with* ECF 35-5 at 7 (Topics 3a, c, e-i).

On June 13, NetChoice served similar, updated interrogatory responses accounting for new members of NetChoice's trade association and members identified as potentially regulated by Defendants' discovery responses. NetChoice also produced approximately 700 more pages of publicly available documents. Importantly, none of those additional members addressed in NetChoice's June 13 responses were at issue in the 30(b)(6) deposition. Thus, to the extent that Defendants attempt to argue that NetChoice's June 13 production necessitated a later deposition date, Defendants' noticed topics for the 30(b)(6) deposition did not include any of the additional NetChoice members identified in the June 13 production.

In addition, as one part of its objections, NetChoice clarified the relationship between NetChoice and its members in response to Defendants attempting to define NetChoice's members as "Plaintiff[s]" in this action: "Plaintiff objects to the Definition of 'Plaintiff' to the extent it includes 'NetChoice's association Members.' NetChoice's members are not parties to this lawsuit. And not all members are even potentially regulated by this law. Accordingly, these responses will construe 'Plaintiff' to mean the only party before the Court, NetChoice itself." Ex. 1 at 1.

**D.** *Defendants'* written discovery responses also indicate that Defendants are in possession of some information about NetChoice's regulated members, including contact information and facts sufficient to support Defendants' view that such members could be in violation of the Act's

unconstitutional requirements. So Defendants cannot complain that they entirely lack any information whatsoever about NetChoice members. *Contra* Mem.3 (complaining that "[n]o other witnesses or discovery leads were disclosed" by NetChoice).

Specifically, in response to NetChoice's discovery requests, Defendants disclosed that they had served "notices of violations" under the Act to twelve companies, including nine companies and/or services that belong to NetChoice's trade association.

**E.** Defendants waited until 57 of the originally allotted 83 days of discovery had elapsed (on June 8) to serve a *draft* 30(b)(6) deposition notice for Mr. Bartlett Cleland. This draft notice overlapped entirely in substance with Defendants' written discovery requests. In addition, it added enormously broad "areas of inquiry" such as: "Regulated Members, including, but not limited to, Meta, Nextdoor, Pinterest, Reddit, Snap Inc., X, and YouTube." ECF 35-5 at 7 (Topic 4). These are hardly "particularized topics." *Contra* Mem.3. In other words, Defendants expected Mr. Cleland to serve as, essentially, a 30(b)(6) witness for at least seven member companies.

Given that, NetChoice requested to meet and confer regarding the deposition topics *four* separate times, on June 11, 17, 19, and 20. Ex. 2 at 1, 4. NetChoice also explained that Mr. Cleland would be available for a deposition on July 7 or 8. Ex. 2 at 1.

Defendants did not respond to those requests to meet and confer and did not notice Mr. Cleland's deposition for July 7 or 8. Defendants only responded to NetChoice's repeated meet-and-confer requests when Defendants wanted to extend the close of fact discovery from July 14 to July 31. Ex. 2 at 4. NetChoice agreed to extend the fact discovery deadline, although it had no need for the additional two-and-a-half weeks of discovery. *See* ECF 31.

The parties then met and conferred *twice* (on June 23 and 27) about the proposed deposition topics for Mr. Cleland, where NetChoice explained its objections to the topics to the extent they

sought privileged information or information that is not in NetChoice's knowledge, custody, possession, or control. NetChoice explained that its 30(b)(6) witness would be able to testify only as to the information in NetChoice's knowledge, custody, possession, or control about its members, which consists mainly of publicly available information, as reflected in NetChoice's written discovery responses. After the parties' June 27 meet and confer, NetChoice informed Defendants that Mr. Cleland could be available for a deposition between July 24 and 31.

