**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| NETCHOICE,<br><br>*Plaintiff*,<br><br>v.<br><br>LIZ MURRILL, in her official capacity as<br>Attorney General of Louisiana;<br>MIKE DUPREE, in his official capacity as<br>Director of the Public Protection Division,<br>Louisiana Department of Justice,<br><br>*Defendants*. | Civil Action No. 3:25-cv-231-JWD-RLB |

**PLAINTIFF NETCHOICE'S MEMORANDUM IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**Table of Authorities**

Page(s)

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ................................................................................................. 18

*A.B. v. Salesforce, Inc.,*
    123 F.4th 788 (5th Cir. 2024) .................................................................................. 31

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008) ..................................................................................... 16

*Airbnb, Inc. v. City of Boston,*
    386 F. Supp. 3d 113 (D. Mass. 2019) ...................................................................... 32

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003) ....................................................................................... 16

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ........................................................................... 12, 21, 24, 27, 29

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ................................... 2, 11, 12, 13, 14, 19, 20, 21, 24, 25

*Calise v. Meta Platforms, Inc.,*
    103 F.4th 732 (9th Cir. 2024) .................................................................................. 33

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980) .................................................................................................. 19

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ...................................................................................... 10, 14, 30

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    596 U.S. 61 (2022) .................................................................................................... 22

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
    747 F. Supp.3d 1011 (W.D. Tex. 2024) ................................................... 1, 9, 22, 25, 29

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier,*
    2025 WL 1570007 (N.D. Fla. June 3, 2025) ............................................ 1, 2, 9, 11, 13

*Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n,*
    760 F.3d 427 (5th Cir. 2014) ..................................................................................... 9

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)..................................................................................................9

*Edenfield v. Fane*,
   507 U.S. 761 (1993)................................................................................................20

*FEC v. Cruz*,
   596 U.S. 289 (2022)........................................................................................10, 29

*Free Speech Coal., Inc. v. Paxton*,
   145 S. Ct. 2291 (2025)..............................................2, 12, 14, 15, 16, 20, 25

*FTC v. Match Grp., Inc.*,
   2022 WL 877107 (N.D. Tex. Mar. 24, 2022).....................................................33

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) ..............................................................................32

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995)........................................................................................17, 18

*John Doe No. 1 v. Reed*,
   561 U.S. 186 (2010)...............................................................................................29

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952).................................................................................................4

*La'Tiejira v. Facebook, Inc.*,
   272 F. Supp. 3d 981 (S.D. Tex. 2017) ...............................................................32

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) .............................................................................33

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995)...............................................................................................16

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974).........................................................................................2, 18

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
   460 U.S. 575 (1983)........................................................................................23, 26

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)...............................................2, 4, 6, 7, 17, 27, 28, 29, 30

*Nat'l Press Photographers Ass'n v. McCraw*,
   90 F.4th 770 (5th Cir. 2024) ...............................................................................30

*NetChoice v. Carr*,
   2025 WL 1768621 (N.D. Ga. June 26, 2025) ...............1, 2, 3, 9, 10, 11, 13, 15, 16, 26, 31, 32

*NetChoice, L.L.C. v. Fitch*,
   134 F.4th 799 (5th Cir. 2025) ..............................................................................................9, 28

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) ...........................................................................................13, 24

*NetChoice, LLC v. Bonta*,
   2025 WL 2600007 (9th Cir. Sept. 9, 2025) ...............................................................................21

*NetChoice, LLC v. Bonta*,
   770 F. Supp. 3d 1164 (N.D. Cal. 2025) ..........................................................................1, 2, 23

*NetChoice, LLC v. Griffin*,
   2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ............1, 2, 5, 11, 13, 15, 26, 27, 28, 29, 30, 31

*NetChoice, LLC v. Reyes*,
   748 F. Supp. 3d 1105 (D. Utah 2024).............................................1, 2, 9, 11, 15, 22, 23, 24, 25

*NetChoice, LLC v. Yost*,
   778 F. Supp. 3d 923 (S.D. Ohio 2025) .....................................................1, 2, 9, 10, 11, 13, 22

*Netflix, Inc. v. Babin*,
   88 F.4th 1080 (5th Cir. 2023) .................................................................................................34

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................................................33

*Ohio v. EPA*,
   603 U.S. 279 (2024)................................................................................................................33

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) ..................................................................................................33

*Packingham v. North Carolina*,
   582 U.S. 98 (2017)........................................2, 6, 12, 13, 14, 15, 16, 20, 21, 24, 25, 27, 30, 34

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)........................................................................................................10, 22, 24

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020)..................................................................................................................33

*Rubin v. Coors Brewing Co.*,
   514 U.S. 476 (1995)................................................................................................................19

*Sable Commc'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989)..................................................................................20

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)..............................................2, 17, 18, 19, 20, 22, 25

*Students Engaged in Advancing Tex. v. Paxton,*
    765 F. Supp. 3d 575 (W.D. Tex. 2025)......................................2, 17, 18, 19

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994)..................................................................................23

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000)......................................................................13, 24, 25

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982)..................................................................................30

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988)..............................................................................9, 13

*X Corp. v. Bonta,*
    116 F.4th 888 (9th Cir. 2024) ..............................................................27, 28

**Statutes**

47 U.S.C. § 230.....................................................................1, 3, 31, 32, 33

Cal. Civ. Code § 1798.140.............................................................................18

La. Rev. Stat. § 51:1751.................................3, 4, 6, 7, 19, 21, 22, 23, 26, 28, 30, 31

La. Rev. Stat. § 51:1752.................................1, 2, 7, 8, 9, 10, 14, 23, 35

La. Rev. Stat. § 51:1753.................................1, 2, 3, 7, 8, 9, 10, 17, 20, 23, 31, 35

La. Rev. Stat. § 51:1754.................................................................8, 10, 23, 35

La. Rev. Stat. § 51:1755.................................................................................8

La. Rev. Stat. § 51:1756.................................................................................8

La. Rev. Stat. § 51:1762.................................................................................8

**Other Authorities**

Bluesky, *Our Response to Mississippi's Age Assurance Law*, Bluesky Blog (Aug. 22, 2025), https://perma.cc/PJL2-G7PA ....................................................................34

Denise, Mississippi site block, plus a small restriction on Tennessee new accounts, Dreamwidth (August 31, 2025), https://perma.cc/EYZ2-UGX3 ...........................34

# Table of Contents

Introduction ........................................................................................................... 1

Background ............................................................................................................. 3

    A. Factual background ........................................................................................ 3

        1. NetChoice-member websites disseminate large amounts of fully protected speech. .......................................................................................................... 3

        2. Parents have many tools to oversee how their children use the internet. .............. 5

        3. Many websites advertise to make their services available to all. .......................... 5

    B. Louisiana Senate Bill 162 ............................................................................ 6

Argument ............................................................................................................... 9

  I. NetChoice is entitled to summary judgment on its claim that the Act's speech regulations violate the First Amendment. ........................................................... 9

    A. The Act's speech regulations trigger heightened First Amendment scrutiny. .............. 9

        1. The Act's parental-consent requirement for minors to access protected speech violates the First Amendment. .............................................................. 10

        2. The Act's age-verification requirement to access protected speech for both minors and adults violates the First Amendment. ................................................... 14

        3. The Act's restriction on certain advertisements on minors' accounts violates the First Amendment. .................................................................................. 17

        4. The Act's limitations on direct messaging violate the First Amendment. ............ 20

        5. The Act's speech regulations are content-based, triggering First Amendment strict scrutiny. .................................................................................. 21

    B. The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny. ....................................................................................... 24

    C. The Act's speech restrictions are both facially invalid under the First Amendment and invalid as-applied to the extent they regulate NetChoice's members' websites. .................................................................................. 27

  II. NetChoice is entitled to summary judgment on its claim that the Act's central coverage definition of "social media company" is unconstitutionally vague. ................. 30

  III. NetChoice is entitled to summary judgment on the merits of its claim that the Act's advertising restrictions are preempted by 47 U.S.C. § 230. .............................. 31

