# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| NETCHOICE, | |
| PLAINTIFF, | |
| v. | Civil Action No. 3:25-cv-231 |
| LIZ MURRILL, et al., | Judge: JWD - RLB |
| DEFENDANTS. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 1

I.     FACTUAL BACKGROUND ......................................................................... 3

     A.   The Internet Is A Dangerous Place, Especially for Minors. ......................... 3

     B.   Age Assurance and Parental Consent Are Traditional,
           Commonsense Ways to Protect Minors. ............................................. 4

     C.   Act 456 Invokes These Traditional Methods of Protecting
           Children. ......................................................................................... 5

II.    PROCEDURAL BACKGROUND ................................................................. 6

STANDARD OF REVIEW .................................................................................. 7

ARGUMENT ....................................................................................................... 7

I.     NETCHOICE HAS NO COMPETENT SUMMARY JUDGMENT EVIDENCE
     TO ESTABLISH JURISDICTION OR SUPPORT ITS CLAIMS. ........................ 7

     A.   NetChoice Has No Admissible Factual Evidence. ................................. 8

     B.   NetChoice Has No Admissible Expert Evidence. .................................. 11

II.    NETCHOICE LACKS ASSOCIATIONAL STANDING. ................................... 12

     A.   NetChoice Failed To Prove Any Individual's Standing. ........................ 13

     B.   NetChoice Failed to Prove That The Claims And The Relief
           It Seeks Do Not Require Individual Members' Participation In
           the Lawsuit. ..................................................................................... 17

III.   THE CLAIMS FAIL ON THEIR MERITS. ................................................... 20

     A.   The Void-For-Vagueness Claim (Count II) Fails. ................................. 20

     B.   NetChoice Cannot Satisfy the Demanding *Moody* Standard,
           So Its Facial Overbreadth Claims (Counts I, II, IV, V) Fail. ................. 21

C.   The "As-Applied" First Amendment Challenges to the Coverage-
     Definition, Age-Verification and Parent-Consent Provisions
     (Count Counts I, III, IV) Fail.......................................................... 23

     1.   The challenged provisions regulate conduct, not speech. ..................... 23

     2.   The Act's challenged provisions are, at most, subject
          to intermediate scrutiny and readily satisfy it. ................................ 25

D.   The "As-Applied" First Amendment Challenge to the Minor
     Privacy Provisions (Count V, VI) Fails. ....................................... 29

     1.   The minor privacy provisions regulates conduct, not speech. .............. 29

     2.   The minor privacy provisions are, at most, a valid
          commercial speech regulation, and readily satisfies
          that lesser burden. .................................................................... 29

E.   The Preemption Challenge to the Minor Privacy
     Provisions (Count VI) Fails. ........................................................ 32

CONCLUSION.................................................................................... 35

CERTIFICATE OF SERVICE................................................................ 37

iii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996) ................................................................. 32

*A.B. v. Salesforce, Inc.,*
   123 F.4th 788 (5th Cir. 2024)................................................. 34, 35

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ................................................................. 33

*Alleman v. Harness,*
   780 F. Supp. 3d 608 (M.D. La. 2025) ............................................. 30, 31

*Allen v. Louisiana,*
   14 F.4th 366 (5th Cir. 2021).................................................... 13

*Am. Acad. of Implant Dentistry v. Parker,*
   860 F.3d 300 (5th Cir. 2017) ................................................... 30

*Anderson v. City of Hermosa Beach,*
   621 F.3d 1051 (9th Cir. 2010) .................................................. 25

*Anderson v. TikTok, Inc.,*
   116 F.4th 180 (3d Cir. 2024) ................................................... 35

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ................................................................. 34

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
   627 F.3d 547 (5th Cir. 2010) .............................................. 17, 19

*Brown v. City of Houston,*
   337 F.3d 539 (5th Cir. 2003) .................................................. 8

*Brown v. Entertainment Merchants Association,*
   564 U.S. 786 (2011) ............................................................ 27, 28

*Carney v. Adams,*
   592 U.S. 53 (2020) ................................................................. 12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................ 1, 3, 7, 8

*Central Hudson Gas & Electric Corp. v. Public Service*
    *Commission of N.Y.,*
    447 U.S. 557 (1980) .......................................................... 2, 29, 30, 32

*Christian Lab. Ass'n v. City of Duluth,*
    142 F.4th 1107 (8th Cir. 2025) .................................................... 13

*Cisneros v. Sanchez,*
    403 F. Supp. 2d 588 (S.D. Tex. 2005) ...................................... 34

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) .................................................................... 32

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .................................................................... 15

*Ctr. for Biological Diversity v. EPA,*
    937 F.3d 533 (5th Cir. 2019) ................................................ 15, 16

*Davidson v. Fairchild Controls Corp.,*
    882 F.3d 180 (5th Cir. 2018) ...................................................... 7

*Deep S. Today v. Murrill,*
    779 F. Supp. 3d 782 (M.D. La. 2025) ................................. 22, 23

*Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for*
    *Pro. Eng'rs & Surveyors,*
    916 F.3d 483 (5th Cir. 2019) ................................................ 30, 31

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) .................................................................... 20

*Ford Motor Co. v. Tex. Dep't of Transp.,*
    264 F.3d 493 (5th Cir. 2001) ...................................................... 21

*Free Speech Coal., Inc. v. Paxton,*
    95 F.4th 263 (5th Cir. 2024) ............................................ 30, 34, 35

*Free Speech Coal., Inc. v. Paxton ("FSC"),*
    145 S. Ct. 2291 (2025) ....................................................... *passim*

v

*Gonzaga Univ. v. Doe,*
  536 U.S. 273 (2002) ........................................................................ 33

*Groome Res. Ltd. v. Par. of Jefferson,*
  234 F.3d 192 (5th Cir. 2000) ........................................................ 21

*Hancock Cnty. Bd. of Sup'rs v. Ruhr,*
  487 F. App'x 189 (5th Cir. 2012) ................................................. 13

*Hanover Ins. Co. v. Superior Lab. Servs., Inc.,*
  No. CV 11-2375, 2017 WL 3582385
  (E.D. La. Aug. 18, 2017) ................................................................ 8

*Health and Hospital Corp. of Marion Cty. v. Talevski,*
  599 U.S. 166 (2023) ........................................................................ 33

*Hines v. Pardue,*
  117 F.4th 769 (5th Cir. 2024) ................................................. 23, 24

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ..................................................... 1, 12, 19, 20

*In re Gee,*
  941 F.3d 153 (5th Cir. 2019) (per curiam) ............................ 15, 17

*Justice v. Hosemann,*
  771 F.3d 285 (5th Cir. 2014) ........................................................ 18

*La. Crisis Assistance Ctr. v. Marzano-Lesnevich,*
  878 F. Supp. 2d 662 (E.D. La. 2012) ........................................... 20

*La. State Conf. of NAAPC v. Louisiana,*
  490 F. Supp. 3d 982 (M.D. La. 2020) .......................................... 13

*Lorillard Tobacco Co. v. Reilly,*
  533 U.S. 525 (2001) .................................................................. 31, 32

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ......................................................... 13, 14, 15, 16

*Mays v. Dir., Off. of Workers' Comp. Programs,*
  938 F.3d 637 (5th Cir. 2019) .......................................................... 9

*MC Trilogy Texas, LLC v. City of Heath*,
  No. 22-2154, 2024 WL 1641233
  (N.D. Tex. Apr. 16, 2024) ........................................................................ 9

*Medina v. Planned Parenthood S. Atlantic*,
  145 S. Ct. 2219 (2025) ............................................................................ 33

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ........................................................................*passim*

*Morgan v. White*,
  964 F.3d 649 (7th Cir. 2020) .................................................................. 24

*Morrissey v. King*,
  No. 2:13-CV-0074, 2014 WL 4802436
  (N.D. Tex. Sept. 26, 2014) ....................................................................... 9

*Murray v. LeBlanc*,
  No. CV 21-592-JWD-RLB, 2024 WL 2741199
  (M.D. La. May 28, 2024) ........................................................................... 9

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ................................................................... 12, 15, 20

*NAACP v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) .................................................................. 13

*Nairne v. Ardoin*,
  No. CV 22-178-SDD-SDJ, 2023 WL 7673856
  (M.D. La. Nov. 14, 2023) ........................................................................ 14

