**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**NETCHOICE**

**VERSUS**

**LIZ MURRILL,** *in her official capacity as*
*Attorney General of Louisiana*;
**MIKE DUPREE,** *in his official capacity as*
*Director of the Public Protection Division,*
*Louisiana Department of Justice*

**CIVIL ACTION**

**NO. 25-231-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on Plaintiff's *Motion for Preliminary Injunction* ("*Motion for PI*") (Doc. 6) filed by Plaintiff NetChoice ("Plaintiff" or "NetChoice"). Relatedly, Plaintiff filed a *Motion for Summary Judgment* ("Plaintiff's *MSJ*") (Doc. 57), requesting permanent injunctive relief. Defendants Liz Murrill ("Murrill") and Mike Dupree ("Dupree") (collectively, "Defendants"), in their respective official capacities, oppose Plaintiff's motions. (Docs. 58, 64.) Defendants have filed their own *Motion for Summary Judgment* ("Defendants' *MSJ*") (Doc. 58), which Plaintiff opposes (Doc. 65).

## TABLE OF CONTENTS

I.    Introduction ........................................................................................................ 2
II.   Relevant Background ......................................................................................... 8
      A.  La. R.S. §§ 51:1751–1756 ......................................................................... 8
          1.  Coverage Definition (La. R.S. § 51:1751) ......................................... 8
          2.  Requirements (La. R.S. §§ 51:1752–1754) ....................................... 9
          3.  Enforcement (La. R.S. §§ 51:1755–1756) ....................................... 11
      B.  Factual Background ................................................................................ 11
III.  Standards of Review ........................................................................................ 13
      A.  Summary Judgment (Fed. R. Civ. P. 56) ............................................... 13
      B.  Preliminary Injunctive Relief ................................................................ 15
      C.  Permanent Injunctive Relief ................................................................. 15
IV.   Discussion ......................................................................................................... 16

A.  Summary Judgment Evidence ................................................................. 16
    1.  Defendants' MSJ (Doc. 58) ......................................................... 16
    2.  Plaintiff's Opposition (Doc. 65) ............................................... 17
    3.  Law & Analysis ......................................................................... 18
B.  Associational & Prudential Standing ................................................. 23
    1.  Defendants' MSJ (Doc. 58) ......................................................... 23
    2.  Plaintiff's Opposition (Doc. 65) ............................................... 25
    3.  Law & Analysis ......................................................................... 27
C.  Facial and As-Applied Challenges ..................................................... 42
    1.  Plaintiff's Motion for PI & MSJ (Docs. 6, 57) ........................... 42
    2.  Defendants' MSJ & Opposition (Docs. 58, 64) ........................... 49
    3.  Plaintiff's Opposition (Doc. 65) ............................................... 53
    4.  Law & Analysis ......................................................................... 57
D.  Vagueness ........................................................................................... 83
    1.  Plaintiff's Motion for PI & MSJ (Docs. 6, 57) ........................... 83
    2.  Defendants' MSJ & Opposition (Docs. 58, 64) ........................... 84
    3.  Plaintiff's Opposition (Doc. 65) ............................................... 84
    4.  Law & Analysis ......................................................................... 85
E.  Permanent Injunction ......................................................................... 89
    1.  Plaintiff's MSJ (Doc. 57) ........................................................... 89
    2.  Defendants' Opposition (Doc. 64) ............................................. 90
    3.  Law & Analysis ......................................................................... 90
V.  Conclusion ............................................................................................... 93

# I.    INTRODUCTION

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear." *Id.* "Social media offers 'relatively unlimited, low-cost capacity for communication of all kinds.'" *Id.* (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)). It is "perhaps

the most powerful mechanism[] available to a private citizen to make his or her voice heard." *Id.* at 107. "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

Even minors "are entitled to a significant measure of First Amendment protection": "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975). Although States "possess[] legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (internal citations omitted); *accord Erznoznik*, 422 U.S. at 213–14 ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.").

In 2023, the Louisiana Legislature passed the Secure Online Child Interaction and Age Limitation Act ("the Act"). La. S.B. 162, Act No. 456 (codified at La. R.S. §§ 51:1751–1759). Under this law, "[s]ocial media compan[ies]" providing "[s]ocial media platform[s]" must impose age-verification, parental consent and parental controls, a prohibition on certain data-collection and advertising to minors, and restrictions on direct-messaging between adults and minors whose accounts are not "already connected . . . on the [social media] service." La. R.S. §§ 51:1751–1754. Defendants represent that the Act is "[a]nimated by concerns over minors' online safety and failures of content moderation," (Doc. 58-1 at 15), although NetChoice disputes the Act's function and efficacy, (*see, e.g.*, Doc. 57-1 at 8–11; Doc. 65 at 15–18). The Act became effective July 1, 2025, *see* La. H.B. 577, Act No. 656, but Defendants agreed not to enforce it until December 19,

2025, to allow time for the parties to file dispositive motions and for the Court to render its decision, (Doc. 26 at 2).

The parties are Plaintiff NetChoice and Defendants Murrill and Dupree. Plaintiff NetChoice is a D.C.-based "nonprofit trade association for internet companies." (Doc. 1 at ¶ 12.) Its stated aim is "to promote online commerce and speech and to increase consumer access and options via the internet, while minimizing burdens that could prevent businesses from making the internet more accessible and useful." (*Id.*) NetChoice's members include: (1) Meta (i.e., Facebook, Instagram, WhatsApp), (2) Nextdoor, (3) Pinterest, (4) Reddit, (5) Snap (i.e., Snapchat), (6) X (née Twitter), (7) YouTube, (8) Automattic (i.e., Tumblr), (9) Discord, and (10) Amazon (i.e., Twitch).[1] (Doc. 57-1 at 10–11 (citing Doc. 57-2 at 2, ¶¶ 5–6, 8).)[2]

Defendant Murrill has been sued in her official capacity as Attorney General of Louisiana. (Doc. 1 at ¶ 18.) Likewise, Defendant Dupree has been sued in his official capacity as Director of the Public Protection Division of the Louisiana Department of Justice ("the Division"). (*Id.*) Louisiana's Attorney General oversees the Division. (*Id.* (citing La. Const. art. IV, § 8).) The Division is responsible for receiving and investigating complaints and otherwise enforcing the Act. La. R.S. §§ 51:1751(3), 1755–1756.

Plaintiff filed its *Complaint* (Doc. 1) and *Motion for PI* (Doc. 6) on March 18, 2025, primarily challenging the validity of the Act under the First Amendment of the U.S. Constitution. (*See* Doc. 6-1 at 15–16.) The Court held a Status Conference on March 25, 2025, (Doc. 22), after which the parties proposed—and the Court issued—a Joint Case Management Order, (Docs. 24,

---

[1] For the sake of simplicity, when the Court says "NetChoice," it refers to the trade association and its covered members, as the case may be.

[2] When considering the cross-motions for summary judgment: Unless otherwise indicated (e.g., with a qualifying record citation), when the Court cites one party's *Statement of Material Facts*, the corresponding fact has been admitted by the other party or else qualified in such a way that it must be deemed admitted as recited by the Court. *See* M.D. La. Civ. R. 56(f).

26). In accordance with that order, the parties filed cross-motions for summary judgment on September 22, 2025. (Doc. 26 at 1.) Defendants' *MSJ* doubles as its opposition to the *Motion for PI*. (*Id.*) The parties also timely filed their respective *Oppositions*. (*Id.*) They agreed not to file *Replies*. (*Id.*) Necessarily, though, Plaintiff's *Opposition* functions as a *Reply* to some of Defendants' arguments, *viz.*, Defendants' arguments directly opposing Plaintiff's *Motion for PI* and its *MSJ*.

Like its *Motion for PI*, (Doc. 6-1 at 15–16, 29), Plaintiff's *MSJ* raises facial and as-applied challenges to the Act, as well as vagueness, (Doc. 57-1 at 34–38). In support of both motions, Plaintiff also argues that 47 U.S.C. § 230 preempts the Act's advertising prohibition. (Doc. 6-1 at 30–31; Doc. 57-1 at 38–40.) Defendants' *MSJ* contends that Plaintiff has no admissible evidence and lacks associational standing. (Doc. 58-1 at 17–18, 22–23.) Defendants also deny Plaintiff's ability to succeed on the merits of any of its claims, insisting that, at most, intermediate scrutiny applies and that the Act "readily" satisfies this standard. (*Id.* at 30, 35–38.)

The Court initially set a hearing for November 18, 2025, (Docs. 26, 69), but later determined that a hearing was unnecessary given the parties' representations that no witnesses would testify and that no new evidence would be presented, (Doc. 77). The Court now finds that: (1) NetChoice has standing to challenge the Act on behalf of its members and their users. (2) NetChoice is entitled to summary judgment on the basis of its First Amendment as-applied challenge. And (3) NetChoice has shown that it is entitled to permanent injunctive relief.

In reaching these conclusions, the Court treads a well-worn path. In the last two years, at least nine other district courts have considered similar challenges to similar state laws. *See NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice v. Griffin*, No. 23-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Fitch*, 787 F. Supp. 3d 262 (S.D.

Miss. 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024); *NetChoice v. Carr*, 789 F. Supp. 3d 1200 (N.D. Ga. 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 24-438, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575 (W.D. Tex. 2025); *NetChoice v. Bonta*, 761 F. Supp. 3d 1202 (N.D. Cal. 2024); *NetChoice v. Skrmetti*, No. 24-1191, 2025 WL 1710228 (M.D. Tenn. June 18, 2025); *see also NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024); *NetChoice v. Griffin*, No. 23-5105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025) (considering similar challenges to a distinct but related law (i.e., protecting minors' digital privacy)); *NetChoice v. Weiser*, No. 25-2538, 2025 WL 3101019 (D. Colo. Nov. 6, 2025) (considering similar challenges to a provision requiring social media companies to provide minors with information about the possible health consequences of social media use).

Eight district courts granted injunctive relief. *See Yost*, 778 F. Supp. 3d at 959 (permanently enjoining the challenged law); *Griffin*, 2025 WL 978607, at *17 (same); *Fitch*, 787 F. Supp. 3d at 283–84 (preliminarily enjoining all challenged provisions); *Reyes*, 748 F. Supp. 3d at 1134 (same); *Carr*, 789 F. Supp. 3d at 1234 (same); *Uthmeier*, 2025 WL 1570007, at *20–21 (same); *Paxton*, 747 F. Supp. 3d at 1044 (preliminarily enjoining the challenged law's "monitoring-and-filtering" provisions); *Bonta*, 761 F. Supp. 3d at 1232 (preliminarily enjoining part of the challenged law); *see also Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 604–05 (preliminarily enjoining additional provisions of Texas's law); *Yost*, 716 F. Supp. 3d at 561–62 (preliminarily enjoining the challenged law); *Griffin*, 2023 WL 5660155, at *21–22 (same); *Bonta*, 770 F. Supp. 3d at 1215 (preliminarily enjoining a law protecting minors' digital privacy based on similar challenges); *Weiser*, 2025 WL 3101019, at *13 (preliminarily enjoining the challenged provision of Colorado's

law). *But see Skrmetti*, 2025 WL 1710228, at *11, *13, *15 (denying preliminary injunction, largely because the court thought that enforcement of the law was unlikely while the case was pending); *id.* at *14 (declining to "take any position on the merits of Plaintiff's claims"). Notably, two of the eight district courts granted summary judgment in NetChoice's favor, issuing permanent injunctions. *See Yost*, 778 F. Supp. 3d at 959; *Griffin*, 2025 WL 978607, at *17.

In several of the above cases, appeals are pending. One case—*NetChoice, LLC v. Bonta*—was previously appealed to the Ninth Circuit, which "direct[ed] the district court to modify its [preliminary] injunction" to cover additional provisions of the challenged law. 152 F.4th 1002, 1025 (9th Cir. 2025).[3]

Perhaps more relevantly, *NetChoice, LLC v. Fitch* has been appealed to the Fifth Circuit twice now. *See NetChoice, L.L.C. v. Fitch*, 134 F.4th 799 (5th Cir. 2025); *NetChoice, L.L.C. v. Fitch*, No. 25-60348, 2025 WL 2078435, at *1 (5th Cir. July 17, 2025) (per curiam). The first time, the Fifth Circuit agreed that NetChoice had associational and prudential standing but remanded so that the district court could reconsider the facial challenge in light of the Supreme Court's intervening decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). *Fitch*, 134 F.4th at 803–07, 809. The second appeal is still pending, although the Fifth Circuit has stayed the preliminary injunction. *Fitch*, 2025 WL 2078435, at *1. The Supreme Court denied NetChoice's application to vacate the stay, *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025). In his concurrence, Justice Kavanaugh explained that NetChoice "ha[d] not sufficiently demonstrated that the balance

---

[3] In another case—*Computer & Communications Industry Association v. Uthmeier*—the Eleventh Circuit has stayed the preliminary injunction, reasoning that the defendant, Florida's attorney general, will likely be able to show that Florida's law satisfies intermediate scrutiny. *See* No. 25-11881, 2025 WL 3458571, at *6, *10 (11th Cir. Nov. 25, 2025). Importantly, the court took the position that "[t]he other laws and accompanying district court decisions . . . are entirely distinct from [Florida's law]." *Id.* at *9 n.12. It explained: "In every other case cited, the district court determined that the broad restrictions in question were *content based* and so applied strict scrutiny." *Id.* The Eleventh Circuit suggested that the Florida law's coverage definition is wholly unlike the others, affecting the level of scrutiny and the court's initial assessment of tailoring. *Id.* at *6–7.

of harms and equities favor[ed] it at th[e] time." *Id.* (Kavanaugh, J., concurring). But he also expressed that NetChoice is "likely to succeed on the merits" of its First Amendment challenge and that it is "no surprise" that eight district courts have granted injunctive relief thus far. *Id.*

Mindful of these authorities—and having carefully considered the law, the facts in the record, and the arguments and submissions of the parties—the Court now grants Plaintiff's *MSJ* and permanently enjoins enforcement of Louisiana Revised Statutes §§ 51:1751–1756 against the following covered NetChoice members, identified by NetChoice and Defendants: (1) Meta (Facebook, Instagram, WhatsApp), (2) Nextdoor, (3) Pinterest, (4) Reddit, (5) Snap (Snapchat), (6) X, (7) YouTube, (8) Automattic (Tumblr), (9) Discord, and (10) Amazon (Twitch). Defendants' *MSJ* is denied. Plaintiff's *Motion for PI* is denied as moot.

## II.    RELEVANT BACKGROUND

### A.  La. R.S. §§ 51:1751–1756

#### 1.  *Coverage Definition (La. R.S. § 51:1751)*

The Act defines a "[s]ocial media *company*" as "a person or entity that provides a social media platform that has at least five million account holders worldwide and is an interactive computer service." La. R.S. § 51:1751(11) (emphasis added). A "[s]ocial media *platform*" is a "public or semipublic internet-based service or application that has users in Louisiana" and that meets certain criteria, including "connect[ing] users in order to allow [them] to interact socially with each other within the service or application" and facilitating that social interaction by allowing users to:

> (aa) Construct a public or semipublic profile for purposes of signing into and using the service or application.
>
> (bb) Populate a list of other users with whom [one] shares a social or virtual connection within the system, including subscribing to content related to another user.

(cc) Create or post content viewable by other users, including but not limited to on message boards, in chat rooms, on video channels, or through a landing page or main feed that presents the user with content generated by other users.

*Id.* § 51:1751(12)(a) (emphasis added). The term "social media platform" does *not* include "an online service, website, or application where the predominant or exclusive function" is, *inter alia*:

(i) Electronic mail.

\*        \*        \*

(iii) A streaming service that provides only licensed media in a continuous flow from the service, website, or application to the end user and [that] does not obtain a license to the media from a user or account holder by agreement to its terms of service.

(iv) News, sports, entertainment, or other content that is preselected by the provider and not user generated, and any chat, comment, or interactive functionality that is provided incidental to, directly related to, or dependent upon provisions of the content.

(v) Online shopping or electronic commerce, if the interaction with other users or account holders is generally limited to the ability to upload a post and comment on reviews, the ability to display lists or collections of goods for sale or wish lists, and any other function that is focused on online shopping or electronic commerce rather than interaction between users or account holders.

(vi) Interactive gaming, virtual gaming, or an online service that allows the creation and uploading of content and the communication related to that content for the purpose of interactive gaming, educational entertainment, or associated entertainment.

*Id.* § 51:1751(12)(b).

## 2. *Requirements (La. R.S. §§ 51:1752–1754)*

If a website qualifies as a "social media platform," then the Act imposes the following requirements:

A. A social media company shall make commercially reasonable efforts to verify the age of Louisiana account holders with a level of certainty appropriate to the risks that arise from the information management practices of the social media company or apply the accommodations afforded to minors pursuant to this Chapter to all account holders.

9

B. A social media company shall not permit a Louisiana resident who is a minor to be an account holder on the social media company's social media platform unless the minor has the express consent of a parent or guardian. Acceptable methods of obtaining express consent from a parent or guardian include any of the following:

> (1) Providing a form for the minor's parent or guardian to sign and return to the digital service provider by common carrier, facsimile, or electronic scan.
>
> (2) Providing a toll-free telephone number for the minor's parent or guardian to call to consent.
>
> (3) Coordinating a call with a minor's parent or guardian over video conferencing technology.
>
> (4) Collecting information related to the government-issued identification of the minor's parent or guardian and deleting that information after confirming the identity of the minor's parent or guardian.
>
> (5) Allowing the minor's parent or guardian to provide consent by responding to an email and taking additional steps to verify the identity of the minor's parent or guardian.
>
> (6) Any other commercially reasonable method of obtaining consent in light of available technology.

*Id.* § 51:1752. In addition, the Act requires that social media companies prohibit:

> (1) Adults from direct messaging a Louisiana minor account holder unless the minor is already connected to the adult on the service.
>
> (2) The display of any advertising in the account based on the Louisiana minor account holder's personal information, except age and location.
>
> (3) The collection or use of personal information from the posts, content, messages, text, or usage activities of the account other than information beyond what is adequate, relevant, and reasonably necessary in relation to the purposes for which the information is collected, as disclosed.

*Id.* § 51:1753. Finally, the Act requires that social media companies provide "a parent or guardian who has given parental consent" with "a means for the minor account holder or the parent or guardian to initiate account supervision," including abilities to "view privacy settings of the

minor's account, set daily time limits for the service, schedule breaks, and . . . set up parental notifications when the minor reports a person or issue." *Id.* § 51:1754.

### 3. Enforcement (La. R.S. §§ 51:1755–1756)

Under the Act, the Division is responsible for receiving and investigating "consumer complaints alleging any violation" and otherwise enforcing the Act. *Id.* §§ 51:1755–1756; *see also id.* § 51:1756 ("The [D]ivision has exclusive authority to administer and enforce the requirements of this Chapter."). Enforcement includes "impos[ing] an administrative fine of up to [\$2,500] for each violation," as well as bringing a court action for declaratory relief, injunctive relief, damages, etc. *Id.* § 51:1756(B)–(C). "At least forty-five days before . . . initiat[ing] an enforcement action," the Division must provide written notice of each alleged violation to the appropriate social media company. *Id.* § 51:1756(D).

### B. Factual Background

NetChoice is a "trade association for online businesses." (Doc. 57-2 at 1, ¶ 1.) Its members include: (1) Meta, (2) Nextdoor, (3) Pinterest, (4) Snap, (5) Reddit, (6) X, and (7) YouTube. (*Id.* at 1–2, ¶¶ 3, 5.) These members' platforms are covered by the Act. (*Id.* at 2, ¶¶ 5, 7.) According to Defendants, the Act also covers the platforms of three other NetChoice members: (1) Automattic, (2) Discord, and (3) Amazon (i.e., Twitch Interactive, Inc.). (*Id.* at 2, ¶ 6.) As discussed above, the Division "has exclusive authority to administer and enforce the requirements" of the Act. La. R.S. § 51:1756; *see also id.* § 51:1755 ("The [D]ivision shall receive consumer complaints alleging any violation of [the Act] . . . . The [D]ivision shall investigate a consumer complaint to determine whether a violation of [the Act] has occurred."). Defendants or their subordinates have already sent "Notice[s] of Violations" to at least eight of the identified NetChoice members. (*Id.* at 2–3, ¶ 8.) These notices state that the identified members' platforms "fail[] to comply with several

11

requirements of the Act," *viz.*, §§ 51:1752(A)–(B), 51:1753, and 51:1754. (*See, e.g.*, Doc. 57-8 at 2–3.)

At least some of the above members' social media platforms disseminate speech. (*See id.* at 3, ¶ 12.) Likewise, users—including minor users—engage in and receive speech on at least some of the above members' platforms. (*See, e.g., id.* at 3–4, ¶¶ 15–18; *id.* at 8, ¶¶ 49–50; *see also* Doc. 57-4 at 3–5; Doc. 64-1 at 5, ¶ 16 ("[T]he fact that minors under the age of 16 engage on social media platforms is one of the reasons the Act was drafted." (citation omitted)).)[4] If the Act is enforced, then at least some covered platforms will be forced to adjust their practices. (Doc. 57-2 at 20, ¶¶ 183–84; *see also* Doc. 57-4 at 19–20, 27–29.) Adjustment entails compliance costs. (Doc. 57-2 at 20, ¶¶ 183–84; *see also* Doc. 57-4 at 10–14, 19–20, 27–29.) Additionally, the Act will decrease the number of users of covered platforms. (*See* Doc. 57-2 at 6, ¶ 37 ("Not every minor's parent will provide the necessary consent . . . to create an account on covered websites.").) But minors will still be able to interact socially on *unregulated* websites. (*See, e.g., id.* at 20, ¶ 186.)