Nevertheless, Defendants made no substantive changes to the noticed topics when they served their formal notice of Mr. Cleland's virtual 30(b)(6) deposition on July 15. And *Defendants* chose to schedule the deposition "for the penultimate day of fact discovery." Mem.11. So NetChoice served its formal objection to that notice, explaining, as relevant, that Mr. Cleland would "respond with non-privileged information that NetChoice has in its knowledge, custody, possession, or control." ECF 35-6 at 2.

**F.** Mr. Cleland's 30(b)(6) deposition was fully in line with NetChoice's discovery responses over the course of months, contrary to Defendants' cherry-picked and contextless portrayal. Mr. Cleland repeatedly emphasized what information NetChoice had, what information was publicly available, what information was perhaps uniquely within the knowledge of member companies or third parties, and what information NetChoice had already provided in discovery. Far from being "remarkable," *contra* Mem.7, these answers were entirely consistent with NetChoice's discovery responses in the case.

To begin, Mr. Cleland clarified that he reviewed all the discovery responses in the case, *see* ECF 35-7 at 15:7-20, 369:7-370:7—contrary to Defendants' erroneous statements. *Contra* Mem.1, 6, 10. Indeed, he repeatedly referred to his interrogatory responses throughout the deposition. *E.g.*, ECF 35-7 at 75:3-8, 206:19-23, 216:9-15, 239:15-19. And he explained that he spent "a

week, 40 hours, something, 30 to 40 hours" in specific preparation for the deposition. ECF 35-7 at 19:5-7. Plus, he agreed that there were not "any items that [he] sought to review but which were not made available to [him] for review." ECF 35-7 at 20:7-10.

Mr. Cleland explained that NetChoice's knowledge of various topics comes from publicly available information that members provide themselves—often on members' websites. ECF 35-7 at 180:3-9; *e.g.*, ECF 35-7 at 28:13-17, 180:15-18, 181:15-18, 206:19-23, 216:9-15, 221:16-20, 225:9-13, 237:25-238:1, 250:1-4, 257:6-8, 268:15-17, 370:8-372:12. He reviewed that publicly available information before the deposition too. *See* ECF 35-7 at 181:7-12, 203:10-13.

Thus, to the extent Mr. Cleland responded "I don't know" to questions, he often followed by explaining that such information is either publicly available or uniquely within the possession of member companies. *E.g.*, ECF 35-7 at 124:8-16; 126:12-14; 181:15-18; 185:13-17; 190:12-16; 197:14-17; 204:8-205:6; 206:19-23; 216:9-15; 228:22-229:2; 250:1-4; 277:2-3; 290:13-14; 294:9-10; 325:1.

**G.** After Mr. Cleland's deposition, the parties met and conferred again. One final point here requires clarification. NetChoice's counsel did not "confirm[] that it had withheld any depo-nent for [Deposition] Topics 7, 8, 18, and 19." Mem.7-8. Those are topics for which NetChoice explained in its objections that "the information sought" in those topics were "not within NetChoice's knowledge, custody, possession, or control." ECF 35-6 at 4, 6.

Nevertheless, Mr. Cleland did provide answers to those questions—reflecting NetChoice's lack of organizational knowledge of information uniquely in the possession of its members. *See* ECF 35-7 at 29:7-30:8 (Topics 7 and 8); *id.* at 178:22-180:2 (Topic 19); *id.* at 229:9-232:7 (Topic 18). For instance, as Mr. Cleland explained about member's "algorithms," NetChoice's members

"protect their IP, and I never encourage them to breach those protections." ECF 35-7 at 179:12-14.

## Standard of Review

Defendants' "lack of diligence in pursuing discovery is an independent reason to deny [their] motion[]." *Melancon v. Cargill Inc.*, 2017 WL 2573950, at *3 (E.D. La. June 14, 2017); *see Hendrick v. Progressive Prop. Ins. Co.*, 2023 WL 3680075, at *4 (M.D. La. Jan. 17, 2023) ("Plaintiff was not diligent").