  IV. NetChoice meets all the remaining factors for a permanent injunction. ........................... 33

Conclusion ........................................................................................................... 35

**Introduction**

Louisiana Senate Bill 162 ("Act"), §§ 1751-56, unconstitutionally restricts a staggering amount of fully protected speech.[1] The Act uses content-based provisions to target disfavored websites. It unlawfully imposes (1) age verification for *all* users to access social media websites, § 1752(A); (2) parental consent for minors to access those websites, § 1752(B); and (3) restrictions on minors' social media accounts, such as certain advertising practices and with whom minors can interact on the services, § 1753. The undisputed record evidence in this case demonstrates that Plaintiff NetChoice is entitled to judgment as a matter of law that these provisions violate the First Amendment, Due Process Clause, 47 U.S.C. § 230—or all three. This Court should join the cases nationwide that have either preliminarily or permanently enjoined enforcement of similar laws. *NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

Accordingly, NetChoice requests that this Court grant NetChoice summary judgment on or before December 19, 2025. In the alternative, NetChoice respectfully requests that this Court grant NetChoice's still-pending motion for preliminary injunction by December 19, 2025, until this Court can rule on the parties' cross-motions for summary judgment. *See* ECF 26 at 1-2.

---

[1] This Memorandum uses "websites" to refer to all websites, applications, and other digital services, and "covered websites" to refer to all digital services the Act regulates. Unless otherwise noted, statutory citations in this Memorandum refer to Title 51 of the Louisiana Revised Code.

The websites regulated by the Act allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all protected by the First Amendment from governmental interference. *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (citation omitted). As a result, these websites curate and disseminate, in "distinctive expressive offering[s]," a "staggering amount" of fully protected speech, across "billions of posts or videos." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719, 734, 738 (2024).

The Act, however, would place multiple restrictions on minors' and adults' ability to access protected speech on covered websites. First, the Act's parental-consent requirement, § 1752(B), infringes minors' right to access protected speech "*without their parents' prior consent,*" *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011); *see, e.g.*, *Carr*, 2025 WL 1768621, at *13-14; *Uthmeier*, 2025 WL 1570007, at *15; *Yost*, 778 F. Supp. 3d at 954-55, 957; *Griffin*, 2025 WL 978607, at *8, *12-13; *Reyes*, 748 F. Supp. 3d at 1126 n.135, 1129-30.

Second, the Act's age-verification requirement, § 1752(A), "necessarily" "burden[s]" both minors' and adults' "right to access" fully protected speech, *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2316 (2025) ("*FSC*"); *see, e.g.*, *Carr*, 2025 WL 1768621, at *13; *Griffin*, 2025 WL 978607, at *13; *Reyes*, 748 F. Supp. 3d at 1129-30 & n.169; *Bonta*, 770 F. Supp. 3d at 1201-03.

Third, the Act's prohibitions on advertisements based on most "personal information" on minors' accounts, § 1753(2), restrict websites' use of information in disseminating speech and their editorial control over the arrangement and presentation of third-party speech, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see, e.g.*, *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 593-95 (W.D. Tex. 2025) ("*SEAT*"). These prohibitions could reach as far as user-generated content

"advertising" tutoring or babysitting services. The Act's advertising restrictions are also preempted by 47 U.S.C. § 230 ("§ 230"). *See Carr*, 2025 WL 1768621, at *19-20.

Fourth, the Act's limitations on direct messaging, § 1753(2), outright prohibit speech in violation of the First Amendment. On top of all that, the Act imposes these and other speech regulations on select websites by using a content-based and vague coverage definition of "[s]ocial media company." § 1751(11). This independently subjects the Act's speech regulations to strict scrutiny. Thus, all the provisions described above and the Act's limitations on data-collection and data-use are likewise content-based regulations of speech that must satisfy strict scrutiny. § 1753(3).

Because none of the Act's provisions can satisfy the First Amendment's demanding standards and are otherwise unlawful, summary judgment should be granted to NetChoice.

## Background

### A.    Factual background

#### 1.    NetChoice-member websites disseminate large amounts of fully protected speech.

NetChoice is a leading internet trade association. Facts ¶ 1.[2] Based on the Act's definitions, NetChoice has identified the following websites belonging to NetChoice members as regulated by the Act: (1) Facebook; (2) Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snapchat; (7) X; and (8) YouTube. Facts ¶ 5. Defendants have also identified the following NetChoice members and/or websites as regulated by the Act: Pinterest, Reddit, Snapchat, X, "Automattic Inc. and [9] Tumblr, Inc.; [10] Discord Inc.; Meta Platforms Inc.; . . . [11] Twitch Interactive, Inc.; and

---

[2] All citations to "Facts" refer to NetChoice's Statement of Material Facts. That statement includes precise citations to supporting exhibits.

[12] WhatsApp LLC." Facts ¶¶ 6, 8. This Motion will treat all of the twelve, specific websites identified by both NetChoice and Defendants as regulated by the Act.

What these twelve websites—and other covered websites under the Act—have in common is their speech-facilitating functions. The Act limits its scope to the kinds of websites that uniquely "allow users to upload content . . . to share [it] with others," where those "viewing the content can" "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719.[3] Consequently, covered websites disseminate "billions of posts or videos," providing users an important means of sharing a "staggering" amount of their own protected expression. *Id.* at 719, 734. Similarly, these websites "engage[] in expression" by "displaying," "compiling, and curating" protected speech. *Id.* at 716-17, 728, 731; Facts ¶ 12. This curation results in "distinctive expressive offering[s]" of fully protected speech that complies with websites' "[c]ommunity [g]uidelines[s]." *Moody*, 603 U.S. at 738.

Because these websites offer vital opportunities for protected expression and communication, they can affect how people "relate to family and friends, as well as to businesses, civic organizations, and governments." *Id.* at 716. Teens (like adults) use these websites for protected expression, education, civic engagement, and plain "entertain[ment]." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952); Facts ¶¶ 13, 18. Indeed, the Defendant Louisiana Attorney General "uses her social media accounts on Facebook, Instagram, X, YouTube, TruthSocial, and LinkedIn to discuss the policies, priorities, and actions of the Attorney General's office." Facts ¶¶ 49-50. Defendant's content is available to those who use the websites, including minor users.

---

[3] This Memorandum uses the term "user" to encompass both what the Act calls "[u]ser[s]" and "[a]ccount holder[s]." § 1751(1), (13). When discussing the Act's requirements, this Memorandum also uses "minor," "adult," "account holder," and "user" to refer only to Louisiana minors, adults, account holders, and users covered by the Act. § 1751(6)-(9).

### 2.    Parents have many tools to oversee how their children use the internet.

"[P]arents may rightly decide to regulate their child's use of social media . . . . And many tools exist to help parents with this endeavor." *Griffin*, 2025 WL 978607, at *3.

To start, parents control what *devices* minors can access—and when. Facts ¶ 22. Not all devices are internet-enabled. And they come with many parental-control options, including the ability to lock or limit specific apps and features, restrict the device settings to limit content and downloads, limit access to approved websites, and set overall or time-of-day usage limits. Facts ¶ 26.

Parents also control the *networks* that minors use. Wireless routers allow parents to manage which network a minor connects to and to set up rules defining which websites minors can use (and at what times). Facts ¶ 24. Many internet service providers offer similar controls. Facts ¶ 23.

Parents also control *software*. Web browsers offer parental controls. Facts ¶ 25. And third-party parental control software is available for many devices. Facts ¶ 27.

In addition, some members have developed their own suite of parental controls and other protections for minors on their services. *E.g.*, Facts ¶¶ 28, 32. These controls supplement the resources that members spend crafting and enforcing "content moderation" policies aiming to prevent objectionable speech from reaching users. *E.g.*, Facts ¶ 30. These members' efforts have been successful. Facts ¶ 31.

Members' services do not permit minors younger than 13 to create accounts on services regulated by the Act. Facts ¶ 29. So "minors" in this case refers only to teenagers aged 13 to 16.