*Nat'l Press Photographers Ass'n v. McCraw*,
  90 F.4th 770 (5th Cir.), *cert. denied sub nom.*
  *Nat'l Press Photographers Ass'n v. Higgins*,
  145 S. Ct. 140 (2024) ...................................................................... 17, 25

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,*
  *& Explosives*,
  700 F.3d 185 (5th Cir. 2012), *abrogated on other grounds by*
  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) .................................................................................... 13

*NetChoice v. Bonta*,
  761 F. Supp. 3d 1202 (N.D. Cal. 2024) ........................................... 10, 18

*NetChoice, L.L.C. v. Fitch,*
    134 F.4th 799 (5th Cir. 2025) .......................................................*passim*

*NetChoice, L.L.C. v. Paxton,*
    121 F.4th 494 (5th Cir. 2024) .......................................................... 23

*NetChoice, LLC v. Bonta,*
    No. 25-146, __ F.4th __, 2025 WL 2600007
    (9th Cir. Sept. 9, 2025) ......................................................... 11, 18, 19

*Rahman v. ExxonMobil Corp.,*
    No. CV 18-894-BAJ-RLB, 2020 WL 354320
    (M.D. La. Jan. 21, 2020)................................................................. 9

*Rancho Palos Verdes v. Abrams,*
    544 U.S. 113 (2005) ...................................................................... 34

*Rasheed v. Church & Dwight Co.,*
    No. 5:11CV80, 2012 WL 262619 (E.D. Tex. Jan. 12, 2012), *report
    and recommendation adopted,* No. 5:11CV80, 2012 WL 262616
    (E.D. Tex. Jan. 30, 2012) .............................................................. 11

*Sable Commc'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989) .................................................................. 28, 32

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality,*
    968 F.3d 419 (5th Cir. 2020) ......................................................... 14

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ...................................................................... 24

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    Coll.,*
    346 F. Supp. 3d 174 (D. Mass. 2018) .............................................. 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    Coll.,*
    600 U.S. 181 (2023) ...................................................................... 12

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) .............................................................. 2, 13, 14

*Tex. Cable & Telecomms. Ass'n v. Hudson,*
    265 F. App'x 210 (5th Cir. 2008)...................................................... 13

*Tex. Democratic Party v. Abbott,*
 961 F.3d 389 (5th Cir. 2020) ............................................................. 2, 21

*Texas v. United States,*
 97 F.4th 268 (5th Cir. 2024) .................................................................. 34

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) ............................................................................... 15

*United States v. Rafoi,*
 60 F.4th 982 (5th Cir. 2023) .................................................................. 21

*US Inventor Inc. v. Vidal,*
 No. 21-40601, 2022 WL 4595001
 (5th Cir. Sept. 30, 2022) ........................................................................ 15

*Virginia v. Am. Booksellers Ass'n,*
 484 U.S. 383 (1988) ............................................................................... 14

*Virginia v. Hicks,*
 539 U.S. 113 (2003). Act 456 .......................................................... 24, 30

*Walker LP v. Certain Underwriters at Lloyds, London,*
 No. CV 22-485-BAJ-RLB, 2023 WL 6134767
 (M.D. La. Sept. 19, 2023) ......................................................................... 9

*Ward v. Rock Against Racism,*
 491 U.S. 781 (1989) ............................................................................... 28

*Webster v. Offshore Food Serv., Inc.,*
 434 F.2d 1191 (5th Cir. 1970) ............................................................... 11

*Young v. UOP LLC,*
 No. CV 21-282-SDD-EWD, 2024 WL 288985
 (M.D. La. Jan. 25, 2024) .......................................................................... 9

*Zauderer v. Off. of Disciplinary Counsel of Supreme Ct. of Ohio,*
 471 U.S. 626 (1985) ............................................................................... 30

**Statutes**

15 U.S.C. §§ 6501–6506 ............................................................................ 32

29 U.S.C. § 1144(a) ................................................................................... 35

47 U.S.C. § 230 ..................................................................................... 34, 35

La. R.S. 51:1751 ....................................................... 1, 5, 6, 20, 21, 24

La. R.S. 51:1752(A) ................................................................ 6, 5, 22, 24

La. R.S. 51:1753 ............................................................ 6, 29, 31, 32, 35

La. R.S. 51:1754 ............................................................................... 6

La. R.S. 51:1755 ............................................................................... 1, 6

La. R.S. 51:1756 ............................................................................... 6

## Other Authorities

2023 La. Sess. Law Serv. Act 456 ......................................................... 5

Fed. R. Civ. P. Rule 30(b)(6) .............................................................. 3, 9

Fed. R. Civ. P. 56(e) ....................................................................... 3, 7, 14

U.S. Const. art. III, § 2 ................................................................... 20

## INTRODUCTION

This is the rare case where a sophisticated plaintiff arrives at summary judgment with no admissible evidence. NetChoice—a D.C. trade association funded by the largest internet companies in the world—asks the Court to invalidate a duly enacted Louisiana law on nothing more than speculation and internet printouts. Rules of evidence and procedure be damned. Summary judgment, however, is the put-up-or-log-out moment of the case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). NetChoice has put up nothing. Summary judgment is thus warranted.

Louisiana's youth is facing a mental-health crisis caused by social media and the predations of online platforms. SOF ¶ 5. Act 456 responds by imposing three commonsense obligations on social media companies. *See* La. R.S. 51:1751–1755. *First*, they must make commercially reasonable efforts to verify the age of Louisiana account holders. *Second*, they must obtain parental consent before a Louisiana minor opens or maintains an account. *Third*, they must restrict how adults, algorithms, and advertisers exploit minors' accounts and personal information. These are the same traditional safeguards states require in countless offline contexts—now "adapt[ed] … to the digital age." *Free Speech Coal., Inc. v. Paxton ("FSC")*, 145 S. Ct. 2291, 2306, 2309 (2025). NetChoice's challenge to that law fails on both jurisdictional and merits grounds—not least because it failed to develop any evidence.

Jurisdiction alone is dispositive. NetChoice failed to prove it has associational standing in this case. It was required to prove that at least one member has standing in its own right and that the claims can be litigated without member-by-member participation. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

1

At summary judgment, that means actual, specific evidence—not allegations, conclusory assertions, or speculation. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). But NetChoice took the remarkable position that it knows nothing about its members beyond what they post online. And as the Court has already foreshadowed, *see* ECF No. 54 at 13, that means that NetChoice cannot meet the first or third prongs of its associational standing burden, *see NetChoice, LLC v. Bonta*, No. 25-146, __ F.4th __, 2025 WL 2600007, at *6–7 (9th Cir. Sept. 9, 2025). This case can thus begin and end with standing.

Even if NetChoice could establish standing (it cannot), its claims collapse on the merits. Its vagueness challenge borders on frivolous: Act 456's definition of "social media company" and "social media platform" are detailed and precise, not "so vague and indefinite as really to be no rule at all." Its lead facial overbreadth theories likewise founder under *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), which requires two-steps of fact-specific showings: first, defining the law's actual sweep; and second, proving that a substantial number of its applications are unconstitutional in relation to its plainly legitimate scope. NetChoice declined to build that record for either step. Its vagueness and overbreadth claims thus fail.

The same is true of its as-applied First Amendment claims aimed at the Act's coverage definition, age verification, and parental consent provisions. Act 456 is a traditional exercise of state power to protect minors from online predators by directly regulating wholly unexpressive conduct—social media companies' verifying ages and obtaining parental consent. If any burden falls on speech at all, it is incidental to the

Act, which makes intermediate scrutiny (at most) the appropriate framework. *See FSC*, 145 S. Ct. at 2306–09. And the Act readily satisfies that standard by implementing traditional safeguards for minors adapted for the digital age.

NetChoice's attack on the Act's minor-privacy provisions also fails outright. Those provisions regulate how platforms collect minors' personal information and share it for extra-targeted advertising. At most, they restrict commercial speech, and NetChoice has offered no evidence that the affected advertising is lawful and non-misleading. Even under *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980), Louisiana's restrictions easily pass that lesser intermediate scrutiny by directly advancing the compelling interest in protecting minors' privacy while leaving adult speech and targeted advertising completely untouched. Nor does Section 230 save NetChoice. That statute is a defense to liability, not a preemptive sword, and it does not apply to a platform's own commercial conduct in exploiting minors' personal information.