Parents already have tools by which they can control their children's access to, and regulate their children's use of, social media platforms. (*Id.* at 4–6, ¶¶ 22–26, 29–30; *see also* Doc. 58-2 at 3, ¶ 11 ("Many of NetChoice's members already have tools to assist parents and maintain internal rules (often set at age 13) that restrict children's access to their services.").) For example:

(1) Not all devices are internet-enabled. (Doc. 57-2 at 4, ¶ 22.)

---

[4] Defendants deny that *all* covered NetChoice members' platforms disseminate speech, (Doc. 64-1 at 3, ¶ 12), and that users engage in and receive speech on *all* covered NetChoice members' platforms, (*id.* at 4, ¶ 13). As is developed in Section IV.A.3 & C.4, *infra*, the Court is not persuaded by Defendants' reasons for denial. Additionally, the Court notes that Defendants' own *Statement of Material Facts* implies, at various points, that speech is available on all covered NetChoice members' platforms. (*See, e.g.*, Doc. 58-2 at 7–9, ¶¶ 32, 38–39; *see also* Doc. 64-1 at 13, ¶ 50 (admitting that "Defendant Attorney General Liz Murrill users her social media accounts on Facebook, Instagram, X, YouTube, TruthSocial, or LinkedIn to discuss the policies, priorities, and actions of the Attorney General's office").) Defendants' briefs also tacitly concede this fact. (*See* Docs. 58-1, 64.) Most importantly, the Supreme Court has routinely accepted that speech permeates social media. *See, e.g., Packingham*, 582 U.S. at 107–08 ("Social media allows users to gain access to information and communicate with one another about it on any subject that might come to mind. . . . These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. . . . [T]o foreclose access to social media . . . is to prevent the user from engaging in the legitimate exercise of First Amendment rights.").

(2) At least some cell service and internet providers "have designed and advertised tools for parents to block Internet access altogether, to block certain apps, sites, and contacts from their children's phones, and to restrict screen time on their children's devices." (*Id.* at 5, ¶ 23.)

(3) At least some wireless routers "allow[] parents to block particular websites, filter content, monitor internet usage, and control time spent on the internet." (*Id.* at 5, ¶ 24.)

(4) "Some internet browsers allow parents to control what online services their children may access through the browser." (*Id.* at 5, ¶ 25.)

(5) Some device manufacturers allow parents to limit screen time, limit or block access to specific applications, filter content, and control privacy settings. (*Id.* at 5, ¶ 26.)

(6) At least some NetChoice members do not allow minors under 13 to create accounts on their covered social media platforms. (*Id.* at 5, ¶ 29.)

(7) At least some NetChoice members "engage in content moderation in efforts to remove or deprioritize content they consider objectionable or harmful." (*Id.* at 6, ¶ 30.)

## III.    STANDARDS OF REVIEW

### A.  Summary Judgment (Fed. R. Civ. P. 56)

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

"A movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the

opponent's claim." (emphasis in original))). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (quoting *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the movant bears its burden of showing that there is no genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted) (quoting Fed. R. Civ. P. 56(e)). The nonmovant's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (cleaned up).

Additionally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (quoting, *inter alia*, *Ragas*, 136 F.3d at 458); *see also Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (rejecting the position "that the entire record in the case must be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").

14

Ultimately, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

### B. Preliminary Injunctive Relief

"To obtain a preliminary injunction, [a] plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial likelihood that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); *accord Book People, Inc. v. Wong*, 91 F.4th 318, 336 (5th Cir. 2024) (quoting *Winter v. Nat. Res. Council, Inc.*, 555 U.S. 7, 20 (2008)).

### C. Permanent Injunctive Relief

A plaintiff seeking a permanent injunction must satisfy a slightly different four-factor test. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). The plaintiff must demonstrate: "(1) actual success on the merits; (2) that it is likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in [the plaintiff's] favor; and (4) that an injunction is in the public interest." *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023) (citing *Winter*, 555 U.S. at 20, 32); *see also eBay*, 547 U.S. at 391. "The decision to grant or deny

permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *eBay*, 547 U.S. at 391.

## IV.    DISCUSSION

### A.    Summary Judgment Evidence

#### 1.    *Defendants' MSJ (Doc. 58)*[5]

In their motion, Defendants argue that NetChoice "arrives at summary judgment with no admissible evidence." (Doc. 58-1 at 17–18.) Instead, NetChoice has "promis[ed] that . . . '[it] will rely on the publicly available information about its members that it has produced to Defendants'" thus far. (*Id.* at 18–19 (quoting Doc. 40 at 23).) According to Defendants, NetChoice did not seek to corroborate its members' "internet postings"—or even to identify "who . . . could corroborate [them]." (*Id.* at 18, 20.) Defendants contend that such "litigation choice[s]" are "fatal" because "[u]ncorroborated internet evidence is not competent summary judgment evidence." (*Id.* at 19 (internal quotation marks omitted) (quoting *Young v. UOP LLC*, No. 21-282, 2024 WL 288985, at *15 n.161 (M.D. La. Jan. 25, 2024) (Dick, C.J.)).)

Relatedly, Defendants assert that, because NetChoice withdrew its only expert, it "cannot genuinely dispute the sworn testimony of Defendants' experts, Dr. Jean Twenge . . . and Tony Allen." (*Id.* at 21 (citing *Rasheed v. Church & Dwight Co.*, No. 11-80, 2012 WL 262619, at *6 (E.D. Tex. Jan. 12, 2012); *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970)).) Thus, Defendants contend, NetChoice has conceded that "social media use is a causal factor in the youth mental health crisis," (*id.* at 22 (quoting Doc. 58-5 at 52, ¶ 149)), and that

---

[5] The Court notes the substantial overlap between Plaintiff's *Motion for PI* and its *MSJ*. (*See* Docs. 6, 57.) Generally, where Plaintiff's briefs have raised the same argument, the Court has seen fit to cite only Plaintiff's *MSJ*. Likewise, the briefs supporting Defendants' *MSJ* and *Opposition* frequently make the same points, (*see* Docs. 58-1, 64), in which case the Court has tended to cite only one or the other. Here, for example, Defendants' *Opposition* makes identical arguments to their *MSJ*. (*See* Doc. 64 at 16–20.)

"[a]ge-assurance methods do not necessarily add a new step to a user's visit to a new website or app," (*id.* (quoting Doc. 58-6 at 25, ¶ 77)). According to Defendants, such statements are "now the undisputed factual predicate on which the case must be decided." (*Id.*)

### 2. *Plaintiff's Opposition (Doc. 65)*

In response, NetChoice notes that it has produced "three forms of evidence": (1) declarations from its General Counsel and two of its members, (2) interrogatory responses indicating what admissible evidence NetChoice can produce via testimony at trial, and (3) documents provided to Defendants during discovery, the content of which can be the subject of testimony at trial. (Doc. 65 at 42.) NetChoice contends that such evidence satisfies the summary judgment standard because it is "capable of being presented in admissible form at trial." (*Id.* at 41–42 (citing *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017)).) It adds that "there is no rule that such evidence [must] be 'corroborated' *now*, particularly given that Defendants have made no effort to create any material dispute." (*Id.* at 42 (citing *Maurer*, 870 F.3d at 384).) NetChoice emphasizes: "Defendants have not identified any fact . . . that is necessary to resolve NetChoice's claims, disputed in good faith, and on which the record lacks competent evidence." (*Id.* at 43.)

NetChoice also asserts that it can challenge the testimony of Defendants' experts—and that it has challenged Dr. Twenge's testimony, both in its *Opposition* to Defendants' *MSJ*, (*see id.* at 15–18), and in its motion to exclude Dr. Twenge's testimony, (*id.* at 43 (referencing Doc. 66)); *see also* Section IV.C.3, *infra* (recounting several of NetChoice's concerns with Dr. Twenge's expert report and deposition testimony). According to NetChoice, it "has contradicted Defendants' expert testimony the same way that any expert can be challenged: [by] identifying problems with their conclusions, methodology, and expertise." (Doc. 65 at 43.) It adds that, because Defendants have

the burden of demonstrating that the Act satisfies heightened scrutiny, they "are the only party to this litigation with the burden to provide expert testimony." (*Id.*) NetChoice argues that Defendants have not met their burden. (*Id.*)

### 3. Law & Analysis

#### a. Uncorroborated Internet Postings

"At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." *Maurer*, 870 F.3d at 384 (citing, *inter alia*, Fed. R. Civ. P. 56(c)). Rather, it "need only be *capable* of being 'presented in a form that would be admissible.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)); *accord Maurer*, 870 F.3d at 384. Summary judgment seeks to ascertain whether evidence admissible at trial "would allow a jury to find in favor of the nonmovant." *Maurer*, 870 F.3d at 384. The flexibility of Federal Rule of Civil Procedure 56(c) is conducive to this objective, enabling courts "to consider the evidence that would likely be admitted at trial . . . without imposing on parties the time and expense it takes to authenticate everything in the record." *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)). As the Fifth Circuit explained decades ago:

> Summary judgment procedure is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial[.] [I]t is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right of trial . . . if they really have evidence which they will offer on a trial[.] [I]t is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists.

*Whitaker v. Coleman*, 115 F.2d 305, 307 (5th Cir. 1940).

Thus, in *Maurer v. Independence Town*, the Fifth Circuit reversed a grant of summary judgment. *Maurer*, 870 F.3d at 387. There, the plaintiff had submitted a copy of his contract with the Tangipahoa Parish Rural Fire Protection District Number 2 in support of his claim that he had a property interest in his employment as fire chief. *Id.* at 381, 383. In granting summary judgment

in the defendants' favor, "the district court refused to consider the contract." *Id.* at 383. "It thought the contract was inadmissible because it was unexecuted, unauthenticated, and did not include a separate agreement . . . [that] it purported to attach." *Id.* On appeal, the Fifth Circuit explained that "[t]here [wa]s nothing to compel a conclusion that the contract . . . [wa]s not capable of being admitted at an eventual trial." *Id.* at 384.

The Fifth Circuit concluded, "[e]ven if . . . some of the concerns the [district] court raised did create substantial doubt about the admissibility of the contract, it was the obligation of the opposing party to object" that such evidence *could not be presented in a form admissible at trial*. *Id.* at 384–85; *see also Ganesh v. United States*, 658 F. App'x 217, 220 (6th Cir. 2016) ("Amended in 2010, Rule 56 now provides that parties asserting no genuine issue of material fact need only cite to particular parts of materials in the record. It then permits a party to object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*." (cleaned up) (emphasis in original)); *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 931 (7th Cir. 2018) ("It is not unusual for parties to submit documentary evidence to support or oppose summary judgment, as happened here, without fully authenticating the documents with affidavits thorough enough to overcome any and all evidentiary objections that could be raised."); *SEC v. Keener*, 580 F. Supp. 3d 1272, 1276 n.1 (S.D. Fla. 2022), *aff'd*, 102 F.4th 1328 (11th Cir. 2024) ("[T]he objection must be that evidence cannot be presented in admissible form, not that the evidence *has not* been presented in admissible form." (quoting *Abbott v. Elwood Staffing Servs., Inc.*, 44 F. Supp. 3d 1125, 1135 (N.D. Ala. 2014))).

Defendants fault NetChoice for submitting "uncorroborated internet postings" at this stage. (Doc. 58-1 at 18–21; *accord* Doc. 64 at 17–19.) But their argument implicitly misunderstands the summary judgment standard. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material

cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). And the case which Defendants cite in support of their contention—*Young v. UOP LLC*—is inapposite. (*See* Doc. 58-1 at 19 (citing *Young*, 2024 WL 288985, at *15 n.161).) In *Young*, the defendant objected that the plaintiff had cited internet articles from a federal government website for *medical information* (e.g., about the side effects of prescription medications). *See Young*, 2024 WL 288985, at *15–16. The court overruled that objection "because courts routinely take judicial notice of federal government websites." *Id.* at *16; *see also id.* at *17 ("The articles submitted by Plaintiff are competent summary judgment evidence."). But regardless of the court's decision, *Young* and the authorities which it collected are substantially different from the instant case. *See id.* at *15 n.161 (collecting cases where parties submitted internet articles from independent websites for their medical information). The possibility that an uncorroborated internet article would be inadmissible in one context (e.g., in a tort suit where medical causation is an element of the claim) does not mean that *all* internet articles are automatically inadmissible if uncorroborated at the summary judgment stage. Defendants read too much into *Young*.

NetChoice maintains that, if necessary, it could prove publicly available information about its members "through live testimony at trial." (Doc. 65 at 42); *see* Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment ("The burden is on the proponent to show that the material is admissible as presented *or to explain the admissible form that is anticipated*." (emphasis added).) The Court accepts this position. *See Maurer*, 870 F.3d at 384 ("There is nothing to compel a conclusion that the [evidence] . . . is not capable of being admitted at an eventual trial."). Plausibly, the information on members' websites is true and accurate, and members are capable of

designating employees or representatives to testify as much.[6] And notably—fatally—Defendants nowhere object that NetChoice's evidence *cannot* be presented in a form admissible at trial. *See, e.g.*, *Maurer* at 384; *Keener*, 580 F. Supp. 3d at 1276 n.1. Defendants' argument about competent summary judgment evidence is therefore unavailing. *See also LSR Consulting*, 835 F.3d at 532–34, 536 (affirming grant of summary judgment over plaintiff's objection that certain evidence had not been properly authenticated); *Cehovic-Dixneuf*, 895 F.3d at 930–31, 933 (affirming grant of summary judgment over defendant's objection—raised for the first time on appeal—that certain evidence was not fully, properly authenticated).

Even if the Court were to accept Defendants' argument that the "uncorroborated internet postings," submitted by NetChoice are not competent summary judgment evidence, (*see* Doc. 58-1 at 18), the outcome of this case would not change, *see* Section IV.B.–E., *infra*. The Court tends to agree with NetChoice that Defendants do not dispute any specific facts. (*See* Doc. 65 at 42–43; *see also* Doc. 58-1 at 17–21.) Nor do they explain how such facts are material to the issues presented. (*See* Doc. 58-1 at 17–21); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 ("[Nonmovants] must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [They] must come forward with specific facts showing that there is a *genuine issue for trial*." (cleaned up)). Lastly, the Court notes the irreconcilability of Defendants' position here with their own submissions. Specifically, Defendants' expert Tony Allen testified that parts

---

[6] In their *MSJ*, Defendants state: "NetChoice has vowed that it does not even know who at [its] member companies could corroborate [the submitted internet postings]." (Doc. 58-1 at 20 (citing Doc. 58-7 at 211).) This assertion rests upon a mischaracterization of the deposition testimony of NetChoice's General Counsel, Bartlett Cleland. (*See* Doc. 58-7 at 211.) Cleland testified that he "doubt[ed]" that anyone at NetChoice could identify someone at Meta who could say how many Louisianans between the ages of 13 and 18 use Facebook. (*See id.* at 210–11.) In other words, Cleland answered a narrow question, apparently unrelated to whether NetChoice's submissions can be presented in a form admissible at trial. Additionally, the Court notes that NetChoice has previously represented that, "at Defendants' request, NetChoice provided the contact information for outside counsel representing certain of its member companies with the understanding that Defendants might seek third-party discovery on those members." (Doc. 44 at 6.)

of his expert report were "based on what [NetChoice members] say on their website[s]." (Doc. 65-3 at 14–15, 17–18; *see also* Doc. 64-4 at 5–6, 8.)

        b.  <u>Expert Testimony</u>

      Likewise, the Court disagrees with Defendants' assertion that NetChoice "cannot genuinely dispute the sworn testimony of Defendants' experts, Dr. Jean Twenge . . . and Tony Allen." (Doc. 58-1 at 21 (citing *Rasheed*, 2012 WL 262619, at \*6).) Here, Defendants stretch *Rasheed v. Church & Dwight Co., Inc.*, a products liability action. *See Rasheed*, 2012 WL 262619, at \*1, \*6. In that case, the plaintiff insisted that a latex condom caused him severe injury but, at the summary judgment stage, failed to submit any expert testimony establishing medical causation, even though he was likely required to do so under the relevant Texas law. *Id.* at \*5–6. In stark contrast, the instant case does not involve medical causation. *Cf. id.* at \*6; *Webster*, 434 F.2d at 1193 (also dealing with medical causation). Defendants cite no rule or law requiring NetChoice to field its own expert. (*See* Doc. 58-1 at 21–22.) And Defendants cite no authority for their position that, by failing do so, NetChoice automatically concedes (1) the admissibility of Dr. Twenge's and Mr. Allen's testimony,[7] and/or (2) *Defendants' interpretation* of that testimony. (*See id.*); *cf. Webster*, 434 F.2d at 1194 ("We are not concerned with whether summary judgment would be improper on the basis of testimony such as supports this motion if the opposing party presented contrary opinion evidence, *or evidence tending to undermine the credibility or qualifications of the expert witness*." (emphasis added)). For its part, the Court is aware of none. Thus, NetChoice can still challenge these experts' methods and conclusions, as well as Defendants' interpretations thereof. Indeed, NetChoice has done so, although the testimony of Defendants' experts is ultimately in no way dispositive of the instant motions, *see* Section IV.C.3 & C.4, *infra*.

---

[7] NetChoice has separately moved to exclude Dr. Twenge's testimony. (Doc. 66.) Defendants oppose this motion. (Doc. 74.) NetChoice filed a reply. (Doc. 76.)

## B. Associational & Prudential Standing

### 1. Defendants' MSJ (Doc. 58)[8]

Defendants declare that this Court "has already recognized" that NetChoice's failure to submit competent summary judgment evidence "raises the issue of whether [it] has associational standing." (Doc. 58-1 at 20 (quoting Doc. 54 at 13 (citing *Bonta*, 761 F. Supp. 3d at 1230–31)).) "As the party asserting jurisdiction, NetChoice 'bears the burden of establishing standing as of the time [it] brought th[e] lawsuit and maintaining it thereafter.'" (*Id.* at 22 (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)).) NetChoice must therefore demonstrate: (1) that "its members would otherwise have standing to sue in their own right," (2) that "the interests [which] it seeks to protect are germane to [its] purpose," and (3) that "neither the claim asserted nor the relief requested requires the participation of individual members." (*Id.* at 22 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).) Defendants contend that NetChoice cannot satisfy prongs (1) and (3). (*Id.*)

Defendants note that the threshold for standing is higher at the summary judgment stage than at the preliminary injunction stage. (*Id.* at 23.) At a minimum, Defendants explain, NetChoice must identify which of its members will be regulated by the Act and must present "specific facts" proving an individual member's standing. (*Id.* at 23–24 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e))); *id.* (citing, *inter alia*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009)).) Defendants argue that, because NetChoice has not shown that the Act will injure any of its members or their users, it has not met its burden and therefore cannot assert standing on behalf of its members or their users. (*Id.* at 24–25.)

---

[8] Here, too, Defendants' *Opposition* makes identical arguments to their *MSJ*. (*See* Doc. 64 at 19, 21–28.)

Defendants observe that only two NetChoice members—Snap and Reddit—"submitted declarations at the [preliminary injunction] stage." (*Id.* at 25 (citing Docs. 6-4, 6-5).) At the summary judgment stage, NetChoice has merely re-submitted these declarations. (*See* Doc. 64 at 24–25.) But, Defendants argue, Snap's and Reddit's declarations "offer virtually no 'specific facts.'" (Doc. 58-1 at 26 (quoting *Lujan*, 504 U.S. at 561).) Rather, these declarations contain "conclusory assertions" about the Act's expected effect(s) on Snap's and Reddit's respective platforms. (*Id.* at 26 (quoting *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 937 F.3d 533, 545 (5th Cir. 2019)).)

Defendants contend that, even if the Court credits these declarations, they fail to "tie any injury to every provision NetChoice challenges." (*Id.*) Specifically, neither declaration discusses the coverage definition (La. R.S. § 51:1751) or the advertising prohibition (La. R.S. § 51:1753(2)). (*Id.* at 26–27.) And according to Defendants, NetChoice lacks standing to challenge the Act as vague because there is no "imminent or even credible threat of prosecution" (i.e., enforcement). (*Id.* at 27 n.4 (quoting *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir.), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, 145 S. Ct. 140 (2024)).)

Separately, Defendants argue that, in order to establish associational standing, NetChoice "must be able to 'prove[] by evidence from representative injured members' the elements of its claims" without "fact-intensive" inquiry into individual members. (*Id.* at 27 (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010)).) Defendants fault NetChoice for "declin[ing] to gather" evidence from its members. (*Id.* at 28.) Worse, Defendants say, "NetChoice disclaimed having *any* special knowledge or relationship with its members relevant to the claims in this case." (*Id.* (citing Doc. 58-7 at 79).) Simultaneously, NetChoice "acknowledges that each of its members is unique." (*Id.* at 29 (quoting *Bonta*, 152 F.4th

at 1014).) Defendants contend that "First Amendment analysis is 'fact intensive' and will 'surely vary' from 'platform to platform.'" (*Id.* at 28 (quoting *Bonta*, 152 F.4th at 1014 (quoting *Moody*, 603 U.S. at 747 (Barrett, J., concurring))).) Defendants therefore conclude that NetChoice "cannot press [its] claims without the active participation of its members."[9] (*Id.*)

### 2. *Plaintiff's Opposition (Doc. 65)*

NetChoice responds that "[b]inding Fifth Circuit and Supreme Court precedent[s] hold that [it] has associational standing." (Doc. 65 at 32–33 (citing *Fitch*, 134 F.4th at 804–07).) It repeats the three "associational standing" prongs (above), noting that "[t]he first two . . . are Article III constitutional requirements, and 'the third . . . is solely prudential.'" (*Id.* at 33 (quoting *Ass'n of Am. Physicians*, 627 F.3d at 550); *id.* (citing *Fitch*, 134 F.4th at 804).) According to NetChoice, its members would have standing to challenge the Act, because they are the object of the Act's regulations. (*Id.* at 33–34 (citing *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019)).)