Because fact discovery has closed, Defendants can only raise issues that "pertain to conduct occurring during the final seven days of discovery." *See* L.R. 26(d)(1). Thus, Defendants cannot use their post-close-of-discovery motion to raise issues that arose *before* the last seven days of fact discovery. *Id.* Relevant here, Defendants' motion should not be used as an end-run to complain about NetChoice's written discovery responses.

And specific to the 30(b)(6) deposition itself, "a Rule 30(b)(6) deposition notice is [also] subject to the limitations under Federal Rule 26—deposition topics should be proportional to the needs of the case, not unduly burdensome or duplicative, and described with reasonable particularity." *Goodyear Tire & Rubber Co. v. CEVA Logistics Singapore, Ltd.*, 348 F.R.D. 54, 72 (E.D. La. 2024) (citation omitted); *see Peairs v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 5371553, at *2 (M.D. La. Nov. 17, 2021) (courts can deny a "motion to compel Rule 30(b)(6) deposition where the notice [is] insufficiently particularized").

## Argument

## I.    Mr. Cleland properly testified as to information within NetChoice's organizational knowledge, custody, possession, and control.

Mr. Cleland discharged his duty as a 30(b)(6) witness to testify about information within *NetChoice's* knowledge, custody, possession, and control. Defendants' arguments to the contrary

misstate both a 30(b)(6) witness's obligations and what the record shows here. If Defendants believed they needed information uniquely in the custody, possession, or control of companies that are members of NetChoice's trade association, Defendants should have sought that information from the member companies themselves—not from a 30(b)(6) deposition of NetChoice scheduled on the second-to-last day of fact discovery. And Defendants have been on notice of that fact since at least May 19—repeated June 11, 13, 17, 19, 20, 23, 27, and July 23. Defendants' failure to even attempt to secure information in third-party discovery is reason alone to deny Defendants' motion.

### A. Rule 30(b)(6)—like the rest of the Federal Rules of Civil Procedure—does not require a witness to confer or consult with third parties to the litigation, such as companies that are members of NetChoice's trade association.

Mr. Cleland adequately testified as to matters within NetChoice's knowledge and control. Rule 30(b)(6) did not require Mr. Cleland to speak with—or otherwise secure internal information from—member companies of NetChoice's trade association. *Contra* Mem.1, 6-7, 10. Thus, the real crux of the dispute between the parties is *not* that Mr. Cleland failed to properly prepare for the deposition. Rather, it is that the information that Defendants sought from Mr. Cleland is not within NetChoice's custody, possession, or control—and thus beyond the scope of a 30(b)(6) deposition of NetChoice. Defendants have been on notice of the scope of NetChoice's knowledge since at least May 19. *E.g.*, *Tucker Mgmt., LLC v. United Nat'l Ins. Co.*, 2016 WL 923110, at *3 (M.D. La. Mar. 10, 2016) (denying motion to compel where moving party was "not diligent in taking timely action").

In general, a 30(b)(6) witness is a witness identified to "testify on . . . behalf" of "*a* public or private corporation, *a* partnership, *an* association, *a* governmental agency, or other entity." Fed. R. Civ. P. 30(b)(6) (emphases added). In other words, a 30(b)(6) witness's role is to testify about the organization he is designated to represent—not any number of other entities that litigants like Defendants would rather not seek the information from.

So NetChoice had no obligation to seek out on Defendants' behalf, for instance, "*internal analyses*, *data sources*, and *academic studies relied upon* to create those policies and drive" "content-moderation, parental-consent, and related minor-protection policies and accompanying enforcement by NetChoice members." Mem.4 (emphases added) (describing Topics 7-10, 12-13, 16-19). And it certainly was not Mr. Cleland's obligation to serve as, essentially, a 30(b)(6) witness on behalf of "Regulated Members, including, but not limited to, Meta, Nextdoor, Pinterest, Reddit, Snap Inc., X, and YouTube." ECF 35-5 at 7 (Topic 4); *see also id.* (Topic 5). These kinds of broad topics demonstrate that Defendants failed to identify topics (1) within NetChoice's knowledge; and (2) "with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). And "to the extent that the information sought is (or could be) limited" properly, "that discovery is properly directed at the individual [members] themselves." *Narcisse v. All Ways Transp., LLC*, 2023 WL 6545423, at \*7 (M.D. La. July 7, 2023).