### 3.    Many websites advertise to make their services available to all.

Most covered websites depend on ads for revenue. Facts ¶ 40. Contextual advertising helps advertisers display their ads to users who are most likely to be interested, rather than blanketing all users indiscriminately. Internet ads often draw insight from a website's or webpage's content.

Facts ¶ 41. For example, a user who visits a National Park's social media account might see ads for lodging near the park or camping equipment. Individuals who use the services also advertise everything from fundraisers to babysitting services in their user-generated content. Facts ¶ 43.

**B.     Louisiana Senate Bill 162**

**1. Covered actors and activities. § 1751(11)-(12).** The Act's speech restrictions apply to only a content-based collection of "[s]ocial media compan[ies]" providing "[s]ocial media platform[s]." § 1751(11)-(12). These are the kinds of "social media" websites that have First Amendment rights to curate and disseminate third-party speech, *Moody*, 603. U.S. at 719, 731; and that people have a First Amendment right to access, *Packingham*, 582 U.S. at 108.

The Act defines "[s]ocial media company" as "a person or entity that provides a social media platform that has at least five million account holders worldwide and is an interactive computer service." § 1751(11).[4] In turn, "[s]ocial media platform" is any "public or semipublic internet-based service or application that has users in Louisiana and":

> (i) The service or application connects users in order to allow users to interact socially with each other within the service or application. . . .
> (ii) The service or application allows users to do all of the following:
> (aa) Construct a public or semipublic profile for purposes of signing into and using the service or application.
> (bb) Populate a list of other users with whom an individual shares a social or virtual connection within the system, including subscribing to content . . . .
> (cc) Create or post content viewable by other users, including but not limited to, on message boards, in chat rooms, on video channels, or through a landing page or main feed that presents the user with content generated by other users.

§ 1751(12)(a).

Accordingly, the Act regulates only "social media" websites that "allow users to upload content . . . to share with others," and where those "viewing the content can" "react to it, comment

---

[4] An "[i]nteractive computer service" is "an information service, information system, or information access software provider that provides or enables computer access by multiple users to a computer server and provides access to the internet." § 1751(5).

on it, or share it themselves." *Moody*, 603 U.S. at 719. In addition to the twelve *member* services identified above at pp.3-4, Defendants have also identified the following companies as covered by this Act: "ByteDance Inc. [TikTok]; . . . Telegram; [and] Tencent LLC [WeChat]." Facts ¶ 6.

The Act excludes websites based on their content, including websites with the following "predominant or exclusive function[s]": "streaming service[s]," "[n]ews, sports, entertainment," "[o]nline shopping," "[i]nteractive gaming, virtual gaming," "[p]hotograph editing" and "associated photograph hosting," "[s]ingle purpose community groups for public safety" (but only "if the interaction with other users or account holders is limited to that single purpose"), "[c]areer development opportunities, including professional networking," "data visualization," "digital news," "technical support," "[a]cademic, scholarly, or genealogical research," and "classified advertising service[s]." § 1751(12)(b).

### 2. The Act's speech restrictions

*Age verification. § 1752(A).* Covered websites "shall make commercially reasonable efforts to verify the age of Louisiana account holders with a level of certainty appropriate to the risks that arise from the information management practices of the social media company." § 1752(A). Otherwise, covered websites must treat *all users* the same way that the Act requires covered websites to treat minors. § 1752(A). That includes the limitations in Section 1753, discussed below.

On NetChoice members' covered services (like many other websites), users must have an account to access either some or all of the fully protected speech and speech-facilitating functions on the service. Facts ¶ 19. Consequently, restrictions on account creation infringe *access* to protected speech.

*Parental consent. § 1752(B).* Covered websites "shall not permit" a minor "to be an account holder . . . unless the minor has the express consent of a parent or guardian." § 1752(B). The

Act provides five enumerated "[a]cceptable methods of obtaining express consent" and one catch-all for "[a]ny other commercially reasonable method of obtaining consent in light of available technology." § 1752(B). For minors that have parental consent, the Act requires covered websites to provide parents with supervision tools. § 1754.

*Certain ads on minors' accounts. § 1753(2).* "For a Louisiana minor account holder," covered websites "shall prohibit . . . [t]he display of any advertising in the account based on the Louisiana minor account holder's personal information, except age and location." § 1753(2). This provision may prohibit contextual advertising, because "[t]argeted advertising" is separately regulated by another provision of Louisiana law. § 1762(A)(10)(a), (B)(1) (prohibiting "advertisement[s] . . . selected based on personal data . . . to predict the account holder's preferences or interests"). Moreover, the Act's failure to define "advertising" could extend the Act's reach to user-created promotional content.

*Restrictions on messaging. § 1753(1).* "For a Louisiana minor account holder," covered websites "shall prohibit . . . [a]dults from direct messaging a Louisiana minor account holder unless the minor is already connected to the adult on the service." § 1753(1).

*Limitation on information collection and use. § 1753(3).* The Act also imposes a restriction on the "collection or use of personal information from . . . activities of the account other than information beyond what is adequate, relevant, and reasonably necessary in relation to the purposes for which such information is collected, as disclosed." § 1753(3).

*Enforcement and penalties. §§ 1755-56.* The Act grants Defendants "exclusive" enforcement authority. §§ 1755-56. The Division Director "may impose an administrative fine of up to two thousand five hundred dollars for each violation." § 1756(B). And the Division Director may seek declaratory and injunctive relief, disgorgement, damages, fees, and costs. § 1756(C), (D)(4).

8

## Argument

NetChoice is entitled to summary judgment: "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 432 (5th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).

NetChoice is also entitled to a permanent injunction because: (1) its members and their users would suffer "irreparable injury" otherwise; (2) "remedies available at law . . . are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

NetChoice has associational standing to assert its members' rights under binding Fifth Circuit precedent. *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025); *see* Facts ¶¶ 2-8.[5] NetChoice also has standing under Fifth Circuit precedent to assert the First Amendment rights of its members' "users"—both current and prospective. *Fitch*, 134 F.4th at 805-07; *see* Facts ¶¶ 9-10.[6]

## I.    NetChoice is entitled to summary judgment on its claim that the Act's speech regulations violate the First Amendment.

### A.    The Act's speech regulations trigger heightened First Amendment scrutiny.

The Act's speech restrictions—including its age-verification, § 1752(A); parental-consent, § 1752(B); advertising, § 1753(2); direct-messaging, § 1753(1); data-collection and data-use, § 1753(3), and parental-supervision-tool requirements, § 1754—trigger strict scrutiny. Laws

---

[5] *See Carr*, 2025 WL 1768621, at *4-6; *Yost*, 778 F. Supp. 3d at 940-41; *Uthmeier*, 2025 WL 1570007, at *6-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *Paxton*, 747 F. Supp. 3d at 1029-31.

[6] *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Carr*, 2025 WL 1768621, at *6-7; *Yost*, 778 F. Supp. 3d at 941-47; *Uthmeier*, 2025 WL 1570007, at *9; *Paxton*, 747 F. Supp. 3d at 1031.

regulating speech based on content are subject to "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). And "[w]hen[ever] the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

**1.    The Act's parental-consent requirement for minors to access protected speech violates the First Amendment.**

**a.** The Act violates the First Amendment by requiring minors to secure the "express consent of a parent" to "be an account holder"—*i.e.*, to access and engage in protected speech—on covered websites. § 1752(B); *see Yost*, 778 F. Supp. 3d at 955 ("[L]aws that require parental consent for children to access constitutionally protected, non-obscene content are subject to strict scrutiny.").

"Laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). The Act's parental-consent requirement operates "at the outset." *Id.* (citation omitted). To access some or all of the fully protected speech and speech-enabling functions on covered websites, users must create accounts. Facts ¶ 19. Thus, restrictions on account creation operate as restrictions on threshold access to countless pieces of fully protected speech on covered websites.[7] The Act's parental-consent requirement is akin to the government requiring bookstores, theaters, and video game arcades—and *only* similar companies dedicated to disseminating protected speech—to verify parental consent before allowing minors to receive protected speech.