At every stage—jurisdictional and merits—NetChoice's case depends on evidence it never developed or produced. This Court should grant Defendants' summary judgment and uphold Act 456 in its entirety.

## BACKGROUND

## I.   FACTUAL BACKGROUND

### A. The Internet Is A Dangerous Place, Especially for Minors.

Social media is causing the youth mental health crisis. SOF ¶ 5. Social media use drives higher rates of adolescent depression, unhappiness, loneliness, self-harm, and suicide. SOF ¶ 1. The more hours a teenager—especially girls and those under

3

fifteen—spends on social media, the more likely she is to be depressed or unhappy. SOF ¶¶ 2–3. People who quit or cut back on social media for even two weeks become less lonely and less depressed. SOF ¶ 4. Use today thus predicts lower psychological well-being.

The scale of predatory content underscores why. In just six months of 2023, Facebook saw at least 2.7 billion spam posts, 28 million hate speech posts, and 27 million violent or graphic posts. SOF ¶ 31. Social media platforms are thus in "a constant battle against malicious actors, including spammers, scammers, and users peddling hateful content." SOF ¶ 30. Content moderation is less than perfect, SOF ¶ 33, even were it executed in the companies' preferred image, *see* SOF ¶¶ 32, 39 (explaining NetChoice's members' preferred content moderations decisions). That is because predators adapt and exploit flaws by spacing racial epithets, using "algospeak" like "unalive" for suicide or "mascara" for sexual assault, or even slipping disturbing versions of children's cartoons into YouTube Kids. SOF ¶¶ 34–37.

For NetChoice, the psychological harm inflicted on Louisiana's teenagers is just "the unavoidable consequence of allowing human expression." SOF ¶ 38. Louisiana begs to differ.

### B. Age Assurance and Parental Consent Are Traditional, Commonsense Ways to Protect Minors.

Age verification and parental consent are traditional safeguards before exposing minors to risky activities like alcohol, tobacco, gambling, tattoos, firearms, and pornography. SOF ¶ 14. Today, these safeguards are cheaper, more reliable, and more privacy-protective than ever. SOF ¶¶ 17–23. Unlike device- or network-level

filters, website-level age assurance is reliable and interoperable across platforms, allowing one verification to apply seamlessly to multiple sites. SOF ¶¶ 10, 28. Age can be confirmed in less than a minute, cost under a cent per check, and does not require retaining sensitive personal data. SOF ¶¶ 17–23. And more than forty third-party providers compete globally to deliver these services, and thousands of businesses use them daily. SOF ¶¶ 16, 20–21, 24. Nor are NetChoice's members strangers to these services: Many already use age-verification mechanisms abroad, SOF ¶¶ 8, 11, 29, and parent-consent mechanisms for those under 13 through the Children's Online Privacy Protection Act's Safe Harbor Program. SOF ¶¶ 26–27.

### C. Act 456 Invokes These Traditional Methods of Protecting Children.

Animated by concerns over minors' online safety and failures of content moderation, the Legislature passed—and Governor Edwards signed—Louisiana's Secure Online Child Interaction and Age Limitation Act of 2023. *See* 2023 La. Sess. Law Serv. Act 456 (S.B. 162) (codified at La. R.S 51:1751 *et seq.*).

The Act imposes three core obligations on large social media platforms. *First*, a covered "social media company" must "make commercially reasonable efforts to verify the age of Louisiana account holders." La. R.S. 51:1752(A). *Second*, a covered company must ensure that no minor opens or maintains an account without "the express consent of a parent or guardian," which may be obtained through several flexible "[a]cceptable methods"—such as signed forms, telephone or video calls, or other "commercially reasonable" mechanisms. La. R.S. 51:1752(B)(1)–(6). Companies must also equip consenting parents "with a means for the minor account holder or the parent or guardian to initiate account supervision," including "the ability for the

parent to view privacy settings of the minor's account, set daily time limits for the service, schedule breaks, and offer the minor the option to set up parental notifications when the minor reports a person or issue." La. R.S. 51:1754. *Third*, a covered company must (1) bar "[a]dults from direct messaging a Louisiana minor account holder" unless already connected, (2) prohibit "[t]he display of any advertising" based on a minor user's "personal information, except age and location," and (3) limit the "collection or use" of minor users' "personal information from the posts, content, messages, text, or usage activities" to only "what is adequate, relevant, and reasonably necessary" for its disclosed purpose. La. R.S. 51:1753.

Enforcement lies exclusively with the Division of Public Protection within the Louisiana Department of Justice. La. R.S. 51:1756(A); *see* La. R.S. 51:1751(3). The Division may promulgate rules and regulations, La. R.S. 51:1752(D); receive and investigate complaints, La. R.S. 51:1755; and pursue enforcement actions, La. R.S. 51:1756(D)(1)–(3). Before initiating any action, however, the Division must issue written notice and allow forty-five days to cure. La. R.S. 51:1756(D)(1)–(3). Absent a cure (or in cases of repeat violations), the Division may impose administrative fines up to $2,500 per violation or file suit for damages, civil penalties, or equitable relief. La. R.S. 51:1756(B)–(C).

## II.    PROCEDURAL BACKGROUND

In March 2025, NetChoice—a D.C.-based trade association of big tech giants—filed this lawsuit to challenge Louisiana's Secure Online Child Interaction and Age Limitation Act of 2023. *See* ECF No. 1 ("Compl."). It seeks, among other things, an injunction barring enforcement of the Act against NetChoice and its approximately

6

40 publicly disclosed members. Compl. at 5 & n.2, 38. That day, NetChoice moved for a preliminary injunction supported by declarations from its general counsel since October 2024, Bartlett Cleland, and representatives of member companies Snap and Reddit. ECF No. 6. Before litigating that motion, however, the parties submitted— and the Court entered—a Joint Case Management Order providing for expedited fact and expert discovery followed by summary judgment briefing. ECF Nos. 24, 26.

## STANDARD OF REVIEW

Summary judgment is warranted "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018) (citation omitted); Fed. R. Civ. P. 56. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23 (quoting Fed. R. Civ. P. 56(c)).

## ARGUMENT

## I.    NETCHOICE HAS NO COMPETENT SUMMARY JUDGMENT EVIDENCE TO ESTABLISH JURISDICTION OR SUPPORT ITS CLAIMS.

This is the extraordinary case in which a sophisticated plaintiff with sophisticated counsel arrives at summary judgment with no admissible evidence—

7

and audaciously asks for judgment in its favor. That defect is self-inflicted. NetChoice first insisted that it has no first-hand knowledge of its members and vowed to rely only on uncorroborated internet postings at summary judgment. *See* ECF No. 44 at 23. Then NetChoice withdrew its only expert Dr. Anthony Bean, *see* ECF No. 51 at 1, but only after being caught serving his largely AI-hallucinated report under penalty of perjury, *see* ECF No. 42. By resisting the Federal Rules of Civil Procedure and the Federal Rules of Evidence at every turn, NetChoice has left itself with the burden of proof and nothing to show for it. *See Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."); *see also Hanover Ins. Co. v. Superior Lab. Servs., Inc.*, No. CV 11-2375, 2017 WL 3582385, at *6 n.39 (E.D. La. Aug. 18, 2017) (Courts need not "rescue parties from their strategic litigation choices … [nor] rescue parties from their own errors." (citation omitted)). That absence of competent proof alone warrants summary judgment for Defendants. *See Celotex*, 477 U.S. at 322–23.

### A. NetChoice Has No Admissible Factual Evidence.

NetChoice's corporate representative took the remarkable position that its corporate knowledge of its members rests entirely on what those members have posted on the Internet—nothing more. *See, e.g.*, Ex. C (NetChoice Dep. Tr.) at 180:3–9 ("Q. Does NetChoice receive information from any of its members pertaining to the use of content moderation methods? … A. Only to the extent that it's placed on their websites."); 28:9–17; 221:10–20; 225:2–13; 253:3–9; 256:20–257:14; 267:18–25; 320:23–321:3; 371:4–11. When Defendants pressure-tested that startling position

through a motion to compel a knowledgeable witness, *see* ECF No. 35, NetChoice doubled down, promising that "[a]t summary judgment, [it] will rely on the publicly available information about its members that it has produced to Defendants." ECF No. 44 at 23; *e.g.*, *id.* at 2, 3, 4, 20 (emphasizing repeatedly that NetChoice has no information in its possession, custody, or control about its members beyond what appears on their websites).