Further, NetChoice says, it *has* "nam[ed] [its] affected members": Meta, Nextdoor, Pinterest, Snap, Reddit, X, and YouTube. (*Id.* at 34 (quoting *Summers*, 555 U.S. at 498).) Defendants themselves have added Discord, Amazon, and Automattic to the list. (*Id.*) Defendants have even sent "Notice[s] of Violations" to most of these NetChoice members, "expressly stating" that their platforms are "regulated by the Act." (*Id.* (emphasis omitted) (quoting Doc. 57-8 at 2).) Thus, NetChoice argues, its members "have an 'actual and well-founded fear that the law will be enforced against' them." (*Id.* (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393

---

[9] As a backup, Defendants argue that associational standing is itself unconstitutional. (Doc. 58-1 at 29–30 n.5 (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring)).) The Court notes that the Supreme Court and the Fifth Circuit have both carefully considered and applied the concept for decades. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (citing, *inter alia*, *NAACP v. Alabama*, 357 U.S. 449, 458–60 (1958)); *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *Familias Unidas v. Briscoe*, 619 F.2d 391, 398 n.7 (5th Cir. 1980) (citing, *inter alia*, *Hunt*, 432 U.S. at 343); *Fitch*, 134 F.4th at 804–05 (finding that NetChoice had associational standing in a case involving a similar challenge to a similar state law).

(1988)).) Enforcement will not only violate members' First and Fourteenth Amendment rights but also inflict "economic injury" (e.g., compliance costs, fines), which "is a quintessential injury upon which to base standing." (*Id.* at 34–35 (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006)).) These harms are more than mere inferences. (*Id.* at 35 (citing, *inter alia*, Doc. 57-4 at 19, 28).)

    As for the third prong of associational standing, NetChoice contends that participation of its members in this litigation is *not* required, because NetChoice "only requests declaratory and injunctive relief," (*id.* at 35–36 (citing *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 505 (5th Cir. 2021))), and because its claims "turn on the application of well-settled precedents to facts common to all of [its] regulated members," (*id.* at 36 (citing *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021))). Such facts include: (1) that "the Act is content-based," (2) that Louisiana lacks the "power to prevent children from hearing or saying anything *without their parents' prior consent*," (*id.* (quoting *Brown*, 564 U.S. at 795 n.3)), and (3) that requirements like age-verification "burden" minors' and adults' "right to access" protected speech, (*id.* (quoting *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 482–83 (2025))).

    NetChoice disputes Defendants' assertion that associational standing depends on an organization's "special" knowledge of members and their operations. (*Id.* at 37 (quoting Doc. 58-1 at 28).) Relatedly, it rejects Defendants' characterization of *Bonta* and *Moody*, arguing that not every First Amendment challenge requires a fact-intensive inquiry. (*Id.* (citing Doc. 58-1 at 28).) In support of this contention, NetChoice points to *Packingham v. North Carolina* and to *Moody* itself, specifically to *Moody*'s recognition that "curated feeds" which rely on algorithms can still be "fully protected by the First Amendment." (*Id.* at 37–38 (citing *Packingham*, 582 U.S. at 108; *Moody*, 603 U.S. at 734–35).) NetChoice distinguishes *Bonta* on the ground that California's law

26

"requir[ed] parental consent for minors to view '*personalized feeds*' online." (*Id.* at 39 (citing *Bonta*, 152 F.4th at 1013–14).) Secondarily, NetChoice argues that *Bonta* misunderstood *Moody* as requiring review of each members' specific algorithm. (*Id.* (citing *Bonta*, 152 F.4th at 1014).)

According to NetChoice, two other district courts granted summary judgment in its favor in similar cases "with less of a record than the parties have here." (*Id.* at 38 (citing *Griffin*, 2025 WL 978607; *Yost*, 778 F. Supp. 3d 923).) Necessarily, then, two other district courts determined—at the summary judgment stage—that NetChoice has associational standing. (*See id.*) At a minimum, NetChoice argues, it has associational standing to make claims which cannot possibly require individual members' participation, *viz.*, its facial First Amendment challenges, its vagueness challenge, and its preemption claim. (*Id.* at 37.)

Lastly, NetChoice avers that—although unnecessary here—it has prudential standing "to raise the rights and interests of members' users." (*Id.* at 40; *see id.* (citing, *inter alia*, *Fitch*, 134 F.4th at 807).) NetChoice contends that "[m]embers' right to disseminate speech and users' ability to receive that speech are two sides of the same coin, because 'the protection afforded is to *the communication*.'" (*Id.* (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976)).) It adds that the Act "imposes a platform-wide burden on users' right to engage in [protected] speech" and that this burden does not "differ between the platforms regulated." (*Id.* at 41 (quoting *Griffin*, 2025 WL 978607, at *7).) NetChoice notes that it does not need to "wait for the damage to occur before filing suit." (*Id.* (quoting *Mahmoud v. Taylor*, 606 U.S. 522, 560 (2025)).) Harms to members and users alike are real. (*Id.*)

### 3. *Law & Analysis*

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

"The plaintiff 'bears the burden of establishing standing as of the time [it] brought th[e] lawsuit and maintaining it thereafter.'" *Murthy*, 603 U.S. at 58 (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). The plaintiff must also "show that [it] has standing for each type of relief sought." *Summers*, 555 U.S. at 493. "[It] must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Murthy*, 603 U.S. at 58 (quoting *Lujan*, 504 U.S. at 561). "At the preliminary injunction stage . . . the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Id.* (citing *Winter*, 555 U.S. at 22). At the summary judgment stage, the plaintiff cannot "rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" establishing its standing. *Lujan*, 504 U.S. at 561 (internal quotation marks omitted) (citing Fed. R. Civ. P. 56(e)).

Constitutional standing requires the plaintiff to demonstrate that it "is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant[s]; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers*, 555 U.S. at 493 (citing *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)); *accord FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "A plaintiff must also satisfy . . . 'prudential limitations on [the court's] exercise [of jurisdiction].'" *Fitch*, 134 F.4th at 804 (quoting *Warth*, 422 U.S. at 498); *see also Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 801 (5th Cir. 2012) (discussing "prudential dimensions of the standing doctrine").

"[S]tanding rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can seek prospective relief." *Ass'n of Am. Physicians*, 103 F.4th at 390 (quoting *Nat'l Press Photographers*, 90 F.4th at 782). Accordingly,

"[i]n pre-enforcement cases alleging a violation of the First Amendment's Free Speech Clause, . . . chilled speech or self-censorship is an injury sufficient to confer standing." *Nat'l Press Photographers*, 90 F.4th 782 (quoting *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021)); *accord Woodlands Pride, Inc. v. Paxton*, 157 F.4th 775, 782 (5th Cir. 2025) (citing *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215–16 (5th Cir. 2023)) ("Chilled speech or self-censorship is an injury in fact if a plaintiff shows that (1) [it] intends to engage in a course of conduct arguably affected with a constitutional interest; (2) the course of action is arguably proscribed by the statute; and (3) there is a credible threat of prosecution under the statute."); *id.* at 786–87 (citing *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 329 (5th Cir. 2025)) (assuming a credible threat of enforcement "given the lack of evidence demonstrating otherwise" and because the statute was "non-moribund").

A plaintiff has standing to bring a *facial* challenge when "the law is aimed directly at [the] plaintiff[], who, if [its] interpretation of the statute is correct, will have to take significant and costly compliance measures or risk . . . prosecution." *Am. Booksellers*, 484 U.S. at 392. "Unlike in other constitutional contexts, in the speech context, [courts] 'may *assume* a substantial threat of future enforcement absent compelling contrary evidence.'" *Nat'l Press Photographers*, 90 F.4th at 782 (quoting *Barilla*, 13 F.4th at 433). For an *as-applied* challenge, however, "[t]here must be some evidence that the rule would be applied to the plaintiff." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019); *accord Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (quoting *Schlissel*, 939 F.3d at 766, with approval).

a.   Associational Standing

Where the plaintiff is an association, it can assert standing to sue on behalf of its members, so long as it demonstrates that: "(1) individual members would have standing, (2) [it] seeks to

29

vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admissions, Inc. v. Univ. Tex. at Aus.*, 37 F.4th 1078, 1084 (5th Cir. 2022) (citations omitted); *accord Students for Fair Admissions*, 600 U.S. at 199 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

### *i.  First Prong of Associational Standing*

As in similar cases, NetChoice "easily meets" the first prong of associational standing here. *See, e.g.*, *Fitch*, 134 F.4th at 804. Its members would have standing to bring facial *and* as-applied challenges to the Act. NetChoice has named its affected members: Meta, Nextdoor, Pinterest, Snap, Reddit, X, and YouTube. (*See, e.g.*, Doc. 57-2 at 2, ¶¶ 5, 7); *see also Summers*, 555 U.S. at 498. Defendants have both admitted that these members will be covered by the Act, (Doc. 64-1 at 3, ¶¶ 5, 7), and named other members who will be covered (i.e., Discord, Amazon, Automattic), (Doc. 57-2 at 2, ¶ 6; Doc. 64-1 at 3, ¶ 6). Defendants have even sent "Notice[s] of Violations" to at least eight of the above members. (Doc. 57-2 at 2–3, ¶ 8; *see* Doc. 57-8.) It is surprising, then, that Defendants now suggest that there is no "imminent or even credible threat" of enforcement. (*See* Doc. 58-1 at 27 n.4 (quoting *Nat'l Press Photographers*, 90 F.4th at 782).) Plainly, there is.[10]

"NetChoice has . . . presented some evidence that the Act w[ill] apply to its members [if enforced]; this is sufficient to support its standing to pursue an as-applied challenge." *Fitch*, 787 F. Supp. 3d at 272 (citing *Fenves*, 979 F.3d at 335). Likewise, it is sufficient to support NetChoice's standing to pursue a facial challenge. *See Am. Booksellers*, 484 U.S. at 392.

---

[10] For the reasons given in Section IV.A.3, *supra*, the Court disagrees with Defendants' argument that Cleland's Declaration is not competent summary judgment evidence. (*See, e.g.*, Doc. 64 at 17–19; Doc. 64-1 at 3, ¶ 12.) Indeed, other district courts have relied on similar declarations by NetChoice's General Counsel, both at the preliminary injunction stage, *see, e.g.*, *Fitch*, 787 F. Supp. 3d at 271–72, and at the summary judgment stage, *see, e.g.*, *Yost*, 778 F. Supp. 3d at 940–41. However, this Court need not rely on Cleland's Declaration, (*see* Doc. 57-4 at 10–14), for its finding that NetChoice has associational standing to challenge the Act, as demonstrated by this Section (IV.B.3).

Enforcement of the Act presents two independent harms: (1) Covered NetChoice members' First and Fourteenth Amendment rights will be violated. *See* Section IV.C.4 & D.4, *infra*; *see also Fitch*, 134 F.4th at 804 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)) ("NetChoice can . . . independently satisfy the first requirement under the theory that the Act will violate its members' First and Fourteenth Amendment rights by proscribing their intended actions and credibly threatening to prosecute those actions."); *Nat'l Press Photographers*, 90 F.4th at 782 (discussing standing for First Amendment challenges). (2) NetChoice members will incur compliance costs or else face steep penalties associated with enforcement of the Act. *See* La. R.S. § 51:1756 (concerning enforcement); *see also Fitch*, 134 F.4th at 804 ("The statute would increase regulatory requirements of NetChoice's members, causing financial harm.").

Defendants do not seriously contest NetChoice's claim that the Act threatens its members' First and Fourteenth Amendment rights. (*See* Doc. 58-1 at 22–27.) Rather, they focus on compliance costs, implying that Snap's and Reddit's declarations lack the specificity necessary to establish this harm. (*See id.* at 26–27.) The Court disagrees with Defendants here.[11] But regardless, these declarations are not the only evidence that the identified NetChoice members will incur compliance costs. Defendants' own expert, Mr. Allen, suggested in his report that these members' platforms do not currently comply with the Act. (*See* Doc. 64-4 at 8 (comparing members' current "retrospective" age restrictions with the Act's requirements).) Similarly, Mr. Allen testified that, based on what he had read, members' restrictions were "inadequate . . . to comply with Louisiana's

---

[11] Snap's declaration, for example, makes clear that the implementation of, *inter alia*, age-verification and parental-consent processes will be "costly," requiring "a significant [investment] of budget, resources, and staff." (Doc. 57-4 at 19.) Likewise, Reddit notes that many of the Act's requirements "will be costly to implement and maintain." (*Id.* at 28.) In *Fitch*, the Fifth Circuit accepted "compliance costs" as a harm based on similar statements by covered NetChoice members. *See Fitch*, 134 F.4th at 804 n.11; *see also Fitch*, 787 F. Supp. 3d at 271–72; *Uthmeier*, 2025 WL 1570007, at *7–8. And in *Yost*, the district court determined, at the summary judgment stage, that NetChoice had associational standing based, in part, on more or less identical statements by covered NetChoice members. *Yost*, 778 F. Supp. 3d at 940.

proposed law." (Doc. 65-3 at 15.) Indeed, the very premise of the Act is that covered NetChoice members (among others) are not implementing adequate restrictions. (*See, e.g.*, Doc. 58-1 at 15.) And most compelling of all, Defendants sent "Notice[s] of Violations," wherein they stated that members' platforms "fail[] to comply with several requirements of the Act," *viz.*, La. R.S. §§ 51:1752(A)–(B), 51:1753, and 51:1754, which encompass all of the specifically-challenged provisions.[12] (*See, e.g.*, Doc. 57-8 at 2–3, 10–11, 18–19, 22–23, 26–27, 30–31, 34–35, 38–39, 49–50, 53–54, 57–58.) The Court has provided an example below:

---

[12] Consequently, the Court also finds unpersuasive Defendants' argument that neither Snap's nor Reddit's declaration discusses the advertising prohibition or the coverage definition. (*See* Doc. 58-1 at 26–27.) Defendants' "Notice[s] of Violations" state that covered NetChoice members are not in compliance with the advertising prohibition. (*See, e.g.*, Doc. 57-8 at 2–3.) And Snap's declaration is unequivocal that the Act will necessarily "modify[] Snap's advertising and targeted content model." (Doc. 57-4 at 19.) As for the coverage definition, it is the very foundation of NetChoice members' injuries. NetChoice and Defendants have identified the NetChoice members covered by the Act. (*See* Doc. 57-2 at 2–3, ¶¶ 5–8.) And the "Notice[s] of Violations" make explicit that members fall under the coverage definition. (*See, e.g.*, Doc. 57-8 at 49 (citing La. R.S. § 51:1751(11)–(12)) ("We have reviewed your company information and determined that it is regulated by the Act.").)



LIZ MURRILL
ATTORNEY GENERAL

STATE OF LOUISIANA
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE, LA
70804-9005

February 4, 2025

**_Via U.S. Mail with Tracking_**

Twitch Interactive, Inc.
350 Bush Street, 2nd Floor
San Francisco, CA  94104

**RE: Notice of Violations of La. R.S. 51:1751, et seq.**

To Whom it May Concern,

On July 1, 2024, Act 456 from the State of Louisiana 2023 Regular Legislative Session became effective, codified as Chapter 20 of Title 51 of the Louisiana Revised Statutes of 1950, Louisiana Revised Statutes 51:1751 through 1759, entitled the Secure Online Child Interaction and Age Limitation Act ("the Act").

We reviewed your company information and determined that it is regulated by the Act. *See La. R.S. 17:1751(11)-(12).* However, your company fails to comply with several requirements of the Act for the following social media platform: Twitch

In accordance with La. R.S. 51:1756(D)(1), you are hereby put on notice that you are in violation of the following provisions:

- §1752(A): Failure to make commercially reasonable efforts to verify the age of Louisiana account holders.
- §1752(B): Permitting a Louisiana resident who is a minor to be an account holder on the social media company's social media platform unless the minor has the express consent of a parent or guardian.
- §1753: Failing to prohibit each of the following: (1) Adults from direct messaging a Louisiana minor account holder unless the minor is already connected to the adult on the service; (2) The display of any advertising in the account based on the Louisiana minor account holder's personal information, except age and location; (3) The collection or use of personal information from the posts, content, messages, text, or usage activities of the account other than information beyond what is adequate, relevant, and reasonably necessary in relation to the purposes for which such information is collected, as disclosed.
- §1754: Failure to provide a parent or guardian, who gave parental consent, with a mechanism for the minor account holder or the parent or guardian to initiate account supervision, including the ability for the parent to view privacy settings of the minor's account, set daily time limits for the service, schedule breaks, and offer the minor the option to set up parental notifications when the minor reports a person or issue.

LADOJ-000048

Pursuant to La. R.S. 51:1756(D), your company has forty-five (45) days from the receipt of this notice to cure the above-stated violations before the Louisiana Department of Justice may proceed with civil enforcement actions. Please initiate compliance and cure all violations within forty-five (45) days. Once cured, provide the Public Protection Division of the Department of Justice with a written statement indicating that the violations are cured and no further violations will occur.

For Louisiana,

**LIZ MURRILL**
**Attorney General**

By: _____
Michael Dupree
Director, Public Protection Division

Cc: Twitch Interactive, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

LADOJ-000049

(Doc. 57-8 at 49–50.)



STATE OF LOUISIANA
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE, LA
70804-9005

LIZ MURRILL
ATTORNEY GENERAL

February 4, 2025

**_Via U.S. Mail with Tracking_**

Twitch Interactive, Inc.
350 Bush Street, 2nd Floor
San Francisco, CA  94104

**RE:  Secure Online Child Interaction and Age Limitation Act - Effective Date**

To Whom It May Concern,

Recently, you received a Notice from our office regarding your non-compliance with Act 456 of the 2023 Regular Section, codified as La. R.S. 51:1751 through 1759, entitled the "Secure Online Child Interaction and Age Limitation Act." We send this letter to note an inconsistency regarding the effective date of Act 456 and to clarify when we expect compliance with the law.

During its 2024 Regular Session, the Louisiana Legislature passed Act 656, which included statutes for the "Protection of Children's Internet Data" and sought to change the effective date of Act 456 from July 1, 2024, to July 1, 2025. However, Act 656 is not, itself, effective until July 1, 2025, and its changes do not have a retroactive effect. Accordingly, the current effective date of Act 456 lawfully remains July 1, 2024.

Nonetheless, the intent of the Louisiana Legislature with Act 656 appears to be, in part, to extend the enforcement date of Act 456 from July 1, 2024, to July 1, 2025. Therefore, we do not expect you to be compliant with the law until July 1, 2025, and will not proceed with any enforcement actions under Act 456 before that date. Please also note the additional prohibitions imposed by Act 656, which are also enforceable on July 1, 2025.

If you have questions, you may contact me at (225) 326-6400.

For Louisiana,

**LIZ MURRILL**
**Attorney General**

By:

Michael Dupree
Director, Public Protection Division

LADOJ-000102

(Doc. 57-8 at 103.)

Given the above, enforcement of the Act invariably threatens economic injury to the covered NetChoice members. *See Am. Booksellers*, 484 U.S. at 392 (identifying compliance costs as an injury); *see also id.* ("Th[e] requirement [of injury in fact] is met here, as the law is aimed directly at plaintiffs who . . . will have to take significant and costly compliance measures or risk criminal prosecution."). Members will either need to implement the Act's requirements—thereby incurring compliance costs—or else face steep penalties for non-compliance. *See also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement."); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). Plus, where an entity is the object of regulation, "there is ordinarily little question that the [law] has caused [it] injury." *Lujan*, 504 U.S. at 561–62. "Because several of NetChoice's members are the direct 'object' of the Act, 'there is little question' that they satisfy the injury requirement."[13] *Yost*, 778 F. Supp. 3d at 941 (quoting *Lujan*, 504 U.S. at 561–62).

The prospective injuries to the covered NetChoice members are fairly traceable to the Division's enforcement of the Act. *See* La. R.S. §§ 51:1755–1756 ("The [D]ivision has exclusive authority to administer and enforce the requirements of this Chapter. . . . [T]he [D]ivision director may impose an administrative fine of up to [$2,500] for each violation of this Chapter, and the [D]ivision may bring an action in a court of competent jurisdiction to enforce any provision of this Chapter."). And an injunction would surely redress such injury. *See, e.g.*, *Fitch*, 134 F.4th at 805 (finding the same); *Lujan*, 504 U.S. at 561–62 (explaining that, if a plaintiff is the object of regulation, "there is ordinarily little question" that an injunction will redress the threatened injury).

---

[13] And again, at the very least, Defendants have not adequately disputed the first harm (i.e., the violation of NetChoice members' First and Fourteenth Amendment rights), which independently establishes that members would have standing to challenge the Act. *See, e.g.*, *Fitch*, 134 F.4th at 804.