Tellingly, *none* of Defendants' cited cases address the requirement of a trade association's 30(b)(6) witness to confer with—or essentially also become an additional 30(b)(6) witness for—member companies. Rather, Defendants' cited cases likewise emphasize that a 30(b)(6) witness is responsible for information that is within the "knowledge of *the organization*," and not multiple third-party companies. *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (emphasis added).

Nor does a 30(b)(6) witness's obligation to prepare with information "reasonably available" to the organization require that 30(b)(6) witness to secure information from third parties, absent circumstances not present here. As one of Defendants' cited cases explains, "the documents that are reasonably available are those documents that are *in a party's control*." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 39 (D. Mass. 2001) (emphasis

added); *id.* ("It is well-established that 'control', which is defined not as possession, but as the legal right to obtain documents on demand, is the test as to whether production is required." (citation omitted)).

Documents and information that are uniquely within the knowledge, custody, possession, and control of regulated companies are not in *NetChoice's* "control." *Id.* So those documents and information are not known to, or "reasonably available to," *NetChoice* within the meaning of Rule 30(b)(6). Thus, there is no risk here that "several officers and managing agents might be deposed in turn, with each disclaiming personal knowledge of facts that are clearly known to persons within the organization and thus to the organization itself." *Brazos*, 469 F.3d at 432-33.

The only circumstances under which Defendants' cited authorities contemplate 30(b)(6) witnesses inquiring outside of their organization is "former employees" or "subsidiaries and affiliates . . . within [the 30(b)(6) witness company's] control." *Goodyear*, 348 F.R.D. at 74-75; *see Murray v. LeBlanc*, 2024 WL 2741199, at *4 (M.D. La. May 28, 2024); *Johnson v. Holliday*, 2016 WL 5334671, at *9 (M.D. La. Sept. 22, 2016). Those situations are plainly inapposite here, where NetChoice lacks—and has *never possessed*—any control over its member companies.[4]

For instance, *Goodyear* concluded that even in the context of a parent-subsidiary relationship—which is a far cry from the relationship between a trade association and its member companies—a 30(b)(6) witness for the parent will not always be obligated to secure information from its subsidiaries. Courts must consider "common relationships, shared ownership or management, routine exchange of documents between the corporations in the ordinary course of business, [and]

---

[4] Other cases Defendants cite just state the general requirements for 30(b)(6) witnesses and provide no further principles relevant to Defendants' arguments here. *E.g.*, *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 266 (5th Cir. 2022); *Bd. of Trustees of Leland Stanford Junior Univ. v. Tyco Int'l Ltd.*, 253 F.R.D. 524, 526 (C.D. Cal. 2008); *United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C. 1996).

benefit or involvement of the nonparty in the transaction." *Goodyear*, 348 F.R.D. at 78. Even assuming that parent-subsidiary analysis for the scope of 30(b)(6) depositions applied here—and it does not—Defendants cannot satisfy it. None of the *Goodyear* factors apply to the relationship between NetChoice and its members.

In sum, NetChoice's 30(b)(6) witness was not required to secure non-public—and often sensitive—information from NetChoice-member companies.

**B.      NetChoice discharged its obligations to provide a 30(b)(6) witness that testified as to information within NetChoice's knowledge, custody, possession, and control.**

With the duties of a 30(b)(6) witness properly understood, Defendants' main arguments necessarily fail. And Defendants' recounting of the facts likewise misrepresents the record.