---

[7] Nor would anyone be better off if these services dispensed with account creation altogether. "The idea that social media would be safer for children if companies imposed fewer guardrails on engagement both defies logic and emphasizes under-inclusion concerns." *Carr*, 2025 WL 1768621, at *17 n.16.

The Supreme Court has held that minors have the "right to speak or be spoken to," and governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3 (emphasis in original). The government may not impose its own "authority" "subject only to a parental veto." *Id.*

*Brown* invalidated a law prohibiting the sale or rental of "violent video games" to minors. *See id.* at 802. After all, "minors are entitled to a significant measure of First Amendment protection." *Id.* at 794 (cleaned up). Although "a State possesses legitimate power to protect children from harm, [] that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794 (cleaned up). Conditioning minors' ability to receive and share protected speech on securing parental consent is impermissible, whether that speech is "political rall[ies]," "religious" services, or content the State disfavors. *Id.* at 795 n.3. There is no "precedent for state control, uninvited by parents, over a child's speech." *Id.*

Since *Brown*, courts have consistently enjoined parental-consent requirements for minors to access social media. Courts have recognized the reality that social media is a prime outlet for minors' fully protected speech. For instance, "[m]inors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them." *Griffin*, 2025 WL 978607, *13. Parental-consent laws in both Arkansas and Ohio have been permanently enjoined. *Id.* at *8, *17; *Yost*, 778 F. Supp. 3d at 959. Similar requirements are preliminarily enjoined in Georgia, *Carr*, 2025 WL 1768621, at *13, *22; Florida, *Uthmeier*, 2025 WL 1570007, *15, *21; and Utah, *Reyes*, 748 F. Supp. 3d at 1126 & n.135, 1134. These decisions have ensured that minors in those States have equal access to protected online speech.

Louisiana's materially identical parental-consent requirement violates the First Amendment for the same reasons as the parental-consent requirements in those other States. It would

impose an unconstitutional hurdle for minors to access protected speech, and outright prohibit access for some minors. *See* Facts ¶¶ 37-39. Minors would need to secure parental consent before, *e.g.*, discussing their faith on Reddit, "petition[ing] their elected representatives" on X, "shar[ing] vacation photos" on Facebook, looking for work around the neighborhood on Nextdoor, or learning how to solve math problems on YouTube. *Packingham*, 582 U.S. at 104.

**b.** Because the Act's parental-consent requirement "target[s] . . . fully protected speech," it triggers and fails "[s]trict scrutiny." *FSC*, 145 S. Ct. at 2310. In any event, the Act's requirement for parental consent would violate any level of heightened First Amendment scrutiny.

To start, the State cannot establish a sufficient governmental interest. The Supreme Court has rejected a governmental interest "in aid of parental authority" to restrict minors' access to protected speech unless parents first consent. *Brown*, 564 U.S. at 802. *Brown* "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* Accepting that argument "would largely vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors." *Id.* (cleaned up). This case presents no such circumstances. And not all minors "have parents who *care* whether" they access covered websites. *Id.* at 804.

Even if that were a permissible governmental interest, however, the Act does not further it. The Act does not account for the difficulty of verifying a parent-child relationship to process parental consent. *See* Facts ¶ 36.

Regardless, the Act's parental-consent requirement is not the "least restrictive" way to accomplish any legitimate governmental ends. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (citation omitted). Uncontested record evidence here demonstrates that

parents already have many options to oversee their children online. *See supra* p.5. Courts nation-wide have agreed. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Carr*, 2025 WL 1768621, at *18; *Uthmeier*, 2025 WL 1570007, at *18; *Yost*, 778 F. Supp. 3d at 956-57; *Griffin*, 2025 WL 978607, at *14. Louisiana could give "parents the information needed to engage in active supervision" over their minor children's internet access, such as information about the tools cataloged above. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000). These private tools are better suited to provide parents with ongoing oversight over their minor children's online activities, compared to a one-time parental consent requirement.

In addition, members' *self-regulation* is extensive, as they already engage in content moderation and provide parental controls and other tools. *See supra* p.5. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention, even if the government does not believe those efforts are perfect in all cases. *Brown*, 564 U.S. at 803 & n.9 (crediting video game industry's self-regulation). Whatever "modest gap in concerned parents' control" those tools leave open, filling it "can hardly be a compelling state interest." *Id.* at 803.

The Act's parental-consent requirements have yet more tailoring flaws. They are not "narrowly tailored" for purposes of intermediate scrutiny—let alone the least restrictive means for strict scrutiny. *Packingham*, 582 U.S. at 105-06 (citation omitted). Respondent has not proffered *any* evidence justifying impeding minors' access to billions of pieces of fully protected speech across the member websites here, to say nothing of the many more websites the Act regulates. Worse, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. The Act unlawfully requires parental consent for all minors at every developmental stage.

As a result, the burden on protected speech here is not "incidental"; the restriction on minors' access to speech is the entire point of the law. *FSC*, 145 S. Ct. at 2317. Put another way, the Act is designed to impede minors' access to speech they have the First Amendment right to view and engage in. *Brown*, 564 U.S. at 795 n.3. As a result, the Act "burden[s] substantially more speech than is necessary to further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted).

The State certainly has not provided "a direct causal link between" access to all of the regulated websites and harms to minors. *Brown*, 564 U.S. at 799. The Act's blunderbuss approach to regulating online speech is an insurmountable tailoring flaw. Even if covered websites were genuinely "dangerous," it is unclear why the State would allow minors to access them "so long as one parent . . . says it's OK." *Id.* at 802. Muzzling speech dissemination to minors on certain covered websites that minors are otherwise free to experience elsewhere "is not how one addresses a serious social problem." *Id.*

> **2.    The Act's age-verification requirement to access protected speech for both minors and adults violates the First Amendment.**

**a.** The Act violates the First Amendment by requiring *all* users—minors and adults—to "verify . . . age[s]" to be "account holders" on covered websites. § 1752(A). The Act burdens threshold access to "what for many are the principal sources for knowing current events, . . . and otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Like the parental-consent requirement discussed above, this provision "operate[s] . . . at the outset" of access to protected speech. *Citizens United*, 558 U.S. at 336 (citation omitted). This age-verification requirement is akin to stationing government-mandated clerks at every bookstore and theater to check identification before citizens can access books, movies, or even join conversations. That makes this case easier than *FSC*: Louisiana requires age verification not for obscene

material, but for staggering amounts of fully protected speech at the core of the First Amendment's protections. 145 S. Ct. at 2313.

*FSC* squarely held that "submitting to age verification is a burden on the exercise of" the "right to access speech" protected by the First Amendment. *Id.* at 2309. Government-mandated "age verification necessarily" "burden[s]" that right. *Id.* at 2316. That is especially true here, where users would need to provide documentation, biometric data, or other personally identifying information before accessing "the most powerful mechanisms available to a private citizen to make his or her voice heard," *Packingham*, 582 U.S. at 107; *see* Facts ¶¶ 33-35, 176-83. One of Defendants' own experts admits that requiring age verification "would reduce the number of adolescents 15 and under using these platforms." Facts ¶ 185. The same is true for older teenagers and adults. That is why every court to have considered the issue on the merits has enjoined enforcement of similar age-verification requirements to access "social media." *E.g.*, *Carr*, 2025 WL 1768621, at *13-14; *Griffin*, 2025 WL 978607, at *8-10; *Reyes*, 748 F. Supp. 3d at 1129 & n.169.

The Supreme Court's recent decision in *FSC* supports NetChoice and certainly does not permit Louisiana to require age verification to access fully protected speech for adults and minors. *FSC*'s holding was cabined to age-verification mechanisms used to restrict access to "pornography." 145 S. Ct. at 2313. As *FSC* explained, "pornography" is a unique category of speech "obscene to" minors, which is simultaneously protected for adults yet unprotected for minors. *Id.* at 2306. *FSC* held that adults could lack the First Amendment right to avoid age verification to access "pornography," because this unique speech category "is unprotected to the extent the State seeks only to verify age" as part of determining if the State may ban that speech from the viewer (as it can for minors). *Id.* at 2309. And even then, age-verification laws in that unique context triggered intermediate scrutiny because they "burden" adults' rights. *Id.* In contrast, because the Act at issue

15

here "direct[ly] target[s]" a staggering amount of "*fully protected speech*" for minors and adults alike, it is subject to (and fails) strict scrutiny. *Id.* at 2310 (emphasis added). This Act thus presents far different issues from pornography laws, as *FSC* recognized would be the case. *Id.* at 2308 n.7.