Defendants are entitled to take NetChoice at its word. Its Rule 30(b)(6) testimony binds the organization. *See Murray v. LeBlanc*, No. CV 21-592-JWD-RLB, 2024 WL 2741199, at *4 (M.D. La. May 28, 2024) ("Rule 30(b)(6) testimony binds the entity[.]" (quoting *MC Trilogy Texas, LLC v. City of Heath*, No. 22-2154, 2024 WL 1641233, at *5 (N.D. Tex. Apr. 16, 2024))).[1] And its express confirmation is a judicial admission that prevents retreat. *Mays v. Dir., Off. of Workers' Comp. Programs*, 938 F.3d 637, 647 (5th Cir. 2019) ("A statement made during the course of a lawsuit … should be considered a judicial admission … 'if it was made intentionally as a waiver, releasing the opponent from proof of fact.'").

NetChoice's litigation choice is fatal. "'Uncorroborated internet evidence' is not competent summary judgment evidence." *Young v. UOP LLC*, No. CV 21-282-SDD-EWD, 2024 WL 288985, at *15 n.161 (M.D. La. Jan. 25, 2024) (collecting cases)

---

[1] *See also Rahman v. ExxonMobil Corp.*, No. CV 18-894-BAJ-RLB, 2020 WL 354320, at *10 (M.D. La. Jan. 21, 2020) ("the Rule 30(b)(6) deposition testimony will bind the corporate deponent"); *Walker LP v. Certain Underwriters at Lloyds, London*, No. CV 22-485-BAJ-RLB, 2023 WL 6134767, at *6 (M.D. La. Sept. 19, 2023) (corporate representative's "testimony, as a Rule 30(b)(6) representative, is binding on" the company).

(quoting *Morrissey v. King*, No. 2:13-CV-0074, 2014 WL 4802436, at *9 n.8 (N.D. Tex. Sept. 26, 2014)); *see* Fed. R. Civ. P. 56(c). Yet NetChoice promises that its entire evidentiary package consists only of what "third-party" member companies have chosen to post online, *see* ECF No. 44 at 2, 5, 10, 13–14, 18, 20, while confirming (emphatically) that it made no effort to independently corroborate, authenticate, or verify the truth of any of those statements with its member companies, *see* NetChoice Dep. Tr. at 249:22–250:4 (Q: And no one at NetChoice sought to verify that with anyone affiliated with Reddit, correct? … A: As I said before, all information that I'm aware of that we know as NetChoice is from their websites and how they explain their verification, whether they do.").[2] Worse, NetChoice has vowed that it does not even know who at the member companies could corroborate those statements. NetChoice Dep. Tr. at 210:22–25 ("Q: Does anyone at NetChoice know who at Meta would have access to that information? A: The honest answer is I don't know, and I doubt it."); *see also, e.g.*, NetChoice Dep. Tr. at 68:4–70:10, 121:19–22.

The Court has already recognized where this leads: "That NetChoice was unable to provide information at its deposition that is relevant" to "its members and services" "raises the issue of whether NetChoice has associational standing to raise an 'as applied' First Amendment challenge on behalf of its members in the first place." ECF No. 54 at 13 (citing *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1230–31 (N.D.

---

[2] *See also, e.g.*, NetChoice Dep. Tr. at 190:7–16 ("there seems to be this obsession with reaching out to somebody"), 19:15–18, 27:19–24, 28:2–7, 30:13–17, 58:18–59:2, 62:16–21, 83:21–25, 141:5–8, 143:24–144:1, 181:7–12, 195:13–18, 203:7–13, 236:11–15, 242:12–24.

Cal. 2024)). And that concern "is just as true in [an] as-applied challenge as it [i]s in *Moody*'s facial challenge." *Bonta*, 2025 WL 2600007, at *6.

**B. NetChoice Has No Admissible Expert Evidence.**

NetChoice also withdrew its only putative expert—Dr. Anthony Bean—and disclaimed "any other expert witness in this case." ECF No. 51 at 4–5. That withdrawal came after Defendants demonstrated that Dr. Bean's testimony was irreparably unreliable because his report was riddled with seemingly AI-fabricated quotations and citations. *See* ECF No. 42-1 at 8–25.

NetChoice's litigation mistake again has consequences. Without an admissible expert of its own, NetChoice cannot genuinely dispute the sworn testimony of Defendants' experts, Dr. Jean Twenge (a psychologist who has studied adolescent mental health and the impacts of social media) and Tony Allen (a world-renowned expert in age assurance and age verification technologies). *E.g.*, *Rasheed v. Church & Dwight Co.*, No. 5:11CV80, 2012 WL 262619, at *6 (E.D. Tex. Jan. 12, 2012) ("[W]here an expert witness has produced legally sufficient evidence in support of a motion for summary judgment, the opposing party must produce other expert testimony to controvert the claims and raise a genuine issue of fact."), *report and recommendation adopted*, No. 5:11CV80, 2012 WL 262616 (E.D. Tex. Jan. 30, 2012); *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970) ("[T]he trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness … where, as here, the testimony bears on technical questions of medical causation beyond the competence of lay determination." (internal citation omitted)).

Thus unrebutted stand Dr. Twenge's conclusion that "social media use is a causal factor in the youth mental health crisis," Ex. A ¶ 149; *see* SOF ¶¶ 1–5, and Mr. Allen's conclusion that "[a]ge-assurance methods do not necessarily add a new step to a user's visit to a new website or app" and have become ubiquitous even among NetChoice's own members, Ex B. ¶¶ 77–80; *see* SOF ¶¶ 6–28. Their testimony is not just unrebutted—it is now the undisputed factual predicate on which this case must be decided.

## II. NETCHOICE LACKS ASSOCIATIONAL STANDING.

NetChoice has not carried its burden to establish associational standing—either on behalf of its members (Compl. ¶¶ 14–16) or their users (Compl. ¶ 17). As the party asserting jurisdiction, NetChoice "bears the burden of establishing standing as of the time [it] brought th[e] lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). To invoke associational standing, more is required: "[A]n organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt*, 432 U.S. at 343); *e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 346 F. Supp. 3d 174, 190–92 & n.15 (D. Mass. 2018) (discussing evidence developed from specific "Standing Members"). NetChoice cannot satisfy the first or third prongs at this juncture.

12

## A. NetChoice Failed To Prove Any Individual's Standing.

NetChoice has not proven anyone's Article III standing in his or her (or its) own right. "The first prong requires that at least one member of the association have standing to sue in his or her own right." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012), *abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). While at "*the pleading stage*," an associational plaintiff need not "identify a particular … member" with standing, summary judgment presents "a different procedural posture." *La. State Conf. of NAAPC v. Louisiana*, 490 F. Supp. 3d 982, 1012–13 (M.D. La. 2020) (quoting *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012)), *aff'd sub nom. Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021). NetChoice's reliance on the forgiving inference of "financial harm" or "financial injury" to its members at the *preliminary-injunction* stage, *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804–05 (5th Cir. 2025), therefore, cannot carry over into the *summary-judgment* stage, *see NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010); *Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 216 (5th Cir. 2008) ("Evidently then, the requirements of the plaintiff with respect to a motion to dismiss and an adversarial motion for summary judgment will be substantially different.").

"At the summary-judgment stage, trust is not enough[,]" *Christian Lab. Ass'n v. City of Duluth*, 142 F.4th 1107, 1114 (8th Cir. 2025)—"naming the affected members" is an Article III minimum, *Summers*, 555 U.S. at 498. And "mere allegations" alone are insufficient. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

"In response to a summary judgment motion," the burden is NetChoice's to "'set forth' by affidavit or other evidence 'specific facts'" that prove the elements of standing for an individual member. *Id.* (quoting Fed. R. Civ. P. 56(e)); *accord Summers*, 555 U.S. at 499 ("Standing ... requires ... a factual showing of perceptible harm." (citation omitted)); *e.g.*, *Nairne v. Ardoin*, No. CV 22-178-SDD-SDJ, 2023 WL 7673856, at *5 (M.D. La. Nov. 14, 2023) ("Plaintiffs herein have pled such harm *and supported the claims with summary judgment evidence.*" (emphasis added)); *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 424–25 (5th Cir. 2020) ("We conclude Petitioners have not satisfied their burden to show their members' injuries in fact."); *but see* ECF No. 44 at 5, 10, 13, 14, 20 (NetChoice describing its members repeatedly as "third parties").