Accordingly, the Court finds that the covered NetChoice members—identified by NetChoice and Defendants—would have standing to sue in their own right.

### ii.     *Second Prong of Associational Standing*

Defendants do not contest the second prong of associational standing, and this Court finds that the interests which NetChoice seeks to vindicate here are germane to its stated purpose. (*See* Doc. 1 at ¶ 12 (noting that NetChoice's objective is "to promote online commerce and speech and to increase consumer access and options via the internet, while minimizing burdens that could prevent businesses from making the internet more accessible and useful"); *see also* Doc. 57-4 at 2 ("NetChoice 'works to make the Internet safe for free enterprise and free expression' . . . .")); *Fitch*, 134 F.4th at 804 ("NetChoice has presented evidence that its purpose is 'to make the Internet safe for free enterprise and free expression[,]' and . . . the lawsuit is centered on doing exactly that . . . .").

### iii.     *Third Prong of Associational Standing*

Finally, NetChoice meets the third prong of associational standing. Its claims "can be proven by evidence from representative injured members, without fact-intensive-individual inquiry." *Griffin*, 2023 WL 5660155, at *10 (quoting *Ass'n of Am. Physicians*, 627 F.3d at 552). And here, "the participation of [certain] individual members does not thwart associational standing." *Id.* (quoting *Ass'n of Am. Physicians*, 627 F.3d at 552); *accord Griffin*, 2025 WL 978607, at *6 (referencing *Griffin*, 2023 WL 5660155, at *8–12); *Fitch*, 134 F.4th at 805 (quoting *Ass'n of Am. Physicians*, 627 F.3d at 552).

Citing *Bonta*, Defendants assert that "First Amendment analysis is 'fact intensive' and will 'surely vary' from 'platform to platform.'" (Doc. 58-1 at 28 (quoting *Bonta*, 152 F.4th at 1014 (quoting *Moody*, 603 U.S. at 747 (Barrett, J., concurring))).) But Defendants mischaracterize

*Bonta*.[14] There, the Ninth Circuit considered a challenge to a California law regulating, *inter alia*, minors' access to "personalized recommendation algorithms" (i.e., personalized feeds). *Bonta*, 152 F.4th at 1009. The district court determined—and the Ninth Circuit agreed—that, "because the expressive qualities of personalized feeds may differ between social media platforms," "each separate as-applied challenge on behalf of each separate NetChoice member [would] require[] its own 'ad hoc factual inquiry'" (i.e., into whether and how each member's algorithm was expressive).[15] *Bonta*, 761 F. Supp. 3d at 1230–31 (quoting *Ass'n of Christian Schs. Int'l v. Stearns*, 678 F. Supp. 2d 980, 986 (C.D. Cal. 2008) (citation omitted), *aff'd*, 362 F. App'x 640, 644 (9th Cir. 2010)); *accord Bonta*, 152 F.4th at 1013–14.

Here, by contrast, the Act does not take aim at covered NetChoice members' unique algorithms. Rather, it "imposes broad restrictions on threshold access to regulated websites." (Doc. 65 at 39 (citing La. R.S. § 51:1752)); *see Paxton*, 747 F. Supp. 3d at 1030–31 (finding that the plaintiffs had associational standing, in part because the Texas law "impose[d] relatively uniform requirements on all Plaintiffs' covered members"); *Uthmeier*, 2025 WL 1570007, at *9 ("The questions this Court must answer . . . can all be answered without reference to the intricacies of each individual platform's operation . . . ."); *see also NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1116 (explaining, in the context of a similar challenge to a distinct but related law, that "all [covered entities] are under the same statutory obligation"); *cf. Bonta*, 152 F.4th at 1022 (citing, *inter alia*, *Bonta*, 113 F.4th at 1116) ("Unlike other cases in which the constitutional analysis is materially identical across all applications of a law, here th[e] record development matters.").

---

[14] Defendants leave a crucial article out of the *Bonta* quotation. *Bonta* did not hold that "First Amendment analysis [writ large] is fact intensive." *See Bonta*, 152 F.4th at 1014 (cleaned up). Rather, *Bonta* determined that "[t]he [instant] First Amendment analysis [wa]s fact intensive." *Id.* at 1014 (cleaned up). With this omission, Defendants expand the decision.

[15] And notably, the district court and the Ninth Circuit both necessarily found that NetChoice had associational standing to challenge other provisions of California's law. *See Bonta*, 761 F. Supp. 3d at 1213; *Bonta*, 152 F.4th at 1025 (affirming and remanding for the district court to consider expanding the preliminary injunction).

So, too, is Defendants' reliance on *Moody* "misplaced." *See Uthmeier*, 2025 WL 1570007, at \*9. "*Moody* simply clarified that applying the standard for a facial challenge will be fact-intensive *in some circumstances*; none of the opinions in the case even mention[] associational standing or the participation of individual members, even though the consolidated cases at issue [in *Moody*] were brought by two trade associations . . . ." *Id.* (emphasis added) (citing *Moody*, 603 U.S. 707); *accord Paxton*, 747 F. Supp. 3d at 1029 ("*Moody* did not alter the standing analysis for associations, only the proper scope of relief for when those associations challenge laws under the First Amendment."). Notably, NetChoice seeks only injunctive relief here. *See Tex. Ent. Ass'n*, 10 F.4th at 505 ("Injunctive relief 'does not make the individual participation of each injured party indispensable to proper resolution.'" (quoting *Hunt*, 432 U.S. at 342–43)). And neither NetChoice's facial nor its as-applied challenge requires the participation of any of its members. *See also Uthmeier*, 2025 WL 1570007, at \*9 (citing *Warth*, 422 U.S. at 511) (reaching the same conclusion); *Fitch*, 134 F.4th at 805 ("[N]o claim asserted nor relief requested requires the participation of each member."). The Court therefore finds that the third prong of associational standing is met here. Having satisfied all three requirements, NetChoice has associational standing.[16]

### b.  Prudential Standing

The Supreme Court has "acknowledged that there are circumstances where it might be necessary to recognize a third party's standing to assert the rights of another." *Fitch*, 738 F. Supp. 3d at 768 (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004)). Prudential standing is limited,

---

[16] Indeed, when deciding similar challenges, all other district courts have reached the same conclusion. *See Yost*, 778 F. Supp. 3d at 938–46; *Griffin*, 2025 WL 978607, at \*6 (referencing *Griffin*, 2023 WL 5660155, at \*8–12); *Fitch*, 787 F. Supp. 3d at 271–72; *Paxton*, 747 F. Supp. 3d at 1028–31; *Carr*, 789 F. Supp. 3d at 1213–16; *Reyes*, 748 F. Supp. 3d at 1118–19; *Uthmeier*, 2025 WL 1570007, at \*5–9; *see also Bonta*, 761 F. Supp. 3d at 1230–32 (necessarily finding that NetChoice had associational standing to challenge some provisions of California's law).

however, by the requirement "that a [third] party seeking . . . standing make two additional showings." *Kowalski*, 543 U.S. at 130. "First, [courts] have asked whether the party asserting the right has a 'close' relationship with the person who possesses the right." *Id.* (citing *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). "Second, [courts] have considered whether there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.*

"Within the context of the First Amendment, the [Supreme] Court has enunciated . . . concerns that justify a lessening of prudential limitations on standing." *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984). "Litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Likewise, "[i]n several cases, th[e] [Supreme] Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Warth*, 422 U.S. at 510 (emphasis added) (citations omitted). The Fifth Circuit has added:

> [V]endors may assert the rights of vendees, . . . doctors may assert the rights of patients, and . . . employers may assert the rights of employees. [*Vote.Org v. Callanen*, 89 F.4th 459, 472 (5th Cir. 2023) (parenthetical omitted).] Indeed, a business "may properly assert its employees' or customers' First Amendment rights where the violation of those rights adversely affects the financial interests or patronage of the business." [*Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995).] With this footing it is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least when the violation of those rights adversely affects the platform. [*See also Am. Booksellers*, 484 U.S. at 393 (holding that a bookstore with constitutional standing was permitted to make First Amendment arguments on behalf of its customers).] NetChoice satisfies the prudential standing requirement.

*Fitch*, 134 F.4th at 807; *see also Yost*, 778 F. Supp. 3d at 941–46 (citing, *inter alia*, *Craig v. Boren*, 429 U.S. 190 (1970)) (considering, at length, whether NetChoice had prudential standing to bring a similar challenge to a similar law).

Given the above, NetChoice plainly has standing to sue on behalf of covered members' Louisiana users—although, as NetChoice notes, such standing is unnecessary here. (*See* Doc. 65 at 40.) Defendants do not seriously challenge NetChoice's prudential standing.[17] (*See* Doc. 58-1 at 24.) That is, they do not dispute that the Act will "impose[] a platform-wide burden on users' right to engage in [protected] speech." (Doc. 65 at 41 (quoting *Griffin*, 2025 WL 978607, at *7).) Nor do they argue that users are *not* the recipients of speech by covered NetChoice members via their platforms. *See Va. State Bd. of Pharmacy*, 425 U.S. at 756–57. Thus, there is no genuine dispute whether users will be injured by enforcement of the Act or whether such injury will, in turn, harm NetChoice members' platforms. *See Fitch*, 134 F.4th at 807. The Court also notes that, where the defendants have more fiercely contested NetChoice's prudential standing, courts have consistently sided with NetChoice, including at the summary judgment stage. *See, e.g.*, *Yost*, 778 F. Supp. 3d at 941–46; *Griffin*, 2025 WL 978607, at *6 (referencing *Griffin*, 2023 WL 5660155, at *10–12); *see also Fitch*, 738 F. Supp. 3d at 768; *Fitch*, 134 F.4th at 805–07; *Fitch*, 787 F. Supp. 3d at 271–72; *Carr*, 789 F. Supp. 3d at 1215–16; *Uthmeier*, 2025 WL 1570007, at *9.

---

[17] The Court understands Defendants to be disputing only NetChoice's associational standing. (*See* Doc. 58-1 at 22–24; Doc. 64 at 21–28.) But to the extent that they seek to challenge NetChoice's prudential standing, it is noteworthy that the only relevant authority which they cite is *Virginia v. American Booksellers Association*. (*See* Doc. 58-1 at 24 (citing *Am. Booksellers*, 484 U.S. at 393); Doc. 64 at 23 (same).) In that case, the Supreme Court held that plaintiffs—booksellers—*could* bring a First Amendment challenge on behalf of prospective customers (i.e., book-buyers). *Am. Booksellers*, 484 U.S. at 392–93. In a separate case, the Court explained: "[I]n First Amendment cases we have relaxed [the] rules of standing without regard to the relationship between the litigant and those whose rights [it] seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech." *Eisenstadt v. Baird*, 405 U.S. 438, 445 n.5 (1972); *accord Am. Booksellers*, 484 U.S. at 392–93. In *Fitch*, the Fifth Circuit agreed with this statement when finding that NetChoice had prudential standing. *See* 134 F.4th at 806–07.

### C. Facial and As-Applied Challenges

#### 1. Plaintiff's Motion for PI & MSJ (Docs. 6, 57)

Preliminarily, NetChoice argues that the Act's coverage definition is content-based and that, as a consequence, all of the Act's "speech regulations" are subject to strict scrutiny. (Doc. 57-1 at 28.) "Specifically, the Act both defines covered websites and excludes numerous other websites from its onerous regulations based on their 'subject matter' and thus their 'content.'" (*Id.* at 29 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)); *see id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64 (2011)).) That is, the Act regulates websites that "allow users to interact socially" but "exempts websites with other 'predominant or exclusive functions.'" (*Id.* (quoting La. R.S. § 51:1751(12)).) According to NetChoice "[m]any courts have held that state laws with similar 'interact socially' coverage provisions are content-based." (*Id.* (citing *Paxton*, 747 F. Supp. 3d at 1032; *Reyes*, 784 F. Supp. 3d at 1122).)

Relatedly, NetChoice contends that the Act triggers heightened scrutiny because its coverage definition is speaker-based. (*Id.* at 30 (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640–41 (1994)).) Whereas the Act "restricts speech" on websites with at least "five million account holders worldwide," (*id.* (quoting La. R.S. § 51:1751(11))), it does not restrict "*identical* speech occurring on . . . similar [but smaller and therefore unregulated] websites," (*id.* (citing *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983)).) At a minimum, NetChoice says, "governmental restrictions on 'access to' social media raise . . . heightened scrutiny." (*Id.* at 28 (quoting *Packingham*, 582 U.S. at 105, 107–08).)

NetChoice therefore argues that all of the Act's requirements—the age-verification requirement (§ 51:1752(A)), parental-consent requirement (§ 51:1752(B)), direct-messaging restrictions (§ 51:1753(1)), advertising prohibition (§ 51:1753(2)) and related data-collection and

data-use restrictions (§ 51:1753(3)), and parental-supervision requirement (§ 51:1754)—trigger heightened (most likely, strict) scrutiny. (*Id.* at 16–17 (citing *Reed*, 576 U.S. at 163–64).) Consequently, it says, Defendants have "the burden of proving the constitutionality of [the Act]." (*Id.* at 17 (quoting *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (quoting *McCutcheon v. FEC*, 572 U.S. 185, 210 (2014) (plurality opinion))).)

a.  <u>Age-Verification Requirement</u>

NetChoice contends that the age-verification requirement "burdens [minors' and adults'] threshold access to 'what for many are the principal sources for knowing current events, . . . and otherwise exploring the vast realms of human thought and knowledge.'" (*Id.* at 21 (quoting *Packingham*, 582 U.S. at 107); *see also id.* at 21–22 (distinguishing *Free Speech Coal.*, 606 U.S at 483, 489–90, 494–95).) It notes that, by the admission of Defendants' own expert, "requiring age verification 'would reduce the number of adolescents 15 and under using these platforms.'" (*Id.* at 22 (quoting Doc. 57-19 at 6).) NetChoice asserts that "[t]he same is true for older teenagers and adults." (*Id.*)

According to NetChoice, *Free Speech Coalition, Inc. v. Paxton*, which upheld an age-verification requirement burdening access to pornographic websites, is distinct because "'pornography' is a unique category of speech"—"protected for adults yet unprotected for minors." (*Id.* (citing *Free Speech Coal.*, 606 U.S. at 477–78).) Here, NetChoice argues, the Act's age-verification requirement impedes access to "a staggering amount of '*fully protected speech*' for minors and adults alike." (*Id.* at 22–23 (quoting *Free Speech Coal.*, 606 U.S. at 484).) Thus, the restriction is "subject to (and fails) strict scrutiny." (*Id.* at 23 (citing *Free Speech Coal.*, 606 U.S. at 484).)

Additionally, NetChoice argues that the age-verification requirement is over-inclusive because it requires adults—not just minors—"to provide personally identifying information to access all manner of fully protected speech." (*Id.*) The requirement will therefore "deter adults from accessing the [covered] websites" and "all but kill anonymous speech online." (*Id.* (quoting *Carr*, 789 F. Supp. 3d at 1226); *see id.* (citing, *inter alia*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995)).)

### b. Parental-Consent Requirement

NetChoice critiques the parental-consent requirement along similar lines. (*Id.* at 17 (citing *Yost*, 778 F. Supp. 3d at 955).) Specifically, it argues that parental-consent is a "threshold" impediment to minors' accessing "countless pieces of fully protected speech on covered websites." (*Id.* at 17.) NetChoice notes that (1) "minors have the 'right to speak or be spoken to,'" and (2) "governments lack the 'power to prevent children from hearing or saying anything *without their parents' prior consent*.'" (*Id.* at 18 (quoting *Brown*, 564 U.S. at 795 n.3).) Drawing parallels to *Brown v. Entertainment Merchants Association*, where the Supreme Court struck down a law prohibiting the rental or sale of violent videogames to minors, NetChoice observes that "[t]here is no 'precedent for state control, uninvited by parents, over a child's speech.'" (*Id.* (quoting *Brown*, 564 U.S. at 795 n.3).)

Consequently, NetChoice says, courts "have consistently enjoined parental-consent requirements" which are "materially identical" to the Act's. (*Id.* (citing *Yost*, 778 F. Supp. 3d at 959; *Griffin*, 2025 WL 978607, at *8, *17; *Carr*, 789 F. Supp. 3d at 1234; *Uthmeier*, 2025 WL 1570007, at *15, *21; *Reyes*, 784 F. Supp. 3d at 1126 & n.135, 1134).) The Act's parental-consent requirement "triggers and fails '[s]trict scrutiny'" but "would violate any level" of heightened scrutiny. (*Id.* at 19 (quoting *Free Speech Coal.*, 606 U.S. at 484).) NetChoice denies that Louisiana

has a "sufficient" interest. (*Id.* (citing *Brown*, 564 U.S. at 802, 804).) At the same time, it argues that the parental-consent requirement "does not further" Louisiana's asserted interest. (*Id.*)

Regardless, NetChoice explains, the requirement "is not the 'least restrictive' way to accomplish any legitimate governmental ends." (*Id.* (quoting *Ams. for Prosperity*, 594 U.S. at 607).) "[P]arents already have many options to oversee their children online." (*Id.* at 20.) NetChoice suggests that Louisiana could make parents aware of existing controls and otherwise encourage their use. (*Id.* (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000)).) Or Louisiana could rely on NetChoice members to self-regulate, as many do now. (*Id.*) Relatedly, NetChoice argues that, because the Act's one-size-fits-all requirements "fail[] to 'take into account juveniles' differing ages and levels of maturity,'" Defendants also cannot show that the parental-consent requirement satisfies intermediate scrutiny. (*Id.* at 20–21 (quoting *Am. Booksellers*, 484 U.S. at 396); *see id.* (citing *Packingham*, 582 U.S. at 106).) Plus, "if covered websites [are] genuinely 'dangerous,' it is unclear why the State would allow minors to access them 'so long as one parent . . . says it's OK.'" (*Id.* (quoting *Brown*, 564 U.S. at 802).)

### c. Advertising Prohibition

Third, NetChoice argues that the advertising prohibition violates the First Amendment by "dictating how [covered] websites choose which lawful ads to publish." (*Id.* at 24 (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995)).) In support of this contention, NetChoice points to *Sorrell v. IMS Health Inc.*, which "rejected the idea that the 'use of . . . information [is] conduct' unprotected by the First Amendment." (*Id.* (quoting *Sorrell*, 564 U.S. at 570).) "[B]ecause [the Act] targets websites' 'editorial control and judgment,' it must satisfy strict scrutiny." (*Id.* at 25 (quoting *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974)).) NetChoice notes that the advertising prohibition is not properly tailored because "[t]here

is an obvious less-restrictive alternative: The Act could give minors the ability to opt out of [targeted] advertising." (*Id.*)

Additionally, NetChoice contends that the advertising prohibition is over-inclusive in that it "could reach all manner of 'advertisements' that do not 'propose commercial transactions'" and/or "*user-generated* promotional content." (*Id.* at 25–26 (quoting *Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 594–95).) Simultaneously, NetChoice says, the restriction is under-inclusive in that minors will encounter identical targeted advertisements on unregulated websites (e.g., interactive gaming websites, social media websites with fewer than five million account holders). (*Id.* at 26 (citing, *inter alia*, *Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 599).)

Finally, NetChoice claims that, even if intermediate scrutiny applies, the advertising prohibition fails. (*Id.* (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 570 (1980)).) Louisiana "has no legitimate interest in 'suppress[ing] [speech] solely to protect the young from ideas or images that a legislative body thinks unsuitable.'" (*Id.* at 27 (quoting *Brown*, 564 U.S. at 795).) Likewise, Louisiana cannot "prohibit certain ads because they are considered 'too persuasive.'" (*Id.* (quoting *Sorrell*, 564 U.S. at 578).)

### d.  Direct-Messaging Restrictions

Fourth, NetChoice observes that "[t]he First Amendment protects private communications as strongly as it protects public speech." (*Id.* (citing *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126–31 (1989)).) Here, NetChoice argues, the Act's direct-messaging restrictions trigger strict scrutiny because they "limit[] minors' own 'constitutional right to speak or be spoken to.'" (*Id.* (quoting *Brown*, 564 U.S. at 795 n.3).) But according to NetChoice, "[t]hese restrictions violate any form of heightened First Amendment scrutiny" because they are over-inclusive,

"sweep[ing] in even innocuous—and fully protected—conversations." (*Id.*) For example, with the restrictions, minors would not be able to "reach[] out to local politicians" on covered social media platforms without first connecting with them. (*Id.*) At best, NetChoice says, the Act's direct-messaging restrictions are redundant of (but more onerous than) companies' current, self-imposed methods of "address[ing] potentially harmful communications" on their platforms. (*See id.* at 27–28.) At the same time, the direct-messaging restrictions are under-inclusive in that minors are still "free to communicate with unconnected users on [unregulated] services." (*Id.* at 28.) Although the Ninth Circuit "upheld a similar restriction under intermediate scrutiny," NetChoice considers that decision "erroneous[]." (*Id.* at 28 (citing *Bonta*, 152 F.4th at 1017–19).)

## e. Facial & As-Applied Challenges

NetChoice reiterates that "[n]either the Act nor any . . . individual provision[] can satisfy [strict scrutiny]"—or "any form of heightened scrutiny," for that matter. (*Id.* at 31.) It challenges Louisiana's interest and the Act's tailoring. (*Id.*; *see also* Doc. 6-1 at 24–25 (citing, *inter alia*, *Erznoznik*, 422 U.S. at 213; *Brown*, 564 U.S. at 803) (disputing Louisiana's interest in restricting minors' (access to) speech).) Specifically, NetChoice argues that "[n]one of the Act's speech restrictions is the 'least restrictive' way" to further whatever interest Louisiana asserts. (Doc. 57-1 at 31 (citing *Ams. for Prosperity*, 594 U.S. at 607).)