**1.** Defendants are wrong to claim that the record reflects a "lack of preparation." Mem.10; *see* Mem.6.

As an initial matter, Defendants' repeated complaints that Mr. Cleland "spoke to no members" fails for all the reasons explained above. *Contra* Mem.10; *see* Mem.1, 6-7, 10. And when asked about information that NetChoice itself does not possess, "I don't know" and "I didn't ask" are perfectly reasonable answers for a 30(b)(6) deponent. *Contra* Mem.7. So "re-preparation and re-deposition" cannot overcome the fundamental limitations on the scope of 30(b)(6) depositions to information within NetChoice's knowledge and control. *Contra* Mem.13.

Next, Mr. Cleland *did* review the discovery materials in this case, contrary to Defendants' repeated contrary claims. Mem.1, 6, 10-11. As recounted above at pp.10-11, Mr. Cleland both reviewed discovery to prepare for the deposition *and* repeatedly referred to his discovery responses

in responding to Defendants' questions. Defendants' contrary arguments rely on Mr. Cleland's

answer to a single question. Mem.6 (citing ECF 35-7 at 15:21-23). But Mr. Cleland later clarified:

> [Q.] In preparation for this deposition, I believe that you testified you did, in fact, review NetChoice's discovery responses?
> A.   Yes.
> Q.   Did you also review those discovery responses before NetChoice served them on the State in this litigation?
> A.   Yes.
> Q.   And those -- those responses include a couple of different types of discovery requests. So did you review the responses to the production requests and the material that we produced in response?
> A.   Be – I'm sorry, time frame? When are you talking about?
> Q.   In preparation for the deposition today.
> A.   Oh, yes. In preparation for the deposition, yes.

ECF 35-7 at 369:7-24.

In addition, Defendants misstate the import of NetChoice's privilege log. *Contra* Mem.11-

13. Because Defendants' overbroad and vague requests for production from NetChoice and its

*Litigation Center* could implicate core privileged communications, NetChoice both objected on

those bases *and* provided a privilege log explaining the kinds of documents that Defendants' re-

quests could include. *See* Ex. 1 at 54-57. (Again, Defendants never objected to *any* of NetChoice's

responses or objections.) That privilege log does *not* mean that any such communications include

the kinds of facts that Defendants sought in the 30(b)(6) deposition.

**2.** Defendants' points of contention about specific testimony also fail. Notably, the specific

and particularized complaints that Defendants raise are narrow and often not tied to particular

specified topics.

For instance, Defendants complain that Mr. Cleland could not "recall when any particular

member joined NetChoice beyond his 10 months of personal knowledge." Mem.6. It is not clear

why this information is relevant to the First Amendment claims in this lawsuit. It is also unclear

why not knowing the precise dates that companies joined NetChoice's trade association prejudices

Defendants. In any event, the better way to have secured precise dates of membership is through written discovery—not a 30(b)(6) deposition.

Similarly, Defendants argue, "when asked about NetChoice and this litigation pointedly— who at NetChoice decided the Act affected seven members, *see* Compl. ¶ 15—Cleland claimed that 'it's a group effort,' careful not to name names." Mem.6. Here too, it is unclear what Defendants' specific concern is or what information Defendants claim they have been deprived of. Mr. Cleland explained, "I mean, certainly I did and certainly others did checking -- we all check each other's work, right, to make sure that we understand that we believe to be covered as best we can given the definitions and what we know of -- we talked about before, information in the public space." ECF 35-7 at 171:5-11. And when asked who the "others" were, Mr. Cleland responded "So internal -- my internal counsel [later identified as 'Mr. Taske']. Really my internal counsel, and then after that, I honestly don't know." ECF 35-7 at 171:14-16. And Mr. Cleland's declaration explains how Mr. Cleland made that determination: He applied the statutory definition of "[s]ocial media platform" (La. Rev. Stat. § 51:1751(12)(a)) to NetChoice's members' publicly accessible services, and relied on third-party statistics about numbers of account holders on NetChoice members' websites. *See* ECF 6-3 ¶¶ 11-13.