**b.** Age verification is only a means to effectuate the Act's other unlawful age-based restrictions, like the parental-consent requirements. Because those other provisions are unlawful, age-verification serves no valid governmental interest.

Besides, the Act is overbroad because it would require adults and minors alike to provide personally identifying information to access all manner of fully protected speech. To discuss the latest proposal in Congress, see family members' latest vacation photos, or view college lectures on covered websites, adults (and minors) would need to verify their age—often across multiple websites. This would deter adults from accessing the websites. As a result, it "burden[s] substantially more speech than is necessary to further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted). Nothing in the record justifies impeding threshold access to countless pieces of fully protected speech on the websites at issue.

The Act also would "all but kill anonymous speech online," by "requir[ing] . . . website visitors [to] forgo the anonymity otherwise available on the internet," which "would undoubtedly chill speech—and, likely, would disproportionately chill speech on the most controversial issues." *Carr*, 2025 WL 1768621, at *15 (citation omitted); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101-02 (2d Cir. 2003). That burdens the First Amendment right of speakers to "remain anonymous." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995).

### 3. The Act's restriction on certain advertisements on minors' accounts violates the First Amendment.

**a.** The Act further violates the First Amendment by prohibiting the "display of any advertising" on minors' accounts based on "personal information, except age and location." § 1753(2).

The First Amendment prohibits the State from dictating how websites choose which lawful ads to publish—and what lawfully obtained, content-based information they use to make that choice. To begin, the "selection of" an "advertisement for inclusion" in a "compilation of speech" "fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995); *see Moody*, 603 U.S. at 728 ("choice of material" in a publication "constitute[s] the exercise of editorial control and judgment").

In addition, "[a]n individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used." *Sorrell*, 564 U.S. at 568 (cleaned up). *Sorrell* thus invalidated a law prohibiting the use of "prescriber-identifying information" for purposes of pharmaceutical marketing by pharmaceutical manufacturers. *Id.* at 564. In so doing, it rejected the idea that the "use of . . . information [is] conduct" unprotected by the First Amendment. *Id.* at 570. The prescriber-identifying information was akin to "cookbooks, laboratory results, or train schedules"—all "facts" protected by the First Amendment. *Id.* And restrictions on the use of particular facts to engage in "protected expression" trigger First Amendment scrutiny. *Id.* at 565. The law in *Sorrell* "burden[ed] disfavored speech by disfavored speakers." *Id.* at 574. So *Sorrell* concluded the law violated any level of heightened First Amendment scrutiny. *Id.* at 571-72.

The Act's restriction on certain ads on minors' accounts violates these principles. The Western District of Texas preliminarily enjoined enforcement of a similar provision. *SEAT*, 765 F. Supp. 3d at 598-99. Rather than targeting specific kinds of problematic ads or regulating

17

advertisers themselves, the Act regulates a handful of covered websites' content-based choices about what information they use when deciding how to display ads on their services. *Id.* at 599. That is like the State telling the *New York Times* that it may not rely on market research to place its ads. The Act singles out content-based categories of "personal information" that websites cannot use, making it analogous to the law invalidated in *Sorrell*, 564 U.S. at 563. And because it targets websites' "editorial control and judgment," it must satisfy strict scrutiny. *Tornillo*, 418 U.S. at 258; *see Hurley*, 515 U.S. at 575. This provision could reach all manner of "advertisements" that do not "propose a commercial transaction," so "strict scrutiny applies to them equally." *SEAT*, 765 F. Supp. 3d at 594-95; *see* Facts ¶ 43. Further, there is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and concurring in the judgment).

Moreover, to the extent the Act covers *user-generated* promotional content that is presented to minor users through personalization based on user data, covered websites would have to screen and monitor all users' posts to determine (1) whether they are advertisements; and (2) whether they are based on "personal information." Assuming such monitoring were possible (which is unlikely, Facts ¶ 42), this would chill protected speech.

**b.** The Act's restriction on disseminating ads based on "personal data" on minors' accounts also is not properly tailored to furthering any governmental interest. There is an obvious less-restrictive alternative: The Act could give minors the ability to opt out of such advertising.

In addition, leaving "personal data" undefined restricts an unduly broad range of ads. For instance, the Act is not limited to what other States call "sensitive personal information." Cal. Civ. Code § 1798.140(ae). It does not serve any governmental interest to prohibit websites from

publishing ads based on, *e.g.*, a user's search for college admissions. Finally, the Act could extend to any number of user-created promotions for pet-sitting, sports camps, or concerts—if that content is presented to users through personalization.

In addition, the advertising restrictions are "seriously underinclusive." *Brown*, 564 U.S. at 805. The "statute allows" minors' personal "information to be used" for advertising "by all but a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573; *see id.* at 574-75. Minors will encounter such ads on "interactive gaming" websites; "news, sports, [and] entertainment" websites; websites without user-generated content; and those that do not have 5 million users. § 1751(11), (12)(a)-(b). "Why . . . can a teenager view a targeted advertisement on a sports or shopping website but not on a social platform?" *SEAT*, 765 F. Supp. 3d at 599. Further, this provision does nothing to regulate the *kinds* of advertisements minors might see and thus permits the dissemination of all manner of inappropriate advertisements. *See id.* The only remaining justification is an impermissible interest in preventing speech "[t]hat the State finds [] too persuasive." *Sorrell*, 564 U.S. at 578.

Even if construed as regulating commercial speech, the Act's "purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional." *Sorrell*, 564 U.S. at 566. This provision fails intermediate scrutiny. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 570 (1980). "[A]ccurately inform[ing] the public about lawful activity" is protected. *Id.* at 563. This Act does not attempt to regulate false or misleading speech.

Consequently, the government must demonstrate a "substantial interest," that the Act "directly advances" that interest, and that the Act "is not more extensive than is necessary." *Id.* at 566; *see id.* at 564 (same). The State "must demonstrate that the harms it recites are real." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995). Otherwise, "a State could with ease restrict

19

commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). The State has no legitimate interest in "suppress[ing] [speech] solely to protect the young from ideas or images that a legislative body thinks unsuitable." *Brown*, 564 U.S. at 795. That includes ads. Nor may the State prohibit certain ads because they are considered "too persuasive." *Sorrell*, 564 U.S. at 578.

### 4. The Act's limitations on direct messaging violate the First Amendment.

The Act also violates the First Amendment by prohibiting "[a]dults from direct messaging a Louisiana minor account holder unless the minor is already connected to the adult on the service." § 1753(1). The First Amendment protects private communications as strongly as it protects public speech. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126-31 (1989) (invalidating restriction on telephone messages). So, these direct-messaging restrictions outright prohibit speech between adults and minors, which limits minors' own "constitutional right to speak or be spoken to," triggering strict scrutiny. *Brown*, 564 U.S. at 795 n.3.

These restrictions violate any form of heightened First Amendment scrutiny. The Act "burden[s] substantially more speech than is necessary to further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted); *see FSC*, 145 S. Ct. at 2317. While the government understandably aims to prevent potential bad actors from communicating with minors, the Act's outright prohibitions on direct communications are far overbroad to achieve that interest. The Act indiscriminately regulates all kinds of interactions without any attempt to isolate particularly harmful kinds of interactions. It will therefore sweep in even innocuous—and fully protected—conversations, such as minors reaching out to local politicians.