Those principles foreclose NetChoice's attempt to assert standing for its "members' current and prospective users" at summary judgment. Compl. ¶ 17; *see* ECF No. 6-1 at 4. It has produced zero evidence—much less competent summary judgment evidence—of any individual user of a member platform that suffers an injury-in-fact traceable to Louisiana's law. *Cf. Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (finding associational standing at the preliminary-injunction stage). And the same is true of its back-door attempt to assert the First Amendment interests of advertisers on members' platforms. *See* Compl. ¶ 91 (The Act "regulate[s] and burden[s] speech by restricting the dissemination of advertisements"). The Court can thus dispose of those associational theories from the jump.

As for members, NetChoice has alleged that seven—Meta, NextDoor, Pinterest, Snap Inc., Reddit, X, and YouTube—are affected by the Act. *See* Compl. ¶ 15. Outside those allegations, only Snap and Reddit submitted declarations at the pleading stage. *See* ECF Nos. 6-4 (Boyle Declaration for Snap), 6-5 (Kessel Declaration for Reddit). But even affidavits from members can fail to establish the elements of standing. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536–37 (5th Cir. 2019) ("We start with the injury-in-fact requirement and hold Petitioners have not shown that one of their members could independently satisfy it."); *US Inventor Inc. v. Vidal*, No. 21-40601, 2022 WL 4595001, at *4 & n.6 (5th Cir. Sept. 30, 2022) ("speculative theory of injury" precludes "individual" and "associational standing"). *Lujan* itself confirms that the "irreducible constitutional minimum of standing" applies with full force even with the associational overlay. 504 U.S. at 560.

NetChoice's evidence, therefore, "must show that" a member "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy*, 603 U.S. at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Because "standing is not dispensed in gross," NetChoice also "'must demonstrate standing for each claim that [it] press[es]' against each defendant, 'and for each form of relief that [it] seek[s].'" *Id.* at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). And NetChoice "must establish [a member's] standing for each and every provision [it] challenge[s]." *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019) (per curiam). "On this record, that is a tall order." *Murthy*, 603 U.S. at 58.

Both declarants offer virtually no "specific facts." *Lujan*, 504 U.S. at 561. Boyle (Snap) supplies only broad gesturing that the Act "implicates fundamental aspects of Snap's current services," claiming it would "fundamentally alter the nature of those services," with "costly" "changes." ECF No. 6-4 ¶ 9. Kessel (Reddit) fares no better. Though conceding that Reddit "likely has few users deemed 'minors' regulated by the Louisiana law," he speculates that age verification and parental consent "will be costly to implement and maintain" and undermine "pseudonymity on the service," thereby "driv[ing] away some users and some communities on Reddit." ECF No. 6-5 ¶¶ 26–30. Kessel adds that any "[i]mpediments on account creation will limit Reddit's ability to disseminate speech and users' ability engage in and to receive speech" ECF No. 6-5 ¶ 28.[3] "Article III demands more than such conclusory assertions." *Ctr. for Biological Diversity*, 937 F.3d at 545. Vagaries in made-for-preliminary-injunction declarations fall shy of the "specific[ity]" summary judgment requires, *Lujan*, 504 U.S. at 561—and NetChoice deliberately declined to seek those specific facts. *E.g.*, NetChoice Dep. Tr. at 249:22–250:4 (Q: And no one at NetChoice sought to verify that with anyone affiliated with Reddit, correct? … A: As I said before, all information that I'm aware of that we know as NetChoice is from their websites and how they explain their verification, whether they do.").

Even crediting these bare assertions, the declarations never tie any injury to every provision NetChoice challenges. At most, Boyle and Kessel muse about burdens

---

[3] Their lay speculation is, of course, displaced by Mr. Allen's unrebutted expert testimony, which directly concludes the opposite. *See* SOF ¶¶ 6–28.

16

from age verification (Count III) and parental consent (Count IV). But neither says a word about the central coverage definition (Counts I and II) or the minor privacy provisions (Counts V and VI). *See Gee*, 941 F.3d at 160 (requiring "standing for each and every provision [it] challenge[s]"). At the very least, then, NetChoice has failed to carry its standing burden as to those provisions, which must be dismissed outright.[4]

## B. NetChoice Failed to Prove That The Claims And The Relief It Seeks Do Not Require Individual Members' Participation In the Lawsuit.

NetChoice also cannot demonstrate that its members' participation in this lawsuit would be unnecessary to resolve its claims or the relief it seeks. It is axiomatic that more often than not "individual members are better positioned to present [their] case." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010). Thus, to invoke associational standing, an association must be able to "prove[] by evidence from representative injured members" the elements of its claims "without a fact-intensive-individual inquiry." *Id.*

In *NetChoice v. Fitch*, NetChoice led the Fifth Circuit to believe that NetChoice would do just that—"prove[]" its "claims … by evidence from representative injured members" at summary judgment. 134 F.4th at 805 (quoting *Ass'n of Am. Physicians*, 627 F.3d at 552). But we now know that was demonstrably false: NetChoice

---

[4] NetChoice's vagueness standing as it relates to the central coverage definition (Count II) is independently foreclosed by binding Fifth Circuit precedent. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir.) ("In the absence of any imminent or even credible threat of prosecution under [the statute], Plaintiffs lack standing to preemptively challenge [it] under the Due Process Clause."), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, 145 S. Ct. 140 (2024).

deliberately declined to gather any summary-judgment evidence from its members in this case, *see supra* Part I.A—and, in fact, tried to fault *Defendants* for not "even attempt[ing] to secure information in third-party discovery[,]" ECF No. 44 at 13. Worse still, NetChoice disclaimed having *any* special knowledge or relationship with its members relevant to the claims in this case—beyond a membership check in the mail. *E.g.* NetChoice Dep. Tr. at 78:18–22 (A: To be a member in good standing with NetChoice, … , you pay your dues, you declare publicly that you are in support of free markets and free expression online."). Discovery exposed the shell game: NetChoice cannot press these claims without the active participation of its members.

The Court has already foreshadowed that defect: "That NetChoice was unable to provide information at its deposition that is relevant to this 'as-applied' First Amendment challenge raises the issue of whether NetChoice has associational standing to raise an 'as applied' First Amendment challenge on behalf of its members in the first place." ECF No. 54 at 13 (citing *Bonta*, 761 F. Supp. 3d at 1230–31); *see, e.g.*, NetChoice Dep. Tr. 121:2–11; 137:16–138:4 (NetChoice has not spoken to—and indeed, does not know—the member declarants). And that observation is "just as true [for] th[e] as-applied challenge as it [i]s in *Moody*'s facial challenge." *Bonta*, 2025 WL 2600007, at *6.

The reason is straightforward. "First Amendment analysis is 'fact intensive' and will 'surely vary' from 'platform to platform.'" *Id.* (quoting *Moody*, 603 U.S. at 747 (Barrett, J., concurring)); *accord Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014) (a "developed factual record is essential" to First Amendment challenges). That

variability "means, in turn, that the merits of 'the claim asserted' and the 'relief requested' requires the participation of individual NetChoice members, making associational standing inappropriate." *Bonta*, 2025 WL 2600007, at *6 (quoting *Hunt*, 432 U.S. at 343). "NetChoice" itself "acknowledges that each of its members is unique," so "the unique design of each platform and its algorithm affects whether the algorithm at issue is expressive" in the first place. *Id.* at *7. Some "[p]ersonalized algorithms might express a platform's unique message to the world"; others may simply "reflect users' revealed preferences to them." *Id.* And "[k]nowing where *each* NetChoice member's algorithm falls on that spectrum reasonably requires some individual platforms' participation." *Id.* (citing *Hunt*, 432 U.S. at 343). But NetChoice cannot even begin to tease out that (or any) member-by-member inquiry. *See* NetChoice Dep. Tr. at 176:10–15 ("Q: Does NetChoice receive information from any of its members pertaining to their use of algorithms? … A: Not to the best of my knowledge."). This case is thus far removed from those where "minimal factual development" suffices or where "once proved as to some, the [claims] would be proved as to all." *Ass'n of Am. Physicians*, 627 F.3d at 552. The rule, not the exception, thus applies here: "[I]ndividual members are better positioned to present [their] case." *Id.*

Because NetChoice has failed to satisfy either the first or third prongs of *Hunt*, this case should "begin—and end—with standing." *Murthy*, 603 U.S. at 56.[5]

---

[5] If NetChoice could satisfy its associational-standing burden on this record and at this posture, then this case would be the poster child for why "[a]ssociational standing seems to run roughshod over th[e] traditional understanding of the judicial

19

## III.    THE CLAIMS FAIL ON THEIR MERITS.

If the Court could reach the merits, Defendants are entitled to summary judgment as to (A) the void-for-vagueness claim (Count II), (B) the First Amendment facial overbreadth claims (Counts I, III, IV, V), (C) the First Amendment as-applied claims aimed at the coverage-definition, parental-consent, and age-verification provisions (Counts I, III, IV), and (D) the First Amendment as-applied claim and the Section 230 preemption claim aimed at the minor privacy provisions (Count VI).[6] Each claim is meritless.