"Even under intermediate scrutiny, the Act 'burden[s] substantially more speech than is necessary to further' any governmental interest." (*Id.* at 32 (quoting *Packingham*, 582 U.S. at 106).) NetChoice explains that the Act "indiscriminately regulates" all social media platforms with five million or more account holders and "indiscriminately restricts access to *all* . . . protected [speech]" on covered platforms. (*Id.*) Equally important, NetChoice says, there are major "gaps" in regulation: Louisiana "is perfectly fine with minors accessing the exact same speech or hav[ing]

the same interactions" if a website's membership is less than five million or if its "predominant or exclusive function" is excepted. (*Id.* at 32–33 (citing La. R.S. § 51:1751(11)–(12)).)

Thus, NetChoice declares, the Act is invalid facially and as applied to its members. (*Id.* at 34.) For the facial challenge, NetChoice argues that, given the above, the Act's "unconstitutional applications substantially outweigh its constitutional ones." (*Id.* (quoting *Moody*, 603 U.S. at 723–24).) Given the coverage definition, NetChoice claims that there "is no dispute that users engage in protected speech on all the platforms that are arguably within the Act's proscription." (*Id.* (quoting *Griffin*, 2025 WL 978607, at *7).) And across all regulated platforms, the Act "imposes a platform-wide burden on users' rights to engage in that speech." (*Id.* at 35 (quoting *Griffin*, 2025 WL 978607, at *7).)

NetChoice argues that *all* of the Act's requirements are "presumptively unconstitutional," so its unconstitutional applications "substantially outweigh" its (non-existent) constitutional applications. (*Id.* at 35–36 (quoting *Moody*, 603 U.S. at 723–24).) According to NetChoice, the burden therefore shifts to Defendants, (*id.* at 36 (citing *Cruz*, 596 U.S. at 305)), to show (1) which, if any, of the Act's applications satisfy heightened scrutiny and (2) that the Act's "purportedly constitutional applications are not 'substantially outweigh[ed]' by [its] unconstitutional applications," (*id.* (quoting *Moody*, 603 U.S. at 723–24)). NetChoice implies that Defendants cannot meet either burden. (*See id.*)

For the as-applied challenge, NetChoice argues that its members "are precisely the kinds of—if not *the*—'social media' websites discussed by the Supreme Court in *Moody* and *Packingham*." (*Id.* at 37.) In both cases, NetChoice says, the Court held that such websites "'engage[] in expression' by 'mak[ing] choices about what third-party speech to display and how to display it.'" (*Id.* (quoting *Moody*, 603 U.S. at 716).)

## 2. *Defendants' MSJ & Opposition (Docs. 58, 64)*

First, Defendants contend that "NetChoice cannot satisfy the demanding standard for a facial overbreadth challenge." (Doc. 64 at 30 (citing Doc. 58-1 at 31–33 (citing, *inter alia*, *Fitch*, 134 F.4th at 807–09)).) They note that NetChoice "was required to develop a *factual* record to (1) 'address the *full range* of activities the law covers,' and then (2) identify 'which of the law['s] applications violate the First Amendment' and 'measure them against the rest.'" (*Id.* at 30–31 (quoting Doc. 58-1 at 32–33 (quoting *Fitch*, 134 F.4th at 808 (emphasis added)))).) Instead, Defendants argue, NetChoice has tried to skirt these requirements, *viz.*, by asserting that the Act's coverage definition is content-based. (*Id.* at 31.) Defendants claim that the Supreme Court rejected a similar strategy in *Moody*. (*Id.* (citing *Moody*, 603 U.S. at 719, 721 & n.2).) They add that, "[b]y forgoing factual development altogether . . . NetChoice has forfeited any ability to carry its burden" under *Moody*. (*Id.* at 31–32 (citing *Moody*, 603 U.S. at 743).) Thus, Defendants believe that, at most, intermediate scrutiny applies here. (*Id.* at 32, 36; *accord* Doc. 58-1 at 35–36 ("Any burden on access to speech is . . . only 'incidental to' Louisiana's regulation of activity outside the First Amendment." (quoting *Free Speech Coal.*, 606 U.S. at 483)).)

Second, Defendants insist that NetChoice's as-applied challenges to the coverage definition and the age-verification and parental-consent requirements fail because "[e]ach regulates conduct, not speech, and at most imposes only incidental burdens on expression and readily satisfies intermediate scrutiny." (Doc. 64 at 32.) They also argue that NetChoice's as-applied challenges "read like a facial challenge in a world where *Moody* never existed." (*Id.* (citing Doc. 57-1 at 17–23).) "The record says nothing about any member, burden, or implementation of commercially reasonable [restrictions] . . . ." (*Id.*) But regardless, Defendants say, "each [challenge] collapses on its own terms." (*Id.*)

a.  Age-Verification Requirement

Defendants contend that the Act's age-verification requirement does not trigger strict scrutiny. (Doc. 58-1 at 33–35; *see also* Doc. 64 at 35–36.) Otherwise, "every age-assurance requirement—whether for alcohol, consumable hemp products, lottery tickets, employment, handguns, fireworks, body piercings, or tattoos—would" do the same. (Doc. 58-1 at 34 (citing *Free Speech Coal.*, 606 U.S. at 479).) According to Defendants, NetChoice's argument to the contrary "relies on conflating . . . (1) the downstream expressive content that flows across its members' platforms, and (2) the members' upstream business decisions not to verify users' ages or collect minor users' parental consent." (*Id.*) In Defendants' view, the Act has "nothing to do with speech or even expressive activity." (*Id.* at 35 (quoting *Nat'l Press Photographers*, 90 F.4th at 788).)

At most, Defendants say, the age-verification requirement is subject to intermediate scrutiny. (*Id.* at 35–36 (citing, *inter alia*, *Free Speech Coal.*, 606 U.S. at 477–80, 482–83).) They contend that the State necessarily has a "substantial interest" in "respect[ing] and reinforc[ing]" "parental authority over a child's upbringing," as well as a "compelling interest in protecting the physical and psychological well-being of minors." (Doc. 64 at 34 (quoting *Sable Commc'ns*, 492 U.S. at 126) (citing *Mahmoud*, 606 U.S. at 547); *see* Doc. 58-1 at 35–36.) And they deny that *Free Speech Coalition* can be "cabin[ed] . . . as a narrow pornography holding," arguing that the Supreme Court "ground[ed] its holding in 'basic principles of freedom of speech' that apply to any regulation of platforms hosting both protected expression and unprotected conduct." (Doc. 64 at 35–36 (citing *Free Speech Coal.*, 606 U.S. at 481).) Defendants add that NetChoice's "tired refrain" about speech on members' websites is "unsubstantiated." (*Id.* at 36.)

Lastly, Defendants seek to distinguish *Brown*, arguing that it invalidated a law that "directly targeted and banned access to protected speech," whereas the Act's regulation is farther "upstream" and targets "non-expressive conduct." (*Id.* at 33 (citing *Brown*, 564 U.S. at 789–805).) Defendants also note that the Act "does not 'outright ban' minors from accessing speech." (*Id.* (quoting *Free Speech Coal.*, 606 U.S. at 486).) Defendants claim that the Fifth Circuit and the Supreme Court agree with Defendants on this issue. (*Id.* at 33–34 (citing *Fitch*, 2025 WL 2078435, at *1; *Fitch*, 145 S. Ct. at 2658).)

Given the above, Defendants reiterate that, to the extent that the age-verification requirement triggers any form of heightened scrutiny, it triggers intermediate scrutiny, which it readily satisfies. (Doc. 58-1 at 37–38.) The Act advances Louisiana's interest in protecting minors by "adapt[ing] th[e] traditional approach [of age-verification] to the digital age." (*Id.* at 38 (quoting *Free Speech Coal.*, 606 U.S. at 496).) Defendants emphasize that intermediate scrutiny does not "require the 'least restrictive means' or [the] narrow tailoring that NetChoice demands." (Doc. 64 at 35 (citing *Free Speech Coal.*, 606 U.S. at 496); *accord* Doc. 58-1 at 38.) And considering also "the State's unrebutted expert testimony," Defendants argue that the Act's age-verification requirement clearly passes constitutional muster. (Doc. 64 at 35 (citing *Free Speech Coalition*, 606 U.S. at 496).)

b.  <u>Parental-Consent Requirement</u>

Defendants incorporate much of the above into their arguments in favor of the parental-consent requirement, claiming first that the parental-consent requirement "does not regulate speech at all." (*Id.* at 32.) Rather, they say, it "regulates the non-expressive conduct of granting minors access to social-media accounts without parental approval." (*Id.*; *see also* Doc. 58-1 at 33–34 ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from

imposing incidental burdens on speech." (quoting *Sorrell*, 564 U.S. at 567)).) Defendants add that, to the extent that the parental-consent requirement triggers intermediate scrutiny, it satisfies the standard because it "merely mandates commercially reasonable efforts to obtain [parental] consent." (Doc. 64 at 34 (citing La. R.S. § 51:1752(B)); *see also* Doc. 58-1 at 37–38 (describing the parental-consent requirement as "another guardrail").) Defendants conclude that NetChoice's argument about the Act's failure to "account for [minors'] differing developmental stages" is "overblown," because here, "minors" means only "teenagers aged 13 to 16." (Doc. 64 at 34–35 (quoting Doc. 57-1 at 12, 20).)

### c.  Advertising Prohibition

Next, Defendants argue that the advertising prohibition regulates conduct or, at most, "commercial speech targeted at unlawful conduct." (*Id.* at 36; *see also* Doc. 58-1 at 39–40 (citing, *inter alia*, *Alleman v. Harness*, 780 F. Supp. 3d 608, 636 (M.D. La. 2025) (deGravelles, J.)).) They note that "[c]ommercial speech enjoys no First Amendment protection unless it 'concern[s] lawful activity and [is] not [] misleading.'" (Doc. 58-1 at 40 (quoting *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017)).) Defendants then posit that, because the Act prohibits harvesting and using minors' data (except what is "adequate, relevant, and reasonably necessary"), including for the sake of targeted advertising, the commercial speech at issue here is unlawful and therefore does not receive First Amendment scrutiny. (*Id.* at 40–41 (quoting La. R.S. § 51:1753(3)).)

At most, Defendants say, intermediate scrutiny applies. (*Id.* at 41.) In their view, *Sorrell* is inapposite: It dealt with a law that "burden[ed] a discrete class of speakers and a disfavored product," whereas the Act is "agnostic as to product, industry, speaker—and speech." (Doc. 64 at 37 (citing, *inter alia*, *Sorrell*, 565 U.S. at 578).) Further, the purpose of the advertising prohibition

is "to protect minors' personal data in *every* commercial interaction on a social media platform." (*Id.*) Defendants argue that a "neutral privacy regulation" of this sort does not get strict scrutiny. (*Id.*)

Defendants further contend that, at most, the advertising prohibition is subject to—and satisfies—"the modest intermediate scrutiny that governs commercial-speech regulations." (*Id.* (citing Doc. 57-1 at 26–27).) Defendants repeat that the State has a "compelling interest in protecting the physical and psychological well-being of minors." (*Id.* at 38 (quoting *Sable*, 492 U.S. at 126).) "And it does so by specifically prohibiting the 'collection' of *minors'* 'personal information' and the display of targeted ads to *minors* based on that data . . . ." (*Id.* (quoting La. R.S. § 51:1753(2)–(3)) (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 565 (2001)).)

### d. Direct-Messaging Restrictions

Finally, Defendants argue that NetChoice has more or less "concede[d]" that the direct-messaging restrictions satisfy intermediate scrutiny. (*Id.* (citing Doc. 57-1 at 28 (citing *Bonta*, 152 F.4th at 1017)).) Defendants also re-urge the issue of standing, asserting that NetChoice cannot bring its challenge on behalf of members' users, *viz.*, "adults wishing to connect with children" on covered platforms. (*Id.*)

### 3. *Plaintiff's Opposition (Doc. 65)*

NetChoice repeats its argument that the Act's restrictions fail strict *and* intermediate scrutiny. (Doc. 65 at 9–10.) In either case, NetChoice says, "the Government bears the burden of proving the constitutionality of its actions." (*Id.* at 10 (quoting *Cruz*, 596 U.S. at 305 (quoting *McCutcheon*, 572 U.S. at 210)).)

First, NetChoice disputes Defendants' claim that the Act's age-verification and parental-consent requirements regulate conduct. (*Id.* (citing Doc. 58-1 at 33–35).) It contends that such

restrictions necessarily burden fully protected speech and therefore receive heightened scrutiny. (*Id.* at 11 (citing, *inter alia*, *Brown*, 564 U.S. at 789, 802).) Further, the age-verification and parental-consent requirements "*are* 'specifically addressed to speech or to conduct necessarily associated with speech'"—namely, the creation of an account, which is a prerequisite to accessing and engaging in speech. (*Id.* at 12 (quoting Doc. 58-1 at 34 (quoting *Virginia v. Hicks*, 539 U.S. 113, 124 (2003))).) NetChoice also notes that the purpose of the Act and the feasibility of compliance with the Act "make[] no constitutional difference." (*Id.* at 13.)

Based on Mr. Allen's testimony, NetChoice argues that age-verification will require "probing users' sensitive documents" (e.g., government identification, financial records). (*Id.* at 13–14 (citing Doc. 65-3 at 7, 55, 60).) NetChoice observes that such documentation is hard for some individuals (e.g., minors) to acquire. (*Id.*) Additionally, NetChoice expects that users will "be concerned about the privacy of their sensitive information." (*Id.*)

Next, NetChoice argues that Defendants have not demonstrated that the Act satisfies *any* form of heightened scrutiny. (*Id.* at 15.) The parental-consent requirement, for example, does not "address th[e] difficulty" of confirming the parent-child relationship. (*Id.* (citing Doc. 65-3 at 42).) "More broadly," NetChoice says, Defendants have not shown proper tailoring. (*Id.*) Manifold controls are already available to parents. (*Id.*) And Defendants have not established "a direct causal link between [covered websites] and harms to minors." (*Id.* at 15–16 (quoting *Brown*, 564 U.S. at 799).) Dr. Twenge's report "did not evaluate research addressing all covered websites," nor could Dr. Twenge provide a "consensus definition of 'social media'"—because none exists "in the field of social psychology." (*Id.* at 16.) Instead, NetChoice explains, Dr. Twenge's report relied on "disparate definitions in varying studies." (*Id.* at 16–17.) The same goes for the term "mental health." (*Id.* at 17.) Lastly, Dr. Twenge had no "'formal criteria' for including or excluding

studies." (*Id.* at 17 (quoting Doc. 65-4 at 21).) "And the studies she *did* include are 'based on correlation, not evidence of causation.'" (*Id.* (quoting *Brown*, 564 U.S. at 800) (citing Doc. 66-1 at 11–14); *see also id.* at 17–18 (critiquing Dr. Twenge's Bradford Hill analysis).)

As for the age-verification requirement, NetChoice argues that it "will only deter users who either do not want to or *cannot* verify their ages." (*Id.* at 19.) "It does nothing to regulate any particular feature or content the State considers harmful." (*Id.*) NetChoice reiterates the distinction between the instant case and *Free Speech Coalition*—namely, that the Act here burdens fully protected speech. (*Id.* (citing *Free Speech Coal.*, 606 U.S. at 495–96).) According to NetChoice, the mere possibility that covered platforms "host[] both protected expression *and unprotected conduct*" does not satisfy heightened scrutiny. (*Id.* at 20 (emphasis added) (quoting Doc. 58-1 at 35 n.7).) "Allowing the government to restrict speech access because there might be an unprotected needle in the haystack would 'vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors.'" (*Id.* (quoting *Brown*, 564 U.S. at 802).)

As for the advertising prohibition, NetChoice emphasizes that advertising is protected speech. (*Id.* at 21 (citing *Cent. Hudson*, 447 U.S. at 561–62).) It also notes the circularity of Defendants' declaring certain means of advertising illegal (via the Act itself) "and then . . . claiming that the [Act's advertising prohibition] does not 'concern[] lawful activity.'" (*Id.* (quoting Doc. 58-1 at 40).) NetChoice explains that "commercial-speech intermediate scrutiny analyzes whether the *speech in the advertisements themselves* 'concerns lawful activity.'" (*Id.* at 22 (quoting *Am. Acad. Implant Dentistry*, 860 F.3d at 307).) Here, Defendants have not met their burden of showing that the advertisements in question are unprotected. (*Id.* (citing *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 (5th Cir. 2019)).)

And there are numerous tailoring issues, including that the Act targets "*all* advertisements, regardless of content," but still allows "personalized advertisements based on 'age and location'" without any explanation of why such data is excepted. (*Id.* (quoting La. R.S. § 51:1753(2)).)

As for the direct-messaging restrictions, NetChoice contends that they violate the First Amendment, *viz.*, by limiting "minors' 'constitutional right to speak or be spoken to.'" (*Id.* at 23 (quoting *Brown*, 564 U.S. at 795 n.3).) It disputes the relevance of the Act's "asserted purpose" (i.e., protecting minors). (*Id.* (emphasis omitted).) But in any event, NetChoice argues, there is a tailoring issue: The direct-messaging restriction captures a large amount of protected speech. (*Id.* at 23–24.)

NetChoice largely repeats its argument that the Act's coverage definition is content-based and that, as a result, the Act's restrictions are subject to strict scrutiny. (*See id.* at 24–25.) It contends that Defendants have mischaracterized *Moody* and *Free Speech Coalition*. (*Id.*)

Finally, NetChoice reiterates that the Act is both facially unconstitutional and unconstitutional as applied to its members. (*Id.* at 26.) Although Defendants seek to problematize the lack of a factual record here, they fail to "articulate[] what specific information the record lacks *and* why that information is 'pertinent' to the First Amendment analysis." (*Id.* (quoting *Ams. for Prosperity*, 594 U.S. at 618).) NetChoice and Defendants seemingly agree on which members are regulated and how. (*See id.* at 26–28.) NetChoice again distinguishes cases that called for a more fact-intensive inquiry into regulations and their consequences for certain challengers. (*Id.* at 28–29 (citing *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 499 (5th Cir. 2024); *Deep S. Today v. Murrill*, 779 F. Supp. 3d 782, 816–21 (M.D. La. 2025) (deGravelles, J.)).) "At a minimum," NetChoice says, Defendants have not meaningfully addressed NetChoice's as-applied challenge. (*Id.* at 29.)

56

### 4.  *Law & Analysis*

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This clause has been incorporated against the States by the Fourteenth Amendment. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). It therefore prohibits States from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Cruz*, 596 U.S. at 305 (quoting *McCutcheon*, 572 U.S. at 210).

"It is . . . well established that the [Free Speech Clause] protects the right to receive information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), because "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them" and is necessary for the recipient's own "meaningful exercise" of First Amendment rights, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion). Even minors "are entitled to a significant measure of First Amendment protection": "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik*, 422 U.S. at 212–13. Although States "possess[] legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (internal citations omitted); *accord Erznoznik*, 422 U.S. at 213–14 ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.").

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear." *Id.* "Social media offers 'relatively unlimited, low-cost capacity for communication of all kinds.'" *Id.* (quoting *Reno*, 521 U.S. at 868). It is "perhaps the most powerful mechanism[] available to a private citizen to make his or her voice heard." *Id.* at 107. "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

### a.  As-Applied Challenge

"The distinction between a facial and as applied challenge goes to the breadth of the remedy employed by the Court." *Turtle Island Foods*, 65 F.4th at 218–19 (cleaned up). "A facial challenge is really just a claim that the law . . . at issue is unconstitutional in *all* its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (emphasis added). Consequently, "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated." *Id.* It does not, however, "speak at all to the substantive rule of law necessary to establish a constitutional violation." *Id.* (citing *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)). "When a litigant brings both as-applied and facial challenges, [courts] generally decide the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (citing *Serafine v. Branaman*, 810 F.3d 354, 362 (5th Cir. 2016)); *see also Moody*, 603 U.S. at 723 (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)) ("For a host of good reasons, courts usually handle constitutional claims case by case, not en masse.").

"Although as-applied challenges are generally favored as a matter of judicial restraint because they result in a narrow remedy, a developed factual record is essential." *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014). "Particularized facts are what allow a court to issue a narrowly tailored and circumscribed remedy." *Id.*; *see also United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011) ("[W]hen we are presented with an as-applied challenge, we examine only the facts of the case before us and not any set of hypothetical facts under which the statute might be unconstitutional."). With these authorities in mind, the Court first considers NetChoice's as-applied challenge to the Act. *See also Fitch*, 787 F. Supp. 3d at 273 (prioritizing the as-applied challenge).

"[T]he protections of the First Amendment are triggered not only by actual restrictions . . . . The risk of a chilling effect . . . is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. for Prosperity*, 594 U.S. at 618–19 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Indeed, the Supreme Court has "applied First Amendment scrutiny in 'cases involving governmental regulation of conduct that has an expressive element,' and to 'some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities.'" *TikTok Inc. v. Garland*, 604 U.S. 56, 67–68 (2025) (per curiam) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703–04 (1986)); *see also Yost*, 778 F. Supp. 3d at 948 ("[T]he First Amendment right to the 'freedom of speech' protects against not just regulations that directly suppress speech but also those that target activities useful for speaking." (quoting *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 882 (6th Cir. 2024))). "The protections of the First Amendment extend[] to social media: '[T]o foreclose access to social media altogether is to prevent the user from engaging in the

legitimate exercise of First Amendment rights.'" *Griffin*, 2025 WL 978607, at *8 (quoting *Packingham*, 582 U.S. at 108).