Then, Defendants claim that it was "evasion" for Mr. Cleland to say that "NetChoice had no knowledge of David Boyle and Jeremy Kessel—whose declarations *NetChoice* filed in this litigation." Mem.6-7. But Mr. Cleland did not have "no knowledge" of these declarants. Instead, the questions reflect that NetChoice does not have information about why companies chose Boyle and Kessell to serve as declarants. The mere fact that these employees of companies belonging to NetChoice's trade association served as declarants for those companies does not mean they necessarily are NetChoice's "points of contact" at those member companies. *Contra* Mem.7. And if

Defendants wanted to know if anyone at NetChoice helped draft the declarations, they should have noticed that particular topic—for which NetChoice may have had additional objections.

Finally, Defendants also complain about Mr. Cleland's purported inability to respond to questions about "particular subject areas" that *Defendants* failed to "designate, with painstaking specificity." *Goodyear*, 348 F.R.D. at 72 (citation omitted). For instance, Defendants complain that Mr. Cleland "could not provide the full name of anyone at any member company who interfaces with NetChoice." Mem.6. But those points of contact were not noticed topics. *Cf.* ECF 35-5 at 6-9. Indeed, the deposition was replete with questions that were not noticed at all, let alone "with painstaking specificity." *Goodyear*, 348 F.R.D. at 72 (citation omitted).[5] Those questions include: (1) how much time minors spend on particular services, *e.g.*, ECF 35-7 at 246:25-247:1; and (2) "effectiveness" (whatever Defendants think that means) of individual members' specific content moderation, ECF 35-7 at 182:2-4. Defendants did not seek this information through written discovery. Nor does this information seem to be particularly important to Defendants, because they waited until the second-to-last day of discovery to inquire about it.

### C.    No redeposition is necessary specifically for Topics 7, 8, 18, and 19, as Defendants request.

As explained above at p.11, NetChoice did *not* "refuse[]" to "produce . . . a designee to testify about Topics 7, 8, 18, and 19" or "unilaterally refuse a topic for deposition." *Contra* Mem.13. So Defendants' specific arguments about Topics 7, 8, 18, and 19 fare no better than Defendants' other arguments. *Contra* Mem.13-14. Rather, NetChoice explained that Topics 7, 8, 18, and 19 *in particular* contemplate "information" that is "not within NetChoice's knowledge,

---

[5] "Rule 30(b)(6) limits the subject matter the deponent is required to prepare for" even if it "does not restrict the examining attorney's inquiry." *Dean v. Shell Pipeline Co., LP*, 2020 WL 5899428, at *4 (M.D. La. Oct. 5, 2020) (citation omitted). Thus NetChoice does not object to the mere fact that Defendants asked these questions. But NetChoice was not obligated to prepare to respond to them.

custody, possession, or control." ECF 35-6 at 4, 6. Precise subsets of user counts and revenue is not information that NetChoice has. *See* ECF 35-5 at 8 (Topics 7 and 8). Likewise, NetChoice members' algorithms are highly protected trade secrets, so they are not in NetChoice's knowledge. *See* ECF 35-5 at 9 (Topics 18 and 19).

Nevertheless, NetChoice's interrogatory responses explained how those algorithms *generally* work, based on publicly available information. *See* Ex. 1 at 7-22, 34-37 (responses to Interrogatory Nos. 4, 10). Mr. Cleland also testified as to how algorithms work *generally* and directed Defendants back to NetChoice's interrogatory responses. *E.g.*, ECF 35-7 at 175:5-178:3. But he agreed that NetChoice does not "receive information from any of its members pertaining to their use of algorithms." ECF 35-7 at 176:10-15.

NetChoice's limited institutional knowledge about these topics is not a reason for NetChoice to produce another witness. And to the extent Defendants' request for these topics relies on the idea that NetChoice must seek this information from its third-party members, that argument is incorrect for all the reasons explained above.