Moreover, it imposes government regulation on top of existing "voluntary" self-regulatory efforts. *Brown*, 564 U.S. at 803 (noting video-game industry's "voluntary rating system"); *see* Facts ¶¶ 28-32. For instance, many NetChoice members have developed their own means to

address potentially harmful communications. And parents too have many means to oversee their minor children online and monitor their communications. *See supra* p.5.

The Act's coverage is also "seriously underinclusive." *Brown*, 564 U.S. at 805. If the State is attempting to regulate particular interactions by minors, that will be ineffective. The Act limits communication only on covered websites while leaving minors free to communicate with unconnected users on other types of services. For example, the Act restricts minor users from using covered websites to engage in conversations about sports but does not do so for *the exact same conversation* that takes place on a website where sports is the "predominant or exclusive function," § 1751(12)(b)(vi). Examples abound for all the Act's other exceptions. *See supra* p.7.

The Ninth Circuit erroneously upheld a similar restriction under intermediate scrutiny. *NetChoice, LLC v. Bonta*, 2025 WL 2600007, at *10 (9th Cir. Sept. 9, 2025). Because strict scrutiny applies here, *see infra* Part I.A.5, the Ninth Circuit's analysis is distinguishable. Defendants here must show that Act's content-based prohibitions are the "least restrictive means" of achieving the State's interest. *AFP*, 594 U.S. at 607. As explained above, these restrictions fail that standard.

### 5. The Act's speech regulations are content-based, triggering First Amendment strict scrutiny.

The Act's "social media company" coverage definition, § 1751(11)-(12), is content-based, subjecting all the Act's speech regulations to strict scrutiny. Regardless, governmental restrictions on "access to" social media raise at least heightened scrutiny. *Packingham*, 582 U.S. at 105, 107-08.

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). "Content-based laws—those that target speech based on its

communicative content—are presumptively unconstitutional and may be justified only if the government proves" the laws satisfy "strict scrutiny." *Reed*, 576 U.S. at 163-64.

The Act's coverage definition is content-based, rendering all of the Act's provisions content-based. *Sorrell*, 564 U.S. at 566 ("[C]ontent-based burdens must satisfy the same rigorous scrutiny as [] content-based bans."). Specifically, the Act both defines covered websites and excludes numerous other websites from its onerous regulations based on their "subject matter" and thus their "content." *Reed*, 576 U.S. at 163; *see Sorrell*, 564 U.S. at 563-64 (content-based exceptions render statute content-based). The Act includes websites based on whether they "allow users to interact socially." § 1751(12)(a)(i). But it exempts websites with other "predominant or exclusive function[s]." § 1751(12)(b). So "[n]on-social interactions, such as professional interactions, are not covered, while social interactions are," rendering the Act content-based. *Paxton*, 747 F. Supp. 3d at 1032. Many courts have held that state laws with similar "interact socially" coverage provisions are content-based. *See id.*; *Reyes*, 748 F. Supp. 3d at 1122. The Act's reference to "function" is a proxy for other content-based restrictions. Governments cannot "swap[] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022).

Meanwhile, the Act outright exempts the State's favored entities based on the content they feature—including, "[n]ews, sports, entertainment," "[s]ingle purpose community groups for public safety," "professional networking," and "[a]cademic, scholarly, or genealogical research" websites. § 1751(12)(b). Consequently, websites that disseminate or devote themselves to these state-preferred topics may serve minors without hurdles. "The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation." *Paxton*, 747 F. Supp. 3d at 1032; *see Yost*, 716 F. Supp. 3d at 557-58. But websites like those

operated by NetChoice's members that disseminate a different or broader mix of content are not so lucky. Nor are their users. Although a 15-year-old may discuss public safety in a "[s]ingle purpose community group[] for public safety," § 1751(12)(b), he cannot discuss that same issue with his neighbors on Nextdoor without parental consent. Likewise, Reddit has some communities devoted to the Act's exempted topics but is nevertheless covered because it also has communities devoted to non-exempt topics.

The Act triggers heightened First Amendment scrutiny because its central coverage definition is speaker-based. Such laws "are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 640-41 (1994) (citation omitted). Along with the laundry list of content-based exclusions, the Act also does not apply to websites with fewer than "five million account holders worldwide." § 1751(11). The Act restricts speech that occurs on covered websites that have a relatively large number of users (*e.g.*, X). But it allows *identical* speech occurring on otherwise similar websites—solely because they do not reach the arbitrary five-million-user threshold. *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting law that "target[ed] a small group of newspapers").

If "a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute." *Bonta*, 770 F. Supp. 3d at 1191 (collecting cases); *see id.* at 1190, 1192; *Reyes*, 748 F. Supp. 3d at 1120. The Act's speech regulations all depend on this coverage definition and are thus content-based and speaker-based: age verification, § 1752(A); parental consent, § 1752(B); advertising restrictions, § 1753(2); direct-messaging limitations, § 1753(1); data-collection and use limitations, § 1753(3); and parental-supervision provisions, § 1754. All of these provisions are "[g]overnment

regulation[s] of speech" because they impose additional legal duties on covered websites if they disseminate speech of a certain type of "content." *Reed*, 576 U.S. at 163.

**B.    The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny.**

Because the Act triggers strict scrutiny several times over, Defendants must demonstrate that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *AFP*, 594 U.S. at 607 (citation omitted). Neither the Act nor any of its individual provisions can satisfy this demanding standard. They also cannot satisfy any form of heightened scrutiny, as they are not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted).

Even if Defendants could demonstrate a sufficient governmental interest, the Act's speech regulations are not narrowly tailored, let alone the "least restrictive means" of pursuing any governmental interest. *AFP*, 594 U.S. at 607 (citation omitted). Rather, the Act is both "seriously underinclusive" and "seriously overinclusive." *Brown*, 564 U.S. at 805. The tailoring flaws discussed below are cross-cutting and apply to every speech restriction in the Act and in every application to covered websites.

None of the Act's speech restrictions is the "least restrictive" way to accomplish any goals that the State might assert. *AFP*, 594 U.S. at 607 (citation omitted). Parents already have many options to oversee their children online. Louisiana could alternatively give "parents the information needed to engage in active supervision" over children's internet access. *Playboy*, 529 U.S. at 826; *see, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 748 F. Supp. 3d at 1127. At a minimum, that would require the State to first *attempt* to publicize the diverse supervisory technologies that are widely available. *See supra* Part A.2. Louisiana ignored these less restrictive options. "It is no

24

response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824.

Furthermore, members' self-regulation is extensive, as websites already engage in content moderation and provide parental controls and other tools. *See supra* Part A.2. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention. *Brown*, 564 U.S. at 803 (crediting video game industry's self-regulation).

Regardless, the Act is vastly overinclusive—both in the range of protected speech it restricts and the regulated websites. It targets websites that disseminate a broad range of protected speech. *See, e.g.*, *Reyes*, 748 F. Supp. 3d at 1129. And it does not purport to identify websites that are harmful to minors or even particularly likely to be accessed by minors.

Even under intermediate scrutiny, the Act "burden[s] substantially more speech than is necessary to further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted); *see FSC*, 145 S. Ct. at 2317. It indiscriminately regulates all "social media" websites (as defined by the Act) with 5 million or more users, without proof that *any* of them are harmful—let alone *all* of them. Defendants' own expert has admitted that there is no consensus definition of "social media" in the field of social psychology. Facts ¶ 187. So the Act cannot possibly target only those websites that purportedly cause harm to their users, because there is no expert agreement about what those websites are. Moreover, the Act indiscriminately restricts access to *all* the protected expression on those covered websites.

The Act's coverage is also "seriously underinclusive." *Brown*, 564 U.S. at 805. The Act's central coverage definition creates pervasive gaps in the State's regulatory regime. *Sorrell*, 564 U.S. at 573 (governmental regulation requires "coherent policy"); *see, e.g.*, *Reyes*, 748 F. Supp. 3d at 1128-29; *Paxton*, 747 F. Supp. 3d at 1038. As Defendants' expert put it, the Act leaves

unregulated "[t]he rest of the internet[.]" Facts ¶ 186; *see* Facts ¶¶ 45-48. So if Louisiana is attempting to provide parents greater control over their minor children, it makes no sense to limit coverage to websites that do not qualify for one of the numerous statutory exceptions (such as "interactive gaming"), or meet an arbitrary 5-million user threshold. § 1751(11)-(12); *see Griffin*, 2025 WL 978607, at *11-12.