### A.  The Void-For-Vagueness Claim (Count II) Fails.

NetChoice brings a "facial" vagueness claim, aimed at the Act's definition of "social media company." Compl. ¶¶ 10, 70 110–18 (citing La. R.S. 51:1751(11)–(12)). Its theory is that operators of some platforms—like LinkedIn or Slack, neither a NetChoice member—might be uncertain whether their "predominant or exclusive function" excludes them from the Act's definition of "social media platform." *Id.* ¶ 113.

That argument borders on frivolity under the governing standard. "[T]o be unconstitutionally vague, a statute must be impermissibly vague in all its applications, including its application to the party bringing the vagueness challenge."

---

power." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring). Defendants thus preserve for purposes of appeal that the doctrine of associational standing is inconsistent with the judicial power. *See* U.S. Const. art. III, § 2.

[6] NetChoice also maintains a seventh "count" for "equitable relief," Compl. ¶¶ 168–70 (capitalization altered), but "injunctive relief" is not itself a separate cause of action, *La. Crisis Assistance Ctr. v. Marzano-Lesnevich*, 878 F. Supp. 2d 662, 669 (E.D. La. 2012) ("Generally, a request for injunctive relief is not considered an independent 'cause of action,' but rather a remedy sought to redress the wrongs alleged in the underlying substantive claims.") (collecting cases).

*United States v. Rafoi*, 60 F.4th 982, 996 (5th Cir. 2023). "In the civil context" (like here) "the statute must be so vague and indefinite as really to be no rule at all." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (quoting *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000)). So unconstitutional vagueness does not spring up "merely because a company or an individual can raise uncertainty about its application[.]" *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001).

Act 456 is nowhere close to "no rule at all." Nor did NetChoice develop any evidence to the contrary. *See supra* Part I. The Act clearly defines a "[s]ocial media company" as any "person or entity that provides a social media platform that has at least five million account holders worldwide and is an interactive computer service." La. R.S. 51:1751(11). The statute then specifies in painstaking detail what is—and is not—a "[s]ocial media platform." La. R.S. 51:1751(12)(a)–(b). Because NetChoice cannot show that definition is unconstitutionally vague in any application—let alone *every* application—its vagueness claim fails as a matter of law.

## B. NetChoice Cannot Satisfy the Demanding *Moody* Standard, So Its Facial Overbreadth Claims (Counts I, II, IV, V) Fail.

NetChoice cannot satisfy the demanding standard for a facial overbreadth challenge. "Facial challenges are 'hard to win' because they 'often rest on speculation' and 'threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways.'" *Deep S. Today v. Murrill*, 779 F. Supp. 3d 782, 820 (M.D. La. 2025) (quoting *Moody*, 603 U.S. at 723). "That is true even when a facial suit is based on the First Amendment, although then a different

21

standard applies." *Id.* (citation omitted). Under that standard, "'[t]he question is whether a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (cleaned up); *accord Fitch*, 134 F.4th at 807.

*Moody* calls for a "two-step analysis." *Fitch*, 134 F.4th at 807. First, a plaintiff must "define the law's scope"—"what activities and what actors are regulated, and whether the law regulates or prohibits those actors from conducting those activities." *Id.* It is not enough to discuss only a subset of affected actors; a plaintiff must "address the *full range* of activities the law covers, as required by *Moody*." *Id.* at 808 (emphasis added) (cleaned up); *e.g.*, *Deep S. Today*, 779 F. Supp. 3d at 820–21 ("It is not limited to journalists or videoing law enforcement."). Step one is especially important here because Act 456 ties many of its obligations to "commercially reasonable efforts" for each regulated company. La. R.S. 51:1752(A)–(B). As the Fifth Circuit has recognized, that means "requirements [are] likely to be different with each … facing a unique regulatory burden." *Fitch*, 134 F.4th at 809. Some companies may already meet the requirements with existing practices and so "may not need to devote additional resources" at all; others may find full compliance "beyond their resources" and need only take "commercially reasonable efforts." *Id.*; *see* SOF ¶¶ 11, 27. But "[w]ithout a *factual analysis* determining the commercially reasonable effort demanded of each," the Court cannot even move to step two of the facial inquiry. *Id.* (emphasis added).

Step two, in turn, requires the Court to "decide which of the law['s] applications violate the First Amendment, and [to] measure them against the rest." *Id.*; *accord*

*Deep S. Today*, 779 F. Supp. 3d at 820–21. That inquiry is inherently evidence-driven. The Fifth Circuit has emphasized the "serious need of *factual development* at the second step of the analysis." *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 499 (5th Cir. 2024) (emphasis added). Without such development, the Court cannot "apply [the required level of] scrutiny to the Act to determine unconstitutional applications." *Deep S. Today*, 779 F. Supp. 3d at 821.

By forgoing factual development altogether, *see supra* Part I, NetChoice has forfeited any ability to carry its burden under step one or under step two of *Moody*'s demanding standard for any of its facial overbreadth claims (Counts I, II, IV, V).

## C. The "As-Applied" First Amendment Challenges to the Coverage-Definition, Age-Verification and Parent-Consent Provisions (Count Counts I, III, IV) Fail.

### 1. The challenged provisions regulate conduct, not speech.

The First Amendment protects "the freedom of speech." U.S. Const. amend. 1. Although sometimes "generally applicable regulations of conduct" may raise expressive-conduct or speech issues, that is only when "a particular act constitutes protected speech, rather than unprotected conduct." *Hines v. Pardue*, 117 F.4th 769, 776 (5th Cir. 2024) (cleaned up). The threshold question, even for an as-applied challenge, is whether the law primarily affects speech or expressive conduct—a question answered "by looking at what triggers coverage under the statute." *Id.* at 777 (cleaned up). That laws "regulating conduct often have incidental effects on speech" "does not require courts to treat them as if they were regulations of speech." *Morgan v. White*, 964 F.3d 649, 652 (7th Cir. 2020) (emphasis omitted); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent

restrictions directed at commerce or conduct from imposing incidental burdens on speech."). To warrant First Amendment scrutiny, the law must be "specifically addressed to speech or to conduct necessarily associated with speech." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). Act 456 is not.

Penalties under the Act are triggered by a company's "provid[ing] a social media platform" in Louisiana, La. R.S. 51:1751(12), and then failing to "make commercially reasonable efforts to verify the age of Louisiana account holders" or "permitting a Louisiana resident who is a minor to be an account holder … unless the minor has the express consent of a parent or guardian," La. R.S. 51:1752(A)–(B). But verifying age (or not) and collecting parental consent (or not) are not "expressive choices." *Cf. Moody*, 603 U.S. at 740. If they were, every age-assurance requirement—whether for alcohol, consumable hemp products, lottery tickets, employment, handguns, fireworks, body piercings, or tattoos—would trigger First Amendment scrutiny. *See FSC*, 145 S. Ct. at 2307 (collecting examples). Yet no one can seriously contend, for example, that a tattoo artist—even though "the process of tattooing is *purely expressive* activity," *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010)—has a First Amendment right to ink a teenager without checking her ID or obtaining parental consent. Just so for social media companies.