Here, the Act implicates the First Amendment in two distinct but related ways: (1) The Act burdens covered NetChoice members' ability to publish speech on their respective platforms—and to publish such speech to minor users specifically. And (2) the Act burdens prospective and current users' ability to access and to engage in speech on covered platforms. *See Yost*, 778 F. Supp. 3d at 948 ("[Ohio's law] regulates speech in two consequential ways: (1) it regulates operators' ability to publish and distribute speech to *minors* and speech *by minors*; and (2) it regulates minors' ability both to *produce speech* and to *receive speech*."); *Griffin*, 2025 WL 978607, at *8 ("[Arkansas's law] forecloses access to social media for those minors whose parents do not consent to the minor's use of social media. It also burdens social media access for all Arkansans—both adults and minors . . . ."); *see also TikTok*, 604 U.S. at 67–68 (quoting *Arcara*, 478 U.S. at 703–04). Defendants have even admitted that "[n]ot every minor's parent will provide the necessary consent . . . to create an account on covered websites," meaning that, at a minimum, the Act will burden some minors' First Amendment rights—and that user-ship of covered websites will decrease. (Doc. 64-1 at 11, ¶ 37 (referencing Doc. 57-2 at 6, ¶ 37).)

### i.  *Coverage Definition*

Where a law is content-based, strict scrutiny requires that it be "the least restrictive means of achieving a compelling state interest." *Free Speech Coal.*, 606 U.S. at 471 (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)); *accord TikTok*, 604 U.S. at 67 ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." (quoting *Reed*, 576 U.S. at 163)). The impetus for the law does not

affect the level of scrutiny that the law receives. *See Reed*, 576 U.S. at 165–66 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." (quoting *Cincinnati Discovery Network, Inc.*, 507 U.S. 410, 429 (1993))).

"In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny . . . ." *Turner Broad. Sys.*, 512 U.S. at 642 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). In other words, courts "will sustain a content-neutral law 'if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than is necessary to further those interests.'" *TikTok*, 604 U.S. at 67 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)). Worth emphasizing, any "incidental restriction" of speech must be "no greater than is essential to the furtherance of" the State's important interest. *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see also Moody*, 603 U.S. at 740 (citing *O'Brien*, 391 U.S. at 377, for its recitation of the intermediate scrutiny standard).

> The Supreme Court has explained that there are
>
> two forms of content-based speech regulation. First, a law is content based on its face if it "applies to particular speech because of the topic discussed or the idea or message expressed." [*Reed*, 576 U.S. at 163; *see id.* at 163–64] (explaining that some facial distinctions define regulated speech by subject matter, others by the speech's function or purpose). Second, a facially content-neutral law is nonetheless treated as a content-based regulation of speech if it "cannot be 'justified without reference to the content of the regulated speech'" or was "adopted by the government 'because of disagreement with the message the speech conveys.'" [*Id.* at 164] (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 [] (1989)).

*TikTok*, 604 U.S. at 70–71. In addition:

> Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," [*Citizens United,* 558 U.S. at 340], [courts] have insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content

preference," [*Turner,* 512 U.S. at 658.] Thus, a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based. Likewise, a content-based law that restricted the political speech of all corporations would not become content neutral just because it singled out corporations as a class of speakers. [*See Citizens United*, 558 U.S. at 340–41.]

*Reed*, 576 U.S. at 170. Where, however, a speaker-based restriction distinguishes between speakers "based only upon the manner in which [they] transmit their messages to viewers, and not upon the messages they carry," intermediate scrutiny is the appropriate standard. *Turner Broad. Sys.*, 512 U.S. at 645.

Here, Louisiana Revised Statutes § 51:1751(12) defines a "[s]ocial media platform" as a "public or semipublic internet-based service or application that has users in Louisiana and that meets" certain criteria, including (1) "connect[ing] users in order to allow [them] to interact socially with each other within the service or application" and (2) facilitating that social interaction. La. R.S. § 51:1751(12)(a). Subsequently, however, the provision defines "[s]ocial media platform" with reference to what it is *not*. *See id.* § 51:1751(12)(b). The term does *not* include "an online service, website, or application where the predominant or exclusive function" is, *inter alia*, electronic mail, streaming, news, sports, entertainment, online shopping or electronic commerce, or interactive or virtual gaming. *Id.* Classification of websites under the Act therefore requires consideration of their content—that is, whether their content is "predominant[ly] or exclusive[ly]" socially interactive.[18] *See id.*; *see also Fitch*, 787 F. Supp. 3d at 274–76 (finding, at the preliminary injunction stage, that a similar coverage definition was content- and speaker-

---

[18] Most likely, the Act is also speaker-based, for similar reasons. *See also Fitch*, 787 F. Supp. 3d at 274–75; *Paxton*, 747 F. Supp. 3d at 1032–34. In *Griffin*, the district court determined that a similar law was speaker-based insofar as it excepted "platforms that distribute 'licensed media' that is not licensed from users, 'news, sports, entertainment or other content that is preselected by the provider and not user generated,' and digital news websites with social features 'if the news content is posted only by the provider of the digital news website.'" *Griffin*, 2025 WL 978607, at *9 (quoting Ark. Code. Ann. § 4-88-1401(8)(B)). Louisiana's law contains essentially identical exceptions. *See* La. R.S. § 51:1751(12)(b).

based); *Griffin*, 2025 WL 978607, at \*9–10 (finding, at the summary judgment stage, that a similar coverage definition was content- and speaker-based); *Yost*, 778 F. Supp. 3d at 952–53 (finding, at the summary judgment stage, that a similar coverage definition was content-based). "[A] regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 74 (2022).

As the district court in *Yost* explained in the case of a similar coverage definition:

[T]he coverage provision's distinction on the basis of [websites'] functionalities"— i.e., their means of disseminating speech and facilitating users' speech—are "content-based." (PI Order, ECF No. 33 at 21). In particular, the Act regulates websites that allow users to: (a) interact socially with other users; (b) construct a public or semipublic profile; (c) populate a list of other users with whom an individual "shares or has the ability to share a social connection"; (d) create or post visible content "including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users." Ohio Rev. Code § 1349.09(A)(1). Similarly, the Act excludes websites that have any number of other "predominant or exclusive function[s]." *Id.* § 1349.09(N)(1).

As this Court has concluded covered websites' choices about whether and how to disseminate user-generated expression "convey a message about the type of community the platform seeks to foster." (PI Order, ECF No. 33 at 21). In other words, the Act's references to "function" are a proxy for "differential treatment" of specific types of speech. *See City of Austin*, 596 U.S. at 71–74 []. Among the messages the Act regulates are the ideas that: (1) user-generated content is not less valuable than speech authored by the websites themselves; and (2) social interactions and connections (as compared to other types of interactions, such as business interactions) have unique value for online communities. Thus, the "features that the Act singles out are inextricable from the content produced by those features." (PI Order, ECF No. 33 at 21). And by disseminating speech these ways (and according to their own editorial policies), many covered websites "engage[] in compiling and curating others' speech into an expressive product of [their] own." *Moody*, 603 U.S. at 709–10 []; *see also id.* at 729–30 [] ("A private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment.").

*Yost*, 778 F. Supp. 3d at 953; *see also Fitch*, 787 F. Supp. 3d at 275 ("Essentially, [Mississippi's law] treats or classifies digital service providers differently based upon the nature of the material they disseminate, whether it is "social interaction," as opposed to "news, sports, commerce, [or] online video games." (citations omitted)).

Defendants do not seriously dispute that the Act is content-based. Rather, they argue that *Free Speech Coalition* and *Moody* demonstrate that content-based coverage definitions do not "automatically require[] strict scrutiny." (Doc. 58-1 at 36 (citing *Free Speech Coal.*, 606 U.S. at 492–93; *Moody*, 603 U.S. at 740); *see also* Doc. 64 at 36.) But this claim is misleading. *Free Speech Coalition* is not analogous to the instant case. There, the Supreme Court considered a Texas law that restricted access to speech that is *unprotected* for minors (i.e., pornography). *Free Speech Coal.*, 606 U.S. at 492. As the Court explained:

> We agree that [Texas's law] targets speech that is obscene for minors based on its communicative content. But, where the speech in question is *unprotected*, States may impose "restrictions" based on "content" without triggering strict scrutiny. [*Stevens*, 559 U.S. at 468] (internal quotation marks omitted). Because speech that is obscene to minors is unprotected to the extent that the State imposes only an age-verification requirement, [the law's] content-based restriction does not require strict scrutiny. The law is content based in the same way that prohibitions of "defamation," "fraud," and "incitement" are. [*Id.*]

*Id.* at 492 (emphasis in original). *Moody* is similarly inapposite. *See Moody*, 603 U.S. at 740 ("In the usual First Amendment case, we must decide whether to apply strict or intermediate scrutiny. But here we need not."). As Defendants themselves admit, *Moody* did not reach the question of which level of scrutiny to apply. (Doc. 58-1 at 36 (citing *Moody*, 603 U.S. at 740).)

Here, the Act may, given its broad sweep, restrict access to some unprotected speech. *See* La. R.S. § 51:1751(11)–(12) (defining "[s]ocial media company" and "[s]ocial media platform"); *see also Griffin*, 2025 WL 978607, at *3 (noting that, "despite [social media platforms'] efforts to self-regulate, social media users of any age may still encounter some speech online that is not

entitled to constitutional protection"). But by its design, the Act mostly burdens access to *protected* speech. *See* La. R.S. §§ 51:1751–1754. Nowhere do Defendants contend otherwise. (*See* Docs. 58, 64.) Because the Act's coverage definition is content-based, strict scrutiny applies to all provisions. *See Bonta*, 770 F. Supp. 3d at 1192 ("[I]f a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute."); *see also id.* (collecting cases). At a minimum, though, the Act's provisions get intermediate scrutiny, for reasons discussed below. *See Packingham*, 582 U.S. at 108 ("[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."). And given either standard—strict or intermediate scrutiny—the Act fails.

### ii.    *The Act (Generally)*

This Court agrees with the majority of district courts that have addressed this issue: If a coverage definition is content-based, then "the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute." *Bonta*, 770 F. Supp. 3d at 1191 (collecting cases); *accord Yost*, 778 F. Supp. 3d at 955; *Griffin*, 2025 WL 978607, at *10; *Fitch*, 787 F. Supp. 3d at 276; *Paxton*, 747 F. Supp. 3d at 1032, 1034; *Carr*, 789 F. Supp. 3d at 1222–23; *Reyes*, 748 F. Supp. 3d at 1123.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Cruz*, 596 U.S. at 305 (quoting *McCutcheon*, 572 U.S. at 210). Defendants have not carried this burden. Even if the Court accepts that there is a causal relationship between social media use and harms to minors,[19] (*see* Doc. 64 at 20), such that Defendants can

---

[19] NetChoice has raised serious concerns about whether Defendants have met their burden here. As discussed in Section IV.C.3, *supra*, NetChoice has pointed out that, *inter alia*, Dr. Twenge: (1) could not supply consensus definitions of "social media" or "mental health," (2) conceded that she did not have any "formal criteria" for including

claim a compelling interest here, *see Sable*, 492 U.S. at 126, Defendants cannot show that the Act is narrowly tailored—that it furthers this interest "without unnecessarily interfering with First Amendment freedoms," *see id.*; *see also Brown*, 564 U.S. at 805 (explaining that, even if the ends are legitimate, "when they affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive").

The parties agree that the Act will decrease the number of users of covered platforms,[20] (Doc. 57-2 at 6, ¶ 37), but that minors will still be able to interact socially on *unregulated* websites, (*see, e.g.*, *id.* at 20, ¶ 186); *see also* La. R.S. § 51:1751(12) (excepting more than twenty categories of websites). They also agree that parents already have tools by which they can control their children's access to, and regulate their children's use of, covered platforms. (*Id.* at 4–6, ¶¶ 22–26, 29–30; *see also* Doc. 58-2 at 3, ¶ 11 ("Many of NetChoice's members already have tools to assist parents and maintain internal rules . . . that restrict children's access to their services.").)

The Court also observes that most of the Act's restrictions are "all or nothing" proposals. For example, a prospective adult or minor user of X (Twitter) must verify her age, at which point she will gain access to more or less the entire platform, including its potentially harmful (but not necessarily unprotected) content. *See* La. R.S. §§ 51:1752–1754. But if she balks at the age-verification process, then she will be barred from the platform, including its many forms of fully protected speech and its many opportunities to engage therein. (*See* Doc. 64-1 at 13, ¶ 50 (admitting that "Defendant Attorney General Liz Murrill uses her social media accounts on Facebook, Instagram, X, YouTube, TruthSocial, or LinkedIn to discuss the policies, priorities, and

---

studies in—or excluding them from—her expert report, and (3) included only studies showing correlation, not causation. (*See* Doc. 65 at 16–18 (quoting Doc. 65-4 at 21) (citing, *inter alia*, Doc. 66-1 at 11–14); *see also* Doc. 65-4 at 7–8, 10–11, 14–15, 17, 21); *Reyes*, 748 F. Supp. 3d at 1125–26 (expressing similar concern about Dr. Twenge's use of studies showing correlation).

[20] The Court notes that, if Defendants did not concede this point, then they would run into tailoring issues. Namely, they would not be able to show that the Act furthers their claimed interest, because minors would necessarily be accessing covered platforms at pre-regulation rates.

actions of the Attorney General's office").) Likewise, if a prospective minor user obtains one parent's consent to create a Reddit account, then he will gain access to forums where users freely disseminate potentially harmful content. If he does not obtain his parent's consent, however, then he will be barred from the entire platform. He will not be able to seek homework help from a forum dedicated to mathematics. He will not be able to learn new painting techniques from a forum dedicated to art. He will not be able to share his most recent song—or solicit feedback—from a forum dedicated to making music.

Given the above, the Act is at once under-inclusive and over-inclusive. It is under-inclusive in that minors (1) can encounter the same potentially harmful content on unregulated websites and (2) can gain more or less unrestricted access to covered platforms upon satisfying the one-time age-verification and parental-consent requirements. It is over-inclusive in that it burdens a large amount of protected speech—for minors and adults alike. And it is seemingly largely redundant of existing parental controls,[21] meaning that there is a less-restrictive alternative: Louisiana can encourage the use of available tools. *See Brown*, 564 U.S. at 803.

Worth emphasizing, the Court breaks no new ground here. Well before the instant case, the district courts in, e.g., *Yost*, *Griffin*, and *Fitch*, articulated the very same concerns with similar laws. *See, e.g.*, *Yost*, 778 F. Supp. 3d at 956–57 ("[T]he Act is either underinclusive or overinclusive, or both, for all the purported government interests at stake. Ohio's response to a societal worry that children might be harmed if they are allowed to access adult-only sections cannot be to ban children from the library altogether absent a permission slip."); *Griffin*, 2025 WL 978607, at \*11, \*13–14 (explaining that Arkansas's law is both under-inclusive and over-inclusive); *Fitch*, 787 F. Supp. 3d at 277–80 (same).

---

[21] Most effectively, parents could decline to purchase internet-enabled devices for their children.

The degree of the Act's over- and under-inclusivity is such that it fails intermediate scrutiny as well. *See Fitch*, 787 F. Supp. 3d at 280–81 ("Even if, as the Attorney General asserts, the Act were deemed content neutral and subject to intermediate scrutiny, the result would not change."); *see also Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024) ("While not as exacting as strict scrutiny, intermediate scrutiny is no gimme for the government . . . . '[T]he burden of justification is demanding and it rests *entirely* on the State.'" (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996))); *Nat'l Press Photographers*, 90 F.4th at 793 ("Under intermediate scrutiny, '[a] content-neutral regulation will be sustained . . . if the incidental restriction on alleged First Amendment freedoms is *no greater than is essential* to the furtherance of [an important governmental] interest.'" (emphasis added) (quoting *Turner Broad. Sys.*, 512 U.S. at 662)).

For the sake of completeness, the Court considers the specifically-challenged provisions individually and in greater detail below. For the reasons that follow, the Court finds that, on their own terms, these provisions trigger and fail heightened scrutiny.

### iii. <u>Age-Verification & Parental-Consent Requirements</u>

"[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell*, 564 U.S. at 567. *But see Yost*, 778 F. Supp. 3d at 948–50 (indicating that, here, this *Sorrell* quotation is inapposite). But "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. As Defendants' own expert has opined—and as Defendants themselves must acknowledge, lest they run into a tailoring issue—even an "upstream" restriction like age-verification will reduce the number of users of covered platforms (mostly minors). (*See* Doc. 57-19 at 6; Doc. 57-2 at 6, ¶ 37); *see also Carr*, 789 F. Supp. 3d at 1226 ("[A] universal age verification requirement for Georgians using social media would

potentially all but kill anonymous speech online. . . . [R]equiring users to tie their online views to their identity would undoubtedly chill speech—and, likely, would disproportionately chill speech on the most controversial issues."). Thus, even if the Court were to ignore the Act's content-based coverage definition—and even if the Court were to agree with Defendants that controlling access to social media is mere conduct, (*see* Doc. 58-1 at 33)—the age-verification and parental-consent requirements would nonetheless trigger First Amendment scrutiny because of their indirect but substantial burdens to (accessing and engaging in) speech, *see TikTok*, 604 U.S. at 67–68 (quoting *Arcara*, 478 U.S. at 703–04).

However, the Court disagrees with Defendants that the age-verification and parental-consent requirements merely regulate non-expressive conduct. These restrictions are strikingly similar to those challenged in *Brown. See Brown*, 564 U.S. at 789. There, California had "prohibit[ed] the sale or rental of 'violent video games' to minors" without the consent of an adult (*viz.*, a parent). *Id.* at 789, 802. The parties to the case agreed that violent videogames "qualify for First Amendment protection." *Id.* at 790. And the Court ultimately struck down the law, explaining that, while "a State possesses legitimate power to protect children from harm," it lacks "a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794 (citations omitted). The Court emphasized: "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213–14). (The Court also faulted California for its inability to "show a direct causal link between violent video games and harms to minors." *Id.* at 799.)

In reaching its decision, the *Brown* Court noted that California's law was "wildly underinclusive" because it (1) did not restrict similar content in other media (e.g., cartoons, movies,

books) and (2) gave minors unrestricted access to violent videogames with parental approval. *See id.* at 802 ("The California Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent . . . says it's OK. . . . That is not how one addresses a serious social problem."). The Court also observed that parents already had tools with which to control and to monitor their children's access to and use of violent videogames. *Id.* at 803. Lastly, the Court found that California's law was "vastly overinclusive" in that "its entire effect [wa]s only in support of what the State th[ought] parents *ought* to want." *See id.* at 804 ("Not all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they purchase violent video games.").

Here, the State seeks to regulate minors' access to speech on social media platforms via, *inter alia*, age-verification and parental-consent requirements. Overwhelmingly, such speech qualifies for First Amendment protection. Identical speech on unregulated websites remains easily accessible to minors. Likewise, minors have more or less unrestricted access to speech on covered social media platforms as soon as they obtain one parent's consent to create an account. And the parties agree that there are already tools with which parents can control and monitor their children's access to and use of social media. *See* Sections II.B. & IV.C.4.a.ii, *supra. Brown* is therefore highly "instructive." *See Griffin*, 2025 WL 978607, at *10.

Defendants insist that the instant case is distinct from *Brown*. But their argument distills to the following: Louisiana's law regulates "granting minors access to social media *accounts* without parental approval" (i.e., "non-expressive conduct"), whereas California's law "directly targeted and banned access to protected speech." (Doc. 64 at 32–33 (emphasis added).) The position that

70

the first concerns mere non-expressive conduct while the second concerns speech is untenable.[22]

Even ignoring the possibility that the creation of a social media account is itself expressive, what

Louisiana's law plainly targets, if indirectly, is access to *speech* on covered social media platforms,

not access to *accounts* themselves.[23] *See TikTok*, 604 U.S. at 67–68 ("[Courts] have also applied

First Amendment scrutiny . . . to 'some statutes which, although directed at activity with no

expressive component, impose a disproportionate burden upon those engaged in protected First

Amendment activities.'" (quoting *Arcara*, 478 U.S. at 703–04)). And in any event, Defendants

mischaracterize *Brown*. California's law was not a "direct[] target[ing]" of violent videogames,

(*cf.* Doc. 64 at 33), but rather an "upstream" regulation akin to the restrictions here, *see Brown*,

564 U.S. at 789–90, 802. Thus, *Brown* remains controlling.[24]

    Nor can Defendants persuasively compare the instant case to *Free Speech Coalition*. (*See*

Doc. 64 at 35–36 (citing *Free Speech Coal.*, 606 U.S. at 481, 496).) There, the Supreme Court

---

[22] Defendants' comparison to similar restrictions for "alcohol, consumable hemp products, lottery tickets, employment, handguns, fireworks, body piercings, or tattoos" also falls flat. (*See* Doc. 58-1 at 34.) Notably, most of these items do not qualify as speech. *But see Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060–61 (9th Cir. 2010) ("The tattoo *itself*, the *process* of tattooing, and even the *business* of tattooing are . . . purely expressive activity fully protected by the First Amendment."). And even the tattoo analogy is unpersuasive—at a minimum, because of the clear difference in tailoring. That is, the Act's age-verification and parental-consent requirements encompass far more protected speech than similar restrictions for tattoos. To complete Defendants' analogy, the Act would be like requiring all people to verify their ages—and all minors to obtain parental consent—before getting tattoos *and* before looking at other people's tattoos.