## II. Defendants' questions about internal NetChoice membership criteria are irrelevant to this First Amendment challenge and protected from disclosure by the First Amendment and the Federal Rules of Civil Procedure—as NetChoice has maintained since May 19, 2025.

This Court should deny Defendants' request to "[o]verrule NetChoice's categorical First Amendment/trade-secret instructions not to answer and, if needed, enter a limited protective order under Rule 26(c)." Mem.15.

As an initial matter, Defendants have waived this request for relief by failing to substantiate it with any argument. "[F]ailure to brief an argument in the district court waives that argument in that court." *Clark v. Auger Servs., Inc.*, 443 F. Supp. 3d 685, 714 (M.D. La. 2020) (citation omitted). Defendants provide *zero* argument or legal authority in support of this request. In fact,

Defendants provide little context and explanation at all for this request. Perhaps this request refers to what Defendants characterize as when "NetChoice's counsel delivered serial speaking objections and instructed Cleland not to answer *eight* times" regarding questions about NetChoice's membership criteria. Mem.5. Assuming that is true, Defendants' argument is baseless.

Defendants' deposition questions sought to pry into topics piercing First Amendment, attorney-client, and joint-and-common-interest privilege. And Defendants did so despite NetChoice's objections to those very topics in NetChoice's May 19 discovery responses. Defendants did not raise any issues or concerns with those discovery responses, or even attempt to discuss them with NetChoice. Instead, Defendants have obliquely complained about them in a motion to compel after conducting a deposition on the second-to-last day of discovery.

Moreover, these topics "have limited relevance, if any, with respect to the claims and defenses in this action," "seek[ing] testimony and documents that pertain generally to [NetChoice's] litigation services, business structure, [and] business relationships . . . with no limitation in scope or relationship to . . . this litigation." *Narcisse*, 2023 WL 6545423, at *7. So Defendants have not shown how they have suffered any prejudice from lacking irrelevant information about whether: (1) NetChoice has "different tiers of membership"; (2) NetChoice's "funding [is] generated solely by member fees"; (3) NetChoice's "members pay more than $50,000 annually"; and (4) "any NetChoice members disagree with the position NetChoice is taking in this litigation." Mem.5-6 (quoting deposition transcript). None of these questions has any relevance to whether age-verification requirements "necessarily" "burden" both adults' and minors' "right to access" fully protected speech. *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2316 (2025). The Supreme Court has said they do. *Id.* They also are not relevant to determining whether minors have

a "constitutional right to speak or be spoken to without their parents' consent." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). The Supreme Court has said they do. *Id.*

Finally, Defendants' *suggestion* that NetChoice should have sought relief from this Court before the 30(b)(6) deposition is contrary to governing law. *Contra* Mem.5. In accordance with Rule 30(c)(2), NetChoice's counsel "instruct[ed the] deponent not to answer . . . to preserve a privilege." Fed. R. Civ. P. 30(c)(2). In a previous case, this Court concluded that a motion to quash is not the proper method to address such objections to deposition topics. Rather, "[t]o the extent [a party] objects to the deposition on the basis that the topics seek attorney-client privileged or confidential information, its counsel may make appropriate objections pursuant to Rule 30(c)(2)." *Dean v. Shell Pipeline Co., LP*, 2020 WL 2813521, at *9 (M.D. La. May 29, 2020).

### III. This Court should accordingly reject Defendants' requests for relief, including its requests for more depositions and for fees.

For all the reasons explained above, this Court should deny Defendants' various requests for relief.

*First*, Defendants are not entitled to "a re-deposition of NetChoice under Rule 30(b)(6)." *Contra* Mem.14. As explained above, NetChoice's 30(b)(6) deposition adequately addressed the information that is within NetChoice's knowledge and control. Defendants' arguments to the contrary rest on the mistaken and unsupported idea that NetChoice was required to inquire with its member companies about information specific to those companies, and outside of NetChoice's knowledge and control. NetChoice is not required to do Defendants' work for them—whether in the July 30 30(b)(6) deposition or any of the additional deposition(s) that Defendants are requesting.