This coverage definition creates even more illogical results that fail any form of heightened First Amendment scrutiny. The State is perfectly fine with minors accessing the exact same speech or have the same interactions on the exact same website if its membership levels ever fall below 5 million users. YouTube must comply with the Act, but Hulu and Disney+ are exempted. § 1751(12)(b)(iii). X must comply with the Act, but the same content shown on a forum with fewer than "five million account holders worldwide," § 1751(11), need not comply. Nextdoor would be covered, but not if it limited discussion to "public safety." § 1751(12)(b)(viii). Minors must secure parental consent (and all users must verify their ages) to engage in "interactive gaming" on Facebook, but not on websites like Roblox "where the predominant or exclusive function is . . . interactive gaming." § 1751(12)(b)(vi). All job seekers must jump through those same hoops on covered websites, but not on websites where "the predominant or exclusive function is . . . [providing] [c]areer development opportunities." § 1751(12)(b)(ix).[8]

---

[8] The Act's constitutional infirmities are not saved by the Act's requirement for "commercially reasonable" age verification or parental consent. Governments cannot restrict speech simply because a publisher can afford it. *E.g.*, *Minneapolis Star*, 460 U.S. at 592 (speech restriction invalid even though larger entities are "better able to bear the burden"). And any form of age verification or parental consent would restrict users' access to speech in violation of the principles above. For example, *Brown* would not have come out differently if California's violent video game law had required only "commercially reasonable" efforts to impose parental consent. In any event, the phrase "commercially reasonable" is unconstitutionally vague, as *Carr* concluded. *Carr*, 2025 WL 1768621, at *19.

**C.    The Act's speech restrictions are both facially invalid under the First Amendment and invalid as-applied to the extent they regulate NetChoice's members' websites.**

NetChoice has demonstrated that the Act's speech restrictions are both facially invalid, and invalid as-applied to the extent they regulate NetChoice's members' services. Although either ground is sufficient to rule for NetChoice, NetChoice respectfully requests that this Court rule on both NetChoice's facial and as-applied First Amendment claims.

**1.** The Act should "be struck down in its entirety" because its "unconstitutional applications substantially outweigh its constitutional ones" when "judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723-24 (citation omitted).

This facial-challenge inquiry "first" asks what "actors" and "activities" are regulated by the Act. *Id.* at 724. Because the Act targets a subset of what the Supreme Court and others have called "social media," this Court "need not speculate" about "hypothetical or imaginary cases" for purposes of NetChoice's facial challenge. *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (cleaned up).

As explained above, the Act singles out a content-based subset of the kinds of "social media" websites that people have a recognized First Amendment right to access. *Packingham*, 582 U.S. at 108; *see supra* pp.6-7. That is because the Act singles out for regulation websites that "allow users to upload content . . . to share [it] with others." *Moody*, 603 U.S. at 719. That is, the Act targets websites that uniquely allow their users to speak and to engage with the speech of others. So "[t]he laws' scope is largely not in dispute. . . . [T]here is no dispute that users engage in protected speech on all the platforms that are arguably within the Act's proscription." *Griffin*, 2025 WL 978607, at *7. Thus, the "pertinent facts" about what qualifies a website for regulation are "the same across the board." *AFP*, 594 U.S. at 618.

On these "social-media" websites, the Act's regulated "activities" are plain on the face of the law. *Moody*, 603 U.S. at 724. The Act uses content-based coverage criteria to both regulate: (1) access to the websites through age-verification and parental-consent requirements; and (2) the speech available on those websites, through restrictions on advertising and messaging. So "the Act imposes a platform-wide burden on users' right to engage in that speech" that does not "differ between the platforms regulated." *Griffin*, 2025 WL 978607, at *7.

If there were any doubt, the Act's exceptions obviate any need for a nuanced analysis of different "kinds of websites" ("actors") identified by *Moody*, that might "fall on different sides of the constitutional line" in considering different theories. 603 U.S. at 718, 726. Specifically:

- the Act's exclusion of "email" and "direct messaging services," § 1751(12)(a)(i); excludes email services like "Google Mail" and direct-messaging services like "Microsoft Teams" and "Google Meet," *Fitch*, 134 F.4th at 809;

- the Act's exclusion of "electronic commerce" and "[o]nline shopping," § 1751(12)(b)(v); excludes "online marketplace[s] like Etsy," and "payment service[s] like Venmo," *Moody*, 603 U.S. at 725;

- the Act's exclusion of websites where the "content . . . is preselected by the provider and not user generated," § 1751(12)(b)(iv); excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725; "Google Maps," and "DraftKings," *Fitch*, 134 F.4th 808; and

- in addition, "DraftKings," *Fitch*, 134 F.4th at 808, also "predominant[ly]" offers "sports" and "electronic commerce," § 1751(12)(b)(iv)-(v).

Having identified the "actors" and "activities" regulated by this Act, the facial-challenge analysis "next" compares the Act's unconstitutional applications to any constitutional applications, asking whether the former "substantially outweigh" the latter. *Moody*, 603 U.S. at 723-24. That inquiry here is straightforward "from the face of the law": All aspects of the Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues." *X Corp.*, 116 F.4th at 899. Any time the Act would regulate based on content or restrict access to—or dissemination of—fully protected speech, it is presumptively unconstitutional. *E.g.*,

28

*Cruz*, 596 U.S. at 305. For example, whenever the Act requires parental consent, it violates *Brown* and *Packingham*. *See supra* pp.10-14. Similarly, whenever the Act requires age verification, it violates *FSC* and *Packingham*. *See supra* pp.14-16.

Because the Act is presumptively unconstitutional in all of its applications, those presumptively unconstitutional applications "substantially outweigh" any purportedly constitutional applications. *Moody*, 603 U.S. at 723-24. That shifts the "burden" to "the Government" to "prov[e] the constitutionality of its actions." *Cruz*, 596 U.S. at 305 (citation omitted). Specifically, *Defendants* have the burden to both (1) demonstrate that the Act can satisfy heightened First Amendment scrutiny in any of its applications; *and* (2) then show that those purportedly constitutional applications are not "substantially outweigh[ed]" by the Act's unconstitutional applications. *Moody*, 603 U.S. at 723-24; *see Griffin*, 2025 WL 978607, at *14 ("[B]ecause [the Act] is a content-based restriction, the State bears the burden of showing the Act meets strict scrutiny."). If Defendants cannot do so, the Act is properly declared facially unconstitutional. That is the case here. For example, "the law's overbroad tailoring does not vary between covered" websites. *Paxton*, 747 F. Supp. 3d at 1031; *see supra* p.25. Likewise, the State's failure to "consider[] alternatives . . . is true in every case." *AFP*, 594 U.S. at 618; *see supra* p.24.

**2.** At a minimum, the Act is unconstitutional as-applied to the extent it regulates NetChoice covered members' services. *See supra* pp.3-4; Facts ¶¶ 51-175. Put otherwise, the Act is unconstitutional "to the extent" that it regulates these eight services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).[9]

---

[9] NetChoice's complaint brought a "challenge to these provisions as applied to the members and services" identified in the complaint: Facebook, Instagram, Pinterest, Nextdoor,

These services are precisely the kinds of—if not *the*—"social media" websites discussed by the Supreme Court in *Moody* and *Packingham* and explained above. In fact, multiple members' services have been discussed by the Court as examples of such services, including "Facebook," "Twitter" (now X), and "YouTube." *Moody*, 603 U.S. at 740; *Packingham*, 582 U.S. at 99. Likewise, members' websites (including "Facebook" and "YouTube") are the kinds of websites the Court has held "engage[] in expression" by "mak[ing] choices about what third-party speech to display and how to display it." *Moody*, 603 U.S. at 716.