NetChoice's contrary theory relies on conflating two very different things: (1) the downstream expressive content that flows across its members' platforms, and (2) the members' upstream business decisions not to verify users' ages or collect minor users' parental consent. Act 456 regulates only the latter. Nothing in the statute

prevents a Louisiana resident from "discussing their faith on a forum dedicated to religion, petition[ing] their elected representatives on X, shar[ing] vacation photos with friends and neighbors on Facebook, looking for work around the neighborhood on Nextdoor, [or] learning how to solve math problems on YouTube." *See* ECF No. 6-1 at 10 (citation omitted). All of that speech remains untouched.

Because Act 456 has "nothing to do with speech or even expressive activity"—and everything to do with protecting minors from predators on the Internet—it does "not implicate the First Amendment" at all. *Nat'l Press Photographers*, 90 F.4th at 788. This Court's analysis can and should end there.

### 2. The Act's challenged provisions are, at most, subject to intermediate scrutiny and readily satisfy it.

Even assuming the challenged provisions could be subject to First Amendment scrutiny, the Act would still stand. The Supreme Court has made clear that when a State uses its "traditional power" to protect minors and it has "only an incidental effect on protected speech," "intermediate scrutiny" is "the appropriate standard." *FSC*, 145 S. Ct. at 2306, 2309 (citation omitted).[7] That standard governs here, and the Act "readily satisfies" it. *Id.* at 2317.

**a. Intermediate scrutiny is the "appropriate standard."** *FSC*, 145 S. Ct. at 2309. Act 456 is a straightforward exercise of Louisiana's "traditional power" to protect minors. *Id.* at 2306. In today's world, that means protecting children from the

---

[7] To the extent NetChoice suggests *FSC* is cabined to pornography, the Court itself rejected that notion by grounding its holding in "basic principles of freedom of speech" that apply to any regulation of platforms hosting both protected expression and unprotected conduct. *Id.* at 2308.

predations that flourish on social media and its harmful effects. *See* SOF ¶¶ 1–5. And the tools Louisiana has chosen—age verification and parental consent—are nothing new, nothing costly, and nothing that compromises privacy. *See* SOF ¶¶ 14, 23, 24. They are the same kind of ordinary safeguards legislatures have long required in other contexts that expose minors to serious risks—from alcohol and tobacco to tattoos and firearms. *See FSC*, 145 S. Ct. at 2307 (collecting examples).

Nor does Act 456 "directly regulate … protected speech." *Id.* at 2309. On its face, the Act regulates predatory conduct by requiring age verification and parental consent for minors to maintain a social media account. *See supra* Part III.C.1. Any burden on access to speech is thus only "incidental to" Louisiana's regulation of activity outside the First Amendment. *FSC*, 145 S. Ct. at 2309. So, at most, the Act is subject to intermediate scrutiny.

*FSC* confirms the point by upholding the Texas law under intermediate scrutiny despite its coverage carve-outs. *Id.* at 2315. If content-based coverage definitions automatically required strict scrutiny, the Court would have applied strict scrutiny. *Moody* confirms the same: NetChoice pressed its coverage-definition argument there, too, but the Court said it "need not" decide to "apply strict or intermediate scrutiny," 603 U.S. at 740—though doing so should have been easy based on the Texas law's coverage carve outs. The lesson from *FSC* and *Moody* is that delineating the reach of a law does not transform it into a content-based law subject to strict scrutiny.

NetChoice's reliance on *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), is also misplaced. *Brown* struck down a law that barred minors from purchasing violent video games precisely because it directly targeted and banned access to protected speech. *Id.* at 789–805. Act 456 does nothing of the sort. It bans no game, book, post, or "idea[] or image[]." *Id.* at 795. Instead, it regulates the upstream, non-expressive conduct that enables predators to exploit children online. And, unlike the law in *Brown*, Act 456 does not "outright ban" minors from accessing speech, *FSC*, 145 S. Ct. at 2311; it targets unlawful conduct—sexual abuse, trafficking, harassment, sextortion—that is "not fully protected speech," *id.* at 2310.

Because "[a]ny burden" the Act imposes on protected speech is "only incidental to" the Act's "regulation of activity that is not protected by the First Amendment," intermediate scrutiny (at most) is "the appropriate standard." *Id.* at 2309.

**b. The challenged provisions "readily satisf[y]" intermediate scrutiny.** *Id.* at 2317. The Act "undoubtedly advances an important governmental interest." *Id.* Louisiana has a "compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). The challenged provisions each further that interest in a direct and concrete way. The age-verification requirement ensures that platforms identify when a user is a minor before exposing her to the negative psychological effects of social media. *See* SOF ¶¶ 1–5; *see also* SOF ¶ 22. The parental-consent requirement adds another guardrail by involving parents before a minor enters that risky online environment. *See* SOF ¶¶ 1–5; *see also* SOF ¶ 26. These measures operate precisely as *FSC* envisioned—

27

"preventing minors from easily circumventing" safeguards and being exposed to online dangers. 145 S. Ct. at 2317; *see* SOF ¶¶ 10, 12, 25.

The Act is also "sufficiently tailored" to the State's interests. *FSC*, 145 S. Ct. at 2317. Act 456 does not ban books, censor video games, or shut down websites. *Cf. Brown*, 564 U.S. at 789–805. Instead, it has adopted a traditional, "modest burden of providing proof of age" and obtaining parental consent long familiar in other contexts—and "adapts this traditional approach to the digital age." *Id.* Under the appropriate standard, those methods "'need not be the least restrictive ... means of' serving the State's interest." *Id.* at 2317 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). Nor does it matter "'that the government's interest could be adequately served by some less-speech-restrictive alternative.'" *Id.* at 2318 (quoting *Ward*, 491 U.S. at 800). And *FSC* itself confirms that "simply requir[ing] established verification methods already in use" "does not impose excessive burdens." *Id.* at 2318 & n.14. Mr. Allen's unrebutted expert testimony now further confirms *FSC*'s priors: In this context, age verification and parental consent are secure, efficient, and inexpensive. *See* SOF ¶¶ 7–8.

In short, Act 456 does exactly what *FSC* permits: It "adapts [] traditional approach[es]" for protecting minors "to the digital age" without burdening "substantially more speech than necessary" to do so. 145 S. Ct. at 2317 (citation omitted).

28

**D. The "As-Applied" First Amendment Challenge to the Minor Privacy Provisions (Count V, VI) Fails.**

NetChoice's attack on Act 456's minor privacy provisions fares no better. Those provisions impose three commonsense limits on how platforms treat minors' accounts and data. *See* La. R.S. 51:1753. An as-applied First Amendment challenge to those provisions fails for three independent reasons: (1) the provisions regulate conduct, not speech; (2) even if treated as commercial speech, NetChoice offers no evidence the State is regulating only lawful, non-misleading advertising; and (3) NetChoice has failed to supply evidence to overcome *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557 (1980).

**1. The minor privacy provisions regulates conduct, not speech.**

Act 456's minor privacy provisions do not target expression; they regulate the commercial use of minors' data. The statute prohibits three interrelated practices: (1) adults cold-messaging minors they are not already connected to; (2) platforms serving ads to minors based on their personal data (other than age and location); and (3) platforms harvesting minors' information beyond what is reasonably necessary for the service's disclosed purpose. La. R.S. 51:1753. Read together, the provisions address a single, concrete harm: the exploitation of minor's personal accounts and data. Nothing about that is "specifically addressed to speech or to conduct necessarily associated with speech." *Hicks*, 539 U.S. at 124. The Court can stop there.

**2. The minor privacy provisions are, at most, a valid commercial speech regulation, and readily satisfies that lesser burden.**

Even accepting NetChoice's contrived reading, the minor privacy provisions are plainly within the realm of commercial speech. "Commercial speech is

29

'[e]xpression related solely to the economic interests of the speaker and its audience.'" *Alleman v. Harness*, 780 F. Supp. 3d 608, 636 (M.D. La. 2025) (quoting *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 n.2 (5th Cir. 2019)). "Though courts have not settled 'the precise bounds of the category of expression that may be termed commercial speech, ... it is clear enough that ... advertising pure and simple—falls within those bounds.'" *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 280 (5th Cir. 2024) (quoting *Zauderer v. Off. of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985)), *aff'd*, 145 S. Ct. 2291 (2025). "That suffices for the part of the statute that covers advertisements." *Id.*

**a.** Commercial speech enjoys no First Amendment protection unless it "'concern[s] lawful activity and [is] not [] misleading.'" *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017) (quoting *Cent. Hudson*, 447 U.S. at 566). That is the threshold NetChoice cannot clear. For one, it is no longer lawful for a social media company to "collect[]"—let alone share with advertisers—the "personal information" of minor users beyond what is "adequate, relevant, and reasonably necessary." La. R.S. 51:1753(3). Thus, the complementary provisions make clear that it is not "adequate, relevant, and reasonably necessary," La. R.S. 51:1753(3), to collect any data beyond "age and location" for purposes of "display[ing] of any advertising in the [minor's] account," La. R.S. 51:1753(2). Read together as intended, these provisions foreclose the practice of social media companies harvesting

minors' personal data for targeted advertising. By definition, *any* extra-targeted advertising to a minor facilitates an unlawful activity.