    The Court prefers the analogy of a supermarket or a strip mall. *See Griffin*, 2023 WL 5660155, at *3, *16 (considering analogy to a shopping mall); *see also Yost*, 778 F. Supp. 3d at 957 (analogizing to a public library). A supermarket sells alcohol, tobacco, and lottery tickets, but it mostly sells other items (e.g., food, cleaning supplies, hygiene products). Similarly, a strip mall may include a liquor store, a store that sells sporting goods (e.g., firearms), etc. But prospective customers do not need to verify their respective ages in order to *enter* a supermarket or *gain access* to a strip mall. Nor do minor prospective customers need parental consent to enter or gain access to such places.

[23] In *Brown*, the Court surely would not have entertained the argument that the California law merely restricted access to the physical CDs on which the violent videogames were stored. But Defendants here ask the Court to accept an essentially identical argument. (*See* Doc. 64 at 32–33 ("The provision does not regulate speech at all. It regulates the non-expressive conduct of granting minors access to social media accounts without parental approval.").)

[24] Defendants also assert that the Fifth Circuit's and the Supreme Court's recent orders in *Fitch* foreclose analogy to *Brown*. (Doc. 64 at 33–34 (citing *Fitch*, 2025 WL 2078435, at *1; *Fitch*, 145 S. Ct. at 2658).) This is simply not so. Neither the Fifth Circuit nor the Supreme Court has decided the merits of *Fitch*. And in his concurrence, Justice Kavanaugh cited *Brown* in support of his claim that "NetChoice has . . . demonstrated that it is likely to succeed on the merits—namely, that enforcement of the Mississippi law would likely violate its members' First Amendment rights under th[e] [Supreme] Court's precedents." *Fitch*, 145 S. Ct. at 2658 (Kavanaugh, J., concurring) (citing, *inter alia*, *Brown*, 564 U.S. 786).

considered a Texas law which "require[d] certain commercial websites"—those where one-third or more of the content was pornographic (i.e., obscene for minors)—"to verify the ages of their visitors." *Free Speech Coal.*, 606 U.S. at 466–67. In upholding that age-verification requirement, however, the Court recognized repeatedly that pornography is unprotected speech for minors and that, as a result, States "may prevent children from accessing [it]." *Id.* at 472, 478, 482–83. But even if Defendants were correct that *Free Speech Coalition*'s principles apply here, Louisiana's law would still be subject to intermediate scrutiny. *See id.* at 477–78, 483, 495.

The Act's age-verification and parental-consent requirements fail strict *and* intermediate scrutiny. Even if the Court accepts that Defendants have a compelling interest "in protecting the physical and psychological well-being of minors," (*see* Doc. 58-1 at 37 (quoting *Sable*, 492 U.S. at 126)), Defendants have not established a causal relationship between social media use and health harms to minors, (*cf. id.* at 22). Defendants' expert, Dr. Jean Twenge, is the subject of a pending *Daubert* motion. (Doc. 66.) Regardless of how the Court would have ruled on this now-moot motion, it must still consider NetChoice's substantive criticisms of Dr. Twenge's expert report. (*See* Docs. 65, 66, 76.) As footnoted above, the Court finds troubling that Dr. Twenge: (1) could not supply consensus definitions of "social media" or "mental health," (2) did not have any "formal criteria" for including studies in her expert report, and (3) included only studies showing a correlative, not a causal, relationship between social media use and harms to minors. (*See* Doc. 65 at 16–18 (quoting Doc. 65-4 at 21) (citing, *inter alia*, Doc. 66-1 at 11–14).) "The record Defendant[s] ha[ve] assembled here . . . is much like the deficient record in *Brown*, where 'nearly all of the research' showing any harmful effects 'is based on correlation, not evidence of causation.' The record also does not show that the full range of [platforms] covered by the Act *cause[s]* harms to minors sufficient to suppress those minors' access to protected speech." *Yost*,

778 F. Supp. 3d at 955 (internal citations omitted) (quoting *Brown*, 564 U.S. at 800 (cleaned up)); *see also Cruz*, 596 U.S. at 305 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." (quoting *McCutcheon*, 572 U.S. at 210)).

But even if Defendants had established a causal relationship between social media use and health harms to minors, (*see* Doc. 58-1 at 22), manifold tailoring issues would nonetheless compel the Court to find that the Act's age-verification and parental-consent requirements fail any form of heightened scrutiny. Most notably, the age-verification and parental-consent requirements are both over- and under-inclusive. As NetChoice has noted, parents already have several ways to control their children's access to—and to monitor their children's use of—social media platforms. (Doc. 57-1 at 20; *see* Doc. 57-2 at 4–6, ¶¶ 22–26, 29–30; Doc. 58-2 at 3, ¶ 11); *see also Brown*, 564 U.S. at 804 ("While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want."); *Uthmeier*, 2025 WL 1570007, at *18–19 ("[T]he fact that few parents choose to use parental controls does not help the State. This fact could simply suggest that few parents know the tools are available or know how to use them, or that parents do not share the [S]tate's concerns about social media. In either circumstance, the appropriate response from the State is a public education campaign . . . ."). And unlike the Texas law at issue in *Free Speech Coalition*, the Act here burdens an enormous amount of protected speech—"substantially more . . . than is necessary to further [Louisiana's] interest." *Free Speech Coal.*, 606 U.S. at 496. At the same time, the Act does not regulate identical speech on smaller social media platforms (i.e., platforms with fewer than five million account holders) and websites with excepted "predominant or exclusive function[s]." La. R.S. § 51:1751(12).

The upshot is that, without restriction, a 13-year-old can access, engage with, and proliferate potentially harmful content on a social media platform with 4,999,999 account holders or any website—regardless of user-ship—where social interaction is a major function but not the *predominant* function. But unless and until that same 13-year-old verifies his age and obtains one parent's consent, he cannot access, engage with, or proliferate benign—even instructive or useful—speech, such as Facebook posts by politicians and other public persons or entities. (*See* Doc. 57-2 at 8, ¶ 50.) If the 13-year-old clears the Act's threshold barriers to covered platforms like Facebook, however, he not only gains access to such benign speech. He also gains more or less unrestricted access to whatever potentially harmful content exists on such platforms. *See Brown*, 564 U.S. at 802 ("The California Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent . . . says it's OK."). "That is not how one addresses a serious social problem." *See id.*

Given this simultaneous over- and under-inclusivity, Defendants have failed to demonstrate that the Act's age-verification and parental-consent requirements satisfy intermediate scrutiny, much less strict scrutiny. *See Hines*, 117 F.4th at 779 ("[I]ntermediate scrutiny is no gimme for the government . . . ."); *Nat'l Press Photographers*, 90 F.4th at 793 (explaining that, in order to satisfy intermediate scrutiny, an "incidental restriction on alleged First Amendment freedoms" must be "no greater than is essential" to further an important governmental interest) (quoting *Turner Broad. Sys.*, 512 U.S. at 662)).

### iv.    Advertising Prohibition

The First Amendment extends to publishing, including the publication of advertisements. *See Hurley*, 515 U.S. at 570 ("Nor, under our precedent, does First Amendment protection require a speaker to generate, as an original matter, each item featured in [a] communication. . . . [T]he

presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages, which, of course, fall squarely within the core of First Amendment security, as does even the simple selection of a paid noncommercial advertisement for inclusion in a daily paper." (internal citations omitted)); *accord Moody*, 603 U.S. at 731 ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own. And that activity results in a distinctive expressive product.").

Thus, where laws have controlled or limited publishing decisions, they have triggered heightened scrutiny. *See, e.g.*, *Miami Herald Pub. Co.*, 418 U.S. at 258 ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials . . . constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time."); *see also Moody*, 603 U.S. at 731–32 ("When the government interferes with . . . editorial choices—say, by ordering the excluded to be included—it alters the content of the compilation. . . . And in doing so—in overriding a private party's expressive choices—the government confronts the First Amendment.").

Further, "[t]he First Amendment, as applied to the States through the Fourteenth Amendment, protects *commercial* speech from unwarranted governmental regulation." *Cent. Hudson*, 447 U.S. at 561 (emphasis added) (citing *Va. State Bd. of Pharmacy*, 425 U.S. at 761–62). Such speech "must concern lawful activity and not be misleading." *Am. Acad. of Implant Dentistry*, 860 F.3d at 306 (quoting *Cent. Hudson*, 447 U.S. at 566); *see also In re R. M. J.*, 455 U.S. 191, 203 (1982) ("[W]hen the particular content or method of the advertising suggests that it

is inherently misleading[,] or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions.").

"Even when a communication is not misleading, the State retains some authority to regulate." *In re R. M. J.*, 455 U.S. at 203. "But the State must assert a substantial interest[,] and the interference with speech must be in proportion to the interest served." *Id.* (citing *Cent. Hudson*, 447 U.S. at 563–64). "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Express Oil Change*, 916 F.3d at 487 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983)). "This burden is a heavy one." *Id.* (cleaned up) (quoting *Pub. Citizen, Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 218 (5th Cir. 2011)). It cannot be "satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). "[R]ather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 770–71; *accord Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 283–84 (5th Cir. 2024) (citing *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995)). In other words, the regulation must "directly advance[] the governmental interest asserted" and must not be "more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566.

Louisiana Revised Statutes § 51:1753 requires that social media companies prohibit "[t]he display of *any* advertising in [a minor's] account based on the Louisiana minor account holder's personal information, except age and location." La. R.S. § 51:1753(2) (emphasis added). On its face, this provision treats social media companies as publishers of speech (i.e., advertising). *See also Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) (describing "monitoring, screening, and deletion of content" as "quintessentially related to a publisher's role," albeit in the context of a 47 U.S.C. § 230 challenge); *Moody*, 603 U.S. at 731–32 (explaining that compiling,

organizing, and presenting third-party speech "is expressive activity of its own"). Additionally, the Act does not clarify whether the advertising prohibition applies only to *commercial* advertisements. *See also Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 594–95 (considering a similar restriction and noting that the term "advertisement" could "apply to any number of forms of speech that do[] not propose a commercial transaction"). By regulating what material these companies can publish (i.e., advertising based on prohibited data versus advertising based on age and location), the advertising prohibition functions as a content-based restriction, *see also Miami Herald*, 418 U.S. at 244, 247, 256–57, in which case it triggers strict scrutiny, *see Free Speech Coal.*, 606 U.S. at 471. At a minimum, though, the restriction triggers intermediate scrutiny given its burden on covered NetChoice members' speech.

Regardless of the level of scrutiny which applies—strict or intermediate—the provision fails. First, Defendants do not seriously contend that the advertising prohibition can satisfy strict scrutiny. (*See* Doc. 64 at 37–38.) And as NetChoice notes, the prohibition is far from the least restrictive option: The Act could instead allow minor account holders to opt out of targeted advertising (or all advertising, for that matter). (Doc. 57-1 at 25–26.) Plus, from its plain language, the prohibition encompasses even those advertisements which do not "propose . . . commercial transaction[s]," (Doc. 57-1 at 25 (quoting *Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 594–95)), while excluding identical advertising (i.e., based on the full range of minors' data) by all unregulated websites, (*id.* at 26 (citing La. R.S. § 51:1751(11)–(12))).

Second, the advertising prohibition fails the intermediate scrutiny that applies to commercial speech. *See also Students Engaged in Advancing Tex.*, 765 F. Supp. 3d at 594–95, 598–99 (applying strict scrutiny but raising similar concerns about "fatal[]" over- and under-inclusivity). Even if the Court accepts that Defendants have a compelling interest "in protecting

77

the physical and psychological well-being of minors," (Doc. 64 at 38 (quoting *Sable*, 492 U.S. at 126)), Defendants have not shown how the advertising prohibition is "no[] more extensive than necessary," *see Cent. Hudson*, 447 U.S. at 566, to advance that interest, (*see* Docs. 58, 64). Defendants claim to have established a causal relationship between use of social media (writ large) and harms to minors. (*See* Doc. 58-1 at 22.) Given that claim, threshold requirements like age-verification and parental-consent make some sense: If a minor cannot use social media at all, she ostensibly cannot be harmed by it, at least not directly. But the advertising prohibition is a much narrower restriction. If Defendants are to carry their burden of justifying the advertising prohibition, they cannot point to the same broad claim of causation. Rather, they must show a more specific causal relationship—between targeted advertising based on data other than age and location and harms to minors. Nowhere, however, do Defendants posit such a relationship.

Dr. Twenge's expert report singles out just one article in which a focus group comprised of teenage social media users partly blamed "inappropriate advertisements" for "the connection between Instagram use and depression." (Doc. 64-3 at 28 (citing Georgia Wells et al., *Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show*, Wall Street Journal (Sept. 14, 2021), https://www.wsj.com/tech/personal-tech/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739).) Neither Dr. Twenge nor Defendants define "inappropriate advertisements." (*See* Docs. 58, 64, 64-3.) They do not indicate which platforms publish such advertisements. They do not link such advertisements to the collection or use of data besides age and location. *See* La. R.S. § 51:1753(2). They do not suggest that the advertising prohibition will reduce the number of inappropriate advertisements, much less explain how. They do not discuss less-restrictive alternatives, such as allowing minors to opt out of targeted advertising (or all advertising). And they do not contend with NetChoice's arguments about over-

and under-inclusivity. (*See* Doc. 57-1 at 24–27.) Thus, even making the (big) assumption that the identified article singlehandedly establishes the requisite causal relationship between "inappropriate advertisements" on covered social media platforms and mental health harms to minors, Defendants have not carried their "heavy" burden under the First Amendment.[25] *See Express Oil Change*, 916 F.3d at 487 (quoting *Pub. Citizen, Inc.*, 632 F.3d at 218); *Cent. Hudson*, 447 U.S. at 566.

*v.*    *Direct-Messaging Restrictions*

Lastly, the direct-messaging restrictions independently trigger and fail heightened scrutiny. Like adults, minors have a "constitutional right to speak or be spoken to." *Brown*, 564 U.S. at 795 n.3. By burdening this right, the Act's direct-messaging restrictions trigger heightened scrutiny. *See id.* ("In the absence of any precedent for state control, uninvited by the parents, over a child's speech . . . and in the absence of any justification for such control that would satisfy strict scrutiny, those laws must be unconstitutional."). These restrictions also fail any form of heightened scrutiny because they are simultaneously over- and under-inclusive. (*See* Doc. 57-1 at 27–28.)

The direct-messaging restrictions are over-inclusive in that they burden, if not thwart, many innocuous—even productive—forms of communication. Defendants do not deny, for example, NetChoice's hypothetical where, on account of the restrictions, a minor cannot "reach[] out to local politicians" in order to engage in political speech.[26] (*Id.* at 27.) Nor do Defendants seriously dispute that such restrictions are largely redundant of existing parental controls and content moderation. (*Id.* at 27–28; *see also* Doc. 58-2 at 3, ¶ 11 ("Many of NetChoice's members already have tools to

---

[25] NetChoice has shown that it succeeds on the merits of this as-applied challenge to the advertising prohibition, so the Court need not consider NetChoice's additional claim that 47 U.S.C. § 230 preempts the advertising prohibition. (*See* Doc. 65 at 29–32.)

[26] Because the direct-messaging restrictions only prevent adults from messaging minors (and not the reverse), the Court understands NetChoice to be arguing that politicians would not be able to respond to minors who message them on covered platforms. *See* La. R.S. § 51:1753(1). But the issue which NetChoice has identified obviously remains.

assist parents and maintain internal rules . . . that restrict children's access to their services.").) At the same time, the direct-messaging restrictions are under-inclusive in that they do not limit minors' communication with adults on unregulated websites. (*Id.* at 28.) For example, under the Act, a minor using a platform with 4,999,999 account holders can receive and reply to unsolicited messages from adult users. The same minor using a platform with 5,000,000 account holders cannot. Lastly, the restrictions are under-inclusive in that minors can skirt them easily (e.g., by connecting with adults on covered platforms prior to exchanging messages with them).

NetChoice argues that the Ninth Circuit "erroneously" determined that a similar restriction satisfied intermediate scrutiny. (*See id.* at 28 (citing *Bonta*, 152 F.4th at 1017).) Defendants treat this as a concession that the Act's direct-messaging restrictions both trigger and satisfy intermediate scrutiny.[27] (Doc. 64 at 38.) Notably, though, the purpose and function of the Act's direct-messaging restrictions are distinct from those of the restriction upheld by the Ninth Circuit. *See Bonta*, 152 F.4th at 1017. The "private mode" provision of California's law limited the ability of users unconnected to a minor to view and to interact with that minor's *posts*. *Id.* (citing Cal. Health & Safety Code § 27002(b)(5)). The goal, as identified by the Ninth Circuit, was to discourage minors from "conform[ing] their social media habits to maximize interaction and approval of a worldwide audience." *Id.*; *see also id.* ("This logically serves the end of protecting minors' mental health *by reducing screentime and habit-forming platform usage*." (emphasis added)). Here, by contrast, the direct-messaging restrictions limit communication *between individuals*. *See* La. R.S. § 51:1753(1). And seemingly, they do so in order to prevent harassment and/or predation. (*See* Doc. 58-1 at 35 (explaining that the Act has "everything to do with protecting minors from predators on the Internet"); Doc. 64 at 12, 33 ("[The Act] regulates the . . .

---

[27] Defendants raise a second argument—that NetChoice lacks standing to challenge these direct-messaging restrictions. The Court has already addressed this concern. *See* Section IV.B.3., *supra*.

conduct that enables predators to exploit children online. . . . [I]t targets unlawful conduct . . . ."); *see also* Docs. 58, 64.) For these reasons, the comparison to *Bonta* is not a neat fit. At most, California's law underscores several of this Court's concerns with the tailoring of the Act's direct-messaging restrictions, namely: (1) The direct-messaging restrictions do not alter adults' ability to view and to comment on minors' posts. (2) Adults and minors can communicate without restriction so long as they connect with one another on covered platforms. And (3) adults and minors can communicate without restriction on unregulated websites.

Thus, even if the Act's direct-messaging restrictions only trigger intermediate scrutiny, they do not automatically satisfy it. (*Cf.* Doc. 64 at 38.) In fact, the same concerns of over- and under-inclusivity apply with full force. Defendants have not demonstrated that the restrictions here are even substantially related to their stated interest. *See TikTok*, 604 U.S. at 67; *see also Hines*, 117 F.4th at 779 ("[I]ntermediate scrutiny is no gimme for the government . . . ."). And given that the Government is restricting speech, "the Government bears the burden of proving the constitutionality of its actions." *Cruz*, 596 U.S. at 305 (quoting *McCutcheon*, 572 U.S. at 210).

b. <u>Facial Challenge</u>

"In First Amendment facial challenges, '[t]he question is whether a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Carr*, 789 F. Supp. 3d at 1217 (quoting *Moody*, 603 U.S. at 723). In other words, a law is only facially invalid under the First Amendment "if [its] unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724. "The first step in the proper facial analysis is to assess the state law['s] scope." *Id.* That is, "[w]hat activities, by what actors do[es] the law[] prohibit or otherwise regulate?" *Id.* The second step "is to decide which of

the law['s] applications violate the First Amendment, and to measure them against the rest." *Id.* at 725.

In *Fitch*, the Fifth Circuit explained: "By not determining the full scope of actors regulated by the Act and the activities it regulates, the district court did not apply *Moody* in the manner now required." *Fitch*, 134 F.4th at 809. The court included in its analysis several hypothetical digital service providers (e.g., "Uber, Google Maps, DraftKings, Microsoft Teams, Reddit, Pinterest, or X") to whom Mississippi's law conceivably applied. *Id.* at 808–09; *see also id.* at 809 ("One could even puzzle over whether Google Mail is covered by [Mississippi's law]: it is a [digital service provider], but it may or may not be excepted from the Act's coverage as it does not facilitate 'only' e-mail or direct messaging—it also facilitates Google Meet video chats."). On remand, the district court did not apply *Moody*'s two-step analysis to NetChoice's facial challenge, but rather considered NetChoice's newly-added as-applied challenge to Mississippi's law, consistent with Supreme Court and Fifth Circuit precedents. *Fitch*, 787 F. Supp. 3d at 282–83.

Because NetChoice has demonstrated that it succeeds on the merits of its as-applied challenge here, "the Court need not reach its facial challenge to the constitutionality of the Act." *See Fitch*, 787 F. Supp. 3d at 282 (citing *United States v. Jubert*, 139 F.4th 484, 489 (5th Cir. 2025)); *accord Buchanan*, 919 F.3d at 852 ("[W]e generally decide the as-applied challenge first because it is the narrower consideration."); *id.* at 854 ("Generally, we proceed to an overbreadth issue only if it is determined that the statute would be valid as applied." (cleaned up)). As the Supreme Court has explained: "[A]lthough the occasional case requires [courts] to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, [courts] neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995)

(citations omitted); *accord Serafine*, 810 F.3d at 363 ("Applying the overbreadth doctrine is strong medicine and is also more difficult to resolve than the as-applied challenge, since it requires consideration of many more applications than those immediately before the court." (cleaned up)).