*Second*, as a result, Defendants are not entitled to "court-reporter or videographer costs and the reasonable attorneys' fees associated with (i) the July 30 deposition, (ii) this motion, and

(iii) the re-deposition." *Contra* Mem.14. This request is, of course, tethered to this "Court concluding[ing] that NetChoice violated its discovery duties," which NetChoice has not. Mem.14. Regardless, this Court should "not award costs associated with the depositions that have already been taken, as the corporate representative[] answered many of the questions [he was] asked and provided [Defendants] with certain of the information [they] sought. Thus, [Defendants] received some 'value' from the time spent preparing and taking the deposition." *Canyon Furniture Co. v. Rueda Sanchez*, 2018 WL 6265041, at *16 n.27 (W.D. Tex. Nov. 8, 2018) (quoting *Netsales, Inc. v. FesteCapital Mgmt., LLC*, 2007 WL 9710173, at *4 (W.D. Tex. July 5, 2007)). In all events, the Federal Rules of Civil Procedure preclude the awarding of costs here because NetChoice's "non-disclosure, response, or objection was substantially justified" and "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(ii)-(iii).

*Third*, it is not clear what Defendants mean by asking this Court to "preclude NetChoice from supplying evidence on a motion, at a hearing, or at a trial of member-specific cost, usage, revenue, or algorithm evidence not disclosed through a prepared Rule 30(b)(6) witness by the court-ordered deadline." Mem.15.

NetChoice does not have relevant and non-privileged member-specific information that it has not produced to Defendants. Indeed, that is the crux of this entire dispute: NetChoice has, and intends to rely on, publicly available information about its covered members. It has no intent to rely on any information that Defendants currently lack. At summary judgment, NetChoice will rely on the publicly available information about its members that it has produced to Defendants. Fact discovery is completed and NetChoice has no intent to add to the discovery record generated thus far. (Rather, Defendants are the ones attempting to reopen fact discovery.)

Thus, to the extent that Defendants request that NetChoice rely on the factual record developed thus far, NetChoice has no problem abiding by the Court's case management order and the time limitations it imposed on fact discovery.

But to the extent that Defendants are requesting this Court preclude NetChoice from relying on the information it has produced thus far, that is an improper request for which Defendants have provided no authority. *Cf.* Mem. 15 ("Preclude NetChoice, under Rules 37(b)(2)(A)(ii) and 37(c)(1), from supplying evidence on a motion, at a hearing, or at a trial evidence not disclosed through a prepared Rule 30(b)(6) witness by the deadline or contradicting its Rule 30(b)(6) testimony on the noticed topics."). If Defendants have any problems with the publicly available information that NetChoice has produced thus far, they should raise specific objections to that material in proper motions in limine—not in unsupported requests for relief in this dispute about NetChoice's 30(b)(6) deposition.

## Conclusion

This Court should deny Defendants' motion. Defendants have known for months what information NetChoice possesses. Yet they chose to confirm that understanding in a 30(b)(6) declaration scheduled for the second-to-last day of discovery. Defendants may not have liked the answers they received in that deposition. But that is no reason to compel a second 30(b)(6) deposition.

Dated: August 20, 2025

Respectfully submitted,

*/s/ Claire E. Juneau*
Claire E. Juneau (#33209)
Jeffrey J. Gelpi (#37130)
KEAN MILLER LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone: (504) 585-3050
claire.juneau@keanmiller.com
Jeffrey.gelpi@kenmiller.com

**Lead Counsel**

*/s/ Jeremy Evan Maltz*
Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon G. Denmark*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

J. Christopher Dippel, Jr. (#30480)
KEAN MILLER LLP
400 Convention Street, Suite 700
Baton Rouge, LA 70802
chris.dippel@keanmiller.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

*admitted pro hac vice

*Attorneys for Plaintiff NetChoice*