## II.    NetChoice is entitled to summary judgment on its claim that the Act's central coverage definition of "social media company" is unconstitutionally vague.

The Act's "[s]ocial media company" definition is also unconstitutionally vague. § 1751(11)-(12). "[V]agueness may be grounds for a pre-enforcement challenge" if a law "chills protected speech under the First Amendment"—even if the law is not vague in every application. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024). This First Amendment vagueness standard is "more stringent" for the State to meet than the ordinary vagueness standard. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Determining whether the Act applies requires identifying a website's "predominant or exclusive function." § 1751(12)(b). *Griffin* enjoined as unconstitutionally vague a law relying on similar terms that similarly lacked definition. 2025 WL 978607, at *15. Here too, a website's "predominant or exclusive function" is undefined, even though it is "critical to determining which entities fall within [the Act]'s scope." *Id.* at *15-16. For example, many people use LinkedIn for

---

Snapchat, Reddit, X, and YouTube. ECF 1 ¶ 67. Discovery in this case has demonstrated that Defendants regard four more NetChoice member services as covered by the Act: Discord, Tumblr, Twitch, and WhatsApp. *See supra* pp.3-4. Because "the distinction between facial and as-applied challenges" does not "control the pleadings" and instead "goes to the breadth of the remedy employed by the Court," this Court can declare that the Act is unconstitutional as applied to all twelve member services identified by both parties. *Citizens United*, 558 U.S. at 331.

"professional networking," § 1751(12)(b)(ix), but others use it for social interaction. In addition, many people use Discord and Twitch for "[i]nteractive gaming" and "virtual gaming," § 1751(12)(b)(vi), but others could use them for social interaction. For these examples and others, the Act "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements." *Griffin*, 2023 WL 5660155, at *13.

Faced with these questions, potentially regulated websites must either censor vast amounts of speech or risk unpredictable fines. *Id.* This is precisely the type of chilling effect the vagueness doctrine guards against, and that "renders a law unconstitutional." *Id.*

III. **NetChoice is entitled to summary judgment on the merits of its claim that the Act's advertising restrictions are preempted by 47 U.S.C. § 230.**

The Act's restriction on disseminating certain ads on minors' accounts, § 1753(2), is unlawful for an independent reason in addition to the First Amendment arguments discussed above at Part I.A.3. It is preempted by § 230, because it would penalize covered websites for disseminating third-party content and could require monitoring that content. *E.g.*, *Carr*, 2025 WL 1768621, at *20 (holding as preempted under § 230 a nearly identical requirement).

Websites have "broad immunity" for "*all claims* stemming from their *publication of information created by third parties*." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (cleaned up). That includes penalizing websites for exercising "editorial functions" over third-party content, such as "decisions relating to the monitoring, screening, and deletion of content." *Id.* at 797-98 (citation omitted). "No [website] shall be treated as the publisher or speaker of any

information provided by" someone else. 47 U.S.C. § 230(c)(1).[10] "No cause of action may be brought and no liability may be imposed . . . that is inconsistent with" § 230. *Id.* § 230(e)(3).

Here, § 230 preempts the Act's restriction on ads on minors' accounts. As *Carr* concluded when analyzing a similar law, this "requirement would ultimately result in liability for decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role. In such a case, section-230 immunity would likely attach." 2025 WL 1768621, at *20 (cleaned up).

The Act's undefined term "advertising" potentially encompasses both commercial advertisements and also *user-generated* promotional content. *See supra* p.8. User-generated advertisements could include everything from announcements about school fundraisers and local concerts to small business promotions and educational opportunities. Thus, compliance with the Act would require covered websites to monitor all user posts to determine whether they constitute "advertisements" and whether their display to users is based on "personal information." To the extent that the Act requires covered websites to *monitor* user-generated content for advertisements, § 230 preempts that purported duty to "monitor third-party content." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 123 n.11 (D. Mass. 2019) (similar); *La'Tiejira*, 272 F. Supp. 3d at 993-94 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." (citation omitted)).

Similarly, the undefined term "personal information" sweeps in a vast array of information that could inform ad placement decisions, including entirely innocuous information like a user's

---

[10] Members operate websites that qualify as "interactive computer service[s]" under 47 U.S.C. § 230(f)(2). *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017).

interests in sports, music, or academic subjects. Multiple other courts have concluded that § 230 protects websites' decisions to disseminate third-party ads. *See, e.g.*, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024); *FTC v. Match Grp., Inc.*, 2022 WL 877107, at *10 (N.D. Tex. Mar. 24, 2022).

At bottom, the Act would penalize websites for their display of advertisements to minors, which § 230 preempts.

## IV.    NetChoice meets all the remaining factors for a permanent injunction.

NetChoice meets all remaining factors for a permanent injunction prohibiting Defendants' enforcement of the Act's speech restrictions.

NetChoice "has satisfied the irreparable-harm requirement because it has alleged violations of" members' and users' "First Amendment . . . rights." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012). "The loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). The Act's penalties—$2,500 per violation, plus damages—magnify the harms that come from the Act's unconstitutional restrictions. *See supra* p.8. Defendants have already indicated their willingness to enforce the Act, having sent some NetChoice members a (later-withdrawn) letter stating that members are not in compliance. Facts ¶ 8.

Furthermore, the Act requires websites to shoulder "nonrecoverable compliance costs." *Louisiana v. Biden*, 55 F.4th 1017, 1033 (5th Cir. 2022) (citation omitted); *see Ohio v. EPA*, 603 U.S. 279, 292 (2024). Among other things, each website must adopt age-verification and parental-consent systems and alter the way they publish ads. Facts ¶ 184.

The final factors—harm to the opposing party and the public interest—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First

Amendment rights are always in the public interest." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1100 (5th Cir. 2023) (cleaned up). Here, that is not merely theoretical.

When a few other States' similar laws have taken effect, some NetChoice members have had to deny their speech services to either some or all users in the State. *See, e.g.*, Facts ¶ 99 (Nextdoor: "[I]ndividuals who are under the age of 18 are not permitted to create an account starting on September 1, 2024, if they are residents of the State of Texas, starting on January 1, 2025, if they are residents of the State of Tennessee.");[11] Denise, Mississippi site block, plus a small restriction on Tennessee new accounts, Dreamwidth (August 31, 2025), https://perma.cc/EYZ2-UGX3. And NetChoice members are not alone. One of the fastest-growing social media services in the country (Bluesky) likewise announced that it will "block access from Mississippi IP addresses." Bluesky, *Our Response to Mississippi's Age Assurance Law*, Bluesky Blog (Aug. 22, 2025), https://perma.cc/PJL2-G7PA.

The evidence is clear: When States are permitted to enforce laws that restrict minors' and adults' access to online services, websites may choose to withdraw their expressive offerings altogether. Whether that is because of the costs of compliance, the risk of liability, or something else is no matter. Self-censorship of protected speech is the natural and intended result of laws restricting speech. And it leaves both the websites and their would-be users+ worse off.

So granting NetChoice's regulated members permanent injunctive relief would prevent the further balkanization of access to "what for many are the principal sources for knowing current events, . . . and otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107.

---

[11] After discovery closed, Nextdoor added Mississippi to this list. Facts ¶ 100.

## Conclusion

This Court should declare §§ 1751-56 unconstitutional and otherwise unlawful and enjoin Defendants from enforcing §§ 1751-56 against NetChoice's regulated members.

Dated: September 22, 2025

Respectfully submitted,

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon G. Denmark*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

*admitted pro hac vice*

J. Christopher Dippel, Jr. (#30480)
KEAN MILLER LLP
400 Convention Street, Suite 700
Baton Rouge, LA 70802
chris.dippel@keanmiller.com

*/s/ Claire E. Juneau*
Claire E. Juneau (#33209)
Jeffrey J. Gelpi (#37130)
KEAN MILLER LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone: (504) 585-3050
claire.juneau@keanmiller.com
Jeffrey.gelpi@keanmiller.com

**Lead Counsel**

*Attorneys for Plaintiff NetChoice*