For another, NetChoice failed to develop any record evidence that these putative targeted advertisements are not actually or inherently misleading. *See supra* Part I. "[T]he term 'inherent' is completely absent" in NetChoice's complaint—and the evidentiary record. *Alleman*, 780 F. Supp. 3d at 641. NetChoice "wholly fails to make any effort to explain how or why the [putative targeted advertisements] [are] not inherently misleading." *Id.* Just pure *ipse dixit*: "This Act does not attempt to regulate false or misleading speech." ECF No. 6-1 at 15. But "[w]ithout more," *Alleman*, 780 F. Supp. 3d at 641, the State is entitled to summary judgment.

**b.** The minor privacy provisions are, at most, subject to the lesser intermediate scrutiny applied to commercial speech regulations. Under that standard, the provisions need only "directly and materially advance[] a substantial state interest in a manner no more extensive than necessary to serve that interest." *Alleman*, 780 F. Supp. 3d at 637 (quoting *Express Oil*, 916 F.3d at 488); *see Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (requiring only "reasonable fit between the legislature's ends and the means chosen to accomplish those ends" (cleaned up)). The State again readily meets that burden.

The governmental interests are indisputable: protecting "the physical and psychological well-being of minors," *Sable Commc'ns*, 492 U.S. at 126; *accord Lorillard Tobacco Co.*, 533 U.S. at 555 (no one "contests the importance of the State's interest in preventing the use of tobacco products by minors"), and ensuring the

31

privacy interests of minors, *see* 15 U.S.C. §§ 6501–6506 (Children's Online Privacy Protection Act); SOF ¶ 29. And the State, in turn, advances those interests by specifically prohibiting the "collection" of *minors'* "personal information" and the display of targeted ads to *minors* based on that data. La. R.S. 51:1753(2)–(3). The State has thus "'carefully calculated' the costs and benefits associated with the burden on speech imposed," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993), by ensuring the minor-only commercial speech restriction permits every targeted ad *targeted at adults* and does not "unduly impinge on … the *adult listener*'s opportunity to obtain information." *Lorillard*, 533 U.S. at 565 (emphasis added). Even if necessary, therefore, the State plainly satisfies its modest *Central Hudson* burden.[8]

## E. The Preemption Challenge to the Minor Privacy Provisions (Count VI) Fails.

NetChoice's preemption claim is self-defeating: Its First Amendment claims depend on treating the platforms as active speakers, while its § 230 theory depends on treating them as passive conduits. That contradiction aside, the claim collapses for three independent reasons.

*First*, § 230 provides no private right of action to assert offensive preemption of a state law in federal court. "[F]ederal statutes do not confer 'rights' enforceable under § 1983 'as a matter of course.'" *Medina v. Planned Parenthood S. Atlantic*, 145

---

[8] Perhaps recognizing as much, NetChoice suggests that the commercial speech doctrine is wrong—a complaint for the Supreme Court, not this Court. *See* Compl. ¶ 145 (citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and concurring in the judgment)).

S. Ct. 2219, 2227 (2025) (quoting *Health and Hospital Corp. of Marion Cty. v. Talevski*, 599 U.S. 166, 183 (2023)). Instead, "statutes create individual rights only in 'atypical case[s].'" *Id.* at 2229 (quoting *Talevski*, 599 U.S. at 183).. "To prove that a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms.'" *Id.* (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 290 (2002)). "In addition, the statute must display 'an unmistakable focus' on individuals like the plaintiff." *Id.* (quoting *Gonzaga*, 536 U.S. at 284). The "interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action." *Alexander v. Sandoval*, 532 U.S. 275, 288 n.7 (2001) (internal citation omitted). "And even for the rare statute that satisfies it, [the Supreme Court] has said, a § 1983 action still may not be available if Congress has displaced § 1983's general cause of action with a more specific remedy." *Medina*, 145 S. Ct. at 2229 (citing *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)); *accord Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015) ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." (citation omitted)).

That is exactly § 230: a carefully balanced grant of immunity, not a rights-conferring statute. Its operative text bars plaintiffs and courts from "treat[ing]" providers "as the publisher or speaker" of third-party content. 47 U.S.C. § 230(c)(1). But it contains none of the unmistakable rights-creating language necessary to

ground an affirmative cause of action. And because it lacks rights-creating language, NetChoice "cannot, by invoking [the Court's] equitable powers, circumvent Congress's exclusion of private enforcement." *Texas v. United States*, 97 F.4th 268, 276 (5th Cir. 2024) (citation omitted).

*Second*, § 230 does not preempt state law at all. It only creates a federal defense to any cause of action, state or federal. *See Cisneros v. Sanchez*, 403 F. Supp. 2d 588, 593 (S.D. Tex. 2005) ("Any preemptive effect the CDA may have only rises to the level of a defense to certain causes of action[.]"); *see also Paxton*, 95 F.4th at 285 (explaining that § 230 "protect[s] 'providers' of 'interactive computer service[s]' from liability stemming from [providers'] attempts to 'restrict' unwanted material"). That is why "the analysis focuses on the claims and theories of liability advanced by a plaintiff," *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 798 (5th Cir. 2024)—rather than on the validity of the underlying state law itself. And that makes sense: Congress did not speak in the language of preemption—"supersed[ing] any and all State laws" in conflict, as ERISA does, 29 U.S.C. § 1144(a)—but in the language of defense: No provider "shall be treated as the publisher or speaker" of third-party content, 47 U.S.C. § 230(c)(1), or "be held liable for" that content, *id.* § 230(c)(2); *accord id.* § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."). Put otherwise: A state law can remain on the books—even if some attempts to enforce it against an interactive computer service provider fail once the defendant invokes § 230(c). Preemption, that is not.

*Third*, even if § 230 could be asserted offensively, Act 456's core minor privacy obligations does not implicate § 230. "[S]ection 230 does not provide a general immunity against all claims derived from third-party content." *Salesforce*, 123 F.4th at 795 (cleaned up); *see Anderson v. TikTok, Inc.*, 116 F.4th 180, 193 (3d Cir. 2024) (Matey, J., concurring). The Act, read in context, regulates a social media company's own conduct—the collection and distribution of minors' personal information, *see* La. R.S. 51:1753(3), and the audience for advertisements based on that information, *see* La. R.S. 51:1753(2)—not the publication of third-party speech. *See Paxton*, 95 F.4th at 286 ("But publishers do not filter audiences; they filter content."). Those non-publishing duties are "properly attributable to them" and fall outside § 230 altogether. *Salesforce, Inc.*, 123 F.4th at 795.

## CONCLUSION

The Court should grant Defendants summary judgment.

Dated: September 22, 2025

Respectfully submitted,

ELIZABETH B. MURRILL
Attorney General

 /s/ Zachary Faircloth
ZACHARY FAIRCLOTH (La #39875)
  Principal Deputy Solicitor General
OFFICE OF THE LOUISIANA ATTORNEY
GENERAL
1885 North Third Street
Baton Rouge, LA 70802
Telephone:  (225) 421-4088
Facsimile:   (225) 326-6795
FairclothZ@ag.louisiana.gov

/s/ James M. Garner
JAMES M. GARNER (La #19589)
JOSHUA S. FORCE (La #21975)
JEFFREY D. KESSLER (La #30156)
SOPHIE R. TROSCLAIR (La #40979)
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.
  Special Assistant Attorneys General
909 Poydras Street, 28th Floor
New Orleans, LA 70112-1033
Telephone:  (504) 299-2100
Facsimile:   (504) 299-2300
JGarner@shergarner.com
JForce@shergarner.com
JKessler@shergarner.com
STrosclair@shergarner.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2025, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Zachary Faircloth
ZACHARY FAIRCLOTH (La #39875)