"Given the foregoing guidance from the Supreme Court and the Fifth Circuit, and because the Court has determined NetChoice has [succeeded] on the merits of its . . . as-applied challenge to the Act, [the Court] need not reach the facial challenge in order to fully protect the litigants."[28] *See Fitch*, 787 F. Supp. 3d at 282–83. But the Court also notes that the Act's coverage definition is such that "determining the full scope of actors regulated by the Act"—as required by *Moody*— is unrealistic. *See Fitch*, 134 F.4th at 809. As discussed below, the Court finds that, even if NetChoice's as-applied challenge were unsuccessful, NetChoice would succeed on the merits of its vagueness challenge.

### D.  Vagueness

#### 1.  *Plaintiff's Motion for PI & MSJ (Docs. 6, 57)*

As an alternative to its preceding challenges, NetChoice argues that the Act's coverage definition is "unconstitutionally vague." (Doc. 57-1 at 37 (citing La. R.S. § 51:1751(11)–(12)).) Specifically, it observes that "[d]etermining whether the Act applies requires identifying a website's 'predominant or exclusive function.'" (*Id.* (quoting La. R.S. § 51:1751(12)(b)).) But that phrase—"predominant or exclusive function"—is undefined, "even though it is 'critical to determining which entities fall within [the Act's] scope.'" (*Id.* (quoting *Griffin*, 2025 WL 978607, at *15–16).) Discord and Twitch, for example, are used for gaming but also for social interaction. It is therefore unclear whether the Act covers them. (*See id.* at 38.) Given this uncertainty,

---

[28] The Court notes, however, the considerable number of cases where NetChoice has prevailed on a more or less identical facial challenge. *See, e.g.*, *Yost*, 778 F. Supp. 3d 923; *Griffin*, 2025 WL 978607; *Reyes*, 748 F. Supp. 3d 1105; *Carr*, 789 F. Supp. 3d 1200.

NetChoice says, websites will be forced to "censor vast amounts of speech or [else] risk unpredictable fines." (*Id.* (citing *Griffin*, 2023 WL 5660155, at \*13).)

### 2. Defendants' MSJ & Opposition (Docs. 58, 64)

Defendants respond that NetChoice "is not entitled to summary judgment on its 'facial' vagueness claim," because the Act clearly defines "[s]ocial media company" and "[s]ocial media platform." (Doc. 64 at 29 (quoting La. R.S. § 51:1751(11)–(12)).) Given these definitions, Defendants say, NetChoice cannot show that the Act is "impermissibly vague in all its applications," (*id.* (quoting Doc. 58-1 at 30–31 (quoting *United States v. Rafoi*, 60 F.4th 982, 996 (5th Cir. 2023)))), or "so vague and indefinite as really to be no rule at all," (*id.* (quoting Doc. 58-1 at 31 (quoting *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020)))). "[U]nconstitutional vagueness does not spring up 'merely because a company . . . can raise uncertainty about [a law's] application[.]'" (Doc. 58-1 at 31 (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001)).) Defendants add that NetChoice's example of Discord (1) does not satisfy its burden of proof and (2) is inapt because "everyone [here] agrees that Discord is covered by the Act." (Doc. 64 at 30 (citing Doc. 57-1 at 35; Doc. 57-2 at 2, ¶ 6; *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010)).)

### 3. Plaintiff's Opposition (Doc. 65)

Again, NetChoice argues that the Act's coverage definition is unconstitutionally vague. (Doc. 65 at 32.) According to NetChoice, the issue is "whether the law 'chills protected speech under the First Amendment.'" (*Id.* (quoting *Nat'l Press Photographers*, 90 F.4th at 782 n.32).) It reiterates that the phrase "predominant or exclusive function" is so unclear that "people of common intelligence must necessarily guess at its meaning and differ as to [the Act's] application." (*Id.* (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (cleaned up)).)

### 4. *Law & Analysis*

"[B]ecause we assume that [a person] is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited . . . . Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Equally important, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.* Thus, a law "is void for vagueness if its prohibitions are not clearly defined." *Id.*; *accord McClelland*, 63 F.4th at 1013 ("A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926))).

Where a law raises First Amendment concerns, "rigorous adherence to [the above] requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012); *accord Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) ("If . . . [a] law interferes with the right of free speech or of association, a more stringent vagueness test should apply."); *Baggett v. Bullitt*, 377 U.S. 360, 372 (1967) ("The vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." (quoting *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961))); *see also Deep S. Today*, 779 F. Supp. 3d at 823–24 ("When a statute is capable of reaching [F]irst [A]mendment freedoms, the doctrine of vagueness 'demands a greater degree of specificity than in other contexts.'" (quoting *Kramer v. Price*, 712 F.2d 174, 177 (5th Cir. 1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)))). *But see Ward*, 491 U.S. at 794

("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.").

"Indefinite statutes abutting upon sensitive areas of basic First Amendment freedoms may force the entities regulated to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Griffin*, 2025 WL 978607, at *15 (cleaned up) (quoting *Baggett*, 377 U.S. at 372). Due to this acute risk of "chill[ing] protected speech," vagueness "may be grounds for a pre-enforcement challenge." *Nat'l Press Photographers*, 90 F.4th at 782 n.32 (citing *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546–47 (5th Cir. 2008)). Vagueness is not "rendered less objectionable" just because a "regulation of expression . . . was adopted for the salutary purpose of protecting children." *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 688–89 (1968).

While Defendants are correct that there is a slightly greater tolerance for vagueness in the civil (as opposed to criminal) context, *see Vill. of Hoffman*, 455 U.S. at 498–99, the Act—including the coverage definition, challenged here—raises First Amendment concerns, *see* Section IV.C.4, *supra*. Therefore, a "more stringent vagueness test" applies. *Vill. of Hoffman*, 455 U.S. at 499. Having considered this test, the Court finds that the Act (writ large) is unconstitutionally vague because the scope of the term "[s]ocial media platform" is unclear. *See* La. R.S. § 51:1751(12). (Consequently, the term "[s]ocial media company" is also unclear. *See id.* § 51:1751(11).)

The Act defines a "social media platform" as a "public or semipublic internet-based service or application that has users in Louisiana" and that meets certain criteria (i.e., connecting users and facilitating social interaction). *Id.* § 51:1751(12). But the Act also defines a "social media platform" with reference to what it *isn't*: The term does *not* include "an online service, website, or application where the *predominant or exclusive function*" is, *inter alia*, electronic mail, streaming,

news, sports, entertainment, online shopping or electronic commerce, or interactive or virtual gaming. *Id.* § 51:1751(12)(b) (emphasis added). The phrase "predominant or exclusive function" is undefined. *See id.* § 51:1751. In the Court's view, it is also nebulous.

In particular, "predominant" is troubling. The term is inherently comparative. *See Predominant*, *Webster's Third New Int'l Dictionary* 1786 (2002) ("[H]olding an ascendancy: having *superior* strength, influence, authority, or position[.]" (emphasis added)). But the Act does not indicate *how* to compare platforms' functions in order to determine which is "predominant." *See* La. R.S. § 51:1751; *see also Griffin*, 2025 WL 978607, at \*16 ("[Arkansas's law] does not explain how platforms are to determine which function is 'predominant,' leaving those services to guess whether they are regulated."); *Fitch*, 738 F. Supp. 3d at 778 ("[I]t is unclear what test one uses to determine how a digital service 'primarily' functions."); *Carr*, 789 F. Supp. 3d at 1221 ("[I]t is inexplicable how the State plans to determine which platforms serve a 'predominant or exclusive function' of news, sports, entertainment, gaming, career development, academic research, or public safety without looking to the content of those websites and making highly discretionary calls about that content."). Many online videogames allow players to create (semi-)public profiles, connect with friends (and strangers), and communicate via text and/or voice chat(s), thereby satisfying the Act's "[s]ocial media platform" criteria. *See* La. R.S. § 51:1751(12). If enough people use an online videogame for social interaction as opposed to, or in conjunction with, gaming, does the "predominant . . . function" of the videogame change, such that it is suddenly covered by the Act? *See id.*

Perhaps more relevant here is the reverse: If enough people *stop* using a covered platform for social interaction, is it no longer covered by the Act? NetChoice identified seven members whom it understood to be covered by the Act. (*See* Doc. 57-2 at 2, ¶¶ 5, 7.) Defendants added three

members to the list, including Amazon, with its platform Twitch.[29] (*See id.* at 2, ¶ 6.) Twitch is an especially useful illustration of the issue.[30] The platform plausibly oscillates between enumerated functions, chiefly interactive gaming[31] and social interaction. Accepting that, at present, Twitch's predominant function is social interaction, what happens if tomorrow (or next week, next month, next year) more people use the platform for its interactive gaming function? Will the Act cease to cover Twitch? And again, where is the line between these functions? The Act does not say.[32]

The Act's coverage definition turns on the phrase "predominant or exclusive function." *See* La. R.S. § 51:1751(11)–(12). Due to the phrase's indeterminacy, companies must guess whether their websites cross the threshold from, e.g., "interactive gaming" into "social interaction." On the one side are burdens to protected speech, not to mention compliance costs. On the other, the risk of "unpredictable and arbitrary enforcement" of the Act, including fines. *See Griffin*, 2023 WL 5660155, at *14 (considering, *inter alia*, the same undefined phrase); *accord Griffin*, 2025 WL 978607, at *15–16 (granting NetChoice summary judgment, in part because of vagueness).

---

[29] On its own, this mismatch between NetChoice's and Defendants' lists of covered NetChoice members speaks to the ambiguity of the Act's coverage definition.

[30] Twitch is a live-streaming service. Ordinary users can become content creators by making Twitch accounts and live-streaming their content on the platform. Account holders can also participate in live-streams via, *inter alia*, a live chat function. Live-streams fall into a number of categories, including gaming, conversation, cooking, sports, and music. But account creation, content creation, and participation in live-streams are all optional. A person can use Twitch just to, say, watch a content creator silently play his favorite videogame. *See About*, Twitch, https://www.twitch.tv/p/en/about/ (last visited Dec. 14, 2025); Roland Martin, *Twitch*, Britannica (Dec. 3, 2025), https://www.britannica.com/topic/Twitch-service; *see also Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (discussing Fed. R. Evid. 201 (i.e., judicial notice)); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224–25 (7th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web."); *Schaffer v. Clinton*, 240 F.3d 878, 885 n.8 (10th Cir. 2001) (taking judicial notice of factual information contained in an online political almanac). As well, the Court notes that anyone can gain personal knowledge of Twitch simply by visiting and interacting with the website.

[31] "'Social media platform' shall not include an online service, website, or application where the predominant or exclusive function is . . . [i]nteractive gaming, virtual gaming, *or an online service that allows the creation and uploading of content and the communication related to that content for the purpose of interactive gaming*, educational entertainment, or associated entertainment." La. R.S. § 51:1751(12)(b) (emphasis added).

[32] As an aside, if platforms like Twitch *are* covered by the Act, then the Act's under-inclusivity becomes all the more apparent. At a minimum, a user would have to verify his age in order to watch a Twitch stream of his favorite massively multiplayer online videogame. But the same user could play the videogame itself (e.g., make a profile, populate a friends list, chat with friends and strangers) without having to satisfy any of the Act's requirements.

NetChoice argues that, given this uncertainty, at least some of its members (and other companies) will "censor vast amounts of speech." (Doc. 57-1 at 38.) The Court agrees that the ambiguity of the Act's coverage definition makes it plausible that even unregulated websites will implement restrictions. Relatedly, ambiguity vests the Division with a worrisome amount of discretion. *See* La. R.S. §§ 51:1755–1756 ("The [D]ivision has exclusive authority to administer and enforce the requirements of this Chapter."); *see also Carr*, 789 F. Supp. 3d at 1221 (considering the same phrase and explaining that the State would need to "mak[e] highly discretionary calls" about content in order to determine which websites are covered); *Yost*, 778 F. Supp. 3d at 958 ("Such capacious and subjective language practically invites arbitrary application of the law."). And because the source of the vagueness is the coverage definition, the Court finds that all applications of the Act are impermissibly vague. *See McClelland*, 63 F.4th at 1013.

### E. Permanent Injunction

#### 1. *Plaintiff's MSJ (Doc. 57)*

NetChoice concludes with the argument that it has met "all remaining factors for a permanent injunction." (Doc. 57-1 at 40.) First, "Defendants have already indicated their willingness to enforce the Act." (*Id.*) Enforcement will violate NetChoice members' First Amendment rights and inflict economic injury (e.g., compliance costs, fines). (*See id.*) "The loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." (*Id.* (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)).) Penalties and compliance costs "magnify" this harm. (*Id.*)

Second, NetChoice explains, "harm to the opposing party and the public interest . . . 'merge' in lawsuits against the government." (*Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).) And because "injunctions protecting First Amendment rights are always in the public

interest," NetChoice argues that it has satisfied the remaining two factors. (*Id.* at 40–41 (cleaned up) (quoting *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1100 (5th Cir. 2023)).) NetChoice reiterates that the harm here "is not merely theoretical": Where similar laws have been enforced, "NetChoice members have had to deny their speech services to either some or all users in the State." (*Id.* at 41.)

### 2. *Defendants' Opposition (Doc. 64)*

Defendants recite the standard for permanent injunctive relief, then point to the Fifth Circuit's and the Supreme Court's decisions in *Fitch*. (Doc. 64 at 39–40 (citing *Fitch*, 2025 WL 2078435, at \*1; *Fitch*, 145 S. Ct. at 2658; *id.* (Kavanaugh, J., concurring)).) They contend that such decisions "must 'inform how a court should exercise its equitable discretion in like cases.'" (*Id.* (quoting *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025)).)

### 3. *Law & Analysis*

Again, in order to obtain a permanent injunction, NetChoice must demonstrate: (1) "actual success on the merits," (2) that "irreparable harm" is "likely . . . in the absence of injunctive relief," (3) that "the balance of equities tips in [NetChoice's] favor," and (4) that injunctive relief "is in the public interest." *Crown Castle Fiber*, 76 F.4th at 441. In lawsuits against the Government, items (3) and (4)—the balance of equities and the public interest—"merge." *Nken*, 556 U.S. at 435. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). And "injunctions protecting First Amendment rights 'are always in the public interest.'" *Netflix*, 88 F.4th at 1100 (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012)).

Defendants are correct, of course, that the Fifth Circuit granted a stay of the preliminary injunction in *Fitch*, *see* 2025 WL 2078435, at *1, and that the Supreme Court denied an emergency application to vacate that stay, *see Fitch*, 145 S. Ct. at 2658. But the Fifth Circuit did not give any explanation for the stay. *See Fitch*, 2025 WL 2078435, at *1. Nor did the Supreme Court explain its decision not to vacate. *See Fitch*, 145 S. Ct. at 2658. The only clue comes from Justice Kavanaugh's concurrence, which states that, in *Fitch*, "NetChoice ha[d] not sufficiently demonstrated that the balance of harms and equities favor[ed] it at th[e] time" when the Court considered the emergency application. *Fitch*, 145 S. Ct. at 2658 (Kavanaugh, J., concurring).

In support of that claim, Justice Kavanaugh cited the *Fitch* defendant's *Response in Opposition* to NetChoice's emergency application, wherein the defendant devoted considerable space to the argument that the equities supported the Fifth Circuit's stay. *See* Response in Opposition at 37–39, *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025) (No. 25A97), 2025 WL 2243667, at *37–39. And crucially, Mississippi's Act "ha[d] been in full effect for [non-NetChoice members'] platforms" for an entire year before the emergency application. *Id.* at 39. In that time, NetChoice had not "identified anyone with a complaint about accessing any platform in Mississippi," any "instance of a platform censoring speech," or any instance where a platform "shut down or had any difficulty complying with the Act." *Id.*

Here, by contrast, Louisiana's law has not been enforced. There is, in other words, no rollback necessary, nor will injunctive relief result in only partial enforcement of the (yet-to-be-enforced) Act. *See also Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) ("The [statute] is unconstitutional[,] so the public interest was not disserved by an injunction preventing its implementation."); *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024) (finding that the threat of First Amendment injury was "not

outweighed by any threatened harm to [the State] because the government has 'no legitimate interest' in enforcing an unconstitutional law." (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)). Further, NetChoice has submitted to this Court evidence of similar laws' adverse effects on social media platforms, including NetChoice members' platforms. (Doc. 57-1 at 41 (citing Doc. 57-2 at ¶¶ 99–100).)[33] NetChoice member Dreamwidth, for example, has stopped serving Mississippi altogether. (*Id.*)

Beyond the mere insistence that *Fitch* can—must—be applied here, (*see* Docs. 58, 64), Defendants do not discuss the balance of equities at all, (Doc. 64 at 40 (citing *Fitch*, 2025 WL 2078435, at *1; *Fitch*, 145 S. Ct. at 2658 (Kavanaugh, J., concurring))). NetChoice, on the other hand, has articulated a First Amendment injury, (*see* Doc. 57-1 at 40–41 (citing, *inter alia*, *Netflix*, 88 F.4th at 1100)), cautioned that "websites may choose to withdraw their expressive offerings" from Louisiana in light of the Act, and explained how an injunction "would prevent the further balkanization of access to 'what for many are the principal sources for knowing current events . . . and otherwise exploring the vast realms of human thought and knowledge,'" (*id.* at 41 (quoting

---

[33] Defendants object that the internet articles submitted in support of NetChoice's statements are "uncorroborated . . . and hearsay." (Doc. 64-1 at 19, ¶¶ 99–100.) The Court has already addressed these arguments. *See* Section IV.A.3., *supra*. But in any event, "[c]ourts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles." *Mealey v. Gautreaux*, No. 16-716, 2020 WL 515853, at *23 (M.D. La. Jan. 31, 2020) (quoting *United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) (citing, *inter alia*, *Jackson v. Godwin*, 400 F.2d 529, 536 (5th Cir. 1968))). By now, there has been fairly extensive coverage of social media companies' reactions to Mississippi's law. *See, e.g.*, Michael Goldberg, *Bluesky Blocks Access in Mississippi, Citing Free Speech and Privacy Concerns over Age Verification Law*, Mississippi Today (Aug. 25, 2025), https://mississippitoday.org/2025/08/25/bluesky-blocks-access-mississippi-free-speech-privacy-concerns/ ("Mississippians can no longer access the Bluesky app after the social media platform blocked access to users in the state."); Michael Goldberg, *Bluesky Social Media App Restores Access for Adult Mississippians*, Mississippi Today (Dec. 10, 2025), https://mississippitoday.org/2025/12/10/bluesky-restores-access-adults-mississippi/ (noting that Bluesky has restored access to adults only); *see also* Elizabeth Nolan Brown, *More Age Verification Fallout: Artist Blogs Blocked, Porn Data Leaked, Traffic Boosts for Noncompliant Sites*, MSN (Sept. 3, 2025), https://www.msn.com/en-us/news/technology/more-age-verification-fallout-artist-blogs-blocked-porn-data-leaked-traffic-boosts-for-noncompliant-sites/ar-AA1LOpV5 (discussing how NetChoice member Dreamwidth has "block[ed] access for people in Mississippi" and implemented new restrictions in Tennessee in reaction to similar laws).

*Packingham*, 582 U.S. at 107)). Given these meaningful differences between the instant case and *Fitch*, the balance of equities more clearly favors NetChoice here.

The Court notes that, at a minimum, the above establishes that NetChoice meets the requirements for a preliminary injunction. It has shown that "there is a substantial likelihood that it will succeed on the merits." *Sierra Club*, 992 F.2d at 551; *see also Fitch*, 145 S. Ct. at 2658 (Kavanaugh, J., concurring) ("To be clear, NetChoice has, in my view, demonstrated that it is likely to succeed on the merits . . . ."). Likewise, it has shown that enforcement of the Act will cause its covered members and their users to suffer irreparable harm. *See Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19. Third, NetChoice has demonstrated that "the threatened injury to [its members] outweighs the threatened injury to the defendant[s]." *See Sierra Club*, 992 F.2d at 551; *see also Ingebretsen*, 88 F.3d at 280. Finally, granting the preliminary injunction is in the public interest. *See Netflix*, 88 F.4th at 1100.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiff's *Motion for Summary Judgment* (Doc. 57) is **GRANTED**. The Court finds that, as applied to the covered NetChoice members identified by NetChoice and Defendants, Louisiana Revised Statutes §§ 51:1751–1754 violate the First Amendment of the U.S. Constitution, as incorporated by the Fourteenth Amendment of the U.S. Constitution.

**IT IS FURTHER ORDERED** that Defendants are **PERMANENTLY ENJOINED** from enforcing Louisiana Revised Statutes §§ 51:1751–1756 against the following covered NetChoice members, identified by NetChoice and Defendants: (1) Meta (Facebook, Instagram, WhatsApp), (2) Nextdoor, (3) Pinterest, (4) Reddit, (5) Snap (Snapchat), (6) X, (7) YouTube, (8) Automattic (Tumblr), (9) Discord, and (10) Amazon (Twitch).

**IT IS FURTHER ORDERED** that NetChoice is hereby awarded costs and attorney's fees in an amount to be determined after submissions are made pursuant to Local Rule 54. *See* M.D. La. Civ. R. 54.

**IT IS FURTHER ORDERED** that Defendants' *Motion for Summary Judgment* (Doc. 58) is **DENIED**. Plaintiff's *Motion for Preliminary Injunction* (Doc. 6) and *Motion to Exclude Expert Testimony of Dr. Jean Twenge* (Doc. 66) are **DENIED** as moot.

Signed in Baton Rouge, Louisiana, on <u>December 15, 2025</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**